UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI by his Next Friend Migdaliz Quinones; and JUSTIN RODRIGUEZ by his Next Friend Jacklyn Romanoff,<br><br>individually and on behalf of all others similarly situated,<br><br>                       Petitioners,<br><br>              *-against-*<br><br>WARDEN DEREK EDGE,<br><br>                 Respondent. | No. 20 Civ. 1590<br><br>**CLASS ACTION PETITION SEEKING WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241** |

Hassan Chunn, Nehemiah McBride, Ayman Rabadi, and Justin Rodriguez ("Petitioners"), on behalf of themselves and others similarly situated, and by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, the Cardozo Civil Rights Clinic, and Alexander A. Reinert, allege as follows:

## PRELIMINARY STATEMENT

1.      New York City is the epicenter of the Country's struggle with the novel COVID-19 virus and resulting coronavirus disease ("COVID-19"). As this disease ravages our City, infecting more than 25,000 and killing over 366 to date, the risks posed by COVID-19 to people confined in jails and prisons—in terms of transmission, exposure, and harm—are stark and alarming. For reasons beyond their control, people in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their own environment. People in jails and prisons are more vulnerable and susceptible to the risks of coronavirus because they are more likely to have chronic underlying health conditions,

such as diabetes, heart disease, chronic lung and liver diseases, asthma, and lower immune systems from HIV. People have limited opportunities to access medical care under normal circumstances in jails; medical facilities are limited, and as staff become sick, fewer people are present to care for those who remain confined. The outbreak of a highly infectious, deadly virus in a closed detention setting is a disaster, calling for urgent and decisive action to protect the health of those confined in the jail, those who work there, and the medical professionals who will treat those who become infected.

2.     Five days ago, a person jailed at the Metropolitan Detention Center ("MDC") in Brooklyn, New York tested positive for COVID-19, the first coronavirus case of a detainee in the federal prison system. As of March 26, 2020, four people in BOP custody in New York City, including one at the MDC, have tested positive. At least four staff members at the MDC have tested positive, with two staff-member cases reported just today. The coronavirus is spreading in the MDC and federal BOP system, fast.

3.     Unfortunately, the Warden of the MDC has failed to respond to the urgent and serious threat to the health of people confined at the MDC. Although the Warden has identified that 537 medically vulnerable individuals are confined in his facility according to CDC guidelines, the Warden has failed to release these most vulnerable individuals. Instead, the facility has acted at a slow pace to respond to requests for emergency compassionate relief and to take other measures appropriate for a public health crisis.

4.     Petitioners Hassan Chunn, Nehemiah McBride, Ayman Raybadi, and Justin Rodriguez are four of the 537 individuals confined at the MDC who face an imminent risk of serious injury or death at the MDC if exposed to COVID-19. Petitioners suffer variously from conditions such as chronic heart disease, asthma, high blood pressure, and respiratory problems.

Because of their pre-existing chronic medical conditions and the nature of the jail environment, Petitioners cannot be adequately protected from contracting COVID-19 if they remain confined in the MDC. Instead, they face a risk of serious illness if they become infected.

5.     The MDC has a terrible track record of neglecting individuals with serious health needs under ordinary circumstances. And the MDC is grossly ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The combination of an epidemic striking a facility that houses 1,700 people and the MDC's inability to provide appropriate medical care under normal circumstances is likely to result in serious illness and death, if people remain confined there at current population levels and under current conditions.

6.     According to the The New York Times, cities around the country, including New York, are moving to release hundreds of high-risk individuals from jail to stem the spread of the virus among the incarcerated. Courts in this Circuit and around the country have also ordered the release of incarcerated and detained individuals due to their heightened risk of contracting COVID-19-related serious illnesses. *See infra* n.21. New York State announced this evening that it is releasing 1,100 people from state prisons who are incarcerated on parole violations.[1]

7.     Petitioners and similarly situated medically vulnerable individuals must be released from the MDC in order to avoid serious harm to their health. Now is the time to act to stop the spread of coronavirus to high-risk and older people confined at the MDC, and to protect them and the broader community from the serious risk to their health and safety.

---

[1] Brendan J. Lyons, *NY to release 1,100 parole violators as coronavirus spreads*, Times Union (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php.

## PARTIES

8.      Petitioner Hassan Chunn is a 46-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Chunn was in the custody of the Federal Bureau of Prisons ("BOP") at the MDC.

9.      Petitioner Nehemiah McBride is a 34-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. McBride was in the custody of BOP at the MDC.

10.     Petitioner Ayman Rabadi is a 59-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Rabadi was in the custody of BOP at the MDC.

11.     Petitioner Justin Rodriguez is a 26-year-old man who currently resides in Kings County, New York. At all times relevant to this Complaint, Mr. Rodriguez was in the custody of BOP at the MDC.

12.     Derek Edge ("Respondent") is the Warden at the MDC. As Warden of the MDC, Respondent Edge is responsible for and oversees all day-to-day activity at the MDC. He is responsible for all aspects of the operation and function of the MDC. His responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Approximately 1,700 people are detained at the MDC. Respondent Edge is aware of and has adopted and enforced a policy that leaves Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Defendant Edge is the immediate physical custodian responsible for the detention of the Petitioners. He is sued in his official capacity.

## JURISDICTION AND VENUE

13.     The Petitioners bring this action pursuant to 28 U.S.C. § 2241 for relief from custody in violation of the Fifth and Eighth Amendments to the U.S. Constitution.

14.     The Court has subject matter jurisdiction over this Petition pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Fifth and the Eighth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (All Writs Act); and 28 U.S.C. § 2241 (habeas corpus). In addition, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

15.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.     Petitioners are all excused from 28 U.S.C. § 2241's prudential exhaustion requirement. The statutory exhaustion requirement of the Prison Litigation Reform Act does not apply to this action. *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001). In cases brought under 28 U.S.C. § 2241, courts may excuse failure to strictly comply with administrative procedures where good cause is found. Exhaustion can be excused where "'(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a party has raised a substantial constitutional question.'" *Sanchez v. United States*, No. 12 Civ. 01540 (CBA), 2012 WL 5987858, at *1 (E.D.N.Y. Nov. 29, 2012) (quoting *Beharry v. Aschcroft,* 329 F.3d 51, 62 (2d Cir. 2003).

17.     The only process ostensibly available to Petitioners is the BOP's Administrative Remedy Program ("ARP"), a lengthy process that does not purport to provide the requested

relief of release to home confinement and that here would have been futile. *See* Ex. 1, Declaration of Deirdre von Dornum, dated March 27, 2020, ¶¶ 22, 23 ("von Dornum Decl."). As Deirdre von Dornum explains in her declaration, the Federal Defenders of New York, Inc. ("the Federal Defenders") has engaged in a weeks-long effort to secure release of vulnerable clients and to advocate for the MDC to take steps to mitigate risk. *Id.* ¶¶ 3-7, 9-11, 20, 21, 23. The MDC has had ample opportunity to take appropriate action, but has failed to do so. Because the ARP does not provide the requested relief, because engaging in the ARP would have been futile given that seasoned advocates with far greater resources could not secure the requested relief, and because Petitioners are likely to experience irreparable injury while waiting for that process to unfold, they are excused from exhaustion.

## STATEMENT OF FACTS

### I.   The Covid-19 Crisis

18.     The novel coronavirus that causes COVID-19 has led to a global pandemic.[2] As of March 26, 2020, there were more than 500,000 reported COVID-19 cases throughout the world and more than 1,000 deaths in the United States. The number of COVID-19 cases in the United States is expected to grow exponentially. Projections by the Centers for Disease Control and Prevention ("CDC") indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.5 million deaths in the most severe projections.[3]

---

[2] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794.

[3] Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html.

19.     The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart and liver. To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.

20.     People over the age of fifty face greater chances of serious illness or death from COVID-19. In a February 29, 2020 WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was as low as 0.2%.[4]

21.     People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk as well.[5] The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[6]

---

[4] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-China Joint Mission Report).

[5] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[6] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those

22.     In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in higher risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.

23.     COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

24.     Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

---

with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

25.     Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

26.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[7] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.

27.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.

28.     There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19.

**II.     Incarcerated People and Staff in New York City Are Particularly Vulnerable**

29.     New York is currently at the epicenter of the coronavirus pandemic. On March 23, 2020, approximately six percent of confirmed coronavirus cases in the world were in New York State. Governor Cuomo declared a state of emergency in New York State on March 7, 2020. Mayor DeBlasio declared a state of emergency in New York City on March 12, 2020.

---

[7] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM) https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

30.     As of March 27, 2020, there are 44,745 positive cases in New York State with more than 25,000 of those cases being in New York City. To date, there have been 519 deaths from COVID-19 just in New York, with 366 of those deaths in New York City. Ex. 2, Declaration of Jonathan Giftos, MD, dated March 27, 2020, ¶ 7 (Giftos Decl.").

31.     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. People who are confined in prisons, jails, and detention centers will find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with the best-laid plans. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.

32.     On March 20, 2020, Governor Cuomo took the strictest measure yet to fight the virus's spread, issuing a "stay at home" executive order for all residents. In a statement to the public, Governor Cuomo explained that the order prohibits non-essential gatherings of any size, requires all non-essential businesses to close and 100 percent of their employees to work from home, and recommends that people stay at least six feet away from others. "We know the most effective way to reduce the spread of this virus is through social distancing and density reduction measures," Governor Cuomo said.[8]

33.     Correctional settings increase the risk of contracting an infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in

---

[8] *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others. Giftos Decl. ¶ 11.

34.     Correctional facilities house large groups of people together, and move people in groups to eat, do recreation, and go to court. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility. Hot water, soap, and paper towels are frequently in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

35.     Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases. Giftos Decl. ¶ 12.

36.     For this reason, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

37.     Internationally, governments and jail and prison staff have recognized the threat posed by COVID-19 and released detainees. In Iran, for example, more than 70,000 people were temporarily released from jails to curb the spread of coronavirus.[9]

38.     In the United States, the stimulus package that is on the verge of becoming law as of the time of this filing includes funding for federal prisons to purchase protective gear and test kits for COVID-19 and authorizes the Justice Department to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic.[10]

39.     On March 23, 2020, a bipartisan group of fourteen U.S. Senators sent a letter to U.S. Attorney General Barr and BOP Director Carvajal to express their "serious concern for the health and wellbeing of federal prison staff and inmates . . . especially those who are most vulnerable to infection." The Senators wrote that they reviewed the BOP's COVID-19 Action Plan, noting that it did not include any measures to protect the most vulnerable staff and inmates. The Senators urged DOJ and BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and are near release.

40.     On March 26, 2020, Attorney General William Barr sent a memo to the Director of BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the COVID-19 pandemic." The Attorney General specifically recognized that "there are some at-risk inmates who are non-

---

[9] *Iran Temporarily Releases 70,000 Prisoners as Coronavirus Cases Surge*, Reuters (Mar. 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

[10] Todd Ruger, *Prisons and Courts Get Coronavirus Help in Senate Relief Bill*, Roll Call (Mar. 25, 2020, 2:21PM) https://www.rollcall.com/2020/03/25/prisons-and-courts-get-coronavirus-help-in-senate-relief-bill/.

violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[11]

41.     Senator Dick Durbin has called on the federal government to take action to protect staff and people detained in federal prisons. "Federal prisons will inevitably be a hotspot for the spread of coronavirus, especially among vulnerable staff and inmates," Durbin said. "It is imperative for BOP to take immediate action to protect staff and inmates at federal prisons throughout the country and ensure that facilities are prepared to address this threat."[12]

42.     Some jurisdictions, including Los Angeles and Chicago, have already taken steps to protect people in custody from the impending spread of COVID-19 by releasing people in an effort to reduce populations.[13]

43.     In New York City, public officials, the jail oversight board, and even doctors working at Rikers Island have acknowledged that the City's jails are simply unsafe and releasing people is the only humane option.[14] *See* Statement of New York City Board of Correction,

---

[11] Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[12] *Durbin Discusses Coronavirus Threat At Federal Prisons With Council Of Prison Locals*, Dick Durbin United States Senator Illinois (Mar. 24, 2020),  https://www.durbin.senate.gov/newsroom/press-releases/durbin-discusses-coronavirus-threat-at-federal-prisons-with-council-of-prison-locals.

[13] Thirty-one district attorneys from around the country put out a joint statement calling for a reduction in jail populations. Jurisdictions in California, Illinois, and Ohio have already released people from jail, and officials in Louisiana, Oregon, Pennsylvania, and Virginia have made announcements that they will begin releasing people soon. Other cities are putting plans in place to do the same. *See, e.g.* Allen Kim, *Cities in the US Move to Lower Inmate Populations as Coronavirus Fears Grow*, CNN (Mar. 16, 2020), https://www.cnn.com/2020/03/16/us/inmates-released-jail-coronavirus-trnd/index.html; Megan Cassidy, *Coronavirus: San Francisco, Contra Costa Prosecutors Join National Call for Jail Releases*, San Francisco Chronicle (Mar. 17, 2020) https://www.sfchronicle.com/crime/article/Coronavirus-San-Francisco-Contra-Costa-15137291.php.

[14] *See* Ross MacDonald (@RossMacDonaldMD), Twitter (March 18, 9:51 p.m.) https://twitter.com/RossMacDonaldMD/status/1240455796946800641  (Dr. MacDonald is the Chief Medical Officer for Correctional Health Services ("CHS"), which provides healthcare to New York City's Department of Corrections); Rachel Bedard, (@rachelbedard), Twitter (March 18, 8:34 a.m.) https://twitter.com/rachaelbedard/status/1240255196644741120  (Dr. Bedard is the Director of Geriatrics and Complex Care for CHS); Jonathan Giftos (@JonGiftosMD), Twitter (March 18, 10:37 p.m.)

March 17, 2020 (calling on the City to release people from criminal custody, prioritizing people over 50, those with underlying health conditions, detained for administrative reasons, and those who have been convicted and sentenced to one year or less).[15] On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues — those people are likely to die from a coronavirus infection."[16]

44.     Several doctors working in New York City's jails have echoed the calls to release vulnerable people. Dr. Rachael Bedard, senior director of the geriatrics and complex care service at Rikers Island, has described depopulation as "[t]he only meaningful public health intervention."[17] In correctional facilities, "if you think about how many excess human contacts [there are], even compared to something like a shelter setting, you can imagine why viral spread in this environment is extra dangerous."

45.     Incarcerated people in New York City have already begun to test positive for COVID-19. Among the 5,200 people incarcerated by the New York City Department of Correction, seventy-five people in city custody have tested positive for coronavirus. This is a higher rate of infection than seen outside of detention facilities.

---

https://twitter.com/JonGiftosMD/status/1240467288198873088 (until January 2020, Dr. Giftos was the Clinical Director of Substance Use Treatment for CHS).

[15] *New York City Board of Correction Calls for the City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19* (Mar. 17, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf

[16] Jen Ransom and Alan Feuer, *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, N.Y. Times (March 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[17] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus*, New Yorker (Mar. 20, 2020), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

46.    As of March 26, 2020, four people in BOP custody in New York City, including one at the MDC, have tested positive.[18] And the virus is spreading like wildfire across the population held on Rikers Island. Giftos Decl. ¶ 15.

47.    Numerous people working in the criminal justice system have also tested positive, increasing the likelihood of exposure to and by incarcerated people: a security officer and an agent in the U.S. Attorney's Office, SDNY; an NYC Department of Corrections investigator (who has since died from COVID-19)[19]; a lawyer with an office in Midtown Manhattan (and his wife and son)[20]; a healthcare worker in Manhattan; an attorney and legal intern in local New York State courts; and an attorney at the Brooklyn Supreme Court.[21]

48.    Just this week, New York City pledged to release approximately 300 nonviolent inmates from Rikers Island. The Mayor intends to release people held on Rikers who are over 70 years-old or who have preexisting conditions that place them at heightened risk from the virus.[22]

---

[18] *Covid-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed March 27, 2020).

[19] Aliza Chasan, *NYC Corrections Officer Dies of Coronavirus*, Pix11, https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus.

[20] *Midtown Lawyer, Family and Friends Test Positive*, NBC New York (March 4, 2020), https://www.nbcnewyork.com/news/local/nyc-attorneyin-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/.

[21] *Information about Coronavirus and New York State Courts*,

https://www.nycourts.gov/whatsnew/covid.shtml; *see also* Two People with Coronavirus were in

Manhattan and Brooklyn Courts, https://twnews.us/us-news/two-people-with-coronavirus-were-inmanhattan-brooklyn-courts.

[22] Noah Higgins-Dunn, *Coronavirus: New York City to Release 300 Nonviolent Inmates from Rikers Island*, CNBC (Mar. 24, 2020, 7:25PM) https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html.

49.     Over the last several days, judges in this circuit and across the country have granted habeas petitions and ordered the release of persons who are incarcerated or being detained.[23]

50.     On March 27, 2020, Governor Cuomo announced that the State of New York is immediately releasing 1,000 individuals confined on parole violations in state prisons and jails to supervised release in the community in order to stem the spread of coronavirus among incarcerated people.

51.     Nonetheless, BOP continues to transfer people from facility to facility, ignoring the pleas of government officials and public health experts, and increasing the likelihood that the virus will be transmitted within the incarcerated population.[24]

---

[23] *See Coronel, et al., v. Decker* et al., 20 Civ. 2472 (AJN) (S.D.N.Y. Mar. 27, 2020) (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Basank et al. v. Decker et al.*, 20 Civ. 2518 (AT) (S.D.N.Y. Mar. 26, 2020) (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, recognizing inmates may be at a heightened risk of contracting COVID-19); *Umana Jovel v. Decker* et al., 20 Civ. 308 (GBD)(SN) (S.D.N.Y. Mar. 26, 2020) (granting emergency request for release of petitioner from immigration detention in light of the COVID-19 crisis); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup Ct, Bronx County Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *People ex rel. Stoughton on behalf of Hogan et al. v. Brann*, (Sup Ct, NY County Mar. 27, 2020) (releasing 16 individuals held at Rikers Island jail on pre-trial detention who were particularly vulnerable to illness or death due to COVID-19); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19); *USA v. Garlock*., No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo et al. v. Barr*, 20 Civ. 605 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *U.S.A.v. Matthaei*, 19 Civ. 243 (D. Idaho Mar. 16, 2020) (granting convicted defendant additional time to self-surrender to prison in light of defendant's health problems, which place him at greater risk of complications of COVID-19); *Jimenez et al. . Wolf* et al., 18 cv 10225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *In re Request to Commute or Suspend County Jail Sentences*, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any inmate in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).

[24] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transferring Inmates: Sources*, ABC News (Mar. 23, 2020, 1:22PM) https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

**III.     MDC is Failing to Take Proper Precautions, Placing People at an Increased Risk**

52.     The conditions at the MDC pose a heightened public health risk for the spread of COVID-19 that is even greater than in non-carceral institutions. People live and work in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. They may be unable to maintain the recommended distance of 6.5 feet from others, and may share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use. Food preparation and service is communal with little opportunity for surface disinfection. Staff arrive and leave on a shift basis, and there is limited ability to adequately screen staff for new, asymptomatic infection.

53.     Since March 4, 2020, the Federal Defenders has engaged in extensive efforts to get the MDC to address the risks associated with the spread of COVID-19 at the MDC, to little avail. von Dornum Decl. ¶ 3-7, 9-11, 20, 21, 23.

54.     The Federal Defenders initially requested that the BOP put in place the following measures at the MDC:

      a.     Make public the MDC's plans and policies for preventing a coronavirus outbreak and responding to detained people who contract coronavirus;

      b.     Put in place a comprehensive testing protocol for incarcerated people and staff;

      c.     Increase sanitation and hygiene in the facility, including increased cleaning of the housing units and making soap and tissues freely available to incarcerated people;

      d.     Provide for isolating anyone who tests positive for the coronavirus at a hospital or other medical facility, not at the jail;

17

e. Ensure that the jail is not locked down to social and legal visitors in response to the epidemic sot that lawyers and family members can have continued access to their clients and loved ones;

f. Coordinate with the Courts and U.S. Attorneys' Offices in advance to ensure that only in extraordinary circumstances should any new arrestee be detained at the jails during the epidemic, and no one should be admitted without testing. von Dornum Decl. ¶ 4.

55. On March 11, 2020, for the first time, MDC officials responded to these concerns, when, at the request of the Chief Judge of the Eastern District of New York, Attorney Holly Pratesi and Associate Warden Andy Cruz attended a special meeting of the EDNY Facilities Security Committee focused on coronavirus issues. At that meeting Associate Warden Cruz indicated that the MDC was still receiving guidance from national BOP leadership as to how to handle the coronavirus epidemic. In response to specific questions, Associate Warden Cruz stated:

a. the facility could not make public its plans or protocols for coronavirus because of security considerations;

b. there was no testing protocol in place, except for the temperature readings of those people being brought to court (by order of the Chief Judge) and the facility did not anticipate having a testing protocol;

c. Staff were being asked to self-report if they had traveled to what were then the designated hotspot countries or had been exposed to someone known to have coronavirus;

    d.      It was unclear if staff who presented with risk factors and were sent home would be on paid or unpaid leave, because that is a national BOP decision;

    e.      the MDC had placed soap in the lobby bathroom for visitors, intended to provide a bar of soap to each inmate and to ask the inmate orderlies to increase cleaning, but could not provide hand sanitizer to inmates, and neither staff nor visitors would be allowed to bring in hand sanitizer;

    f.      the MDC did not yet know where any incarcerated person who tested positive would be placed;

    g.      the MDC did not believe it would be feasible to use the empty floors in the East (or "old") building of the MDC to house people who were symptomatic or who tested positive;

    h.      the MDC did not intend to do a lockdown on social or legal visitation;

    i.      the MDC would continue to accept new arrests;

    j.      the MDC would screen new arrests for symptoms of COVID-19 and would ask newly arriving inmates if they had traveled recently outside the United States;

    k.      the MDC had no plans to move vulnerable inmates but would make an effort to identify which inmates fell under the CDC's definition of vulnerable. *Id.* ¶ 6.

56.    On March 13, 2020, the MDC cancelled all legal and social visitation for the next thirty days. *Id.* ¶ 8.

57.    Beginning on March 14, 2020 and continuing through March 19, 2020, Federal Defenders spoke to over a hundred clients by telephone. The clients uniformly observed that:

     a.     there had been no change in sanitation practices at the facility;

     b.     only some of the units had received the bars of soap;

     c.     education on the symptoms of COVID-19 or how to curb its spread is limited to posters on the walls and a 10-minute presentation on each unit to large groups of inmates that consisted of reading from a CDC pamphlet that largely advised to "Stay at home" and "Avoid gatherings";

     d.     no doctors came to the units to check on anyone;

     e.      inmates understand that staff are being given temperature checks as they entered the facility, but staff on the unit were not wearing gloves, masks, or other protective gear in the facility. *Id.* ¶ 9.

58.     The MDC lacks adequate medical infrastructure to address the spread of infectious disease and treat the people most vulnerable to COVID-19.

59.     Approximately 1,700 people are held at the MDC. The Warden of the MDC has identified 537 of these individuals as falling into the high-risk groups identified by the CDC. *Id.* ¶ 11(a).

60.     New people arrive at the MDC from all over the world each week. These new arrivals are screened only for fever and recent travel to designated hotspot countries.

61.     Correctional officers who live in New York, New Jersey, and Pennsylvania come in and out of the facility each day without sufficient medical screening. Staff being screened only for elevated temperatures as they entered the facility and sent home if they had a temperature over 100.4 degrees Fahrenheit based on a temporal thermometer. *Id.* ¶ 11(e).

62.     Significantly, in a March 18, 2020 CDC report, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home

facility with ineffective infection control and prevention and staff members working in multiple facilities.

**IV.    MDC Has Failed to React to Tests Confirming the Virus Is Within Its Walls**

63.    On March 21, 2020, the Federal Defenders learned that an inmate at the MDC had tested positive for COVID-19. *Id.* ¶ 12.

64.    The inmate who tested positive had been housed on the "intake" unit on the 4th floor of the institution for approximately one week before testing positive. *Id.* ¶ 13. At the time the inmate was admitted to the institution he had been asymptomatic; he developed symptoms within three days of his admission. *Id.*

65.    Between the time the inmate was admitted to the MDC and when he tested positive for COVID-19, he was in contact with many inmates and staff on the intake unit. *Id.* New inmates from other institutions who are in transit to their designated facilities were added to the intake unit on March 20, 2020, the day before the inmate on that unit tested positive. *Id.* Inmates from the intake unit, who would have been exposed to the positive inmate, were subsequently transferred into other units within the facility. *Id.*

66.    Others who were housed on the unit with the individual who was recently diagnosed with coronavirus are now themselves showing symptoms, according to a person confined on that unit.

67.    People housed in the MDC are terrified and panicked. Some are placing socks over the phone when they call family members to prevent infection from the phones, which are not sanitized or cleaned.

68.    No professional or staff cleaners sanitized the intake unit where the inmate who tested positive had been housed, but, instead the inmate orderlies on the adjacent unit were sent

to clean the intake unit with the same cleaning supplies they regularly use and were provided insufficient gloves and masks. *Id.*

69.     Staff is providing people with industrial hand soap in diluted form to "clean" their own cells.

70.     Since, inmates have been directed by executive staff to report other inmates who they believed might be symptomatic, but, inmates were fearful of reporting their own or others' symptoms because they had heard that if you were symptomatic you would be placed in "the box." *Id.*

71.     Federal Defenders has not been informed how many inmates are symptomatic, quarantined or isolated, in addition to the inmate who tested positive. *Id.* ¶ 14.

72.     As of March 27, 2020, the Federal Defenders have learned that four staff members at the MDC have tested positive and a number of others are symptomatic.

73.     Despite the arrival of COVID-19 at the MDC, the MDC continues to implement practices that put inmates and staff at risk of contracting COVID-19. For example:

> a.     Female inmates continue to be asked to launder all inmate uniforms, including from the intake unit, where the inmate tested positive. *Id.* ¶ 16(a).
>
> b.     The phones and computers on the units are not being cleaned. *Id.* ¶ 16(c).
>
> c.     At mealtime, the inmates are directed to line up shoulder to shoulder. *Id.* ¶ 16(d).
>
> d.     Inmates at the MDC are housed either in small two-man cells (designed to hold a single inmate) with a single shared toilet and sink or in large open dormitory units housing up to 70 inmates with shared toilets and sinks and

sharing a large sleeping space and beds spaced only 3 to 5 feet apart. *Id.* ¶ 26. Windows in the units do not open. Inmates cannot go outside.

e.      No hand sanitizer is available to inmates at the MDC.

f.      Tissues are not readily available. Inmates use toilet paper to blow their noses. Each inmate is provided only one roll of toilet paper per week.

g.      Each inmate is given one small bar of soap a week, at most. Some units at the MDC have received no soap since the lockdown of the facility began on March 13, 2020. Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.

h.      Inmates prepare all inmate meals. Meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.

i.      Inmates eat meals in large groups.

j.      Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.

74.     Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection except through posters on the walls of the units and general exhortations (delivered in groups) to wash their hands and practice social distancing. *Id.* ¶ 35.

75.     Inmates who are at lower risk of becoming seriously ill from the virus are not separated from those who are at higher risk (because of age and/or pre-existing medical conditions). Instead, they are mixed together in small two-man cells and locked together in those cells for at least 10 out of every 24 hours.

76.    As of March 26, no doctors have come to the units. Medical only visit inmates if the inmates volunteer that they have symptoms. *Id.* ¶ 16(b).

77.    The facility has not informed the inmate population of what the protocol will be for symptomatic inmates; absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

## V.    MDC is Not Prepared to Treat to Individuals Who Contract Coronavirus

78.    Inmates who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because the MDC lacks the medical resources to care for symptomatic inmates.

79.    Now that COVID-19 is inside the facility, the MDC will be unable to stop the spread of the virus throughout the facility given long-documented inadequacies in BOP's medical care and in light of how these facilities function. Giftos Decl. ¶ 14.

80.    There is no separate medical unit or facility for ill inmates. Unlike many Federal Correctional Institutions and even Rikers' Island, the MDC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing. von Dornum Decl.¶ 41.

81.    As of March 20, 2020, MDC had only 9 nasal swab COVID-19 test kits and only one inmate had been tested at the facility. *Id.* ¶ 11. MDC currently has no ventilators and cannot intubate inmates on-site. *Id.* ¶¶ 39, 40. MDC does not have any specialized equipment or medical providers. *Id.* ¶ 42.

82.    There are only three doctors available at MDC to care for all 1,700 inmates.  *Id.* Even this highly limited number is likely to decrease as doctors themselves go into quarantine. None of these doctors specialize in infectious diseases.

83.     People who contract COVID-19 can deteriorate rapidly, even before a test result

can be received. They need constant monitoring. Most people in the higher risk categories will

require more advanced support: positive pressure ventilation, and in extreme cases,

extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited

supply as well as an entire team of specialized care providers. MDC does not have that

specialized equipment or specialized providers.

84.     MDC is already short-staffed.[25] Now that three staff members have tested positive

and several more are symptomatic, correctional officers are understandably hesitant to come to

work. This staffing shortage will only increase as employees need to stay home to care for

children whose schools are closed, elderly family members, and other personal health situations.

With fewer staff, correctional officers are less able to monitor inmates' health.  Giftos Decl. ¶ 18.

## VI.    Petitioners Are Particularly Vulnerable

85.     Petitioners in this case are individuals who are particularly vulnerable to serious

illness or death if infected by COVID-19 who are currently detained at MDC.

86.     <u>Hassan Chunn</u>. Mr. Chunn is 46 years old. Mr. Chunn has been incarcerated for

approximately three years. He is due to be released on April 18, 2020. Mr. Chunn has been

diagnosed with Coronary Heart Disease. As of 2005, he was diagnosed with chronic heart

failure. He has two stents in his heart. He is pre-diabetic. He also suffers from high blood

pressure, seizures, hypertension and high cholesterol. During his incarceration at MDC, he has

been hospitalized on at least two occasions at outside hospitals for extreme high blood pressure.

---

[25] "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impact on
Inmates," OIG Report (Sept. 2019).

He takes a number of medications including Plavix, Losapril, Norvax, and Lipitor. Mr. Chunn is critically vulnerable to COVID-19 because of his significant health problems.

87.    <u>Nehemiah McBride</u>. Mr. McBride is 34 years old. Mr. McBride has been incarcerated since December 17, 2019, and subsequently was sentenced to 4 months' incarceration. He is due to be released on April 16, 2020. Mr. McBride has been diagnosed with asthma, which is severe, and he suffers from respiratory problems. Mr. McBride is currently experiencing breathing problems and wheezing. Mr. McBride is critically vulnerable to COVID-19 because of his significant health problems.

88.    <u>Ayman Rabadi</u>. Mr. Rabadi is 59 years old. Mr. Rabadi has been incarcerated for approximately 1 year, after being sentenced to 24 months for a wire fraud-related conviction of which he has served approximately 14 months. Mr. Rabadi has been diagnosed with a serious heart condition, anxiety and diabetes. Mr. Rabadi suffered a heart attack approximately six years ago, and thereafter he had several stents placed in his heart. He has a tumor on one of his kidneys which is being monitored via ultrasound. He takes medication for high blood pressure, cholesterol, and blood thinners. He also suffers from severe anxiety and depression. Mr. Rabadi is critically vulnerable to COVID-19 because of his significant health problems.

89.    <u>Justin Rodriguez</u>. Mr. Rodriguez is 26 years old. Mr. Rodriguez is scheduled to be released on June 9, 2020. Mr. Rodriguez suffers from asthma. Mr. Rodriguez is critically vulnerable to COVID-19 because of his significant health problems. Mr. Rodriguez requested an inhaler from BOP staff but as of this filing has not received one.

## LEGAL ALLEGATIONS

**I.  Section 2241 is an Appropriate Vehicle to Address Unconstitutional Conditions of Confinement**

90.  Section 2241(c)(3) authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the United States." The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison conditions." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (internal quotation marks omitted). This includes challenges to detention where conditions pose a threat to Petitioners' medical wellbeing. *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a prisoner's transfer where that transfer created a risk of fatal heart failure).

91.  The Second Circuit's decision in *Roba* is instructive. In that case, Petitioner alleged that an imminent transfer from New York to face charges in California would create a substantial risk of death because of his precarious heart condition. The Second Circuit held that there was Section 2241 jurisdiction to challenge his contemplated transfer, where such custody would threaten his life, citing *Estelle v. Gamble*, the Supreme Court's seminal case establishing the Eighth Amendment's deliberate indifference standard. 604 F.2d at 218–19. Critically, the court held that habeas jurisdiction was appropriate even though the transfer, and hence custody, was imminent: "Petitioner need not wait until the marshals physically lay hands on him; he is entitled now to challenge the allegedly unlawful conditions of his imminent custody." *Id.* at 219.

92.  In this case, the unconstitutional threat to Petitioners' health and life posed by being held in Respondent's custody is ongoing, not simply imminent. Every hour that Petitioners are held in the MDC, they are at a significantly elevated risk of contracting coronavirus, and because of their age and/or medical conditions, their risk of dying from coronavirus is

27

significant. For similar reasons, Judge Analisa Torres recently ordered the release of several

individuals from federal immigration detention. *See* Memorandum and Order, *Basank et al. v.

Decker, et al.*, No. 20 Civ. 2518 (S.D.N.Y. March 26, 2020) (ECF No. 11).

## II.     Respondent Edge's Failure to Take Steps to Mitigate Transmission of Coronavirus Constitutes Deliberate Indifference to the Serious Medical Needs of Plaintiffs

93.     Respondent is violating Petitioners' Fifth and Eighth Amendment rights by

continuing to incarcerate them in conditions where it is virtually impossible to take steps to

prevent transmission of an infectious disease that will prove deadly because of Petitioners'

vulnerable condition.

94.     All people held in the MDC, whether convicted or not, are entitled to be protected

from condition of confinement that create a serious risk to health or safety, including through

release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding

lower court's order releasing people from state prison even though release was based on prospect

of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834

(correctional official violates Eighth Amendment by consciously failing to prevent "a substantial

risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to

serious medical needs violate the Eighth Amendment).[26] The risk of exposure to a deadly

infectious disease such as COVID-19 constitutes a serious risk to health, particularly for the

Petitioners and the vulnerable class members described herein. *Helling v. McKinney*, 509 U.S.

25, 34 (1993) (noting with approval Eighth Amendment claims based on exposure to serious

---

[26] Named Petitioners are convicted and therefore their treatment is governed by the Eighth Amendment.  Class members who are detained for pretrial purposes, however, are protected from deliberate indifference by the Fifth Amendment.  Although pretrial class members may be entitled to even greater protection from unsafe conditions than convicted class members, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."), for present purposes the distinction is immaterial because Respondent's continued detention of the class plainly violates the Eighth Amendment.

contagious diseases). Under the MDC's current conditions, Respondent has not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, release is the only means of protecting Petitioners and the class they seek to represent from unconstitutional treatment.

95.     Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33. This Court need not "await a tragic event" to find that Respondent is maintaining unconstitutional conditions of confinement. *Id.* Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] future health" is sufficient. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted); *see also Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (incarcerated people "may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.") (citation and internal quotation marks omitted).

96.     The reach of the Fifth and Eighth Amendments includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33; *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease").

97.     In this case, as established by the facts above, Petitioners face a significant risk of exposure to coronavirus, with the attendant risk of death that follows given their vulnerable conditions. Respondent is well aware of this risk, having been alerted to it by the CDC, the Attorney General, and advocates such as the Federal Defenders. Indeed, only last week the Second Circuit Court of Appeals, unprompted, acknowledged the "grave and enduring" risk

posed by COVID-19 in the correctional context. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, __ F.3d __, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020); see also *Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention); *United States v. Little*, No. 20 Cr. 57, 2020 WL 1439979, at *4 (S.D.N.Y. Mar. 24, 2020) ("As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.")

98.     Finally, as established above, Respondent has not taken steps sufficient to protect Petitioners from the grave risks that are present every moment they are in detention in the MDC. Respondent simply is not capable of managing the risk to Petitioners in the MDC's current environment. Whether judged under the Fifth or Eighth Amendment, Respondent is holding Petitioners in violation of the Constitution by detaining them in the face of significant threats to their health and safety without taking sufficient steps to prevent that harm.

### III.    Next Friends Have Standing to Assert the Interests of Real Parties In Interest

99.     Migdaliz Quinones is the life partner of Petitioner Ayman Rabadi and brings this action on his behalf to seek his release from custody. Ms. Quinones and Mr. Rabadi have known each other for 36 years.

100.     Jacklyn Romanoff is the mother of Justin Rodriguez.

101.     In the habeas context, a "next friend" may assert the interest of an incarcerated person so long as they have a sufficient personal connection to the real-party-in-interest and there are barriers that prevent the real-party-in-interest from asserting his rights directly. In *Whitmore*

*v. Arkansas,* 495 U.S. 149 (1990), the Supreme Court recognized that "next friend" standing "has long been an accepted basis for jurisdiction in certain circumstances," usually "on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." *Id.* at 162.

102.    The requirement of inaccessibility is met here, where Petitioners Rabadi and Rodriguez cannot easily communicate with counsel because of the current lockdown at the MDC. *See Warren v. Cardwell*, 621 F.2d 319, 321 n.1 (9th Cir. 1980) (finding next friend standing met where petitioner "could not sign and verify the petition because the prison was locked down") (internal quotation marks omitted); *cf. Padilla v. Rumsfeld*, 352 F.3d 695, 703 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004) (holding that inaccessibility can be established when the petitioner is being held "incommunicado").

103.    The requirement of a close personal relationship is met here as well. *See Smith ex rel. Missouri Public Defender Comm'n v. Armontrout*, 812 F.2d 1050, 1053 (8th Cir.1987) (sufficiency of brothers' relationship for "next friend" standing undisputed); *Hays v. Murphy*, 663 F.2d 1004, 1009 (10th Cir.1981) (no dispute that defendant's mother proper party to seek "next friend" action); *see also Padilla*, 352 F.3d at 703-04 (finding that attorney who had represented petitioner could serve as next friend).

## CLASS ACTION ALLEGATIONS

104.    Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and, alternatively, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

105.    Petitioners seek to represent a class consisting of all current and future detainees in custody at the MDC during the course of the COVID-19 pandemic (the "Class").

31

106.     The members of the Class are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the class exceeds 1,700 individuals.

107.     Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amounts to Constitutional violations; (2) what measures Respondent took in response to the COVID-19 Crisis; (3) whether Respondent implemented an adequate emergency plan during the COVID-19 Crisis; (4) whether Respondent's practices during the COVID-19 Crisis exposed people at the MDC to a substantial risk of serious harm; (5) whether the Respondent knew of and disregarded a substantial risk of serious harm to the safety and health of the Class; and (7) what relief should be awarded to redress the harms threatened to members of the Class as a result of the conditions.

108.     Absent class certification, individuals detained at the MDC during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. The MDC has suspended visitation and MDC detainees have limited access to communication with the outside world, impeding their ability to obtain legal representation and pursue litigation. A large portion of the Class has limited educational backgrounds. And a significant percent of them suffer from physical or mental impairments.

109.     Respondent's practices and the claims alleged in this Petition are common to all members of the Class.

110.     The claims of Petitioners are typical of those of the Class. Petitioners are threatened with imminent inhumane conditions of confinement at the MDC.

111.    The legal theories on which Petitioners rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all the other Class members.

112.    Petitioners will fairly and adequately protect the interests of the Class. The interests of the Class representatives are consistent with those of the Class members. In addition, counsel for Petitioners are experienced in class action and civil rights litigation.

113.    Counsel for Petitioners know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

114.    Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

115.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.

116.    There will be no extraordinary difficulty in the management of this class action.

**FIRST CAUSE OF ACTION**
(Declaratory and Injunctive Relief for
Violation of the Fifth and Eighth Amendments)

117.    Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

118.    Petitioners bring this claim on their own behalf and on behalf of the Class.

119.    The Due Process Clauses guarantees pretrial detainees the right to be detained in a safe situation, free from punitive conditions of confinement. See U.S. Const. Amend V. The government violates that guarantee where a widespread outbreak of a contagious disease subjects detainees to inhumane conditions without adequate protection.

33

120. The Eighth Amendment guarantees post-conviction detainees the right to necessary and adequate medical care. See U.S. Const. Amend VIII. The Government's failure to provide adequate medical care in response to a widespread outbreak of a contagious disease constitutes deliberate indifference to the serious medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

121. Because of the conditions at the MDC, Petitioners are not able to take steps to protect themselves—such as social distancing, using hand sanitizer, or washing his hands regularly—and the government has not provided adequate protections. As COVID-19 rapidly spreads at the MDC in a matter of days, as experts predict, the already deplorable conditions at the MDC will be exacerbated, and the ability to protect oneself will become even more impossible.

122. Respondent's failure to adequately protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes an egregious violation of Petitioners' due process rights and deliberate indifference to the serious medical needs of Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

123. Respondent was aware or should have been aware of these conditions, which were open and obvious throughout the entire jail.

124. Respondent knew of and disregarded an excessive risk to health and safety.

125. Respondent failed to act with reasonable care to mitigate these risks.

126. Because Respondent failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Fifth and Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

127.     Because of the unlawful conduct of Respondent, Petitioners and the Class are threatened with immanent physical injury, pain and suffering, emotional distress, humiliation, and death.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners and the Class members respectfully request that the Court enter a class-wide judgment:

A.    Ordering immediate release of vulnerable persons, with appropriate precautionary public health measures, including Petitioner Chunn (scheduled to be released on 4/18/2020); Petitioner McBride (scheduled to be released on 4/16/2020); Petitioner Rabadi (scheduled to be released on 7/19/2020); Petitioner Rodriguez (scheduled to be released on 6/9/2020); and all others confined at the MDC who Respondent has identified as medically vulnerable due to underlying health conditions or age ("Vulnerable Persons")—and therefore at higher risk of developing serious COVID-19 illness;

B.    Ordering Respondent to mitigate the serious risk of illness, death, and harm from COVID-19 to those who remain confined at the MDC;

C.    Certifying this Petition as a Class Action;

D.    Appointing a Special Master on an emergency basis to Chair a Coronavirus Release Committee to evaluate Vulnerable Persons and make recommendations for ameliorative action for other persons at the MDC; and

E.    Ordering such other and further relief as this Court deems just, proper and equitable.

Dated:   New York, New York
       March 27, 2020

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:   /s/ Katherine R. Rosenfeld
      Katherine R. Rosenfeld
      O. Andrew F. Wilson
      Samuel Shapiro
      Scout Katovich
      600 Fifth Avenue, 10th Floor
      New York, NY 10020
      (212) 763-5000

CARDOZO CIVIL RIGHTS CLINIC
Betsy Ginsberg
Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 1003
(212) 790-0403

*Attorneys for Petitioners and Putative Class*