# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI, by his Next Friend MIGDALIZ QUINONES; and JUSTIN RODRIGUEZ, by his Next Friend JACKLYN ROMANOFF, <br><br>individually and on behalf of all others similarly situated, <br><br>　　　　　　　Petitioners, <br><br>　　　　　-*against*- <br><br>WARDEN DEREK EDGE, <br><br>　　　　　　　Respondent. | 20 Civ. 1590 <br><br>**DECLARATION OF DEIRDRE D. VON DORNUM** |

I, Deirdre D. von Dornum, an attorney duly admitted to practice in the Eastern District of New York, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.　　I am the Attorney-in-Charge for the Eastern District of New York at the Federal Defenders of New York, Inc. (the "Federal Defenders").

2.　　I submit this declaration upon personal knowledge in connection with this Class Action Petition Seeking Writ of Habeas Corpus.

**<u>Efforts of the Federal Defenders to Address Impact of Coronavirus on Our Clients</u>**

3.　　Starting on March 4, 2020 and continuing to date, my office has engaged in extensive efforts to address the serious health risk posed by the spread of COVID-19 to medically vulnerable individuals confined at the Metropolitan Detention Center in Brooklyn ("MDC") and other federal jails.

1

4.     My office has consulted at length with representatives of the Federal Bureau of Prisons ("BOP") to address how it will respond to the coronavirus outbreak and protect people at MDC and MCC. We initially requested that the BOP take the following measures:

a.   Make public the MDC's plans and policies for preventing a coronavirus outbreak and responding to detained people who contract coronavirus;

b.   Put in place a comprehensive testing protocol for inmates and staff;

c.   Increase sanitation and hygiene in the facility, including increased cleaning of the housing units and making soap and tissues freely available to inmates;

d.   Provide for isolating anyone who tests positive for the coronavirus at a hospital or other medical facility, not at the jail;

e.   Ensure that the jail is not locked down to social and legal visitors in response to the epidemic so that lawyers and family members can have continued access to their clients and loved ones; and

f.   Coordinate with the Courts and U.S. Attorneys' Offices in advance to ensure that only in extraordinary circumstances should any new arrestee be detained at the jails during the epidemic, and no one should be admitted without testing. (Attached hereto as Exhibit A is a true and complete copy of a string of email correspondence including the March 8, 2020 Email of David Patton, Executive Director, Federal Defenders of New York to Nicole McFarland, Supervisory Attorney, MDC Brooklyn, and MDC Associate Warden Andy Cruz).

5.     For four days after these specific requests were made and repeated efforts were undertaken to engage the MDC in substantive discussion on this issue, the only response the

Federal Defenders received was that our requests were "under consideration." (*See* Exhibit A including a copy of the March 9, 2020 Email of Holly Pratesi, Attorney, MDC Brooklyn to David Patton).

6.     On March 11, 2020, at the request of the Chief Judge of the Eastern District of New York, MDC Attorney Holly Pratesi and MDC Associate Warden Andy Cruz attended a special meeting of the EDNY Facilities Security Committee focused on coronavirus issues and discussed, for the first time, some of the issues raised by Federal Defenders. At that meeting Associate Warden Cruz indicated that the MDC was still receiving guidance from national BOP leadership as to how to handle the coronavirus epidemic. In response to specific questions, Associate Warden Cruz stated that:

a.   the facility could not make public its plans or protocols for coronavirus because of security considerations;

b.   there was no testing protocol in place, except for the temperature readings of those inmates being brought to court (by order of the Chief Judge) and the facility did not anticipate having a testing protocol;

c.   staff were being asked to self-report if they had traveled to what were then the designated hotspot countries or had been exposed to someone known to have coronavirus;

d.   it was unclear if staff who presented with risk factors and were sent home would be on paid or unpaid leave, because that is a national BOP decision;

e.   the MDC had placed soap in the lobby bathroom for visitors, intended to provide a bar of soap to each inmate and to ask the inmate orderlies to

increase cleaning, but could not provide hand sanitizer to inmates, and neither

staff nor visitors would be allowed to bring in hand sanitizer;

f.   the MDC did not yet know where any inmate who tested positive would be

placed;

g.   the MDC did not believe it would be feasible to use the empty floors in the

East (or "old") building of the MDC to house symptomatic or positive

inmates;

h.   the MDC did not intend to do a lockdown on social or legal visitation;

i.   the MDC would continue to accept new arrests;

j.   the MDC would screen new arrests for symptoms of COVID-19 and would

ask newly arriving inmates if they had traveled recently outside the United

States; and

k.   the MDC had no plans to move or segregate vulnerable inmates but would

make an effort to identify which inmates fell under the CDC's definition of

vulnerable.

7.      On March 12, 2020, the Federal Defenders followed up with additional questions

to Ms. Pratesi and Associate Warden Cruz concerning the availability of professional sanitization,

any effort to "cohort" vulnerable inmates, and whether the City or State Departments of Health

would be contacted if an inmate was symptomatic for COVID-19.

8.      On March 13, 2020, the Federal Defenders learned from an associated press report

(https://www.nytimes.com/aponline/2020/03/13/us/poliotics/ap-us-virus-outbreak-federal-

prisons.html) that all BOP facilities would be closed to legal and social visitation for the next 30

days. The Federal Defenders and other defense counsel were subsequently specifically informed

by email from Supervisory Attorney McFarland that MDC would be closed to legal visitation for this 30-day period. (Attached hereto as Exhibit B is a true and complete copy of a March 13, 2020 email from Seth D. Eichenholtz, Deputy Chief, Civil Division, United States Attorney's Office forwarding the email from Supervisory Attorney McFarland.)

9.     Beginning on March 14, 2020 and continuing through March 19, 2020, Federal Defenders spoke to over a hundred clients by telephone. The clients uniformly observed that:

    a.  there had been no change in sanitation practices at the facility;

    b.  only some of the units had received the bars of soap;

    c.  education on the symptoms of COVID-19 or how to curb its spread is limited to posters on the walls and a 10 minute presentation on each unit to large groups of inmates that consisted of reading from a CDC pamphlet that largely advised to "Stay at home" and "Avoid gatherings";

    d.  no doctors came to the units to check on anyone; and

    e.   inmates understand that staff are being given temperature checks as they entered the facility, but staff on the unit were not wearing gloves, masks, or other protective gear in the facility.

10.     On March 16, 2020, Federal Defenders made a formal request to the MDC that David Patton and I be allowed to tour the facility (and MCC New York) on a twice-weekly basis during the 30-day lockdown to monitor conditions, given the lack of legal and social access. We expressed concern about inaccurate information regarding inmate conditions that had been provided to Federal Defenders and the courts by the MDC during the prolonged lockdown during the blackout of the facility in the winter of 2019. (Attached as Exhibit C is a true and complete copy of a letter from David Patton to Nicole McFarland.) On March 17, 2020, the Warden of MCC

denied this request as to both facilities. (Attached as Exhibit D is a true and complete copy of a March 17, 2020 letter from Warden M. Licon-Vitale to David Patton.)

11.     On March 20, 2020, at a special teleconference regarding COVID-19 convened by the Chief Judge of the Southern District of New York, the Warden of MDC, Derek Edge stated that:

   a.   537 inmates at the MDC fell into categories identified by the CDC as particularly vulnerable to COVID-19;

   b.   the facility had 9 nasal swab test kits;

   c.   one inmate had been swabbed at the facility and his test results came back negative;

   d.   two inmates had been sent to the hospital for testing: one was sent back without being tested; the other was back in the facility and test results were awaited; and

   e.   staff were being screened for elevated temperatures as they entered the facility and sent home if they had a temperature over 100.4 degrees Fahrenheit based on a temporal thermometer.

12.     On March 21, 2020, Federal Defenders learned from Twitter that an inmate at the MDC had tested positive; this was subsequently confirmed on the national BOP website. (https://twitter.com/bradlander/status/1241545847994753026;     https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.) We immediately asked the MDC to inform us whether the inmate was hospitalized or being held at the facility and what steps were being taken to identify inmates and staff who had been exposed to the inmate who tested positive. The MDC informed Federal Defenders that the inmate was back at the facility in isolation in an unspecified

location and that appropriate steps were being taken to identify inmates and staff who had been exposed to the inmate. The MDC stated that the unit on which the inmate who had tested positive had been housed would be locked down over the weekend, as would several other units, and the intake unit would undergo a "deep clean" before being re-opened to inmate movement.

13.     From speaking to correctional staff and inmates housed on the unit adjacent to the one in which the inmate who tested positive had been housed, Federal Defenders has learned that:

a.   the inmate who tested positive had been housed on the "intake" unit on the 4th floor of the institution for approximately one week before testing positive;

b.   at the time the inmate was admitted to the institution he had been asymptomatic;

c.   the inmate developed symptoms within three days of his admission;

d.   during that time the inmate had been in contact with many inmates and staff on the intake unit, as well as inmates from the MCC whom he had come into contact with at the courthouse when first arrested;

e.   during that time other inmates from the intake unit, who would have been exposed to the positive inmate, were transferred into other units within the facility;

f.   no professional or staff cleaners sanitized the intake unit after the inmate tested positive, but, instead the inmate orderlies on the adjacent unit were sent to clean the intake unit with the same cleaning supplies they regularly use and were provided insufficient gloves and masks;

g.   new inmates from other institutions who are in transit to their designated facilities were added to the intake unit on March 20, 2020, the day before the

7

inmate on that unit tested positive;

h.   inmates had been directed by executive staff to report other inmates who they

believed might be symptomatic;

i.   inmates were fearful of reporting their own or others' symptoms because they

had heard that if you were symptomatic you would be placed in "the box";

and

j.   no doctors had come to the unit adjacent to the intake unit to check on

inmates.

14.   Federal Defenders has asked the MDC how the inmate who tested positive is being

cared for, and how other symptomatic inmates are being checked on. Few details have been

provided, but the facility has stated that the positive inmate and other symptomatic inmates are

being held in single cells on a separate unit; doctors are checking on the positive inmate and other

symptomatic inmates twice a day, taking temperature readings, and providing Tylenol. Federal

Defenders has not been informed how many inmates are symptomatic, quarantined or isolated, in

addition to the inmate who tested positive.

15.   On March 24, 2020, MDC stated that it will continue to accept new inmates.

16.   On March 25 and 26, 2020, Federal Defenders spoke to inmates from various units

in the facility and learned that:

a.   the female inmates are continuing to be asked to launder all inmate uniforms,

including those of the male inmates, and are concerned that this may include

uniforms from the intake unit, where the inmate tested positive;

b.   no doctors have come to the female or male units. Medical staff only visit

inmates if the inmates volunteer that they have symptoms;

8

    c.   the phones and computers on the units are not being cleaned;

    d.   at mealtime, the inmates are directed to line up shoulder to shoulder;

    e.   a correctional officer who works on unit 62 was removed from the unit by a supervisor after repeatedly coughing; and

    f.   inmates have heard that staff who work in the medical unit at MDC have tested positive, but have not been officially notified of that.

17.    On March 26, 2020, the Federal Defenders was informed by Congresswoman Nydia Velazquez's office that three staff members at the MDC have tested positive and a number of others are symptomatic.

18.    My office has submitted numerous bail applications in recent weeks to request that individuals confined at MDC be released to protect them from COVID-19 exposure and lessen the health risks to the jail population as the virus spreads.

19.    On March 23, 2020, at the request of Chief Judge Mauskopf, we received a list generated by the facility of approximately 537 individuals confined at MDC whom the facility classified as "vulnerable" to COVID-19 within the CDC's definition. As of March 27, 2020, Federal Defenders will have notified the lawyer for each of the 537 vulnerable inmates that the inmate has been so identified. A number of the inmates on the list are sentenced inmates designated to serve their sentence at the MDC; most of those inmates no longer have court-appointed lawyers. Federal Defenders is directly assisting these inmates.

20.    On March 26, 2020, Federal Defenders wrote to the MDC Legal Department, identifying 11 vulnerable inmates who are already eligible for home confinement (because they are almost done serving their sentences) and urging the MDC to immediately evaluate these 11 vulnerable inmates for release to the community, consistent with their statutory authority to do so

and the urging of Attorney General Barr to the BOP to exercise this authority to prioritize inmates deemed vulnerable to COVID-19. (Attached as Exhibit E is a true and complete copy of a March 26, 2020 Memorandum of The Attorney General, Regarding Prioritization of Home Confinement As Appropriate Response to COVID-19 Pandemic.)

21.      No response has yet been received from the MDC.

22.      I am familiar with the administrative remedy procedure at the MDC, which requires an inmate to obtain a "cop-out" (BP-8) form from the unit manager, complete and submit it, wait 20 days to receive a response, then obtain a BP-9 form, complete and submit it, wait an additional 20 days to receive a response, then obtain a BP-10 form, complete and submit it, wait 30 days to receive a response, and finally obtain a BP-11 form, complete and submit it and wait 40 days to receive a response. Given the rapidity with which COVID-19 is spreading in New York City and the vulnerability of so many of the inmates held at MDC Brooklyn, pursuing this lengthy process would be futile at best, in my view, particularly since, although it may be suited for resolving more administrative issues such as the calculation of telephone charges or the inability to access a Corrlinks email account, I have never seen it effectively used to obtain release of an inmate.

23.      As detailed above, Federal Defenders has taken extensive and extraordinary measures in order to effect the release of vulnerable persons confined at MDC, and to mitigate the potential impact of a coronavirus outbreak in the facility. We have explored and attempted all the available avenues to protect our clients. However, Federal Defenders remains deeply concerned that our clients will be exposed, sickened, or potentially face serious illness or death because of MDC's inadequate and slow response to this public health crisis, and its lack of medical facilities.

**Conditions at MDC that Create Risk of a Widespread Outbreak**

24.     I have been inside MDC on numerous occasions, including visiting each of the housing units, and am familiar with its physical layout and the living conditions in the facility.

25.     There are approximately 1,700 people confined in MDC at this time.

26.     Many people confined at MDC share small two-person cells originally designed for one person, with a shared toilet and sink. People continue to be double-celled as of today. Some people are confined in large, dormitory style settings with as many as 70 people sharing a large sleeping space and beds spaced only 3 to 5 feet apart.

27.     People confined at MDC must frequently share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use.

28.     Phones and computer terminals are all shared by numerous people, without disinfection between each use.

29.     Food preparation (by inmates) and service (by inmates) is communal with little opportunity for surface disinfection. Meals are eaten together in large groups.

30.     No hand sanitizer is available to inmates at MDC.

31.     Tissues are not readily available. Inmates use toilet paper to blow their noses.

32.     Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so. This practice continues to date.

33.     Correctional staff who live in New York, New Jersey, and Pennsylvania are entering and leaving the facility every day and arrive and leave on a shift basis. Hand sanitizer is not available to staff even in non-inmate accessible areas. Each staff member can choose whether or not to wear gloves or a mask during his or her work with inmates. Not all are choosing to do so.

11

34.     New inmates continue to arrive at MDC as recently as this week. These new inmates are screened only for fever and recent travel to designated hotspot countries.

**MDC is Not Educating or Sharing Information with People Confined at the Facility**

35.     The BOP has not informed people who are confined at MDC of the symptoms of COVID-19, or of how to prevent the spread of the infection, except through posters on the walls of the units and general exhortations to wash their hands and practice social distancing.

36.     People who are at lower risk of becoming seriously ill from the virus are not separated from those who are at higher risk (because of age and/or pre-existing medical conditions). Instead, they are mixed together in open dorms or small two-man cells and locked together in those cells for at least 10 out of every 24 hours.

37.     The facility has not informed the inmate population of what the protocol will be for symptomatic inmates. Absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

**MDC is Not Medically Equipped to Address a Coronavirus Outbreak**

38.     As of March 20, 2020, MDC had only nine COVID-19 test kits.

39.     MDC currently has no ventilators.

40.     MDC cannot intubate inmates on-site.

41.     There is no separate medical unit or facility for ill inmates. Unlike many Federal Correctional Institutions and even Rikers' Island, MDC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing. MDC has declined to create a separate medical unit in the facility.

42.     There are only three doctors available at MDC to care for all 1700 inmates. None of these doctors specialize in infectious diseases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   March 27, 2020
             Brooklyn, New York

Deirdre D. von Dornum

# Exhibit A



↩ Reply all | ⌄    🗑 Delete    Junk | ⌄    •••                                              ✕

**From:** Holly Pratesi <hpratesi@bop.gov>
**Sent:** Monday, March 09, 2020 5:42 PM
**To:** David Patton <David_Patton@fd.org>
**Subject:** Re: FW: Coronavirus Planning

Good afternoon,

I understand you sent the below email to Associate Warden Cruz. Your email has also been provided to the remainder of the executive staff for consideration.

Thank you,
Holly

-------- Original message --------
From: David Patton <David_Patton@fd.org>
Date: 3/8/20 1:46 PM (GMT-05:00)
To: Andy Cruz <a1cruz@bop.gov>, Nicole McFarland <nmcfarland@bop.gov>
Cc: Deirdre Vondornum <Deirdre_Vondornum@fd.org>, Jennifer Brown <Jennifer_Brown@fd.org>
Subject: Coronavirus Planning

> > > "David Patton" 03/08/2020 13:46 > > >
Nicole and Andy,

I'm asking that you make public the MCC and MDC plans and policies for preventing a coronavirus outbreak and responding to detained people who contract coronavirus.  Let us know your availability to discuss the issues.  We believe that at a minimum, those plans and policies should include:


1.      A comprehensive testing protocol;


2.      Much greater precautionary measures with respect to sanitation and hygiene, including frequent cleaning, ready availability of soap, and tissues (the opposite of what is occurring at the MCC right now);


3.      A provision for quarantining anyone who tests positive for the coronavirus at a hospital, not at the jail;

↩ Reply all | ⌄     🗑 Delete     Junk | ⌄    •••          ✖

5.      Coordination with the Courts and U.S. Attorneys' Offices to ensure that only in extraordinary circumstances should any new arrestee be detained at the jails, and no one should be admitted without testing.

Thanks,
David

# Exhibit B

  

Case 1:20-cv-01590-RPK-RLM   Document 1-4   Filed 03/27/20   Page 19 of 30 PageID #: 63



↩ Reply all | ⌄    🗑 Delete    Junk | ⌄    ⋯

# RE: information from MCC re coronavirus protocols


Eichenholtz, Seth (USANYE) <Seth.Eichenholtz@usdoj.gov>          ↩ Reply all | ⌄
Sat 3/14, 6:13 AM
Deirdre Vondornum; Holly Pratesi <hpratesi@bop.gov>; a1cruz@bop.gov; Cheryl I ⌄

Inbox

Label: Purge Old Mail (20 years) Expires: 3/9/2040 7:13 AM

📄 Document1.pdf                    ⌄
39 KB

⌄ Show all 1 attachments (39 KB)   Download

Hi all,

To the extent it is helpful, attached please find a copy of the notification e-mail that Nicole sent out about this policy, along with the bulletin that will be sent to inmates.  The MDC bulletin is identical, except it will say MDC Brooklyn on top.

---Seth

>>> Nicole McFarland 3/13/2020 2:29 PM >>>
Effective immediately legal visits will be suspended for 30 days, at which time the suspension will be re-evaluated. Case -by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel.

This applies to MDC Brooklyn and MCC NY and across the BOP.

I am attaching a copy of the message going to inmates at both institutions.

_____
Seth D. Eichenholtz
Deputy Chief, Civil Division
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East, 7th Floor

Brooklyn, New York 11201
Telephone: (718) 254-7036
Fax: (718) 254-7489

From: Deirdre Vondornum <Deirdre_Vondornum@fd.org>
Sent: Friday, March 13, 2020 12:22 PM
To: Eichenholtz, Seth (USANYE) <SEichenholtz@usa.doj.gov>; Holly Pratesi <hpratesi@bop.gov>; a1cruz@bop.gov;

🔄 Reply all | ⌄    🗑 Delete    Junk | ⌄    •••       ✖

**Subject:** Re: information from MCC re coronavirus protocols

Seth - thanks. One more immediate request: Can we arrange for the videoconferencing equipment at MDC to be tested today or Monday to see if it will connect with the courthouse and with probation? On the courthouse end I think Doug Palmer would be person to coordinate through and then Rob Capers at Probation.

Deirdre D. von Dornum
Attorney-in-Charge
Federal Defenders of New York
(718) 330-1210

On Fri, Mar 13, 2020 at 10:46 AM -0400, "Eichenholtz, Seth (USANYE)" <Seth.Eichenholtz@usdoj.gov> wrote:

Thanks for this list Deidre. I've already discussed some of these issues with BOP, will look into the others, and we'll have an update for our call on Tuesday.

Thanks,
Seth

_____

Seth D. Eichenholtz
Deputy Chief, Civil Division
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East, 7th Floor

Brooklyn, New York 11201
Telephone: (718) 254-7036
Fax: (718) 254-7489

**From:** Deirdre Vondornum <Deirdre_Vondornum@fd.org>
**Sent:** Friday, March 13, 2020 10:42 AM
**To:** Eichenholtz, Seth (USANYE) <SEichenholtz@usa.doj.gov>; Holly Pratesi <hpratesi@bop.gov>; a1cruz@bop.gov; Cheryl Pollak <Cheryl_Pollak@nyed.uscourts.gov>; Lifshitz, Allon (USANYE) <ALifshitz@usa.doj.gov>
**Cc:** Michelle Gelernt <Michelle_Gelernt@fd.org>; David Patton <David_Patton@fd.org>
**Subject:** information from MCC re coronavirus protocols

Just flagging differences between what Andy and Holly indicated were the current MDC plans as of our meeting, and what the MCC warden and Nicole McFarland indicated to CJ McMahon are the current MCC plans as of yesterday:

- An outside sanitation company has been hired to sanitize the entire first floor of the facility this weekend.
- Goggles, gloves and masks have been ordered for particular staff. (Unclear when these will arrive)
- They have ordered two spray sanitizing machines to use in social and legal visiting areas once a day. (Starting next week)
- They have been authorized by BOP to order alcohol based sanitizer for visitors and inmates. (On backorder)


Case 1:20-cv-01590-RPK-RLM   Document 14   Filed 03/27/20   Page 21 of 30 PageID #: 65

↩ Reply all | ⌄     🗑 Delete     Junk | ⌄     • • •                    ✕

-   They are cohorting all high-risk (older than 55, those with chronic illnesses) on the 11th floor.

Deirdre D. von Dornum
Attorney-in-Charge | EDNY
Federal Defenders of New York
(718) 330-1210
Deirdre_Vondornum@fd.org

# Exhibit C

# Federal Defenders
## OF NEW YORK, INC.

52 Duane Street - 10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David Patton
*Executive Director and*
*Attorney-in-Chief*

March 16, 2020

**VIA EMAIL**

Nicole McFarland
Holly Pretasi
MCC/MDC Legal Counsel

**Re:  Federal Defender Access to the MCC and MDC**

Dear Nicole and Holly:

I write in response to Friday's announcement that the BOP was immediately instituting a 30-day suspension of social and legal visiting at all federal detention facilities, including the MCC in Manhattan and the MDC in Brooklyn, with the possibility of a renewed suspension in 30 days' time. As you know, the Federal Defenders have tried to engage with the BOP about its plans to prevent and contain a COVID-19 outbreak at the MCC and MDC, and expressed specific concerns about treating those facilities entirely as places of "quarantine" and cutting inmates off from their lawyers and loved ones as a result. The BOP's recently announced plans are exactly what we feared. Although we appreciate the severity of the health risks that COVID-19 poses, it appears that the BOP has not considered alternative ways in which it can protect the health of inmates and facility staff while respecting inmates' constitutional rights.

Shutting down visitation not only directly burdens these rights, but also puts inmates at risk of additional harm. During recent lockdown periods, inmates have been denied warm food, fresh drinking water, adequate medical treatment, and the ability to engage in even minimal hygiene. And without regular access to their counsel, inmates lose the primary means of addressing these issues in real time.

The BOP has further frustrated the Federal Defenders' efforts to help their clients through such crises by providing the Defenders' and other stakeholders inaccurate or incomplete information.  For instance, less than two weeks ago, after shutting down the MCC in response to a tip that a corrections officer had smuggled a gun into the facility, the BOP moved more than 150 inmates to FCI Otisville. Warden Licon-Vitale informed both the Federal Defenders and Chief Judge McMahon that none of the transferred inmates was a pre-trial detainee, but rather all were designated inmates who were in holding status at the MCC. In fact, the majority of the transferees were pre-trial detainees, and several had impending court appearances that had to be cancelled as a result of their transfer.

Nicole McFarland/Holly Pratesi                                    March 16, 2020
**Re:  Federal Defenders' Access to MCC/MDC**

      In addition, BOP officials informed the Federal Defenders that inmates were receiving necessary medical treatment, provided one hot meal a day, and permitted to shower, in line with BOP policy. Yet, scores of inmates with no relationship to one another reported the exact opposite. Certain inmates did not receive medications, including for anemia, AIDS and diabetes, many reported receiving only cold (and in some cases frozen) food for days on end, and others went almost a week without fresh drinking water, a shower or change of clothing. For twelve days, menstruating women had one pair of underwear and no hygiene products, and were told by corrections officers to "stuff tissue up there."

      The Federal Defenders uncovered similar misstatements by BOP leadership in the aftermath of the electrical fire that resulted in the cancellation of visiting at the MDC in February 2019. Then-Warden Herman Quay represented to court officials that inmates had not been confined to their cells, that neither heat nor hot water had been impacted, that inmates continued receiving hot meals, and that there had been no disruption of medical care. Yet when Chief Judge Irizarry issued an administrative order permitting Deirdre von Dornum, Attorney-in-Charge for the Federal Defenders in the Eastern District, to access the facility, the reality that Ms. von Dornum and U.S. Attorney Investigator John Ross discovered was markedly different than what Warden Quay had reported. Cells were pitch black, and a guard informed Ms. von Dornum that some inmates had not been allowed outside of their cells for a week. Other inmates had not received hot food for days, and the facility was painfully cold, causing BOP officers to wear multiple layers while inmates suffered in short-sleeved shirts and light cotton pants. Many inmates reported not receiving prescriptions, and others said that they had requested, but not received, medical attention, including for open wounds, which Ms. von Dornum and Mr. Ross observed first-hand.

      We have deep concerns about what the over 2000 inmates at the MCC and MDC are experiencing. We intend to play a constructive role in helping the BOP navigate the challenges that COVID-19 presents, while continuing to demand that the rights of our clients and other inmates at the MCC and MDC are respected. It is our understanding that this is exactly what the BOP expects of us. In fact, the government has represented to at least one Southern District judge that it thinks that it "makes sense to have [the Federal Defenders] continue to be . . . the point people for discussion" about the BOP's plans relating to COVID-19. Tr. at 15, *United States v. Holloway*, No. 20 Cr. 126 (S.D.N.Y. Mar. 12, 2020) (conference before Hon. Laura Taylor Swain).

Nicole McFarland/Holly Pratesi                                     March 16, 2020
**Re:  Federal Defenders' Access to MCC/MDC**


       To perform this role effectively, the Federal Defenders request that Deirdre von Dornum and I be permitted to tour the MCC and MDC, and speak with inmates in all units, on a twice-a-week basis, for the duration of the current 30-day shutdown. We are prepared to take the same health precautions as corrections officers who continue to work in the facilities, as well as any additional measures medically necessary to protect the health of inmates and staff, as well as our own health.

       I ask that you respond to this request no later than noon on Tuesday, March 17.

               Yours truly,

               /s
               David E. Patton


cc:    Jeff Oestericher, Chief, Civil Division (SDNY)
       Seth Eichenholtz, Deputy Chief, Civil Division (EDNY)
       Adam Johnson, BOP Regional Counsel

# Exhibit E



# Office of the Attorney General
## Washington, D. C. 20530

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:            THE ATTORNEY GENERAL

SUBJECT:         <u>Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic</u>

    Thank you for your tremendous service to our nation during the present crisis.  The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times.  We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe.  At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities.  I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.   TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

    One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances.  I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

    In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

- The security level  of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home detention.  Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement.  We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.  You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.    **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public.  That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways.  I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement.  Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public.  I thank you for your service to the country and assistance in implementing this Memorandum.

# Exhibit D



**U.S. Department of Justice**

Federal Bureau of Prisons

*Metropolitan Correctional Center*

*150 Park Row*
*New York, NY 10007*

March 17, 2020

David Patton
Executive Director
Federal Defenders of New York, Inc.
52 Duane Street – 10th Floor
New York, NY  10007

**RE:     Federal Defender Access to the MCC and MDC**

Dear Mr. Patton:

    We are writing in response to your March 16, 2020, letter in which you request that you and Ms. Deirdre von Dornum be permitted to tour MCC New York and MDC Brooklyn.

    In accordance with the Federal Bureau of Prisons' March 13, 2020, National Measures, your request to tour the institutions was sent to the Federal Bureau of Prisons' Central Office for review.  After review, your request to tour the institutions was denied.

    MCC New York and MDC Brooklyn will continue to keep your office apprised of any appropriate developments concerning their COVID-19 response.  Your request to tour the institutions may be revisited at a later date.

Sincerely,

M. Licon-Vitale
Warden
MCC New York

D. Edge
Warden
MDC Brooklyn