UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI, by his Next Friend
MIGDALIZ QUINONES; and JUSTIN
RODRIGUEZ, by his Next Friend JACKLYN
ROMANOFF,

No. 20 Civ. 1590

individually and on behalf of all others similarly
situated,

Petitioners,

*-against-*

WARDEN DEREK EDGE,

Respondent.

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 1003
(212) 790-0403

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES .................................................................................................ii-v

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

        A.    The COVID-19 Crisis in the United States...................................................3

        B.    COVID-19 Poses Significant Dangers for Incarcerated People and
              Correctional Staff..........................................................................................5

        C.    Respondent Is Disregarding Known Risks by Failing to Take Proper
              Precautions to Protect Vulnerable People.....................................................9

        D.    MDC is Not Prepared to Treat to Individuals Who Contract
              COVID-19......................................................................................................12

        E.    Petitioners Are Particularly Vulnerable .......................................................13

ARGUMENT ......................................................................................................................16

     I.    PETITIONERS FACE IRREPARABLE HARM IF THEY REMAIN
         CONFINED AT THE MDC…………………………………………………17

     II.    PETITIONERS HAVE A SUBSTANTIAL LIKELIHOOD OF
         SUCCEEDING ON THE MERITS ..............................................................19

     III.    THE COURT HAS THE AUTHORITY TO ORDER PETITIONERS'
         RELEASE; THE BALANCE OF EQUITIES TIPS IN PETITIONERS'
         FAVOR; AND RELEASE WOULD SERVE THE PUBLIC INTEREST ..........22

CONCLUSION...................................................................................................................24

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdi v. Duke*,
   280 F. Supp. 3d 373 (W.D.N.Y. 2017)................................................................. 23

*AIM Int'l Trading LLC v. Valcucine SpA.*,
   188 F. Supp. 2d 384 (S.D.N.Y. 2002)................................................................ 17

*Andino v. Fischer*,
   555 F. Supp. 2d 418 (S.D.N.Y. 2008)................................................................ 16

*Arana v. Barr et al.*,
   19 Civ. 7924 (PGG)(DCF) (S.D.N.Y. Mar. 27, 2020) ..................................... 7

*Basank et al. v. Decker et al.*,
   20 Civ. 2518 (AT) (S.D.N.Y. Mar. 26, 2020).................................................... 7

*Basank v. Decker*,
   No. 20 Civ 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ............................ 18, 23

*Bell v. Wolfish*,
   441 U.S. 520 (1979)......................................................................................... 19

*Brown v. Plata*,
   563 U.S. 493 (2011)......................................................................................... 19

*Castillo et al. v. Barr*,
   20 Civ. 605 (C.D. Cal. Mar. 27, 2020) ............................................................ 8

*Castillo v. Barr*,
   No. 20 Civ. 605 (Mar. 27, 2020)...................................................................... 18

*Charles v. Orange Cty.*,
   925 F.3d 73 (2d Cir. 2019)............................................................................... 19

*Conn. Dep't of Envtl. Prot. v. OSHA*,
   356 F.3d 226 (2d Cir. 2004)............................................................................. 18

*Coronel v. Decker*,
   No. 20-CV-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ..................... 18

*Coronel, et al., v. Decker et al.*,
   20 Civ. 2472 (AJN) (S.D.N.Y. Mar. 27, 2020)................................................. 7

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) ........................................................................... 23

ii

*Estelle v. Gamble*,
    429 U.S. 97 (1976)................................................................................. 19, 22

*Farmer v. Brennan*,
    511 U.S. 825 (1994).................................................................................... 19

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
    No. 19-1778, __ F.3d __, 2020 WL 1320886 (2d Cir. Mar. 20, 2020) ........................... 20

*Flores et al. v. Barr et al.*,
    85 Civ. 4544 (C.D. Cal. Mar. 28, 2020) ............................................................ 8

*Harris v. Bd. of Supervisors, Los Angeles Cty.*,
    366 F.3d 754 (9th Cir. 2004) ........................................................................ 18

*Helling v. McKinney*,
    509 U.S. 25 (1993)........................................................................ 17, 19, 20, 21

*Hutto v. Finney*,
    437 U.S. 678 (1978).................................................................................... 21

*In Re Extradition of Alejandro Toledo Manrique*,
    19 Mj. 7105 (N.D. Cal. Mar. 19, 2020) ............................................................. 9

*In re Request to Commute or Suspend County Jail Sentences*,
    Dkt. No. 084230 (N.J. Mar. 22, 2020) ............................................................... 9

*Innovative Health Sys., Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997) ........................................................................... 17

*Jimenez v. Cronen, et al.*,
    18 Civ. 10225 (D. Mass. Mar. 26, 2020) ............................................................ 9

*Johnson v. Connolly*,
    378 F. App'x 107 (2d Cir. 2010) ..................................................................... 18

*Johnson v. Miles*,
    355 F. App'x 444 (2d Cir. 2009) ..................................................................... 18

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)........................................................................ 18, 20

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990)........................................................................... 17

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018)................................................................ 23

*Litwin v. OceanFreight, Inc.*,
    865 F. Supp. 2d 385 (S.D.N.Y. 2011)..................................................... 16

*New York Civil Liberties Union v. New York City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012).................................................................. 16

*People ex rel. Stoughton on behalf of Hogan et al. v. Brann*,
    (Sup. Ct. N.Y. Cty. Mar. 27, 2020)........................................................ 8

*People ex rel. Stoughton on behalf of Little et al. v. Brann*,
    Index No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) ................ 8

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002)................................................................. 20

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir.1990)................................................................. 17

*Roba v. United States*,
    604 F.2d 215 (2d Cir. 1979)................................................................. 22

*Stagliano v. Herkimer Cent. Sch. Dist.*,
    151 F. Supp. 3d 264 (N.D.N.Y. 2015)................................................. 18

*Thompson v. Choinski*,
    525 F.3d 205 (2d Cir. 2008)................................................................. 22

*U.S.A. v. Barkman*,
    19 Cr. 52 (D. Nev. Mar. 17, 2020)......................................................... 9

*Umana Jovel v. Decker et al.*,
    20 Civ. 308 (GBD)(SN) (S.D.N.Y. Mar. 26, 2020)................................ 7

*United States v. Garlock*,
    No. 18 Cr. 00418, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020)................... 8

*United States v. Little*,
    No. 20 Cr. 57, 2020 WL 1439979 (S.D.N.Y. Mar. 24, 2020) ................ 20

*United States v. Matthaei*,
    19 Civ 243 (D. Idaho Mar. 16, 2020) .................................................... 9

*United States v. Stephens*,
    15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ................ 7

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................ 16

*Xochihua-Jaimes v. Barr*,
    No. 18-71460 (9th Cir. Mar. 24, 2020)..............................................................8

*Zhang v. Barr et al.*,
    20 Civ. 331 (C.D. Cal. Mar. 27, 2020) ...........................................................8

## INTRODUCTION

Petitioners Hassan Chunn, Nehemiah McBride, Ayman Rabadi, and Justin Rodriguez ("Petitioners"), on behalf of themselves and others similarly situated, respectfully move this Court under Federal Rule of Civil Procedure 65 for a temporary restraining order ("TRO"):

> (a) directing that Petitioners be immediately released from detention at the Metropolitan Detention Center ("MDC") in Brooklyn, New York and returned to their homes under such conditions as the Court deems appropriate, and

> (b) appointing a Special Master on an emergency basis to chair a Coronavirus Release and Mitigation Committee, which shall include a correctional health expert, in order to (i) evaluate all persons currently incarcerated at the MDC who Respondent has identified as vulnerable to developing serious COVID-19 illness ("Vulnerable Persons") for release, and (ii) make recommendations for ameliorative action for other persons held at the MDC.

Release is necessary to protect Petitioners, who are particularly vulnerable to contracting and suffering dire consequences from COVID-19. Respondent Warden Derek Edge has not taken steps to protect Petitioners from the substantial risk of harm posed by COVID-19, nor could he under the MDC's current conditions. Every hour that Petitioners are held under these circumstances, they are exposed to the substantial risk of a COVID-19 infection, with a substantial risk of death to follow. Continuing to hold Petitioners under these circumstances patently violates their Eighth Amendment rights.

As one of the Petitioners grimly reported:

> Things are very bad here. We don't have any gloves, masks or any personal protective equipment. Also, we can't social distance from each other. There are approximately 90 people in a small area because this is considered a "camp" status floor… They came up here and told us that there were 2 officers and 1 inmate that are infected. We found out there are many more inmates and probably guards with the virus. One of our friends we maybe think he got the virus. He walks around with a mask and he has a deep cough and we are freaking out and are not doing well mentally. They tell us to wash our hands but they don't have any hand sanitizer and

1

> they tell us to use soap, but we don't have soap because they don't
> have any. We tried to buy soap from commissary, but commissary
> is out for 3 weeks. We are in big trouble here. Not just me, but
> everyone in here is freaking out because we cannot get any
> information or anyone to listen to us . . . Please help me before I
> die. I want to be with my family where I am safe.

Declaration of Katherine Rosenfeld ("Rosenfeld Decl.") ¶ 28.

New York City is the current epicenter of the COVID-19 pandemic, and the measures necessary to mitigate spread of the disease—most notably, social distancing—cannot be implemented in its prisons and jails.  Indeed, already there are signs that the disease is spreading even faster in New York City jails than it has spread among the population at liberty;[1] there is every expectation that the MDC is just as vulnerable to rapid spread of the disease.  Social distancing is not a realistic possibility in the confines of the MDC, medical equipment and personnel are insufficient to ensure that the disease is contained, and the MDC lacks critical resources necessary to treat Petitioners if they contract the disease.

For Petitioners, this state of affairs is particularly treacherous, making release the only appropriate remedy.  Because of their age and/or underlying medical conditions, Petitioners face a substantial risk of serious illness and death if they contract COVID-19.  The risk to their health and well-being increases every moment they are held within the close confines of the MDC, with no ability to protect themselves and no assurance that Respondent and his staff are taking adequate steps to mitigate the substantial and ever-present risk of harm.  At the state and local levels, corrections officials, medical experts, and our political leaders, among others, have concluded the same.  Petitioners' lives lie in the balance—release is the only means to preserve the status quo.

---

[1] COVID-19 Infection Tracking in NYC Jails, The Legal Aid Society, https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last accessed Mar. 29, 2020).

For the rest of the MDC population—the putative class—a Special Master should be appointed immediately to ensure that appropriate measures are taken to protect everyone who is being detained, particularly the 537 Vulnerable Persons that Respondent has already identified. Like Petitioners, the Vulnerable Persons are at extreme risk of serious illness and death if they contract COVID-19.  The Court should therefore direct the Special Master to apply a presumption in favor of releasing all Vulnerable Persons, under terms and conditions the Court deems appropriate, unless Respondent can make a particularized showing to rebut the presumption.

In light of the grave and irreparable harm facing Petitioners and all those detained at MDC, Petitioners' substantial likelihood of success on the merits of this Petition, the clear balance of equities in their favor, and the public interest in mitigating the harm from an inevitable COVID-19 outbreak in the MDC, Petitioners respectfully request that the Court issue a temporary restraining order mandating Petitioners' immediate release to their homes under such other conditions as the Court deems appropriate and immediately appointing a Special Master to chair a Coronavirus Release and Mitigation Committee.

## FACTUAL BACKGROUND

### A.      The COVID-19 Crisis in the United States

The novel coronavirus that causes COVID-19 has led to a global pandemic.  As of March 30, 2020, COVID-19 has infected more than 737,000 people worldwide and more than 143,000 people in the United States.[2]  New York City has reported more than 33,000 cases,[3] with more than 775 deaths,[4] although the number of infections is drastically understated.  The number of

---

[2] https://coronavirus.jhu.edu/map.html (last visited Mar. 30, 2020 9:05AM).

[3] *Id.*

[4] *Id.*

COVID-19 cases in the United States is expected to grow exponentially.  Pet. ¶ 18.[5]  Projections

by the Centers for Disease Control and Prevention ("CDC") indicate that over 200 million people

in the United States could be infected with COVID-19 over the course of the epidemic without

effective public health intervention, with as many as 1.5 million deaths in the most severe

projections.  *Id.*[6]

       Certain populations—those over the age of 50 and those with specific underlying medical

conditions—are particularly vulnerable to serious illness and death from COVID-19.  *Id.* ¶¶ 20-

21 (citing *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*,

World Health Organization (Feb. 28, 2020), https://www.who.int/docs/default-

source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.)  People aged 60-69

have a mortality rate 18 times higher than people under the age of 40; the rate is 40 times higher

for people aged 70-79 years old.  *Id.* ¶ 20.  The mortality rate for people of any age with

cardiovascular disease, diabetes, hypertension, chronic respiratory disease, and cancer, is

significantly elevated as well.  *Id.* ¶ 21.  Even if the COVID-19 infection is not fatal, it will often

require highly specialized care for people over the age of 50 and will result in longstanding

medical complications.  *Id.* ¶¶ 22, 27.  Serious complications can develop rapidly, as little as five

days after the first symptoms first appear.  *Id.* ¶ 24.  Compared to influenza, COVID-19 is much

more deadly, with a fatality rate of 15 percent in the highest risk populations.  *Id.* ¶ 26.

---

[5] Citations to "Pet." refer to the Petition that was filed on March 27, 2020.

[6] *See also* Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html.

**B.      COVID-19 Poses Significant Dangers for Incarcerated People and Correctional Staff**

New York has been in a state of emergency since March 7, 2020, to more effectively contain the spread of COVID-19, deploying the National Guard among other strategies.[7]  In New York, people must remain in their homes to the greatest extent possible, not gather in groups of any size, and remain six feet away from others at all times.[8]  The CDC and World Health Organization have agreed that "social distancing" and rigorous hygiene practices, including washing hands with soap and water, are critical to stop the spread of COVID-19. *Id.* ¶ 28.

It is virtually impossible to take these necessary measures in prisons and jails.  *Id.* ¶ 31. In correctional settings, the risk of contracting an infectious disease, like COVID-19, is significantly increased due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.  Pet. Ex. 2 (Declaration of Jonathan Giftos, MD, dated March 27, 2020 ("Giftos Decl.")) ¶ 11; *see also* Rosenfeld Decl. Ex. 9 (Declaration of Jaimie Meyer, M.D.) ¶ 7.  It is thus no surprise that flu outbreaks occur regularly in jails and prisons and that during past epidemics, such as with H1N1 in 2009, many jails and prisons dealt with high numbers of cases.  Giftos Decl. ¶ 12.  On Saturday, March 28, 2020, the inevitable occurred: a person incarcerated in a federal prison died

---

[7] Eileen AJ Connelly & Laura Italiano, *Cuomo Declares State of Emergency in New York as State Coronavirus Cases Soar to 89*, N.Y. Post (Mar. 7, 2020), https://nypost.com/2020/03/07/cuomo-declares-state-of-emergency-as-new-york-state-coronavirus-cases-soar-to-76/; *NJ Announces 1st COVID-19 Death; NY Deploys National Guard to New Rochelle,* NBC New York (Mar. 11, 2020), https://www.nbcnewyork.com/news/local/nyc-adds-5-new-covid-19-cases-tri-state-total-more-than-triples-in-days/2319688/.

[8] *Cuomo Bans Gatherings, Nonessential Workers to Stay Home*, N.Y. Times  (Mar. 20, 2020), https://www.nytimes.com/aponline/2020/03/20/us/ap-us-virus-outbreak-new-york-2nd-ld-writethru.html; Berkely Lovelace, Jr., *Coronavirus: NY, NJ, CT Coordinate Restrictions on Restaurants, Limit Events to Fewer than 50 People*, CNBC (Mar. 16, 2020), https://www.cnbc.com/2020/03/16/new-york-new-jersey-and-connecticut-agree-to-close-restaurants-limit-events-to-less-than-50-people.html.

from COVID-19.[9]  The Louisiana prison in which he had been held is now seeing an explosion of coronavirus cases that is crippling the facility, with 30 incarcerated people having tested positive and 60 more in quarantine.[10]

For this reason, correctional public health experts have responded to the COVID-19 pandemic by recommending the release from custody of people most vulnerable to COVID-19. Pet. ¶¶ 36; 43-44.  Release protects these people, mitigates the risk of infection for all people held and working in a correctional setting, and lessens the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.  *Id.* ¶ 36.  On March 23, 2020, a bipartisan group of U.S. Senators urged BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and are near release.  *Id.* ¶ 39.  Attorney General William Barr has specifically given the BOP instruction to grant home confinement to vulnerable populations held in federal custody.  *Id.* ¶ 40.

Recognizing the Emergency, state and local jurisdictions across the country, including New York State, New York City, Los Angeles, and Chicago, have taken steps to protect people in custody from the impending spread of COVID-19 by releasing people in an effort to reduce populations.  *Id.*  ¶¶ 42-43, 48, 50.  As Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues—those people are likely to die from a coronavirus infection."  *Id.*  ¶ 43.  At the same time, COVID-19 is spreading rapidly within incarcerated

---

[9] Sadie Gurman, *First Federal Inmate Dies of COVID-19, Deepening Fear of Coronavirus Spread in Prisons* (Mar. 29, 2020), https://www.wsj.com/articles/first-federal-inmate-dies-of-covid-19-deepening-fear-of-coronavirus-spread-in-prisons-11585456750.

[10] https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html

populations in New York City.  Giftos Decl. ¶ 14.  People who work in the criminal justice system also have tested positive, increasing the likelihood of exposure to and by incarcerated people.  Pet. ¶ 47.  And United Nations High Commissioner for Human Rights Michelle Bachelet stated that governments must quickly reduce the number of people in detention, encouraging them to examine ways to release those particularly vulnerable to Covid-19.[11]

Reflecting this reality, over the last several days, judges in this circuit and across the country have granted habeas petitions and ordered the release of persons who are incarcerated or being detained.  *See Coronel, et al., v. Decker et al.*, 20 Civ. 2472 (AJN) (S.D.N.Y. Mar. 27, 2020) (granting release of four petitioners with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19 from immigration detention); *Arana v. Barr et al.*, 19 Civ. 7924 (PGG)(DCF) (S.D.N.Y. Mar. 27, 2020) (recommending "that, due to extraordinary circumstances brought about by the COVID-19 outbreak, which has apparently reached the jail where Petitioner is being detained, and by which he may be particularly seriously impacted as a result of underlying medical conditions, Petitioner be ordered released from [immigration] custody pending his bond hearing"); *Basank et al. v. Decker et al.*, 20 Civ. 2518 (AT) (S.D.N.Y. Mar. 26, 2020) (granting release of ten petitioners who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19" from immigration detention); *United States v. Stephens*, 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, recognizing that incarcerated people may be at a heightened risk of contracting COVID-19); *Umana Jovel v. Decker et al.*, 20 Civ. 308 (GBD)(SN) (S.D.N.Y. Mar. 26, 2020) (granting

---

[11] https://news.un.org/en/story/2020/03/1060252.

emergency request for release of petitioner from immigration detention in light of the COVID-19 crisis); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *People ex rel. Stoughton on behalf of Hogan et al. v. Brann*, (Sup. Ct. N.Y. Cty. Mar. 27, 2020) (releasing 16 individuals held at Rikers Island jail on pre-trial detention who were particularly vulnerable to illness or death due to COVID-19); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19); *Flores et al. v. Barr et al.*, 85 Civ. 4544 (C.D. Cal. Mar. 28, 2020) (granting a Temporary Restraining Order application requiring the Office of Refugee Resettlement and United States Immigrations and Customs Enforcement to immediately put in place measures to reduce the risk of COVID-19 infection for unaccompanied minors in their custody and ordering the defendants to show cause why an order should not issue requiring defendants to immediately release class members); *Zhang v. Barr et al.*, 20 Civ. 331 (C.D. Cal. Mar. 27, 2020) (granting Petitioner an immediate bond hearing in light of the "global pandemic by which delay in determining Petitioner's release exposes him to unnecessary risk"); *United States v. Garlock*, No. 18 Cr. 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo et al. v. Barr*, 20 Civ. 605 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *In Re Extradition*

8

*of Alejandro Toledo Manrique*, 19 Mj. 7105 (N.D. Cal. Mar. 19, 2020) (granting motion for release on bail of 74-year old subject of extradition request due to risks associated with remaining in custody during COVID-19 pandemic); *U.S.A. v. Barkman*, 19 Cr. 52 (D. Nev. Mar. 17, 2020) (suspending requirement that defendant report to prison to serve intermittent confinement due to risks associated with COVID-19); *United States v. Matthaei*, 19 Civ. 243 (D. Idaho Mar. 16, 2020) (granting convicted defendant additional time to self-surrender to prison in light of defendant's health problems, which place him at greater risk of complications of COVID-19); *Jimenez v. Cronen, et al.*, 18 Civ. 10225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *In re Request to Commute or Suspend County Jail Sentences*, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any person in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).

### C.     Respondent Is Disregarding Known Risks by Failing to Take Proper Precautions to Protect Vulnerable People

Like every other correctional setting, MDC is not well-situated to mitigate the risks of COVID-19 spread.  Necessary social distancing is impossible; toilets, sinks, and showers are shared without disinfection between each use; communal food preparation and service leaves little opportunity for surface disinfection; and staff arrive and leave without proper screening for new infection.  Pet. ¶ 52.  Since March 4, 2020, the Federal Defenders has engaged in extensive efforts to get Respondent to address the risks associated with the spread of COVID-19 at the MDC, to little avail.  Pet. Ex. 1 (Declaration of Deirdre D. von Dornum, dated March 27, 2020 ("von Dornum Decl.")) ¶¶ 3-7, 9-11, 20, 21, 23.  The Federal Defenders asked that the MDC take specific measures to reduce the spread of infection, *id.* ¶ 4, but the MDC's response was woefully inadequate.

9

As of March 11, 2020, the MDC did not anticipate having a testing protocol for COVID-19; it had no policy to address staff who presented with COVID-19 risk factors; it would not permit the use of hand sanitizer by people held at the MDC or by staff who worked there; it maintained that increased cleaning in the facility would be handled by incarcerated people; it had no plan for where the MDC would place people who tested positive for the virus; and it had no plans to move particularly vulnerable people housed at the MDC.  *Id.* ¶ 6.

Unfortunately, there is no evidence that Respondent has taken any additional steps since March 11, even as the pandemic has spread.  In conversations with the Federal Defenders, people held at the MDC have observed no changes in sanitation practices—only *some* units have received bars of soap—and have not been given relevant education about the symptoms of COVID-19 or how to mitigate its spread.  *Id.* ¶ 9.  Doctors have not even been present to evaluate people in the housing units.  *Id.* ¶ 9(d).  Staff are given temperature checks when they enter the MDC, but they are not wearing gloves, masks, or any other protective gear while on duty.  *Id.* ¶ 9(e).

Even if Respondent were devoted to responding to the COVID-19 threat, the MDC lacks sufficient resources to protect Petitioners and similarly situated people.  Almost one-third of the 1,700 people held at the MDC have been identified by Respondent as falling into categories identified by the CDC as particularly vulnerable to the virus.  *Id.* ¶ 11(a).  New arrivals to the MDC are screened only for fever and recent travel to designated hotspots, and staff are screened only for fever (they are sent home if their temperature exceeds 100.4 degrees Fahrenheit).  *Id.* ¶ 11(e).

Respondent has failed to take protective measures even in the face of known infections at the MDC.  A little over one week ago, on March 21, 2020, the Federal Defenders learned that an

10

individual incarcerated at the MDC had tested positive for COVID-19.  *Id.* ¶ 12.  This person had been in contact with many others, both staff and incarcerated people, with the latter subsequently transferred throughout the facility.  *Id.*  According to one person confined at the MDC, others who were housed with the person who tested positive are now showing symptoms.  Pet. ¶ 66.  No professional or staff cleaners sanitized the intake unit where the person who tested positive had been housed.  von Dornum Decl. ¶¶ 12-13.  Instead, incarcerated people on the adjacent unit were sent to clean the intake unit with the same cleaning supplies they regularly use and were provided insufficient gloves and masks.  *Id.* ¶ 13(f).  To "clean" their own cells, people are provided only with diluted hand soap.  Pet. ¶ 69.

At least four MDC staff members have tested positive for COVID-19 and others are symptomatic.  *Id.* ¶ 72.  Nonetheless, Respondent continues to implement hazardous practices, including: forcing women housed at the MDC to wash the clothing of incarcerated people, including clothing from the unit where an incarcerated person tested positive, von Dornum Decl. ¶ 16(a); failing to clean phones and computers, *id.* ¶ 16(c); directing people to line up shoulder to shoulder during meals, where people eat in large groups, *id.* ¶ 16(d); Pet. ¶ 73(i); housing people in small two-person cells or in large dormitory units, all with shared sinks and toilets and in spaces where it is impossible to maintain necessary social distance, von Dornum Decl. ¶ 26; failing to provide any hand sanitizer and providing limited to no soap, depending on the unit, Pet. ¶ 73(e), (g); and relying on incarcerated people to sanitize common areas without providing adequate cleaning supplies, *Id.* ¶ 73(j).

Petitioners have grave concerns about the current scale of infection at the MDC, and whether the BOP's publicly reported numbers about infections in New York's federal prisons are accurate.  On the evening of March 29, 2020, the BOP's official website listed two total positive

11

cases at the MDC, one incarcerated person and one staff.  *See* Supplemental Declaration of Deirdre D. von Dornum, dated March 30, 2020 ("Supp. von Dornum Decl.") ¶ 4.  Although the website is supposed to be updated daily at 3 PM, this information is incorrect, based on information gleaned by the Federal Defenders.  *Id.* ¶¶ 3, 5 (reporting a total of  4 staff infections).  The Federal Defenders learns of additional cases only when they ask specific questions based on information learned from their clients, raising the serious concern that if additional cases exist, neither the Federal Defenders nor the public will learn of them from the BOP.  *Id.* ¶ 6.  This concern is heightened because the Federal Defenders continue to hear from clients that people held in the MDC are reporting symptoms consistent with COVID-19, but have not yet been tested and have not been isolated from asymptomatic individuals.  *Id.* ¶ 7.

Nor has Respondent taken steps to educate incarcerated people about the spread of infection or separated individuals based on their risk of becoming seriously ill from COVID-19. von Dornum Decl. ¶ 35; Pet. ¶ 74.  Physicians have not visited housing units, medical staff will visit only if someone reports symptoms, which many people are afraid to do because, absent a transparent protocol for treatment, they are reasonably concerned that if they report feeling symptomatic they will be placed in solitary confinement.  von Dornum Decl. ¶ 16(b); Pet. ¶ 77.

### D.    MDC is Not Prepared to Treat to Individuals Who Contract COVID-19

If Petitioners contract COVID-19 at the MDC, they will be at a high risk of developing serious symptoms because the MDC lacks the medical resources to care for symptomatic individuals.  Pet. ¶ 78.  Now that COVID-19 is inside the facility, the MDC will be unable to stop the spread of the virus throughout the facility given long-documented inadequacies in BOP's medical care and in light of how these facilities function.  Giftos Decl. ¶ 14.  MDC has no separate medical unit for sick people, unlike many Federal Correctional Institutions and even Rikers' Island.  von Dornum Decl. ¶ 41.  As of March 20, 2020, MDC had only 9 nasal swab

COVID-19 test kits and only one incarcerated person had been tested at the facility.  *Id.* ¶ 11(b),
(c).  MDC currently has no ventilators and cannot intubate patients on-site.  *Id.* ¶¶ 39, 40.  MDC
does not have any specialized equipment or medical providers.  *Id.* ¶ 42.  There are only three
doctors available at MDC to care for all 1,700 people held there.  *Id.*  Even this highly limited
number is likely to decrease as doctors themselves go into quarantine.  None of these doctors
specialize in infectious diseases.  *Id.*

These resources will be inadequate to treat people who contract COVID-19, particularly
vulnerable individuals like Petitioners.  Most people in the higher risk categories will require
more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal
mechanical oxygenation.  Pet. ¶ 83.  Such care requires specialized equipment in limited supply
as well as an entire team of specialized care providers.  *Id.*  MDC does not have that specialized
equipment or specialized providers.  *Id.*  And MDC's staffing shortage will only increase with
the epidemic, leaving officers less able to monitor the health of the incarcerated population.
Giftos Decl. ¶ 18.

### E.    Petitioners Are Particularly Vulnerable

Because of their age and/or medical conditions, Petitioners are particularly vulnerable to
serious illness or death if infected by COVID-19.

#### 1.    Hassan Chunn

Hassan Chunn is 46 years old.  Declaration of Katherine Rosenfeld, dated March 30,
2020 ("Rosenfeld Decl."), Ex. 1 ¶ 3.  He has many serious medical problems, including
Coronary Heart Disease, high blood pressure, and diabetes.  *Id.* ¶ 3.  He has two stents in his
heart.  *Id.*  He takes many different medications, and he has had a difficult time getting medical
care while at the MDC.  *Id.* ¶ 5.  While held at the MDC, he has been hospitalized multiple for
heart and breathing problems.  *Id.* ¶ 6.  According to medical records from Jamaica Hospital, Mr.

Chun was receiving care in 2017 for coronary artery disease, poorly controlled hypertension, and obesity.  Rosenfeld Decl. ¶ 15.  Mr. Chunn is due to be released on April 18, 2020.  Rosenfeld Decl. Ex. 1 ¶ 2.  When he is released, he will live with his mother in Brooklyn.  *Id.*

On March 26, 2020, Mr. Chunn's criminal defense counsel requested that Respondent grant a reduction in Mr. Chunn's sentence pursuant to title 18 U.S.C. Section 3624, and release Mr. Chunn for the remainder of his short sentence, in light of Mr. Chunn's serious heart condition and other health problems, and his resulting vulnerability to the spread of COVID-19 in the MDC.  Rosenfeld Decl. Ex. 2.  Mr. Chunn's counsel has not received a response to his letter.  Rosenfeld Decl. ¶ 18.

### 2. Nehemiah McBride

Mr. McBride is 34 years old.  Rosenfeld Decl. Ex. 3 ¶ 2.  He has had asthma and respiratory problems for many years.  *Id.* ¶ 4.[12]  He can get very sick when his asthma is activated, and he has used both an inhaler and a nebulizer.  *Id.*  On several occasions, he has had such severe asthma attacks that he had to go to the emergency room for treatment.  *Id.* ¶ 5.  Mr. McBride is due to be released on April 15, 2020.  *Id.* ¶ 2.  When he is released, he will live with his partner at her home in Jamaica.  *Id.* ¶ 3.

On March 26, 2020, Mr. McBride's criminal defense counsel requested that Respondent grant a reduction in Mr. McBride's sentence pursuant to title 18 U.S.C. Section 3624, and release Mr. McBride for the remainder of his short sentence to home confinement, in light of Mr. McBride's severe asthma and breathing problems and resulting vulnerability to the spread of

---

[12] The CDC states that people with asthma "may be at higher risk of getting very sick from COVID-19" and directs people with asthma to be sure to know how to use their inhaler.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

COVID-19 in the MDC.  Rosenfeld Decl. Ex. 4. Mr. McBride's counsel has not received a response to his letter.  Rosenfeld Decl. ¶ 21.

       **3.**    **Ayman Rabadi**

Mr. Rabadi is 59 years old; he will be 60 in May.  Rosenfeld Decl. Ex. 5 ¶ 2.  He suffers from many health problems, and he had a heart attack about five years ago.  *Id.*  Mr. Rabadi takes medication for high blood pressure, cholesterol, hypertension, pre-diabetes, and other conditions.  *Id.* ¶ 3.  He has stents in his heart.  *Id.* ¶ 6.  He has a tumor in one of his kidneys and suffers from an anal fistula.  *Id.* ¶¶ 4-5.  Mr. Rabadi suffered from a stroke in jail last year. Rosenfeld Decl. ¶ 26.  He reports that he takes over a dozen different medications a day.  *Id.*

Mr. Rabadi is scheduled to be released on July 19, 2020.  *Id.* ¶ 23.  He has four children and two grandchildren.  *Id.*  He is spending as much time as possible in his cell to avoid contact with others, but he shares a small cell with another person and he must leave his cell to get food. Rosenfeld Decl. ¶ 27.

       **4.**    **Justin Rodriguez**

Mr. Rodriguez is 26 years old.  Rosenfeld Decl. Ex. 8 ¶ 2.  He has suffered from asthma since he was a baby.  *Id.* ¶ 6.  When he was young, he had a nebulizer machine that his mother used to give him breathing treatments.  *Id.* ¶ 7.  Today, he has difficulty breathing when places are dirty, dusty, pollen-filled, or smoky.  *Id.* ¶ 9.  His breathing problems are exacerbated by extreme coldness or sickness.  *Id.*  Mr. Rodriguez has gotten several bad colds while at the MDC, and it routinely takes him several weeks to be seen by a medical professional.  *Id.* ¶ 10.

Mr. Rodriguez is due to be released on June 9, 2020.  *Id.* ¶ 2.  He has a four-year-old son and is a very active father.  *Id.* ¶ 3.  When he is released, he will live with his mother in Staten Island.  *Id.* ¶ 5.  On March 27, 2020, Mr. Rodriguez's  criminal defense counsel requested that Respondent grant a reduction in Mr. Rodriguez's sentence pursuant to title 18 U.S.C. Section

3624 and release him for the remainder of his short sentence to home confinement, in light of

Mr. McBride's lifelong asthmatic condition and resulting vulnerability to the spread of COVID-

19 in the MDC.  Rosenfeld Decl. Ex. 7.  Mr. Rodriguez's counsel has not received a response to

his letter.  Rosenfeld Decl. ¶ 30.

## ARGUMENT

Applications for temporary restraining orders ("TRO") are governed by the same

standards as motions for preliminary injunctions. *See Andino v. Fischer*, 555 F. Supp. 2d 418,

419 (S.D.N.Y. 2008).  The moving party must establish: (1) a likelihood of success on the

merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of

equities tips in favor of the moving party; and (4) that the public interest is served by an

injunction.  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  "The party seeking

the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the

necessary elements are satisfied."  *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 392

(S.D.N.Y. 2011).

Petitioners maintain that a TRO is necessary to preserve the status quo—namely, their

current health—but even if the Court determines that Petitioners must meet the higher standard

necessary for a mandatory status quo, they do so here.  *New York Civil Liberties Union v. New

York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("For mandatory injunctions, which

alter rather than maintain the status quo, such as the one at issue here, the movant must show a

clear or substantial likelihood of success on the merits." (internal quotation marks and citation

omitted)).

I.      **PETITIONERS FACE IRREPARABLE HARM IF THEY REMAIN CONFINED
        AT THE MDC**

The irreparable harm here is immense: Petitioners likely face death or serious illness

from COVID-19 if they remain incarcerated at the MDC.

"The Second Circuit has deemed the threshold showing of 'irreparable harm' to be of

particular significance under Rule 65, regardless of the strength of the movant's case on the

merits."  *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002)

(citing *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990)).  Harm is

considered to be irreparable if it "cannot be redressed through a monetary award."  *JSG Trading

Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

With confirmed COVID-19 infections among staff and incarcerated people housed at the

MDC, it will be nearly impossible to prevent widespread internal transmission.  *See supra* at

11-12.  Petitioners are much more likely to be infected within the MDC than if they were able to

practice social distancing and personal hygiene in home confinement.  Once they contract

COVID-19, they will be at a substantially increased risk of death or serious illness because of

their age and/or underlying medical conditions.  *See supra* at 4.  The putative class—particularly

the 537 Vulnerable Persons Respondent has identified—are at imminent risk from the virus as

well.

Being compelled to endure a substantially increased risk of serious illness and death will

always constitute irreparable injury.  *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It

would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening

condition in their prison on the ground that nothing yet had happened to them."); *Innovative

Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997) (finding irreparable

injury was satisfied where evidence was presented that closing of treatment program would lead

to plaintiffs' continued abuse of alcohol and drugs, "resulting in death, illness, or disability"); *see also Harris v. Bd. of Supervisors, Los Angeles Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding likelihood of "pain, infection, amputation, medical complications, and death" constituted irreparable harm.); *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) ("[T]he obvious potential for such issues as developing chronic health issues or spreading contagious diseases underscores the need for equitable relief . . .").

Moreover, the Second Circuit has repeatedly held that the alleged violation of constitutional rights amounts to irreparable injury. *See, e.g.*, *Johnson v. Connolly*, 378 F. App'x 107, 108 (2d Cir. 2010); *Johnson v. Miles*, 355 F. App'x 444, 446 (2d Cir. 2009); *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 230-31 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). As discussed below, Petitioners have established that current MDC conditions violate the Fifth and Eighth Amendments.

Absent immediate relief, Petitioners' lives are at risk. The harm that would flow from allowing them to remain at the MDC is undoubtedly irreparable. Several courts have already found that the very risk Petitioners face here constitutes irreparable injury justifying release from custody. *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, [COVID-19] infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Coronel v. Decker*, No. 20-CV-2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *Castillo v. Barr*, No. 20 Civ. 605, ECF No. 32 at 10 (Mar. 27, 2020) (finding that petitioners should be released from immigration custody because they established irreparable harm stemming from risk of exposure to COVID-19.).

18

## II.   PETITIONERS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS

Respondent is violating Petitioners' Fifth and Eighth Amendment rights by continuing to incarcerate them in conditions where it is virtually impossible to take steps to prevent transmission of an infectious disease that will prove deadly because of Petitioners' vulnerable conditions.

All people held in the MDC, whether convicted or not, are entitled to be protected from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary. *See Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violate the Eighth Amendment).[13]   The risk of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for Petitioners and the vulnerable class members described herein.  *See Helling,* 509 U.S. at 34 (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases.); *Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019) (a serious medical need is "a condition of urgency such as one that may produce death, degeneration, or extreme pain."). Under the MDC's current conditions, Respondent has not and cannot protect Petitioners and the class from this risk of serious harm.

---

[13] The named Petitioners are convicted and therefore their treatment is governed by the Eighth Amendment.  Class members who are detained for pretrial purposes, however, are protected from deliberate indifference by the Fifth Amendment.  Although pretrial class members may be entitled to even greater protection from unsafe conditions than convicted class members, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."), for present purposes the distinction is immaterial because Respondent's continued detention of the class plainly violates the Eighth Amendment.

Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S., at 33.  The reach of the Fifth and Eighth Amendments includes "exposure of inmates to a serious, communicable disease." *Id.*; *see also Jolly*, 76 F.3d at 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease.").  This Court need not "await a tragic event" to find that Respondent is maintaining unconstitutional conditions of confinement.  *Helling*, 509 U.S. at 33. Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration and internal quotation marks omitted).

Here, Petitioners are likely being exposed to COVID-19 while at the MDC, placing them at risk of death because of their vulnerable medical conditions.  Respondent is well aware of this risk, having been alerted to it by the CDC, the Attorney General, and advocates such as the Federal Defenders.  Indeed, only last week the Second Circuit, unprompted, acknowledged the "grave and enduring" risk posed by COVID-19 in the correctional context.  *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, __ F.3d __, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020); *see also Jovel*, 2020 WL 1467397, at *1 (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention); *United States v. Little*, No. 20 Cr. 57, 2020 WL 1439979, at *4 (S.D.N.Y. Mar. 24, 2020) ("As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC,

and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.").

In the face of this risk, Respondent has not taken sufficient steps to protect Petitioners or the other people who are incarcerated at MDC.  Respondent simply is not capable of managing the risk to Petitioners in the MDC's current environment.  Whether judged under the Fifth or Eighth Amendment, Respondent is holding Petitioners in violation of the Constitution by failing to protect them in the face of significant threats to their health and safety.

The Supreme Court's decision in *Helling* is particularly instructive.  In *Helling*, the plaintiff alleged that exposure to second-hand tobacco smoke was an unconstitutional condition of confinement because it put the health of incarcerated people at risk.  509 U.S. at 28.  In language pertinent to the case at bar, the Court rejected defendants' argument that a claim cannot lie based on potential future harm from a health risk:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. . . *Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease* on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33 (emphasis added); *see also Hutto v. Finney*, 437 U.S. 678, 682 (1978) (leaving undisturbed district court's conclusion that it was unconstitutional to hold people in crowded cells exposed to hepatitis and venereal disease).  Finally, the *Helling* Court explained, "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." 509 U.S. at 33.

Continuing to detain Petitioners in the midst of the COVID-19 pandemic and failing to take measures to protect the putative class poses a significantly greater risk than the plaintiff in

*McKinney* or in any of the other cases cited *supra* faced.  COVID-19 is already inside the MDC. The facility is not equipped to stop the spread of the disease or treat people who become ill. Social distancing is effectively impossible at the MDC, and Respondent has not taken any steps to allow people who are incarcerated at the MDC to practice social distancing.  And Petitioners are at an increased risk because of their age and/or underlying medical conditions.

Accordingly, Petitioners have established a substantial likelihood of success on the merits of their claims.

## III.   THE COURT HAS THE AUTHORITY TO ORDER PETITIONERS' RELEASE; THE BALANCE OF EQUITIES TIPS IN PETITIONERS' FAVOR; AND RELEASE WOULD SERVE THE PUBLIC INTEREST

The Court has the power to grant Petitioners' immediate release because they are not being provided safe conditions or adequate care, and the situation cannot be remedied under current circumstances.  Section 2241(c)(3) authorizes courts to grant habeas corpus relief where a person is "in custody in violation of the Constitution or laws or treaties of the United States." The Second Circuit has "long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as . . . prison conditions."  *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (internal quotation marks omitted).  This includes challenges to detention where conditions pose a threat to Petitioners' medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218-19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a detainee's transfer where that transfer created a risk of fatal heart failure).

The Second Circuit's decision in *Roba* is instructive.  In that case, the petitioner alleged that an imminent transfer from New York to face charges in California would create a substantial risk of death because of his precarious heart condition.  The Second Circuit held that there was Section 2241 jurisdiction to challenge his contemplated transfer, where such custody would threaten his life, citing *Estelle v. Gamble*, the Supreme Court's seminal case establishing the

Eighth Amendment's deliberate indifference standard. *Id.* Critically, the court held that habeas jurisdiction was appropriate even though the transfer, and hence custody, was imminent: "Petitioner need not wait until the marshals physically lay hands on him; he is entitled now to challenge the allegedly unlawful conditions of his imminent custody." *Id.* at 219.

In this case, the unconstitutional threat to Petitioners' health and life posed by being held in Respondent's custody is ongoing, not simply imminent. Every hour that Petitioners are held in the MDC, they are at a significantly elevated risk of contracting coronavirus, and because of their age and/or medical conditions, their risk of dying from coronavirus is significant. For similar reasons, Judge Analisa Torres recently ordered the release of several individuals from federal immigration detention. *See Basank*, 2020 WL 1481503; *see also supra* at 7-9 (listing cases in which courts have ordered release from detention due to risks posed by incarceration during the COVID-19 pandemic.).

Moreover, both the balance of equities and the public interest favor releasing Petitioners. The government has no interest in maintaining an unconstitutional practice. *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017) (the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented") (quotation marks and citations omitted); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018); *Abdi v. Duke*, 280 F. Supp. 3d 373, 410 (W.D.N.Y. 2017). And in this case, release would help ameliorate a regional medical crisis that is threatening to overwhelm local hospitals. The interest in having Petitioners serve the remainder of their terms at the MDC, rather than under home confinement, is slight compared to the substantial risk to Petitioners' health.

Releasing Petitioners will not ameliorate the risks for the remainder of the people held at the MDC. Respondent already has identified more than 500 people who, like Petitioners, are

23

vulnerable to serious illness and death if they contract COVID-19.  Those individuals face the same risk of imminent harm as Petitioners and may be entitled to immediate release as well.  For this reason, Petitioners respectfully request that this Court appoint a Special Master on an emergency basis to chair a Coronavirus Release and Mitigation Committee to (i) evaluate all Vulnerable Persons currently incarcerated at the MDC for release, and (ii) make recommendations for ameliorative action for other persons held at the MDC.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant Petitioners a temporary restraining order immediately releasing them from detention at the MDC to serve the remainder of their sentences in home confinement under such conditions as the Court deems appropriate, and appointing a Special Master to chair a Coronavirus Release and Mitigation Committee.

Dated: March 30, 2020
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:    /s/ Katherine R. Rosenfeld
Katherine R. Rosenfeld
O. Andrew F. Wilson
Samuel Shapiro
Scout Katovich
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

CARDOZO CIVIL RIGHTS CLINIC
Betsy Ginsberg
Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 1003
(212) 790-0403

*Attorneys for Petitioners and Putative Class*