UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI by his Next Friend Migdaliz
Quinones; and JUSTIN RODRIGUEZ by his Next
Friend Jacklyn Romanoff, individually and on
behalf of all others similarly situated,

        Civil Action No.
        20-CV-1590 (Kovner, J.)

                 Petitioners,

      -against-

WARDEN DEREK EDGE,

                 Respondent.

----------------------------------------------------------x


**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**


RICHARD P. DONOGHUE
United States Attorney
*Counsel for Respondent*
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

March 31, 2020


JAMES R. CHO
Assistant United States Attorney
(Of Counsel)

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY OF STATEMENT ............................................................................1

FACTUAL BACKGROUND ........................................................................................2

    A.    Steps Taken at the MDC To Address COVID-19 ...................................2

    B.    Ongoing Efforts To Address Issues Posed By COVID-19 ......................................4

OBJECTIONS TO PETITIONERS' DECLARATIONS .................................................5

STANDARD OF REVIEW REGARDING A TEMPORARY RESTRAINING ORDER ............6

ARGUMENT ...............................................................................................................7

    A.    Petitioners' Alleged Injury Is Not Redressable By Release ..................................12

    B.    Petitioners Do Not Satisfy The Requirements For Preliminary
        Relief ......................................................................................................12

        1.    Petitioner Are Unlikely To Succeed On The Merits .................................12

        2.    Petitioners Have Not Shown Irreparable Harm .........................................19

        3.    The Balance Of Interests And Public Interest Favors
            Respondent .....................................................................................20

CONCLUSION ...........................................................................................................22

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Charette v. Town of Oyster Bay*, 159 F.3d 749 (2d Cir. 1998) ....................................................... 6

*Charles v. Orange County*, 925 F.3d 73 (2d Cir. 2019) ........................................................ 2, 14

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ................................................................................................ 7

*CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011) ............................ 7

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................... 12

*Crawford v. Bell*, 599 F.2d 890 (9th Cir. 1979) ................................................................... 12

*Dawson v. Asher*, No. C20-0409JLR-MAT,
2020 WL 1304557 (W.D. Wash. Mar. 19, 2020) .................................................. 12

*Francisco v. Decker,* No. 2:20-CV-02176-CCC (D.N.J. Mar. 25, 2020) .................................... 12

*Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984) ................................................. 6

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) .................................................. 17

*Garcia, v. Google, Inc*., 786 F.3d 733 (9th Cir. 2015) ................................................................ 14

*Gonzales v. Gorsuch*, 688 F.2d 1263 (9th Cir. 1982) .................................................................. 14

*Heck v. Humphrey,* 512 U.S. 477 (1994) .................................................................................. 12

*Johnson v. Barr*, No. 19-CV-693-LJV, 2019 WL 6112338 (W.D.N.Y. Nov. 14, 2019) ............. 18

*Kamara v. Farquharson*, 2 F. Supp. 2d 81 (D. Mass. 1998) ................................................... 12

*Kimberly v. Arms*, 129 U.S. 512 (1889) ................................................................................. 21

*Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999) ........................................................ 6

*Los Angeles v. Lyons*, 461 U.S. 95 (1983) ......................................................................... 10, 12

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814 (2d Cir.1986) ..................................... 21

*Marlyn Nutraceuticals, Inc., v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ........................................................................................ 17

i

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................. 6

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ...................................... 7

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) .......................... 6

*Singh v. Barr*, No. 19-CV-1208-LJV, 2019 WL 6609312 (W.D.N.Y. Dec. 3, 2019) ................ 18

*Stauble v. Warrob, Inc.*, 977 F.2d 690 (1st Cir. 1992) .................................................. 21

*United States of America, v. Tommie Rollins*, No. 11-CR-251S,
2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) ................................................................ 16

*United States v. Gileno, 3:19-cr-161-(VAB)-1,*
2020 WL 1307108 (D. Conn. Mar. 19, 2020) ............................................................... 13

*United States v. Hamilton*, No. 19-CR-54-01,
2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020) ............................................................... 13

*United States v. Jefferson*, No. CCB-19-487,
2020 WL 1332011 (D. Md. Mar. 23, 2020) ................................................... 16, 18, 19, 20

*United States v. Martin*, No. PWG-19-140-13,
2020 WL 1274857 (D. Md. Mar. 17, 2020) .................................................................. 15

*United States v. Redzepagic*, 17-cr-228 (DRH) (AKT), ECF No. 118
  (E.D.N.Y. Mar. 30, 2020) ...................................................................................... 13

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................... 18

*United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) ........................................... 13

*United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ........................ 13

*Univ. of Texas, v. Camenisc*h, 451 U.S. 390 (1981) ..................................................... 16

*Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395 (W.D.N.Y. 2014) ............................ 7

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ............. 14

*Viens v. Daniels,* 871 F.2d 1328 (7th Cir.1989) ........................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................... 7, 9, 17

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) .......................................................... 7

ii

**Statutes**

18 U.S.C. § 3142(i)(4) ........................................................................... 9, 10

18 U.S.C. § 3582 .................................................................................. 18

18 U.S.C. § 3624(c) .............................................................................. 18

## PRELIMINARY STATEMENT

Respondent Derek Edge, Warden of the Metropolitan Detention Center in Brooklyn, New York ("MDC"), respectfully submits this Memorandum of Law in Opposition to Petitioners' Motion for a Temporary Restraining Order (ECF No. 12). As shown herein, Petitioner's Motion should be denied. Petitioners' fear of contracting Coronavirus Disease-19 ("COVID-19") does not entitle them to release from the MDC. The Federal Bureau of Prisons ("BOP") and MDC have taken strong measures to reduce the risk of COVID-19 for inmates and have reduced inmate populations, increased sanitation and screening, limited visitors, increased testing and improved isolation protocols.

Against this backdrop, Petitioners have produced no evidence that COVID-19 is spreading in the MDC. To the contrary, COVID-19 has not been spreading in the MDC, with only one inmate having tested positive to date, while in contrast, it has been spreading rapidly among the general public.

Petitioners have given this Court no basis to substitute their self-selection for the discretion vested in BOP by statute and regulation. Petitioners' arguments to the contrary rely in substantial part on either unfounded, unattributed hearsay anecdotes about the facility and the mistaken assumption that just because MDC does not make public every action they are taking, it follows they are not taking any action. The Court should reject Petitioners' mistaken assumptions.

Further, as discussed in greater detail below, Petitioners' request for the certification of a class and appointment of a Special Master to review the status of all inmates is unfounded and unsupported. Granting such sweeping relief would short-circuit already existing judicial and administrative processes designed to provide such review for inmates.

The Court should also deny Petitioners' Motion for a Temporary Restraining Order ("TRO") because they have failed to establish a likelihood of success on the merits of their claims. To succeed, Petitioners must show that the MDC is deliberately indifferent to their medical needs as a result of the COVID-19 pandemic. But to the contrary, the MDC has actively responded to the pandemic and taken steps to prevent its spread. In addition, the MDC has taken steps to treat any infections and will isolate infected inmates, if and when there is a need. While Petitioners may disagree with the steps the MDC has taken, its efforts do not "shock the contemporary conscience" as required for the petitioners to succeed on their constitutional claims. *See Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019). Importantly, the MDC's efforts to date have been effective, holding the spread of any contagion to a rate that is lower than that which exists in the general public. Thus, Petitioners cannot succeed on the merits, and the TRO should be denied. Respondent submits the instant Memorandum along with the Declaration of Associate Warden Milinda King ("King Decl.").

## FACTUAL BACKGROUND

### A.     Steps Taken at the MDC To Address COVID-19

The MDC located in Brooklyn is an administrative security metropolitan detention center that houses approximately 1700 inmates, who are mostly pre-trial detainees. The MDC's health services unit comprises a multidisciplinary workforce that consists of U.S. Public Health Service Commissioned Corps officers, federal civil servants, and contract health professionals.

Since the World Health Organization ("WHO") declared COVID-19 a global pandemic on March 11, 2020, BOP medical professionals have been tracking the outbreak, regularly updating MDC's infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among inmates.

2

In addition, all outside visitors are prohibited from entering the MDC.  Inmates have access to an e-mail system, regular telephone calls, and dedicated and unmonitored telephone calls that can connect them with the Federal Defenders of New York.  In addition, MDC staff work to arrange legal calls and a limited number of video conferences.

The MDC has increased sanitation frequency.  Frequent cleaning of all common area high-contact surfaces is being conducted throughout the day.  The facility provides education on COVID-19 to staff and inmates (including postings throughout the facility), and provides inmates daily access to sick call.

To date, the MDC has reported only one confirmed COVID-19 case among its 1700 inmates.  In testing for COVID-19, the BOP is following guidance issued by the Centers for Disease Control ("CDC") to safeguard those in its custody and care.

On March 26, 2020, the Attorney General of the United States, issued a memorandum directing the BOP to consider "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."  *See* Ex. E (ECF No. 1-4) attached to the declaration of Deirdre D. von Dornum. The Attorney General issued the memorandum to "ensure that [the BOP] utilize[s] home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody."

The Attorney General's Memorandum states in part:

I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.  Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.  But for some eligible inmates, home confinement might be more effective in protecting their health.

*See* Memorandum to the Director of the Federal Bureau of Prisons:  Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020) (referred to as "Attorney General's Memorandum").  *See id.*

The BOP is willing to consider sentenced and designated inmates in its custody for Residential Reentry Center ("RRC") or home confinement placement, provided they are eligible and do not pose a danger to the community.  As relevant specific information is provided on any inmate, BOP may exercise its discretion to release the inmate, provided he or she is not a danger to the community.  The BOP takes no position on whether pre-trial inmates in its custody may be released on bail or bond, as that decision lies in the discretion of the United States Attorney's Office and the Courts.

### B.     Ongoing Efforts To Address Issues Posed By COVID-19

The MDC, the United States Attorney's Office, Federal Defenders, and the United States District Court for the Eastern District of New York are engaged in continuing dialogue on a wide range of issues associated with COVID-19.  As part of MDC's effort to ensure the safety of its staff, the inmates, and the public, two representatives from MDC Brooklyn attended an Eastern District of New York Facilities Security Committee to address questions related to its preparations for COVID-19.  The MDC representatives presented to the Committee a detailed discussion of the MDC's preparations for the pandemic.  Since that meeting, MDC has continued to evaluate the ongoing challenges and taken steps to maximize the safety of the inmates, staff and the public.

As part of the ongoing effort to ensure the safety of the inmates at the MDC, Warden Edge directed that staff create a list of inmates who are most at risk for potential complications for COVID-19.  The original version of this list was intended to be over-inclusive, and contained

the names of inmates who were over 55 years of age, and who had certain medical conditions that might increase their risk.  On or about March 23, 2020, as part of ongoing communications between the Federal Defenders of New York, the United States Attorney's Office, MDC, and the courts to address the challenges posted by COVID-19, the BOP, in good faith, provided the Court with this list, which consisted of approximately 537 inmates that the BOP had identified as potentially at-risk for contracting COVID-19 (referred to as "BOP list").  The Court also facilitated providing the BOP list solely to ensure that the Federal Defenders were aware of whether any of their clients fell into these high-risk categories; the list was not provided for, nor intended to be, fodder for civil litigation.  The four petitioners in this case were included on this BOP list.  The BOP list did not distinguish between pre-trial and sentenced inmates.

## OBJECTIONS TO PETITIONERS' DECLARATIONS

Respondents object to the declarations submitted in support of Petitioners' Motion for TRO.  Petitioners' attorneys have submitted their own declarations based on hearsay and lack personal knowledge relating to conditions at MDC.  The Court should afford little or no weight to these unreliable declarations.  Although courts may, in their discretion, give some weight to hearsay and otherwise inadmissible evidence when considering whether to issue emergency relief, *see*, *e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988); *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984), the above declarations warrant little or no weight because they lack foundational support and other indicia of reliability.  Indeed, many of the hearsay statements contained in the declarations are attributed to unnamed individuals and simply are not accurate.  Given the limited time that Respondent Edge has to oppose the motion for a temporary restraining order, he cannot specifically respond to and refute each of these inaccurate claims in this filing.

## STANDARD OF REVIEW REGARDING A TEMPORARY RESTRAINING ORDER

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). "First, the party must demonstrate that it will suffer irreparable harm in the absence of the requested relief." *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). Generally, even if the moving party establishes irreparable harm, a court may not grant the requested injunctive relief unless the moving party also establishes either (a) that it is likely to succeed on the merits or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships that tips decidedly in favor of the moving party. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998). Additionally, where, as here, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted "only if the moving party meets the more rigorous likelihood-of-success standard.'" *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000) (citation omitted); *see also Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 424 (2d Cir. 2004) (because "government action taken in furtherance of a regulatory or statutory scheme [is] presumed to be in the public interest[,] in such situations, a plaintiff must meet a more rigorous likelihood-of-success standard'" to obtain preliminary injunctive relief (internal citation omitted)).

An even higher standard of proof applies in this case because the temporary restraining order that the Petitioners seek would alter, rather than maintain, the *status quo*. *See Wright*, 230

F.3d at 547.[1]  In this context, the movant must show not only a likelihood of success on the merits, but a "clear" or "substantial" one.  *Id*; *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 n.4 (2d Cir. 2010).

Lastly, a party seeking injunctive relief must also show "that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 400 (W.D.N.Y. 2014).

The decision whether to grant or deny a TRO or a preliminary injunction falls within the sound discretion of the district court.  *See CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 140 (E.D.N.Y. 2011).  However, because a preliminary injunction is "an extraordinary remedy" that may only be awarded "upon a clear showing that the plaintiff is entitled to such relief," it "is never awarded as of right."  *Winter*, 555 U.S. at 22, 24.

## ARGUMENT

Petitioners have failed to meet their heavy burden of establishing that they are entitled to a temporary restraining order.

Petitioners assert that, because of their age and/or medical conditions, they have elevated risk of serious, adverse outcomes if they contract COVID-19.  Some of the conditions alleged, especially if treated and/or controlled, do not render them at high risk for COVID-19 pursuant to the Centers for Disease Control (CDC).  *See* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last visited March 31, 2020) (listing risk factors as age 65 or older; living in nursing homes or long-term care facilities; chronic lung disease;

---

[1] Petitioners argue that they are maintaining the *status quo* "of their health."  This argument is unavailing – the TRO they seek most decidedly changes the *status quo* of their incarceration status, which is the focus of their requested relief.  Under the relevant law, they seek a mandatory TRO.

moderate to severe asthma; serious heart conditions; immunocompromised; severe obesity;
potentially diabetes, renal failure, or liver disease, particularly if not well controlled; and
potentially pregnancy).

In any event, Petitioners' assertion that detention *per se* poses an increased risk of health
complications or death from COVID-19 is purely speculative.  To date, there has been only one
reported case of COVID-19 among inmates at the MDC.  In contrast, COVID-19 is spreading
rapidly in the communities into which Petitioners seek to be released.  Even assuming a
concentrated inmate population, crowding in and of itself does not cause COVID-19 infection if
no one in the group has contracted COVID-19.  Petitioners' claims of future injury are
hypothetical, and they are not entitled to release from detention based on a conjectural injury that
they have not suffered, and are not immediately threatened with.  An injunction is "unavailable
absent a showing of irreparable injury, a requirement that cannot be met where there is no
showing of any real or immediate threat that the plaintiff will be wronged . . . — a  likelihood of
substantial and immediate irreparable injury."  *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)
(internal quotation omitted).

Moreover, even if the number of reported cases of COVID-19 increased at the MDC,
Petitioners cannot show that the MDC is unprepared to respond to that contingency.  The BOP
has expended extensive resources and efforts to address the very issues that Petitioners have
identified, and is prepared to address the challenges posed by COVID-19, as follows:

1. MDC Brooklyn screens all new inmates, as well as any inmate returning to the facility -- *e.g*., from a hospital trip or court.  These screenings include questions relating to symptoms consistent with COVID-19, and risk of exposure, including recent travel.
2. Incoming detainees are initially screened in Receiving and Discharge (R&D), not in the intake housing unit or general population.  They are then brought to an intake unit where they are isolated for 14 days to ensure the inmates do not

develop symptoms.  After the expiration of 14 days, and upon medical clearance, inmates may be released into general population.

3.    Inmates being transported to Court are also screened in accordance with standing administrative orders issued by the Chief Judges of the Eastern and Southern Districts of New York.  These orders require that all inmates' temperature is taken, and if he or she registers a body temperature of 100.4 degrees or higher, the inmate will not be produced.

4.    Any inmate, whether a new commit or not, who presents with symptoms consistent with COVID-19 will be evaluated by MDC Brooklyn's health services department.  Based upon the evaluation, a determination will be made whether isolation[2] and testing is appropriate.

5.    If any inmate is isolated, those inmates housed in the same housing unit with him or her will be quarantined pending results of the test, or 14 days, whichever is sooner.

6.    Detainees may also be placed in a quarantine/isolation setting if exposed to a person with COVID-19, where they will be monitored daily for an incubation period of at least 14 days. Quarantine or isolation is only discontinued once 14 days elapse with no inmates developing new symptoms.

7.    All new inmates admitted to the facility receive soap.  Soap is also delivered to unit team on a biweekly basis. An inmate may request additional soap from unit team if he or she needs to, or purchase soap from commissary.  All inmates have access to sinks and soap at all times.

8.    Guidance from the BOP's Central Office Health Services Division indicates that any type of soap (whether anti-bacterial or deodorant) is effective as long as proper handwashing procedures are followed.  Additionally, hand washing with soap and water is superior to using hand sanitizer.  Hand sanitizer is a last resort when soap and water are not available, which they are.

9.    MDC administrative staff have explained best practices regarding personal hygiene to prevent the spread of COVID-19 to both detainees and staff.  Staff have been notified via email and in a recall.[3]  Information sheets are also posted in numerous locations around the facility, including inmate housing units, the front lobby, and all departments.  Staff are also notified of important updates by the BOP alert system, known as the ops planner.

10.    Inmates have been notified via town halls, and information bulletins have been posted on TRULINCS in both English and Spanish.  Executive staff members have conducted town halls on March 13, 2020, March 20, 2020, March 21, 2020, March 24, 2020, and March 27, 2020.  As guidance changes, MDC Brooklyn will provide updates to the inmate population and staff members.

11.    Additional sanitation procedures have been put in place.  Additional and stronger cleaning supplies have been issued and used by inmates and staff alike.

---

[2] Isolation means that an inmate is confined to his or her cell, except to place a legal call or to shower. Personal protective equipment ("PPE") are being utilized in either of those circumstances.  Quarantine, on the other hand, refers to inmates remaining on their housing unit, cohorted together.  They are not required to remain in his or her cell, and may interact and utilize the common area.  However, they will not be moved from the housing unit to other areas of the institution.

[3] A recall is another name for a facility-wide meeting that staff are encouraged to attend.

12.     Inmate orderlies have been provided cleaning materials, and cleaning supplies are available on the housing unit for use by inmates to clean their personal living spaces (cells).

13.     Once MDC Brooklyn learned of one inmate testing positive for COVID-19, MDC Brooklyn conducted a deep clean of the facility.  Inmate orderlies were provided personal protective equipment in order to clean during this period.

14.     Pill line and insulin line are conducted twice a day in housing units.  Medical staff perform sick call every day on the housing units.

15.     There has been a significant decrease in routine group meetings among inmates and staff.

16.     Custody staff has been given an increased stock of PPE.  Also, for those staff members who have not received fit-testing for N-95 respirator masks, additional testing is being performed, if requested by staff.

17.     Access to legal counsel remains of paramount importance at MDC Brooklyn. MDC Brooklyn is mitigating the risk of exposure by increasing the amount and provision of legal calls and now offering video teleconferences (VTC) with attorneys on a limited basis.

18.     MDC medical staff is prioritizing immediate medical care for anyone who claims symptoms indicative of COVID-19 infection.

19.     MDC employees have been urged to stay home if they are ill, and individuals conducting health screening at the front entrance can deny an employee entry if he or she reports a fever or symptoms consistent with COVID-19.

20.     To date, there has only been one inmate who has tested positive for COVID-19. There have been five (5) confirmed cases of staff members who have tested positive for COVID-19.

21.     MDC has identified inmates who fall into categories designated by the CDC as higher risk for COVID-19.  This list is updated periodically, especially as guidance by the CDC regarding who is at greater risk is updated.

22.     Posters in both English and Spanish issued by the CDC relating to COVID-19 that have been posted throughout the MDC.

23.     On March 13, 2020, BOP's Central Office issued nationwide guidance regarding modified operations to prevent and mitigate the spread of COVID-19.  The guidance has undergone frequent updates since they were first issued.  Latest updates available at: https://www.bop.gov/coronavirus/covid19_status.jsp.

*See generally* King Decl.

In light of the efforts the BOP has made to contain and protect inmates from COVID-19, and in light of only one case being reported, Petitioners cannot show as they must that there is a "likelihood of substantial and immediate irreparable injury." *Lyons*, 461 U.S. at 111.

Other courts, in addressing requests for relief in light of the COVID-19 pandemic, have held that "[t]he 'possibility' of harm is insufficient to warrant the extraordinary relief of a TRO."

10

*Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *3 (W.D. Wash. Mar. 19,

2020) (quoting *Winter*, 555 U.S. at 22); *Francisco v. Decker*, Case 2:20-CV-02176-CCC at 3-4

(D.N.J. March 25, 2020) ("Although he expresses his fear of the coronavirus which is presently

afflicting the United States, two cases of which have occurred at the jail in which he is housed,

Petitioner himself does not allege that he has contracted or been directly exposed to the virus,

and his fears of contracting it at this point are speculative.").

In *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036 (E.D.N.Y. Mar. 20,

2020), Judge Garaufis denied defendant Darin Hamilton's request for temporary release under 18

U.S.C. § 3142(i)(4).  Hamilton alleged the same reasons, as Petitioners here, in support of his

request for release from the MDC.  Hamilton argues that, in light of his advanced age and

medical conditions, the ongoing COVID-19 pandemic constitutes "another compelling reason"

to permit his temporary release under 18 U.S.C. 3142(i)(4).  The Court noted that this provision

has been used sparingly to permit a defendant's release where, for example, he is suffering from

a terminal illness or serious injuries.  *See, e.g., United States v. Scarpa*, 815 F. Supp. 88

(E.D.N.Y. 1993) (permitting release of defendant suffering from terminal AIDS that could no

longer be managed by correctional authorities); *see also United States v. Stephens*, 2020 WL

1295155 (S.D.N.Y. Mar. 19, 2020) (permitting release of defendant due to COVID-19

pandemic).  Judge Garaufis held that while mindful of Hamilton's concerns, the Court did not

believe that the COVID-19 outbreak constituted a sufficiently compelling reason to justify

release under the circumstances of this case given the risks that Hamilton's release would pose.

The Court held that possibility of an outbreak at MDC is not a "compelling circumstance"

justifying his release.  Judge Garaufis further recognized that the Bureau of Prisons was taking

system-wide precautions to mitigate the possibility of infection within its facilities.  *See also*

*United States v. Gileno*, 3:19-cr-161-(VAB)-1, 2020 WL 1307108 (D. Conn. Mar. 19, 2020) (denying Gileno's request to substitute the remainder of his imprisonment with home confinement notwithstanding the COVID-19 pandemic); *see also United States v. Redzepagic*, 17-cr-228 (DRH) (AKT), Dkt. No. 118 (E.D.N.Y. Mar. 30, 2020) (denying defendant's bail request over COVID-19 concerns).

Likewise, here, Petitioners have not demonstrated that they have suffered substantial and immediate irreparable injury. Accordingly, their Petition and TRO should be denied.

### A.    Petitioners' Alleged Injury Is Not Redressable By Release

Petitioners' alleged injury -- that they are subject to a heightened risk of death or serious illness if they contract COVID-19 -- will not be redressed by ordering their release. Petitioners' requested relief will not ameliorate or diminish their claimed heightened risk of injury or death resulting from COVID-19, nor can a court order requiring release prevent Petitioners from contracting COVID-19. Additionally, there is scant evidence in the record about the housing conditions into which Petitioners seek to be released, such as whether they also involve people living in close quarters, and living with individuals who present a risk of exposure. This is especially true where, as stated in detail above, MDC is taking concrete steps to reduce the risk of those in its custody to exposure to COVID-19.

### B.    Petitioners Do Not Satisfy The Requirements For Preliminary Relief

#### 1.    Petitioners Are Unlikely To Succeed On The Merits.

Likelihood of success on the merits is a threshold issue: "[W]hen a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three *Winters* elements." *Garcia*, 786 F.3d at 740 (internal quotation omitted). Petitioners' constitutional claim boils down to an argument that the MDC is constitutionally required to

reduce its inmate population, and Petitioners are the ones who are entitled to be released. Petitioners in effect invite the Court to ignore the discretion vested in the BOP to release inmates in appropriate circumstances, and instead decide that Petitioners are entitled to release. Petitioners have no such entitlement.

Petitioners' Motion for a TRO should be denied because they have failed to establish a sufficient likelihood of success on the merits of their claims. Petitioners claim that they face conditions of crowding and scant medical care resources. These claims lack merit. Accordingly, they cannot make the required "clear" or "substantial" showing of success on the merits and this Petition and Motion should be denied.

Petitioners in effect request that this Court overrule a statutory and regulatory scheme, governing early release procedures for inmates. Additionally, Petitioners ask that this Court second-guess the experts at the BOP during an ongoing and uncertain public health crisis, and immediately release a number of inmates into the general public. But Petitioners have failed to show that the government's efforts to prevent the Petitioners' infections with COVID-19, and its provision of medical care to Petitioners should they become ill, amounts to deliberate indifference to their medical needs. On the contrary, the MDC has instituted numerous provisions and safeguards to protect inmates at the MDC from infection, and from negative health consequences should that infection spread within the MDC. Of note, Petitioners have not even shown that infection at the MDC is likely in light of the MDC's many precautions, let alone that they would be able to seek and obtain treatment elsewhere.

The Second Circuit has delineated the requirements of a conditions-of-confinement claim brought by inmates alleging inadequate medical care. In *Charles v. Orange County*, 925 F.3d 73 (2d Cir. 2019), the Circuit held that "[i]n order to establish a violation of a right to substantive

13

due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 85 (citation and quotation marks omitted).  In particular, an inmate raising a constitutional challenge to the medical care provided in detention must establish "(1) that [the inmate] had a serious medical need . . . , and (2) that the Defendants acted with deliberate indifference to such needs." *Id*. at 86.  The Second Circuit further explained that, to establish deliberate indifference in the context of an inmate's medical needs, the inmate had to prove that the defendant failed to provide treatment while having actual or constructive knowledge that doing so would pose a substantial risk to the detainee's health:

> [A] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.

*Id*. at 87.

Petitioners cannot establish deliberate indifference here.  Further, Petitioners' assertions are overly generalized and do not relate to the MDC specifically, or the measures implemented there.  Indeed, Petitioners fail to recognize many of the implemented policies and procedures discussed above.  The government has taken steps to provide all MDC inmates with adequate medical care, both with respect to the prevention of infection with COVID-19 as well as the treatment should they become infected with COVID-19.

Far from being indifferent, the government has taken significant steps to minimize the risk of infection at the MDC.  Even if Petitioners disagree with the government's efforts to prevent the spread and treatment of COVID-19, the relevant standard here is deliberate indifference.  The government's ongoing efforts to respond to the COVID-19 crisis soundly

14

rebut any showing of deliberate indifference in this instance, and preclude Petitioners from succeeding on the merits of their claims.

Courts around the country have denied similar TRO requests, finding that the petitioners had failed to show a likelihood of success on the merits. *See Dawson*, 2020 WL 1304557, at *5 (no evidence that anyone at the detention facility had COVID-19, and Plaintiffs did not address the measures Defendants were taking to prevent such a spread from occurring); *Sacal-Micha v. Longoria*, 20-CV-37, at *8 (S.D.T.X. Mar. 27, 2020) (record showed ICE implemented preventative measures to reduce the risk of contracting COVID-19).

Courts around the country have recently received challenges to detention on the grounds of COVID-19 in the criminal bail context and have recognized the government's public health efforts, particularly the efforts of the Bureau of Prisons, to address the COVID-19 crisis. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020); *United States v. Jefferson*, No. CCB-19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020); *United States of America, v. Tommie Rollins*, No. 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) (denying motion for release from custody pending sentencing and explaining that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions above.").

Even assuming *arguendo* that Petitioners could show that they were likely to prevail on their claim that the conditions of their detention violate the Fifth and Eighth Amendments, they cannot establish that they are entitled to immediate release "as opposed to injunctive relief that would leave [them] detained while ameliorating any alleged violative conditions within the

facility." *Dawson*, 2020 WL 1304557, at *2.[4]  Moreover, as the Supreme Court has recognized, it is not appropriate for a court to give a final judgment on the merits at the preliminary stage. *Univ. of Texas*, 451 U.S. at 395.  The BOP has implemented procedures and protocols to protect the inmates in its care and custody, including at the MDC.

Petitioners essentially argue that the Court should find that MDC cannot continue to exercise its statutory and regulatory discretion as to which inmates should be released. Petitioners also assert that MDC's efforts are "inadequate" to address COVID-19, where MDC is acting to protect the safety of the inmates.  Petitioners should not, on less than 24 hours-notice to defendant, be granted such sweeping and unprecedented relief when existing administrative and statutory proceedings can grant them the relief they seek, if appropriate.

As discussed earlier, Petitioners' motion for a TRO essentially short-circuits ongoing conversations between various parties to address these issues, and the established administrative and statutory proceedings to address these issues.  Petitioners' requested relief to short-circuit the criminal justice process by appointing—in this civil matter—a Special Master who would, in Petitioners' view, have the authority to determine which criminal defendants may be released from BOP custody and which criminal defendants may not.  Such an unprecedented action would undermine the authority of district judges and magistrate judges throughout this district, as these judges would no longer be able to make custody determinations about criminal cases on their own dockets.

Incredibly, despite asking the Court to usurp these processes through the appointment of a Special Master, Plaintiffs fail to even address the Fed. R. Civ. P. 53 requirements for the appointment of a Special Master.  Contrary to Fed. R. Civ. P. 53(a)(1)(C), Petitioners make no

---

[4] Petitioners have not sought any changed conditions in the MDC, let alone met their burden to show that they would be entitled to mandatory injunctive relief in that regard.

attempt to explain why criminal defendants cannot "effectively and timely" address their claims

by the "available district judge or magistrate judge of the district." *Id.* Indeed, incarcerated

criminal defendants have already raised their COVID-19 concerns in other cases in this district.

*See United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20,

2020) (Garaufis, J.); *United States v. Redzepagic*, 17-cr-228 (DRH) (AKT), Dkt. No. 118

(E.D.N.Y. Mar. 30, 2020).

But even if Petitioners had sought to argue that a Special Master is needed here pursuant

to Fed. R. Civ. P. 53, the Constitution and the separation of powers doctrine prohibits this Court

from ordering this non-consensual appointment. In short, a Special Master does not, and indeed,

cannot, possess the attributes that Article III of the Constitution demand here.

"The role of the Special Master is not meant to supplant the role of the court." *Board of

Governors of the Federal Reserve System v. Pharaon*, 140 F.R.D. 642, 649 (S.D.N.Y.1991). In

*Cadwell Indus., Inc. v. New York Hosp.-Cornell Med. Ctr.*, the Southern District of New York

noted that the express language of Fed. R. Civ. P. 53 provides that "a reference to a master shall

be the exception and not the rule." *Cadwell Indus., Inc. v. New York Hosp.-Cornell Med. Ctr.*,

88 Civ. 7307 (LMM), 1993 WL 60604, at *2 (S.D.N.Y. Feb. 26, 1993). A reference to a master

"is intended to aid courts in the performance of their judicial duties" and thus, reference should

be "discouraged where the matter sought to be referred may be dispositive of basic issues

involved in the litigation." *Id.* (quoting *United States v. Hooker Chemicals & Plastics Corp.*,

123 F.R.D. 62, 63 (W.D.N.Y. 1988)).

A Special Master would be ill-equipped to usurp the authority of BOP officials,

prosecutors, district and magistrate judges to make the unparalleled and case-specific custody

determinations that Plaintiffs seek here. *See In re Bituminous Coal Operators' Ass'n, Inc.*, 949

17

F.2d 1165, 1168 (D.C. Cir. 1991) (granting a writ of mandamus against a district judge because the judge "has no discretion to impose on parties against their will 'a surrogate judge,' a substitute from the private bar charged with responsibility for adjudication of the case."); *Stauble v. Warrob, Inc.*, 977 F.2d 690, 695 (1st Cir. 1992) ("Because Rule 53 cannot retreat from what Article III requires, a master cannot supplant the district judge."); *see also* Moore's Federal Practice 3D, §53.03[3] ("Article III of the Constitution effectively places limits on a district court's authority to appoint a special master under Rule 53"); *Cf. Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 818 (2d Cir.1986) (noting that the district judge's explanation that he did not "understand anything about ... patent or trademark" law and was "not about to educate [him]self" was not sufficient reason to justify appointment of a master to hear and determine the entire case.  Indeed, it is long established that "Article III bars a district court 'of its own motion, or upon the request of one party' from 'abdicating its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers.'" *Stauble*, 977 F.2d at 695 (quoting *Kimberly v. Arms*, 129 U.S. 512, 524 (1889)).

Finally, as Respondent does not consent to the entry of the TRO nor the appointment of a Special Master, the Court should not take the unusual step of appointing one absent such consent.  In *Wasley Prod., Inc. v. Bulakites*, the District of Connecticut explained that although there is wide discretion afforded to courts in appointing a special master, "it is impermissible to refer fundamental issues of liability to a special master over the objection of one or more parties." *Wasley Prod., Inc. v. Bulakites*, 3:03cv383(MRK)(WIG), 3:03CV1790(MRK)(WIG), 2006 WL 3834240, at *11 (D. Conn. May 31, 2006).

For all these reasons, Petitioners have not shown that they are likely to succeed on the merits.

### 2.     Petitioners Have Not Shown Irreparable Harm

Petitioners cannot show irreparable harm such that an injunction or TRO should issue. To the contrary, as discussed above, the MDC has taken significant steps to ensure the health and safety of inmates, and the minimization of risk of exposure to all detainees at the MDC.  The MDC also has instituted necessary precautions and procedures to ensure that any inmates who become ill will be well-cared for.

Petitioners have failed to establish irreparable harm on their constitutional claims.  "To satisfy the irreparable harm requirement, [petitioners] must demonstrate that absent [relief] they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quotation marks omitted).

Merely showing a "possibility" of irreparable harm is insufficient. *See Winter*, 555 U.S. at 22.  Moreover, mandatory injunctions are not granted unless extreme or very serious damage will result. *See Marlyn Nutraceuticals, Inc*., 571 F.3d at 879 (internal citation omitted).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

As discussed above, Petitioners fail to take into account the myriad protections which have been put in place to not only prevent spread of infection within the MDC, but to reduce the risk that COVID-19 enters the MDC in the first place.  Moreover, Petitioners fail to address in any meaningful way how, if released, they will be safer from the risk of infection or have access to adequate care if infected.  Thus, Petitioners are far from showing irreparable harm.

Petitioners assert that only release from detention at the MDC into the community will spare them the heightened risk of adverse consequences from COVID-19.  As in *Dawson*, "[t]here is no evidence of an outbreak at the detention center or that Defendants' precautionary measures are inadequate to contain such an outbreak or properly provide medical care should it occur."  2020 WL 1304557, at *3.

Further, Petitioners have other, alternative methods for relief other than seeking a temporary restraining order, for securing early release.  *See, e.g.*, 18 U.S.C. § 3582 (compassionate release); 18 U.S.C. § 3624(c) (prerelease custody/home confinement).

Petitioners have not shown irreparable harm.

### 3.    The Balance Of Interests And Public Interest Favors Respondent

The balance of the equities weighs in the government's favor and in favor of maintaining Petitioners' detention at the MDC, for their own safety and that of the public.

As Courts have recognized, the government has a legitimate and compelling interest in protecting public safety.  *See, e.g., Johnson v.* Barr, No. 19-CV-693-LJV, 2019 WL 6112338, at *7 (W.D.N.Y. Nov. 14, 2019) ("The government's interest in preventing crime by arrestees is both legitimate and compelling.") (quoting *United States v. Salerno*, 481 U.S. 739, 749 (1987)); *Singh v. Barr*, No. 19-CV-1208-LJV, 2019 WL 6609312, at *5 (W.D.N.Y. Dec. 3, 2019) (finding that "the government's interests in . . . protecting against a danger to the community may be served" by immigration detention).  Petitioners' argument is highly generalized, and would have an unwieldly result if followed to its logical conclusion.  As one court addressing a similar claim recognized:

> In essence, Sacal contends that a high likelihood exists that many detainees in the Port Isabel Detention Center will contract COVID-19, and that for those who are elderly or suffer from underlying medical conditions that render them prone to the more serious aspects of the virus, the risk of death is significant.  Sacal offers no evidence to support

20

these propositions other than conclusions extrapolated from general information.  And accepting Sacal's reasoning would logically require the release of all individuals currently detained who are elderly or suffer from certain underlying medical conditions. The law does not require such a generalized result.

*Sacal-Micha*, 20-CV-37, at pg. 9.

As an initial matter, the public's interest is not served by short circuiting the existing administrative and judicial processes that are designed to carefully weigh freeing the individuals at issue from custody against the risk to public safety in doing so.  The risk of danger to the public in granting a TRO requiring the immediate release of the four petitioners, who have been convicted and sentenced for their crimes, outweighs the alleged need for expediency here.  BOP policy requires determinations to be made as to which inmates are entitled to home confinement (*see, e.g.,* Attorney General's Memorandum), or the other judicial avenues available to both pre-trial and convicted detainees.  Further, the government's interest in public safety extends to protecting the public from the risk of the spread of COVID-19.  Indeed, in the Attorney General's Memorandum on which Petitioners rely in their argument that they should be entitled to home confinement, the Attorney General makes clear that such release should be done in a manner that balances the safety considerations for all involved.  The Memorandum states: "While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public.  That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-1 9, or put the public at risk in other ways.  I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement.  Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release." Attorney General's Memorandum at 2.  These

21

weighty considerations cannot be adequately addressed by the Court's grant of a temporary restraining order that permits the Petitioners' immediate release.

Petitioners have not shown that the balance of hardships and public interest tips in their favor.

## CONCLUSION

For all of the foregoing reasons, Petitioners have not satisfied their heavy burden of establishing entitlement to mandatory injunctive relief, and their Motion for a Temporary Restraining Order should be denied.

Dated: Brooklyn, New York          RICHARD P. DONOGHUE
      March 31, 2020          United States Attorney
                                *Counsel for Respondent*
                                Eastern District of New York
                                271-A Cadman Plaza East, 7th Fl.
                                Brooklyn, New York 11201

                    By:    s/ James R. Cho
                                JAMES R. CHO
                                Assistant United States Attorney
                                (718) 254-6519
                                james.cho@usdoj.gov