# Exhibit C

I, Homer Venters, hereby declare the following:

## Background

1. I am a physician, internist and epidemiologist with over a decade of experience in providing, improving and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with ICE on numerous individual cases of medical release, formulation of health-related policies as well as testimony before U.S. Congress regarding mortality inside ICE detention facilities.

2. After my fellowship training, I became the Deputy Medical Director of the NYC Jail Correctional Health Service. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints. During this time I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacts almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

3. In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

4. In December 2018 I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I became the president of COCHS. I also work as a medical expert in cases involving correctional health and I have a book on the health risks of jail (*Life and Death in Rikers Island*) which was published in early 2019 by Johns Hopkins University Press.

## COVID-19 in Brooklyn Federal Prison

5. It is my understanding that one inmate and one or more staff members tested positive for COVID-19 during the week of March 20, 2020. Based on this, and my understanding of COVID-19 pathology and spread in correctional institutions, I would expect that many more staff and inmates are currently symptomatic and would have positive tests at this point. By comparison, after the initial index cases among one correctional officer and one inmate occurred in the NYC jail system, the number of combined cases jumped to 38 and 454 in the two subsequent weeks.



6. If a similar rise in the number of cases has not been observed in the Brooklyn Federal Detention Center, I would be concerned that the facility is not following accepted infection control and surveillance measures to address COVID-19 among staff and inmates. The following measures should be part of the facility plan in place;

   a. All known contacts with the initial case who are asymptomatic should be quarantined either at home for staff, or in a designated housing area for inmates.

   b. Anyone who is symptomatic, whether or not they are a known contact of a confirmed case, should be tested.

   c. People held in the quarantine housing area should have their signs and symptoms checked daily, including temperature.

   d. People identified as high risk should be considered for immediate release based on their risk of serious illness and death from COVID-19 infection.

   e. People identified as high risk who remain incarcerated should be subject to the same active surveillance (daily sign and symptom checks) as the quarantine group.

Signed

Homer Venters MD, MS

4/2/20