

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 17, 2020

**By ECF**

Honorable Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *Chunn, et al. v. Warden Derek Edge*,
               Civil Action No. 20-cv-1590 (Kovner, J.) (Mann, M.J.)

Dear Judge Kovner:

      On April 15, 2020, the Court ordered an inspection of the Metropolitan Detention Center ("MDC") in Brooklyn, New York, and ordered the parties to meet and confer regarding the parameters of the inspection. Dkt. No. 45. Counsel for all parties have met and conferred in good faith in an effort to agree on the parameters of the inspection. The parties have reached agreement on some, but not all, of the terms of the inspection, as set forth in the parties' "Status Report: Parameters for Inspection of the Metropolitan Detention Center, Brooklyn." Dkt. No. 50. Respondent sets forth those areas of agreement, and his position with respect to the areas of disagreement, below.

      In short, Petitioners' broad demands do not take into account that the present inspection is taking place in the midst of an unprecedented public health crisis during which the entire nation has been instructed to stay at home and reduce interactions between people as much as possible. Thus, consistent with CDC guidance, the inspection should involve the fewest number of participants inspecting a representative section of the prison, with a nexus to the claims raised by the two Petitioners, as Respondent has proposed.

      **1.**    **The Respondent's Proposed Length of the Inspection Gives Petitioners' Sufficient Time to Conduct an Inspection, and Takes Into Account The Burdens Imposed On Maintaining Adequate Staffing Levels During the Inspection**

      **Petitioners' Position**: The inspection shall be limited to 4 hours,

      **Respondent's position**: Inspection limited to 2 hours.

Respondent seeks to limit the duration of the inspection to two hours due to the significant burden imposed on allocating limited and critical BOP staff resources to accompany Petitioners' expert, Dr. Homer Venters, during the inspection.

The inspection of the MDC will require the re-allocation of BOP staff members from their normal duties safeguarding and caring for inmates at a time when the MDC is currently undergoing staffing challenges due to the COVID-19 outbreak. The inspection will require, at a minimum, two BOP staff members to accompany Dr. Venters and one of Petitioners' attorneys during the inspection.

To the extent Petitioners seek to have more than one attorney participate in the inspection, to which Respondent objects (as noted in Section 5, below), the BOP will need to re-allocate additional staff members, including, at a minimum, three BOP staff members, to accompany them on the tour because each visitor must be accompanied by a minimum number of BOP staff members for security reasons. Requiring BOP to allocate significant staffing resources for the inspection for more than two hours, which will prevent them from attending to their normal work functions at a time of heightened security concerns is unduly burdensome and imposes significant risks on the security of the facility and the safety of inmates and other staff in the institution.

But in an effort to seek compromise and avoid judicial intervention, Respondent will permit Dr. Venters' inspection to last 3 hours, if necessary. Respondent also previously informed Petitioners that he will also agree that, in the event of unanticipated delays, Respondent will provide Dr. Venters with a reasonable amount of time to complete inspecting the agreed-upon areas, if more time is needed.

> 2. **The Date and Times Proposed By Respondent Are Reasonable and Provides Petitioners' Expert Sufficient Time To Conduct His Inspection**

**Petitioners' position:** The inspection shall take place on Tuesday, April 21, 2020, from 9-1 p.m.

**Respondent's position:** The inspection shall take place on Thursday, April 23, 2020, from 9-11 a.m. as the least burdensome date and time for Respondent.

In the Court's Inspection Order dated April 14, 2020 (Dkt. No. 43), the Court ordered the parties to choose a mutually acceptable date in the week of 4/21/2020 for the inspection. Respondent proposed Thursday, April 23, 2020 as the best day for the inspection to ensure sufficient staffing levels throughout the MDC while pulling BOP staff off their normal duties to escort Dr. Venters and the attorney during the inspection. Further, Dr. Venters needs to undergo a security background check prior to being permitted to enter the MDC. Conducting the inspection on Thursday would also ensure that BOP has had sufficient time to complete Dr. Venters' background check. In addition to the background, check, Dr. Venters will need to get formal approval for his inspection by the Deputy Director of the BOP. *See* BOP guidelines at https://www.bop.gov/coronavirus/covid19_status.jsp.

During the meet and confer, Petitioners did not state that they were unavailable on Thursday for the inspection, but simply stated that they preferred conducting an inspection earlier in the week. Petitioners have not stated whether conducting the inspection on Thursday would unduly prejudice the inspection. To the extent Petitioners claim that conducting the inspection on Thursday would hinder their ability to comply with any of the discovery deadlines, we informed Petitioners' counsel that Respondent would consent to any extension to accommodate their schedule, while still keeping the preliminary injunction hearing set for May 12, 2020.

With respect to the time of the inspection, Respondent proposed conducting the inspection from 9-11 a.m. to minimize interference with MDC operations, including meal service. Meal service typically starts at 11 a.m. During the meet and confer, Petitioners stated that they wanted Dr. Venters to observe the meal service, and Petitioners proposed an inspection from *9-12 p.m.,* to include the meal service. In response, Respondent proposed, as an alternative, that Dr. Venters conduct the inspection from 10-12 p.m., which would permit Dr. Venters to observe the meal service. However, in the status report (Dkt. No. 50), Petitioners revised their position again, and requested that the inspection take place from 9-1 p.m., even though they had previously proposed 9-12 p.m. during the meet and confer.

In sum, Respondent proposes that Dr. Venters' inspection occur from 9-11 a.m. or, in the alternative, in an effort to accommodate Petitioners' request to observe a meal service, from 10-12 p.m.

3. **Respondent's Proposal For The Units To Be Inspected Provides Dr. Venters With The Opportunity To See A Wide Range of Units With Different Classifications Without Unduly Interfering With MDC Operations.**

**Petitioners' position:**

a. The inspection shall be limited to:
   (1) one housing unit not under quarantine or isolation;
   (2) the intake unit;
   (3) one quarantine unit;
   (4) K84 (one of the isolation units);
   (5) the Special Housing Unit (SHU);
   (6) the Kitchen; and
   (7) the Health Services Offices and Exam Rooms not located on housing units.

b. These units will encompass the units where petitioners Rodriguez and Rabadi are housed.

c. For the units identified above, the expert may view any area of the housing unit, including but not limited to dorms, cells, common areas, toilets, sinks, showers and any sick call rooms, except the expert will not be allowed inside any occupied cell.

**Respondent's position:**

a. The inspection shall be limited to:
(1) one housing unit not under quarantine or isolation;
(2) the intake unit;
(3) one quarantine unit; and
(4) one isolation unit.

b. These units will encompass the units where petitioners Rodriguez and Rabadi are housed.

c. For the units identified above, the expert may view any area of the housing unit, except the expert will not be allowed inside any occupied cell.

With respect to the areas that Dr. Venters may inspect, the parties have reached agreement on the following: Dr. Venters may inspect (1) one housing unit not under quarantine or isolation; (2) the intake unit; (3) one quarantine unit; and (4) one isolation unit.[1] The parties further agree that any of the units identified above would include units where petitioners Rodriguez and Rabadi are housed at the time of the inspection. The parties also agree that for the unit inspected, Dr. Venters would be allowed to view all areas of the unit, but would not be allowed inside any occupied cell.

The parties do not agree on the three other areas of the MDC proposed by Petitioners, namely, the SHU, the kitchen, and Health Services Offices and Exam Rooms not located on housing units. Respondent objects to extending the inspection to these other areas of the MDC for the following reasons:

First, the BOP objects to the three other areas of the MDC in part to limit unnecessary foot traffic within the institution to areas not relevant to the claims in this case. An inspection of the other units would require the BOP to move staff members that may be working in those units out of those areas to provide for social distancing and to avoid Dr. Venters and his attorney potentially contaminating BOP staff members and those areas of the institution.

Second, the Court should not permit an inspection of the SHU due to security concerns. The SHU is the most secure unit in the facility because it houses inmates who are specifically removed from the general population for various reasons, including custody and security concerns, disciplinary issues, disruptive behavior, and protective custody. Further, inmates in the SHU are not subject to either quarantine or isolation.

Petitioners may argue that there is less of a security concern in the SHU because inmates are housed in their cell. All inmates in the facility, however, are currently housed in their cell, like

---

[1] With respect to the isolation unit, Petitioners have specified that they would like to inspect unit K84. Respondent could not agree to a specific unit number at this time as the status of a particular unit could change in advance of the inspection. However, the parties agree in principle that Dr. Venters will be allowed to inspect an isolation unit.

those in the SHU. Importantly, inmates in the SHU are typically housed there because they have the highest security classification or due to disciplinary infractions. An inspection of the SHU would unduly disrupt SHU operations, especially, if the Court permits inmate interviews.[2] Further, inmates in SHU tend to become agitated when visitors to the facility walk through. Finally, touring the SHU could be disruptive to standard rounds conducted by SHU staff members, department heads, and health services staff who need to perform their daily duties. The ranges in SHU do not allow for sufficient social distancing when additional individuals walk through.

Further, symptomatic inmates are not placed in the SHU. All symptomatic inmates are placed in an isolation unit, and, thus, Dr. Venters would have no reason to inspect the SHU. Given the security concerns with SHU inmates, Respondent cannot permit an inspection of the SHU, where there is no reason for the SHU inspection pertinent to this litigation.

Third, Petitioners seek permission to inspect the kitchen (also known as the Food Services Unit). The Food Services Unit is in a separate part of the MDC where inmates are not housed. Some inmates do work in the Food Services Unit, but those inmates are housed in a unit that is not currently subject to isolation or quarantine.

At this time, for safety reasons the BOP does not permit visitors in this area because the Food Services Unit provides food for the entire facility, and the MDC seeks to prevent the risk of contaminating the entire institution by allowing visitors, or any non-essential staff, into the Food Services Unit. Further, Petitioners do not allege in their Petition that the food provided to inmates is in any way inadequate or that the food contributes to the alleged unconstitutional conditions of confinement. For these reasons, the Court should not permit an inspection of the Food Services Unit.

Fourth, Petitioners seek permission to inspect the Health Services Office (also known as the Health Services Unit). Since the COVID-19 outbreak, all medical care has been provided locally in each housing unit, and not in the Health Services Unit. Because no inmates are being examined or treated in the Health Services Unit, Dr. Venters has no reason to visit the Health Service Unit. During the meet and confer, Petitioners have stated that they want to inspect the Health Services Unit and Exam Rooms (that are not in use) to evaluate the medical resources available at the MDC and if they are "potentially" used in the future. But such a request is wholly irrelevant to Petitioners' claims here; to the extent the MDC, is unable to provide medical care on an inmate's specific unit, the inmate would be transported to a nearby hospital rather than treated in the Health Services Unit.

---

[2] To the extent the Court permits an inspection of the SHU and allows inmate interviews in other parts of the MDC over Respondent's objection as noted in Section 5, below, the Court should not permit inmate interviews of the inmates in the SHU due to security concerns discussed above. Further, Petitioners are not prejudiced by their inability to interview SHU inmates because they already have an alternative method for Dr. Venters to talk to inmates in the SHU. Petitioners have stated repeatedly to the Court that they already are in contact with inmates in the SHU. Transcript from April 1, 2020 hearing at 10:4-13 (notifying Court relating to inmates being transported to the SHU). Petitioners presumably have been in touch with the inmates that were purportedly transported to the SHU and not some other housing unit.

### 4. The Court Should Not Permit Inmate Interviews During The Inspection

**Petitioners' position**: Dr. Venters shall be permitted to speak to people incarcerated in the MDC during his inspection of the facility. Dr. Venters may speak to people "cell-side" as he inspects the facility, and may also speak to incarcerated people who may be working or moving about the facility. For up to five individuals, Dr. Venters may request that the person be removed from their cell for interview in a common area. BOP counsel will not be permitted to listen to these interviews and should maintain an appropriate distance from Dr. Venters as he speaks to people.

**Respondent's position**: Dr. Venters and petitioners' attorney shall not be permitted to talk to any inmates during the inspection. In the alternative, if the Court permits inmate interviews, Dr. Venters may only interview inmates currently represented by the Federal Defenders of the Eastern and Southern Districts of New York. To conduct the interview, the inmate shall be taken out of his cell and the interview shall be conducted in the common area so as to provide privacy from other inmates and permit social distancing between the inmate and the interviewer and to avoid the expert/inmate having to talk through the cell door. BOP will be permitted to observe and listen to the interview. If necessary, the parties may enter into a separate protective order to protect the identities of the inmate.

Respondent objects to any communication between Dr. Venters/Petitioners' attorney and inmates because an inspection to observe conditions in the MDC does not warrant inmate interviews. Petitioners seek to interview any inmate at the MDC without restriction with the caveat that they will only interview inmates represented by the Federal Defenders (or inmates for whom their defense attorneys have consented to the interviews) (hereafter referred to as "Represented Inmates").

Respondent objects to the interviews because Petitioners and Dr. Venters have an alternative means of communicating with inmates and, at no time, have Petitioners' attorneys stated that these alternative methods are inadequate. During the meet and confer, Petitioners' counsel acknowledged that they are in contact with numerous inmates, including Petitioners, by email. Nothing is preventing Dr. Venters and Petitioners' attorneys from continuing to communicate with inmates by email.

Further, Petitioners and Dr. Venters may communicate with inmates through unmonitored legal calls and, as such, inmates do not need to be interviewed in person at the MDC. Communicating with inmates by telephone is a viable alternative for Petitioners and Dr. Venters to talk to inmates at the MDC. As Petitioners stated in their Petition, "[b]eginning on March 14, 2020 and continuing through March 19, 2020, Federal Defenders spoke to *over a hundred clients by telephone*." Pet. ¶ 57 (Dkt. No. 1) (emphasis added).

Even authority cited by Petitioners in their April 11, 2020 letter to the Court (Dkt. No. 39) relating to inspections support Respondent's position prohibiting communication with inmates during inspections. For example, Petitioners cited *Mack v. City of New York*, No. 14 Civ. 3321 (S.D.N.Y.), Dkt. 36. The court in *Mack* limited access to certain locations at Riker's Island, and unequivocally prohibited the plaintiffs' attorneys from "*speak[ing] to any inmate for any reason*."

*See id*. (emphasis added); *see also Guadalupe v. City of New York*, 15 Civ. 0220 (CM) (S.D.N.Y.) Dkt. 67-1 (also referenced, but mis-cited, by Petitioners) (limiting inspection to a specific area and expressly precluding plaintiff's attorneys from speaking to inmates and prison staff, like the order in *Mack*).

Petitioners state in the Status Report (Dkt. No. 50) that they prefer "cell-side" interviews of inmates whereby Dr. Venters would attempt to have a conversation with inmates through the cell door. Petitioners, however, have repeatedly expressed the importance of maintaining privacy as it relates to the inmate interviews. These "cell-side" interviews would not prevent neighboring inmates or even cell mates from listening in on those conversations, and would not provide the inmate with any privacy. Further, upon information and belief, during past inspections that included "cell-side" interviews, inmates on those units became extremely agitated and disruptive, which caused inmates to bang on their cell doors and shout, in part, to get the attention of the visitors to come to their cells. Such disruptive actions created significant security concerns for BOP staff, who were forced to immediately respond to the situation in order to maintain a safe environment -- again, straining staff resources.

Petitioners also previously informed the Court that they were concerned about inmate retaliation if inmates talked to Dr. Venters in front of BOP staff. Given the newly implemented Court protocols, Federal Defenders can schedule legal calls with Represented Inmates they would like to speak to regarding this lawsuit. The use of emails and legal calls is a viable alternative method by which Dr. Venters can talk to inmates while maintaining inmate security and addressing potential inmate concerns of retribution by BOP staff. Petitioners have repeatedly informed this Court that they have spoken inmates in the past month relating to the issues in this litigation, including "over a hundred" over a five-day period. There is no reason for an inspection to encompass in-person interviews given the health risks to all involved when Petitioners have already had the benefit of email communications and telephone conversations with "over a hundred" inmates at the MDC.

In the alternative, if the Court permits inmate interviews, Respondent has informed Petitioners' counsel that the BOP would permit Dr. Venters alone to interview inmates currently represented by the Federal Defenders.[3] Logistically, to facilitate the interviews, the inmate would be taken out of his cell and the interview would be conducted in the common area, so as to permit social distancing—pursuant to BOP safety guidelines—between the inmate and Dr. Venters. BOP would still be permitted to observe and listen to Dr. Venters' interview with the inmate; indeed, for security reasons, Dr. Venters and the inmate cannot be left unattended.

Finally, Respondent objects to Petitioners' request for "confidential" interviews of the inmates. If these conversations were "confidential," Respondent would have no way of ascertaining the veracity of any information provided during these "confidential" interviews. Respondent would be hindered in his ability to investigate fully the witnesses' claims, so as to participate meaningfully in the preliminary injunction hearing, and to assist the Court in finding

---

[3] The parties are in agreement that, in the event the Court permits inmate interviews, that Dr. Venters would only talk to inmates represented by the Federal Defenders or those inmates for which defense counsel has given consent to Dr. Venters to interview.

7

the truth. For instance, if an inmate were to inform Dr. Venters that he requested a certain type of medication, and claimed that such medication was not provided by BOP staff, Respondent would need to investigate (1) whether such a request was actually made; and (2) if the request was made, why such medication was not provided, to challenge the hearsay testimony. Respondent must be afforded the opportunity to contest the hearsay testimony presented to Dr. Venters, but will be unable to do so if these inmate interviews are anonymous. Further, no attorney-client privilege exists between Dr. Venters and any of the inmates he seeks to interview.

If necessary, the parties can meet and confer regarding the terms of an appropriate protective order to protect the identities of the inmates. Respondent can provide a proposed protective order to Petitioners for their review today (April 17) and can finalize it by Monday at the latest.

### 5. Number of Participants

**Petitioners' position**: For Petitioners, the inspection is limited to Dr. Homer Venters, one attorney from Petitioners' legal team, and Deirdre von Dornum, Attorney-in-Charge of the Eastern District Federal Defenders.

**Respondent's position**: For Petitioners, the inspection is limited to Dr. Homer Venters and one attorney (counsel of record).

Respondent is willing to permit Dr. Venters and one of Petitioners' attorneys to attend the inspection. Petitioners seek to have two attorneys accompany Dr. Venters on the inspection. Allowing Petitioners to have two attorneys present resulting in three individuals participating in the inspection will result in a significant strain on limited BOP staff members, as set forth in Section 1 above.

Petitioners further seek to have Ms. Deirdre von Dornum, Attorney-in-Charge of the Federal Defenders accompany Dr. Venters on the inspection. Respondent, however, objects to Ms. von Dornum participating in the inspection. In short, Ms. von Dornum is not an attorney of record in this case, is not qualified to opine as an expert, and is not a party, and therefore, has no basis to appear at this inspection in the midst of a global pandemic.

While Petitioners argue that Ms. von Dornum's presence is necessary to gauge which inmates are represented by Federal Defenders, Petitioners have conceded to Respondent that Ms. von Dornum has that client list available to her and intends on bringing the list to the inspection. There is no reason why Ms. von Dornum cannot make that list available to Petitioners' counsel on a confidential basis; indeed, if Ms. von Dornum appears at the inspection, such information will invariably be shared with Petitioners' counsel regardless. Further, given the Court's April 15, 2020 Order prohibiting communication with staff, her purported familiarity with BOP staff is irrelevant to the inspection. Dkt. No. 45.

Accordingly, for these reasons, Respondent objects to having anyone other than Dr. Venters and one of Petitioners' attorneys at the inspection.

8

**6. Hand Sanitizer**

Petitioners have requested permission to bring hand sanitizer on the inspection. Respondent objected on the grounds that the BOP does not permit visitors to bring alcohol into the institution and hand sanitizer contains alcohol. Respondent notified Petitioners' counsel that there is non-alcohol based sanitizer located in common areas in the facility and, if Dr. Venters and the attorney are wearing gloves, there would be no reason to bring hand sanitizer into the facility. Further, there is an area for Dr. Venters and Petitioners' attorney to wash their hands upon entry and when leaving the facility, and a locker at the entrance to the facility where they can store their hand sanitizer.

The parties have reached agreement with respect to items in Section 6 (a) through (d).

For these reasons, Respondent requests that the Court approve Respondent's proposed inspection parameters.

                                                  Respectfully submitted,

                                                  RICHARD P. DONOGHUE
                                                  United States Attorney

By:             /s/
                James R. Cho
                Seth D. Eichenholtz
                Joseph A. Marutollo
                Paulina Stamatelos
                Assistant U.S. Attorneys
                (718) 254-6519/7036/6288/6198
                james.cho@usdoj.gov
                seth.eichenholtz@usdoj.gov
                joseph.marutollo@usdoj.gov
                pauline.stamatelos@usdoj.gov

cc:     The Honorable Roanne L. Mann, U.S. Magistrate Judge
        All Counsel of Record (by ECF)