UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI, by his Next Friend
MIGDALIZ QUINONES; JUSTIN RODRIGUEZ,
by his Next Friend JACKLYN ROMANOFF;
ELODIA LOPEZ; and JAMES HAIR,

                                 No. 20 Civ. 1590

individually and on behalf of all others similarly
situated,

                  Petitioners,

             *-against-*

WARDEN DEREK EDGE,

                  Respondent.

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 790-0403

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................iii-vii

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND .....................................................................................2

    A.    The COVID-19 Crisis in the United States....................................................2

    B.    COVID-19 Poses Significant Dangers for Incarcerated People
          and Correctional Staff .................................................................................3

    C.    Respondent Is Disregarding Known Risks by Failing to Take Proper
          Precautions to Protect Petitioners and the Class .........................................5

          1.    MDC's Testing Is Practically Nonexistent......................................6

          2.    MDC's Screening Protocols Are Inadequate ...................................8

          3.    MDC Has Not Provided Adequate PPE or Cleaning Supplies,
               and Has Not Taken Basic Steps to Prevent Spread
               of the Infection ................................................................................9

          4.    MDC Is Not Adequately Protecting Staff, Which Increases
               Risk for People Held at the MDC ..................................................12

          5.    Respondent Has Taken No Steps to Protect
               Vulnerable Persons ........................................................................13

          6.    MDC Is Not Prepared to Treat Individuals Who
               Contract COVID-19........................................................................14

    D.    Petitioners Are Particularly Vulnerable ....................................................16

          1.    Ayman Rabadi ...............................................................................16

          2.    Elodia Lopez ..................................................................................16

           3.    James Hair......................................................................................17

ARGUMENT ...........................................................................................................18

    I.   PETITIONERS FACE IRREPARABLE HARM IF THEY REMAIN
        CONFINED AT THE MDC UNDER CURRENT CONDITIONS .....................18

    II.  PETITIONERS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING
        ON THE MERITS ...............................................................................21

III. THE COURT HAS THE AUTHORITY TO ORDER THE RELIEF SOUGHT
BY PETITIONERS AND  THE BALANCE OF EQUITIES TIPS IN
PETITIONERS' FAVOR ........................................................................................26

IV. THE COURT SHOULD EXERCISE ITS GENERAL EQUITY POWERS OR
CONDITIONALLY CERTIFY THE CLASS TO AWARD CLASS-WIDE
RELIEF ................................................................................................................30

     A.     The Proposed Class is Numerous .................................................................31

     B.     Questions of Law and Fact Are Common to the Proposed Class..............32

     C.     The Claims of the Named Plaintiffs are Typical
of the Proposed Class...................................................................................33

     D.     The Named Plaintiffs and Class Counsel Will Fairly and Adequately
Represent the Class......................................................................................33

     E.     Petitioners Meet the Requirements of Rule 23(b)(2)..................................34

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*AIM Int'l Trading LLC v. Valcucine SpA.*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002) ............................................................................ 18

*Austin v. Pa. Dep't of Corr.*,
    No. 90-7497, 1992 WL 277511 (E.D. Pa. Sept. 29, 1992) ............................................. 19

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) .............................................................................................. 33

*Banks v. Booth*,
    No. 20 Civ. 849(CKK), 2020 WL 1914896 (D.D.C. Apr. 19, 2020) ...................... *passim*

*Basank et al. v. Decker et al.*,
    No. 20 Civ. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) .......... 4, 20, 24, 26

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ........................................................................................................ 21

*Boone v. Brown*,
    No. 05 Civ. 750 (AET), 2005 WL 2006997 (D.N.J. Aug. 22, 2005) ............................. 19

*Brown v. Plata*,
    563 U.S. 493 (2011) ........................................................................................................ 21

*Butler v. Suffolk Cty.*,
    289 F.R.D. 80 (E.D.N.Y. 2013) ..................................................................................... 33

*Cameron v. Bouchard*,
    No. 20 Civ. 10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020), *modified on reconsideration*, No. 20 Civ.10949, 2020 WL 1952836
    (E.D. Mich. Apr. 23, 2020) .............................................................................. 4, 20, 27, 30

*Carty v. Farrelly*,
    957 F. Supp. 727 (D.V.I. 1997) ................................................................................ 23, 24

*Castillo et al. v. Barr*,
    No. 20 Civ. 605, 2020 WL 1502864  (C.D. Cal. Mar. 27, 2020) .................................... 20

*Charles v. Orange Cty.*,
    925 F.3d 73 (2d Cir. 2019) .............................................................................................. 21

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir.2011) ............................................................................................. 28

*Conn. Dep't of Envtl. Prot. V. O.S.H.A.*,
　356 F.3d 226 (2d Cir. 2004)......................................................................... 20

*Consol. Rail Corp. v. Town of Hyde Park*,
　47 F.3d 473 (2d Cir. 1995).......................................................................... 31

*Coronel v. Decker*,
　No. 20 Civ. 2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ......................... 4, 20, 24

*Damus v. Nielsen*,
　313 F. Supp. 3d 317 (D.D.C. 2018) ............................................................... 30

*Dean v. Coughlin*,
　107 F.R.D. 331 (S.D.N.Y. 1985) .................................................................... 31

*Denney v. Deutsche Bank AG*,
　443 F.3d 253 (2d Cir. 2006)......................................................................... 33

*Doe v. Kelly*,
　878 F.3d 710 (9th Cir. 2017) ....................................................................... 27

*Dukes v. Wal-Mart Stores, Inc.,*
　564 U.S. 338 (2011).............................................................................. 31, 32

*Estelle v. Gamble*,
　429 U.S. 97 (1976)............................................................................... 21, 23

*Farmer v. Brennan*,
　511 U.S. 825 (1994).............................................................................. 21, 23

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
　954 F.3d 118 (2d Cir. 2020)......................................................................... 22

*Flores et al. v. Barr et al.*,
　85 Civ. 4544 (C.D. Cal. Mar. 28, 2020) ........................................................... 5

*Fraihat v. U.S. Immigration & Customs Enf't,*
　No. ED-CV 191546 (JGB) (SHKx), 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020)........ 34

*Helling v. McKinney*,
　509 U.S. 25 (1993)......................................................................... *passim*

*In Re Extradition of Alejandro Toledo Manrique*,
　No. 19 Mj. 7105, 2020 WL 1307109 　(N.D. Cal. Mar. 19, 2020) ...................................... 5

*In re Frontier Ins. Grp., Inc., Sec. Litig.*,
　172 F.R.D. 31 (E.D.N.Y. 1997) ..................................................................... 34

*Inmates of Attica Corr. Facility v. Rockefeller*,
    453 F.2d 12 (2d Cir. 1971)........................................................................... 32

*Innovative Health Sys., Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997)........................................................................... 20

*Jimenez v. Cronen, et al.*,
    No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020) ................................................ 5

*Johnson v. Connolly*,
    378 F. App'x 107 (2d Cir. 2010) ................................................................. 20

*Johnson v. Miles*,
    355 F. App'x 444 (2d Cir. 2009) ................................................................. 20

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996).................................................................... 20, 22

*Jovel v. Decker*,
    No. 20 Civ. 308, 2020 WL 1467397 (S.D.N.Y. Mar. 26, 2020) .................... 23

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990).......................................................................... 19

*Lareau v. Manson*,
    651 F.2d 96 (2d Cir. 1981).......................................................................... 23

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013)......................................................... 30

*Litwin v. OceanFreight, Inc.*,
    865 F. Supp. 2d 385 (S.D.N.Y. 2011)......................................................... 18

*Malam v. Adducci*,
    No. 20-10829, 2020 WL 1899570 (E.D. Mich. Apr. 17, 2020) .................... 26

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)........................................................................ 34

*Morales Feliciano v. Calderon Sierra*,
    300 F. Supp. 2d 321 (D.P.R. 2004)............................................................. 23

*New York Civil Liberties Union v. New York City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)........................................................................ 18

*Nicholson v. Williams*,
    205 F.R.D. 92 (E.D.N.Y. 2001) ................................................................. 32

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014)......................................................................... 31

*People ex rel. Stoughton on behalf of Hogan et al. v. Brann*,
    Index No. 451078/2020, 2020 WL 1679209 (Sup. Ct. N.Y. Cty. Apr. 6, 2020)............... 4

*People ex rel. Stoughton on behalf of Little et al. v. Brann*,
    Index No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) ......................................... 4

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002).................................................................... 22, 25

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir.1990)........................................................................ 19

*Rivas v. Jennings*,
    20 Civ. 02731 (VC), 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020) ........................ 31, 33

*Roba v. United States*,
    604 F.2d 215 (2d Cir. 1979)....................................................................... 26

*Robidoux v. Celani*,
    987 F.2d 931 (2d. Cir. 1993)................................................................... 31, 33

*Stagliano v. Herkimer Central School District*,
    151 F. Supp. 3d 264 (N.D.N.Y. 2015)............................................................ 20

*Strouchler v. Shah*,
    891 F.Supp.2d 504 (S.D.N.Y.2012)................................................................ 30

*Swain v. Junior*,
    No. 20 Civ. 21457 (KMW), 2020 WL 1692668 (S.D. Fla. Apr. 7, 2020)............... *passim*

*Thompson v. Choinski*,
    525 F.3d 205 (2d Cir. 2008)....................................................................... 26

*Umana Jovel v. Decker et al.*,
    No. 20 Civ. 308 (GBD)(SN), 2020 WL 1539282 (S.D.N.Y. Mar. 26, 2020).................... 4

*United States v. Garlock*,
    No. 18 Cr. 00418, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020)................................. 5

*United States v. Little*,
    No. 20 Cr. 57, 2020 WL 1439979 (S.D.N.Y. Mar. 24, 2020) ......................................... 23

*United States v. Matthaei*,
    No.19 Civ. 243 (D. Idaho Mar. 16, 2020)......................................................... 5

*United States v. State of Conn.*,
   931 F. Supp. 974 (D. Conn. 1996) ................................................................. 29

*United States v. Stephens*,
   No. 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ................................ 4

*United States v. Yonkers Bd. of Educ.*,
   29 F.3d 40 (2d Cir.1994) ........................................................................... 28

*United States v. Barkman*,
   No. 19 Cr. 52, 2020 WL 1811343 (D. Nev. Mar. 17, 2020) ...................................... 5

*V.W. by & through Williams v. Conway*,
   236 F. Supp. 3d 554 (N.D.N.Y. 2017) ............................................................. 32

*Wilson v. Williams*,
   No. 20 Civ. 00794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) ..................... 27, 31, 42

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................. 18

*Xochihua-Jaimes v. Barr*,
   798 F. App'x. 52 (9th Cir. 2020) ................................................................. 5

*Zhang v. Barr et al.*,
   20 Civ. 331 (C.D. Cal. Mar. 27, 2020) .......................................................... 5

**Statutes and Rules**

Fed. R. Civ. P. 23 ............................................................... 31, 32, 33, 34

Fed. R. Civ. P. 53 ....................................................................... 28, 29

Fed. R. Civ. P. 65(a) ...................................................................... 1, 19

**Other Authorities**

Moore's Federal Practice § 23.50 (2d ed.1990) ..................................... 30

Newberg on Class Actions § 24:83 (4th ed. 2002) ................................. 30

# INTRODUCTION

Petitioners Hassan Chunn, Nehemiah McBride, Ayman Rabadi, Justin Rodriguez, Elodia Lopez, and James Hair ("Petitioners"), on behalf of themselves and others similarly situated, respectfully move this Court under Federal Rule of Civil Procedure 65(a) for a preliminary injunction, as set forth in Petitioners' Notice of Motion and this memorandum of law, directing release of medically vulnerable persons, including Petitioners, from detention at the Metropolitan Detention Center ("MDC") directing that Respondent take specific measures to mitigate the serious risk posed by COVID-19, conditionally certifying the class or awarding class-wide relief under the Court's general equity powers on the grounds set forth in Part IV, *infra*, and appointing a Special Master to assist in the facilitation of this relief,.

The requested relief is necessary to protect Petitioners, who are particularly vulnerable to contracting and suffering dire consequences from COVID-19, and the classes they seek to represent. Respondent Warden Derek Edge has failed to take basic steps to mitigate the risk of COVID-19 transmission within the MDC. Respondent has not even sought to determine how many people held in his custody are infected with COVID-19, leaving every person in the class vulnerable to an invisible and highly contagious infection. Continuing to hold Petitioners and the classes they seek to represent under these circumstances patently violates their Eighth Amendment rights. Therefore, even if this Court determines that release is not appropriate, it should ensure that Petitioners and others held in the MDC are protected from the unjustifiable risk of exposure to and infection with COVID-19 that Respondent is currently tolerating.

As the evidence will establish, Respondent has failed adequately to respond to the COVID-19 crisis at all levels. At the basic level of infection detection, Respondent is simply not ensuring that people who work and are held in the MDC are properly screened. Even when the MDC learns that a person has indicia of COVID-19 infection, they are not being tested. And the

MDC appears to be intent on maintaining its willful blindness to the problem, with fewer than 10 tests available to use for staff and about 1700 incarcerated people. Nor has Respondent adequately responded to the risk of transmission of this highly contagious disease – instead adopting policies that increase the risk of spread. And finally, Respondent is not using his authority to grant compassionate release to people who are at higher risk of death or serious illness, leaving people who are at higher risk unable to seek release through other avenues. If this Court does not order Respondent to take necessary mitigating measures, these conditions will not change. Release, injunctive relief, class certification, and appointment of a Special Master are all appropriate on the record before the Court.

## FACTUAL BACKGROUND

### A.    The COVID-19 Crisis in the United States

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of April 22, 2020, COVID-19 had infected more than 2,600,000 people worldwide and caused more than 46,000 deaths in the United States. Pet. ¶ 20.[1] New York City has reported more than 147,000 cases, with more than 15,000 deaths, although the number of infections is drastically understated. Pet. ¶ 32. Certain populations—those over the age of 50 and those with specific underlying medical conditions—are particularly vulnerable to serious illness and death from COVID-19. Pet. ¶¶ 22-23. People aged 60-69 have a mortality rate 18 times higher than people under the age of 40; the rate is 40 times higher for people aged 70-79 years old. Pet. ¶ 22. The mortality rate for people of any age with cardiovascular disease, diabetes, hypertension, chronic respiratory disease, and cancer, is significantly elevated as well. Pet. ¶ 23. Even if the COVID-19 infection is not fatal, it will often require highly specialized care for people over the age of 50 and will

---

[1] Citations to "Pet." Refer to the Amended Petition that was filed on April 23, 2020.

result in longstanding medical complications.  Pet. ¶¶ 24, 29.  Serious complications can develop

rapidly, as little as five days after the first symptoms first appear.  Pet. ¶ 26.  Compared to

influenza, COVID-19 is much more deadly, with a fatality rate of 15 percent in the highest risk

populations.  Pet. ¶ 28.

**B.    COVID-19 Poses Significant Dangers for Incarcerated People and Correctional Staff**

New York has been in a state of emergency since March 7, 2020, to more effectively

contain the spread of COVID-19, deploying the National Guard among other strategies.[2]  In New

York, people must remain in their homes to the greatest extent possible, wear masks when they

leave their homes, not gather in groups of any size, and remain six feet away from others at all

times.[3]  The CDC and World Health Organization have agreed that "social distancing" and

rigorous hygiene practices, including washing hands with soap and water, are critical. Pet. ¶ 30.

Taking these measures is virtually impossible in prisons and jails, without conscientious

interventions.  Pet. ¶ 33. In correctional settings, the risk of contracting an infectious disease, like

COVID-19, is significantly increased due to the high numbers of people with chronic, often

untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to

personal hygiene, limited access to medical care, and no possibility of staying at a distance from

others.  Pet. Ex. 2 (Declaration of Jonathan Giftos, MD, dated March 27, 2020 ("Giftos Decl."))

¶ 11; *see also* Dkt. 12, Ex. 9 (Declaration of Jaimie Meyer, M.D.) ¶ 7.  For this reason,

correctional public health experts have responded to the COVID-19 pandemic by recommending

the release from custody of people most vulnerable to COVID-19.  Pet. ¶¶ 38; 45-46.  Release

[2] Ex. 36 (Eileen AJ Connelly & Laura Italiano, *Cuomo Declares State of Emergency in New York as State Coronavirus Cases Soar to 89*, N.Y. Post (Mar. 7, 2020), https://nypost.com/2020/03/07/cuomo-declares-state-of-emergency-as-new-york-state-coronavirus-cases-soar-to-76/).

[3] Ex. 37 (Elizabeth Joseph & Eric Levenson, *New York Gov. Cuomo extends stay-at-home order until at least May 15*, CNN  (Apr. 16, 2020),     https://www.cnn.com/2020/04/16/us/new-york-coronavirus/index.html).

protects these people, mitigates the risk of infection for all people held and working in a

correctional setting, and lessens the burden on the region's health care infrastructure by reducing

the likelihood that an overwhelming number of people will become seriously ill from COVID-19

at the same time.  Pet. ¶ 38.

Judges in this circuit and across the country have ordered release and injunctive relief to

reflect these risks.  *See Banks v. Booth*, No. 20 Cr. 849(CKK), 2020 WL 1914896, at *11

(D.D.C. Apr. 19, 2020) (ordering injunctive relief in case involving local jail); *Cameron v.

Bouchard*, No. 20 Civ. 10949, 2020 WL 1929876, at *2–3 (E.D. Mich. Apr. 17, 2020), *modified

on reconsideration*, No. 20 Civ.10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020) (granting

injunctive relief to a class of pretrial detainees and convicted individuals); *Swain v. Junior*, No.

20 Civ. 21457 (KMW), 2020 WL 1692668, at *2 (S.D. Fla. Apr. 7, 2020) (granting temporary

restraining order requiring Miami-Dade County Jails to take specific measures to ameliorate risk

of spread of COVID-19 and ensure testing "for anyone displaying known symptoms of COVID-

19 in accordance with CDC guidelines."); *Coronel v. Decker*, No. 20 Civ. 2472, 2020 WL

1487274 (S.D.N.Y. Mar. 27, 2020) (granting release of four medical vulnerable immigration

detainees); *Basank et al. v. Decker et al.*, No. 20 Civ. 2518 (AT), 2020 WL 1481503 at *1

(S.D.N.Y. Mar. 26, 2020) (granting release of ten medically vulnerable immigration detainees

who "face[] an imminent risk of death or serious injury . . .  if exposed to COVID-19").[4]

---

[4] For additional examples, *see United States v. Stephens*, No. 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, recognizing that incarcerated people may be at a heightened risk of contracting COVID-19); *Umana Jovel v. Decker et al.*, No. 20 Civ. 308 (GBD)(SN), 2020 WL 1539282  (S.D.N.Y. Mar. 26, 2020) (granting emergency request for release of petitioner from immigration detention in light of the COVID-19 crisis); *People ex rel. Stoughton on behalf of Little et al. v. Brann*, Index No. 260154/2020 (Sup. Ct. Bronx Cty. Mar. 25, 2020) (releasing 106 individuals held at Rikers Island jail on parole violations who are particularly vulnerable to illness or death if infected by COVID-19); *People ex rel. Stoughton on behalf of Hogan et al. v. Brann*, Index No. 451078/2020, 2020 WL 1679209 (Sup. Ct. N.Y. Cty. Apr. 6, 2020) (releasing 16 individuals held at Rikers Island jail on pre-trial detention who were particularly vulnerable to illness or death due to COVID-19); *Xochihua-Jaimes*

C.      **Respondent Is Disregarding Known Risks by Failing to Take Proper Precautions to Protect Petitioners and the Class**

Like every other correctional setting, MDC is not well-situated to mitigate the risks of COVID-19 spread.  Necessary social distancing is virtually impossible, toilets, sinks, and showers are shared without disinfection between each use, communal food preparation and service leaves little opportunity for surface disinfection, and staff arrive and leave without proper screening for new infection.  Pet. ¶ 54.  Since March 4, 2020, the Federal Defenders has engaged in extensive efforts to get Respondent to address the risks associated with the spread of COVID-19 at the MDC, to little avail.  Pet. Ex. 1 (Declaration of Deirdre D. von Dornum, dated March 27, 2020 ("von Dornum Decl.")) ¶¶ 3-7, 9-11, 20, 21, 23.  The Federal Defenders asked that the MDC take specific measures to reduce the spread of infection, *id.* ¶ 4, but the MDC's response has been insufficient.

---

*v. Barr*, 798 F. App'x. 52 (Mem) (9th Cir. 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19); *Flores et al. v. Barr et al.*, 85 Civ. 4544 (C.D. Cal. Mar. 28, 2020) (granting a Temporary Restraining Order application requiring the Office of Refugee Resettlement and United States Immigrations and Customs Enforcement to immediately put in place measures to reduce the risk of COVID-19 infection for unaccompanied minors in their custody and ordering the defendants to show cause why an order should not issue requiring defendants to immediately release class members); *Zhang v. Barr et al.*, 20 Civ. 331 (C.D. Cal. Mar. 27, 2020) (granting Petitioner an immediate bond hearing in light of the "global pandemic by which delay in determining Petitioner's release exposes him to unnecessary risk"); *United States v. Garlock*, No. 18 Cr. 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo et al. v. Barr*, No. 20 Civ. 605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *In Re Extradition of Alejandro Toledo Manrique*, No. 19 Mj. 7105, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) (granting motion for release on bail of 74-year old subject of extradition request due to risks associated with remaining in custody during COVID-19 pandemic); *United States v. Barkman*, No. 19 Cr. 52, 2020 WL 1811343 (D. Nev. Mar. 17, 2020) (suspending requirement that defendant report to prison to serve intermittent confinement due to risks associated with COVID-19); *United States v. Matthaei*, No.19 Civ. 243 (D. Idaho Mar. 16, 2020) (granting convicted defendant additional time to self-surrender to prison in light of defendant's health problems, which place him at greater risk of complications of COVID-19); *Jimenez v. Cronen, et al.*, No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020) (ordering release of petitioner from immigration detention due to COVID-19 concerns); *In re Request to Commute or Suspend County Jail Sentences*, Dkt. No. 084230 (N.J. Mar. 22, 2020) (ordering, based on the dangers posed by COVID-19, release of any person in New Jersey serving a county jail sentence as a condition of probation or as a result of a municipal court conviction).

5

### 1.    MDC's Testing Is Practically Nonexistent

As of March 11, 2020, the MDC did not anticipate having a testing protocol for COVID-19 and it had no policy to address staff who presented with COVID-19 risk factors. *Id.* ¶ 6. Unfortunately, there is no evidence that Respondent has taken any additional steps since March 11, even as the pandemic has spread. Despite being ordered to disclose such information by the Chief Judge of this Court, the MDC still has not developed any set testing protocol for COVID-19. Rosenfeld Declaration ("Rosenfeld Decl.") Ex. 1 (Vasquez Tr. 117:6-118:9).[5] Out of approximately 1700 people held at the facility, the MDC has tested only 10 incarcerated people, with an additional three people sent to area hospitals for testing. Ex. 1 (Vasquez Tr. 114:6-25). MDC admits that it has failed to test five symptomatic people that MDC presumes to have been positive, all from the same unit though showing symptoms at different times. Their reasoning is that two other people on that unit had already tested positive, presumably making additional testing superfluous. Ex. 1 (Vasquez Tr. 36:23-37:2; 62:14-64:11; 117:6-118:9; 118:25- 119:6). This failure to test even presumed positive patients clearly artificially lowers the number of positive diagnoses and conceals the true extent to which the pandemic is spreading inside the MDC.

MDC has also failed to test numerous other people who have had symptoms consistent with COVID-19. Ex. 2 (Powell Decl. ¶¶ 10-15); Rosenfeld Decl. Ex. 3 (Bynum Decl. ¶ 8); Ex. 4 (Olivea Decl. ¶ 8); Ex. 5 (Gomez Decl. ¶ 2); Ex. 6 (Mabry Decl. ¶ 18); Ex. 7 (Dixon Decl. ¶¶ 11-12). In fact, as attested to by one person who complained of shortness of breath and a loss of taste and smell, "the nurse told me I could not get tested or see a doctor because I did not have a

---

[5] Hereafter, unless otherwise specified, all references to exhibits are to the exhibits in the Declaration of Katherine Rosenfeld.

fever and had not fainted." Rosenfeld Decl. Ex. 3 (Bynum Decl. ¶ 8). Another class member

and his cellmate were not tested after suffering from headaches, fever, and chills. Rosenfeld

Decl. Ex. 7 (Dixon Decl. ¶¶ 11-12). This inmate stated that, "[t]here are guys asking for months

to get tested, they just do not test for the virus . . . you have to really scream and yell to get

medical attention." Rosenfeld Decl. Ex. 7 (Dixon Decl. ¶ 13). Another person recently released

from the MDC reports that he and his cellmate were not given medical treatment for his illness

despite reporting symptoms including a cough and chest tightness. (Chunn Decl. ¶¶ 21-22). He

is at high risk of COVID-19 complications due to a number of serious medical conditions

including coronary heart disease and asthma. (Chunn Decl. ¶¶ 18-19). One woman, after asking

repeatedly for medical care and testing due to symptoms including fatigue, chills, cough,

breathing difficulty and weight loss, was seen by an MDC medical staff member after her

lawyers wrote to the court. Rosenfeld Decl. Ex. 8 (Needham Decl. ¶¶ 19-25). That staff

member asked her what difference a test would make since she had had symptoms for so long,

and told her to imagine the panic that she would cause on her unit if she tested positive.

Rosenfeld Decl. Ex. 8 (Needham Decl. ¶ 26). She lives in dormitory style housing with

approximately 30 other women, with beds less than six feet apart from one another and common

tables and other facilities. Rosenfeld Decl. Ex. 8 (Needham Decl. ¶¶ 2-8).

       The MDC currently has fewer than 10 tests on hand. It has only had 20 tests delivered to

it throughout the course of the COVID-19 pandemic. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 114:3-

6, 115:2-15). It represents, however, that it has at all times had an adequate number of tests.

Rosenfeld Decl. Ex. 1 (Vasquez Tr. 122:17-20). This beggars belief. Broader testing of both

staff and incarcerated people (as the New York City jails have done) is necessary to ensure the

health and safety of those confined in the facility. Rosenfeld Decl. ¶ 45 (noting that there are

currently 376 incarcerated people with confirmed positive tests in the New York City jails and 1065 staff who have tested positive to date; Ex. 9 (Decl. of Robert L. Cohen, M.D. ¶ 7).

### 2. MDC's Screening Protocols Are Inadequate

Nor has MDC instituted appropriate screening measures. Doctors have not even been present to evaluate people in the housing units. Von Dornum Decl. ¶ 9. Many people report that temperature checks are not taking place on a regular basis. Rosenfeld Decl. Ex. 10 (Finch Decl. ¶ 11); Ex. 11 (Nelson Decl. ¶ 13); Ex. 12 (Platt Decl. ¶ 13); Ex. 7 (Dixon Decl. ¶ 11); Ex. 13 (Pierson Decl. ¶¶ 19, 23). MDC has now clarified that, despite BOP documentation to the contrary, daily temperature checks and COVID screening are not taking place in the general population – only in housing units that have been quarantined and in the one housing unit set aside for isolation. (Rosenfeld Decl. Ex. 1 (Vasquez Tr. 48:13-16; 122:17-20; 211:2-212:5). In units that are quarantined, medical staff is making twice-daily rounds. However, multiple incarcerated people report that those rounds include only a temperature check, not a wellness check asking about symptoms. *See, e.g.*, Rosenfeld Decl. Ex. 14 (Sojos-Valladares Decl. ¶ 5); (Chunn Decl. ¶ 4). Some staff are performing these checks without opening cell doors, through the food slot, a small opening around belly or groin level. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 79:4-80:25). The MDC acknowledges that there is no general set of questions or specific COVID-19 related questions asked during wellness checks, and that no record is kept of these questions or answers. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 44:3-16).

Nor can people promptly obtain medical assessments at the MDC, because of a broken and defective sick call system that has functioned to understate the scale of infection at the MDC. *See Facility Evaluation: Metropolitan Detention Center COVID-19 Respon*se of Dr. Homer Venters dated April 30, 2020 ("Venters Report"), ¶¶ 16-33. MDC admits that emergency

buzzers in the cells, which could otherwise be used to call for medical assistance, are not all working.  Rosenfeld Decl. Ex. 15 (King Tr. 103:3-13).

### 3. MDC Has Not Provided Adequate PPE or Cleaning Supplies, and Has Not Taken Basic Steps to Prevent Spread of the Infection

Adding insult to injury, Respondent has not instituted basic and common-sense steps to prevent the spread of the highly contagious infection.  Incarcerated people have irregular access to basic hygiene supplies like soap.  Rosenfeld Decl. Ex. 2 (Powell Decl. ¶ 6); Rosenfeld Decl. Ex. 16 (Altino Decl. ¶ 6); Rosenfeld Decl. Ex. 3 (Bynum Decl. ¶ 4); Rosenfeld Decl. Ex. 17 (Drayton Decl. ¶ 6); Rosenfeld Decl. Ex. 18 (Hall Decl. ¶ 6); Rosenfeld Decl. Ex. 4 (Oliveira Decl. ¶ 6); Rosenfeld Decl. Ex. 19 (Carpenter Decl. ¶ 6); Rosenfeld Decl. Ex. 20 (R Watson Decl. ¶¶ 8, 13, 19; Rosenfeld Decl. Ex. 21 (A Wilson Decl. ¶ 6); Rosenfeld Decl. Ex. 22 (Miller Decl. ¶ 7); Rosenfeld Decl. Ex. 23 (Soria Decl. ¶¶ 7. 9).  Cleaning supplies have not been provided for cells.  Rosenfeld Decl. Ex. 24 (Haney Decl. ¶ 7); Rosenfeld Decl. Ex. 16 (Altino Decl. ¶ 7); Rosenfeld Decl. Ex. 3 (Bynum Decl. ¶ 4); Rosenfeld Decl. Ex. 18 (Hall Decl. ¶ 7); Rosenfeld Decl. Ex. 25 (McCann Decl. ¶ 7); Rosenfeld Decl. Ex. 26 (D Sanchez Decl. ¶ 20); Rosenfeld Decl. Ex. 27 (Molina Decl. ¶¶ 6-7); Rosenfeld Decl. Ex. 20 (R Watson Decl. ¶ 9); Rosenfeld Decl. Ex. 28 (Batista Decl. ¶ 6); Rosenfeld Decl. Ex. 23 (Soria Decl. ¶ 7); Rosenfeld Decl. Ex. 29 (Singer Decl. ¶ 6); Rosenfeld Decl. Ex. 30 (Deutsch Decl. ¶ 8; Rosenfeld Decl. Ex. 14 (Sojos-Valladares Decl. ¶ 10).  Communally used items like the phone, computer, and showers are not reliably cleaned between use.  Rosenfeld Decl. Ex. 2 (Powell Decl. ¶ 5); Rosenfeld Decl. Ex. 24 (Haney Decl. ¶ 11); Rosenfeld Decl. Ex. 3 (Bynum Decl. ¶ 7); Rosenfeld Decl. Ex. 17 (Drayton Decl. ¶¶ 4, 10); Rosenfeld Decl. Ex. 11 (Nelson Decl. ¶ 6); Rosenfeld Decl. Ex. 12 (Platt Decl. ¶ 10); Rosenfeld Decl. Ex. 20 (R Watson Decl. ¶ 11); Rosenfeld Decl.

Ex. 28 (Batista Decl. ¶ 9); Rosenfeld Decl. Ex. 13 (Pierson Decl. ¶ 10); Rosenfeld Decl. Ex. 30 (Deutsch Decl. ¶ 9); Rosenfeld Decl. Ex. 29 (Singer Decl. ¶ 3).

The facility distributes disposable paper masks to incarcerated people, not fit for reuse, once a week at most. Ex. 2 (Powell Decl. ¶¶ 7-8); Ex. 16 (Altino Decl. ¶ 8); Ex. 3 (Bynum Decl. ¶ 5); (Drayton Decl. ¶ 8); Ex. 18 (Hall Decl. ¶ 8); Ex. 11 (Nelson Decl. ¶ 10); Ex. 25 (McCann Decl. ¶ 8); Ex. 26 (D Sanchez Decl. ¶¶ 10, 19); Ex. 27 (Molina Decl. ¶ 8); Ex. 12 (Platt Decl. ¶ 8); Ex. 19 (Carpenter Decl. ¶ 8); Ex. 31 (Roberts Decl. ¶ 7); Ex. 20 (R Watson Decl. ¶ 10); Ex. 28 (Batista Decl. ¶ 5); Ex. 22 (Miller Decl. ¶ 7); Ex. 6 (Mabry Decl. ¶ 16);. Ex. 29 (Singer Decl. ¶ 7); Ex. 7 (Dixon Decl. ¶ 8); Ex. 30 (Deutsch Decl. ¶ 10); Ex. 32 (Whitley Decl. ¶ 7); Ex. 13 (Pierson Decl. ¶¶ 18-19); Ex. 14 (Sojos-Valladares Decl. ¶ 10). Nor are staff wearing masks consistently, although the MDC has reported more staff infections than the vast majority of BOP facilities. Rosenfeld Decl. Ex. 2 (Powell Decl. ¶ 15); Ex. 24 (Haney Decl. ¶ 16); Ex. 8 (Needham Decl. ¶ 17); Ex. 17 (Drayton Decl. ¶ 12); Ex. 18 (Hall Decl. ¶ 16); Ex. 26 (D Sanchez Decl. ¶ 16); Ex. 12 (Platt Decl. ¶ 14); Ex. 19 (Carpenter Decl. ¶ 15); Ex. 31 (Roberts Decl. ¶ 7); Ex. 20 (R Watson Decl. ¶ 14); Rosenfeld Decl. Ex. 21 (A Wilson Decl. ¶ 15); Ex. 28 (Batista Decl. ¶ 14); Rosenfeld Decl. Ex. 6 (Mabry Decl. ¶ 11); Ex. 7 (Dixon Decl. ¶ 16); Ex. 30 (Deutsch Decl. ¶ 11); Ex. 13 (Pierson Decl. ¶¶ 18-19); *see also*

https://www.bop.gov/coronavirus/ (reporting as of April 29 that, among BOP facilities, the MDC has third highest number of staff positives in the country). Even on a unit on quarantine, staff do not regularly wear masks or gloves, coming and going from other areas throughout the facility. Ex. 20 (R Watson Decl. ¶ 14); Rosenfeld Decl. Ex. 7 (Dixon Decl. ¶ 18).

MDC insists that it performs contact investigations, looking for people who had "close prolonged contact" with an infected person two or fewer days before the onset of symptoms. Ex.

1 (Vasquez Tr. 83:14:24). However, only cellmates are considered to have "close prolonged contact" with each other. Ex. 1 (Vasquez Tr. 85:21-24). When asked to explain why this is so, MDC responded that "[s]ocial distancing has been encouraged. They're also suppose[d] to be wearing masks." Rosenfeld Decl. Ex. 1 (Vasquez Tr. 84:5-21). In other words, social distancing is presumed to have taken place. And yet, there are many instances where, as MDC knows full well, social distancing *cannot* take place. Women are housed in a dormitory-style unit with bunkbeds placed less than six feet apart, and alternating top and bottom bunks to create additional space between inmates is not always possible Rosenfeld Decl. Ex. 15 (King Tr. 96:14-97:2, 97:15-19). The women also eat seated close together and share phones, computer terminals, showers, and bathrooms. Rosenfeld Decl. Ex. 8 (Needham Decl. ¶¶ 2-5). Staff do not consistently wear masks, and may be infecting incarcerated people as a result. Rosenfeld Decl. Ex. 8 (Needham Decl. ¶ 30). Some of these women have complained of COVID symptoms, but not removed from the dormitory area Rosenfeld Decl. Ex. 1 (Vasquez Tr. 101:8-23); Ex. 8 (Needham Decl. ¶¶ 19, 32-35).

Men are normally double-celled, as there is not enough space to truly distance them from one another. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 22:14-18); Rosenfeld Decl. Ex. 7 (Dixon Decl. ¶ 10). When they are let out of their cells to use communally shared items like phones, computers, and showers, they are also not able to socially distance themselves from one another. Rosenfeld Decl. Ex. 7 (Dixon Decl. ¶ 10); Ex. 32 (Whitley Decl. ¶ 9). Crowds form as incarcerated people attempt to access these items in the limited time that they have outside of their cells. Ex. 6 (Mabry Decl. ¶¶ 8-9); Ex. 32 (Whitley Decl. ¶ 9). Both the phones and computers are placed near each other, so it is impossible to socially distance during use. Rosenfeld Decl. Ex. 32 (Whitley Decl. ¶ 9); (Chunn Decl. ¶ 7). Neither staff nor incarcerated

people are required to use masks when they cannot practice social distancing.  Rosenfeld Decl. Ex. 7 (Dixon Decl. ¶¶ 10, 14, 16); Ex. 2 (Powell Decl. ¶ 15); Ex. 24 (Haney Decl. ¶ 16); Ex. 17 (Drayton Decl. ¶ 12); Ex. 18 (Hall Decl. ¶ 16); Ex. 26 (D Sanchez Decl. ¶ 16); Ex. 12 (Platt Decl. ¶ 14); Ex. 19 (Carpenter Decl. ¶ 15); Ex. 31 (Roberts Decl. ¶ 7); Ex. 20 (R Watson Decl. ¶¶ 11, 14); Ex. 28 (Batista Decl. ¶ 14); Ex. 6 (Mabry Decl. ¶ 11); Ex. 30 (Deutsch Decl. ¶¶ 11-12); Ex. 13 (Pierson Decl. ¶¶ 18-19).  Nor do guards enforce social distancing when people are out of their cells during lockdown.  (Chunn Decl. ¶ 7).

### 4. MDC Is Not Adequately Protecting Staff, Which Increases Risk for People Held at the MDC

The risk that staff will infect incarcerated people with COVID-19 is high.  Twenty-seven MDC staff have tested positive for COVID-19 *that MDC knows of*: MDC's position is that it cannot require staff to tell it of a positive diagnosis. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 147). Nor does MDC test staff itself, despite staff having requested such testing.  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 145:17-18, 147:3-8). Yet staff are uniquely suited to spreading COVID.  Both medical and custody staff move between quarantined units, the unit where people are being isolated, and the general population units.  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 95:20-96:9).  No one monitors staff for compliance with infectious disease protocols when they transfer between Units.  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 96:10-15).

Staff are also not informed when an incarcerated person tests positive for COVID-19, unless they "need to know."  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 123:4-6.)  MDC's definition of need to know is limited to executive staff and medical staff.  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 123:22-124:15).  As a result, no custody staff are ever informed that a person they had contact with tested positive.  In addition, MDC still has yet to fit-test all of its staff for N-95 masks; as a

result most N-95 masks at MDC are in storage and have not been distributed. Rosenfeld Decl. Ex. 15 (King Tr. 66:24-67:12).

MDC states that it screens all staff for fever before allowing them to enter the facility. However, it admits that the forehead thermometers that it uses may result in artificially lowered temperature readings for people coming in from outside. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 135:23-136:14). In addition, staff are not being asked about contact with people who have confirmed or presumed cases of COVID-19. Id. ¶ 136. Taken together, these many failures to protect MDC staff will necessarily result in increased risk for incarcerated people.

### 5.      Respondent Has Taken No Steps to Protect Vulnerable Persons

MDC has identified more than 300 (*see* Ex. 1 Vasquez Tr. 204-05) incarcerated people who are particularly at risk of complications, including death, from COVID-19. But it has taken no specific affirmative steps to protect these individuals from infection. Rosenfeld Decl. Ex. 1 (Vasquez Tr. 207:15-209:18; Vasquez Depo. Ex. 18). Indeed, MDC has conceded that the facility does not have the capacity to provide specific measures to protect Vulnerable Persons. Vasquez Depo. Ex. 18 ("MDC Brooklyn has not isolated its at risk population at this time because the number of inmates who fall into this category is too large to contain and isolate on one or even two units.").

Respondent's current practices in the MDC fail to identify and protect detainees who are particularly vulnerable to the effects of COVID-19. Respondent has not provided high-risk detainees with any additional protection or surveillance for COVID-19 symptoms. Venters Report ¶¶ 45, 47. High-risk detainees share cells with other people, *id.* ¶ 48, and even when an incarcerated person was diagnosed with COVID-19 and held in isolation, there is no record of any care provided to him for the ten day period after he was diagnosed. *Id.* ¶ 55.

Respondent has failed to take protective measures even in the face of known infections at the MDC. The MDC has relied on incarcerated people, rather than professional cleaners or staff, to clean units where confirmed positive people have been housed. von Dornum Decl. ¶¶ 12-13. According to one person confined at the MDC, others who were housed with a person who tested positive eventually showed symptoms. Pet. ¶ 68. To "clean" their own cells, people are provided only with diluted hand soap or nothing at all. Pet. ¶ 71; Rosenfeld Decl. Ex. 23 (Soria Decl. ¶ 7); *supra* Facts, C.3.

Nor has Respondent taken adequate steps to educate incarcerated people about the spread of infection or separated individuals based on their risk of becoming seriously ill from COVID-19. von Dornum Decl. ¶ 35; Pet. ¶ 77. Physicians have not visited housing units, medical staff will visit only if someone reports symptoms, which many people are afraid to do because, absent a transparent protocol for treatment, they are reasonably concerned that if they report feeling symptomatic they will be placed in solitary confinement. von Dornum Decl. ¶ 16(b); Pet. ¶ 77; Rosenfeld Decl. Ex. 1 (Vasquez Tr. 45:5-15) (Prisoners have not been assured that they will not be placed in the SHU if they report symptoms.).

### 6. MDC Is Not Prepared to Treat Individuals Who Contract COVID-19

If Petitioners contract COVID-19 at the MDC, they will be at a high risk of developing serious symptoms because the MDC lacks the medical resources to care for symptomatic individuals. Pet. ¶ 81. MDC has no separate medical unit for sick people, unlike many Federal Correctional Institutions and even Rikers' Island. von Dornum Decl. ¶ 41. MDC currently has no ventilators and cannot intubate patients on-site. von Dornum ¶¶ 39, 40. MDC does not have any specialized equipment or medical providers. *Id.* ¶ 42. There are only three doctors available at MDC to care for all 1,700 people held there. *Id.* MDC cannot even care for isolated prisoners

in the isolation unit: if they need care in a medical room, they must go outside the unit to receive it.  Rosenfeld Decl. Ex. 1 (Vasquez Tr. 75:16-76:17).

These resources will be inadequate to treat people who contract COVID-19, particularly the Vulnerable Persons sub-class.  Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.  Pet. ¶ 86.  Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers.  *Id.*  MDC does not have that specialized equipment or specialized providers.  *Id.*  And MDC's staffing shortage will only increase with the epidemic, leaving officers less able to monitor the health of the incarcerated population.  Giftos Decl. ¶ 18.

If Petitioners or class members contract COVID-19, they will encounter significant delays in obtaining medical care, further exacerbating the risks they face.  As Dr. Venters has opined based on his review of the MDC's sick call slips, Respondent is operating a "broken" system that increases the risk of infections and complications, particularly for Vulnerable Persons.  Venters Report, ¶ 3.  This is confirmed by reports from class members about the lack of timely responses to their requests for medical attention.  Rosenfeld Decl. Ex. 8 (Needham Decl. ¶¶ 19-35);. Ex.10 (Finch ecl. ¶ 11); Ex. 26 (D. Sanchez Decl. ¶ 13); Ex. 12 (Platt Decl. ¶ 11); Ex. 20 (R. Watson Decl. ¶¶ 16-17); Ex. 21 (A. Wilson Decl. ¶¶ 10-12); Ex. 35 (Castillo Decl. ¶¶ 5, 7); Ex. 22 (Miller Decl. ¶ 8); Ex. 23 (Soria Decl. ¶ 2); Ex. 7 (Dixon Decl. ¶¶ 11-13); Ex. 13 (Pierson Decl. ¶¶ 11, 21); Ex. 29 (Singer Decl. ¶ 12); Ex. 30 (Deutsch Decl. ¶¶ 15, 18-19); Ex. 32 (Whitley Decl. ¶ 14);. Ex. 14 (Sojos-Valladares Decl. ¶ 5).  And if members of the class are in need of emergent attention, the emergency call buttons in their cells may not even work. Rosenfeld Decl. Ex. 24(Haney Decl. ¶ 14); Ex. 16 (Altino Decl. ¶ 13); Ex. 10 (Finch Decl. ¶ 13);

Ex. 18 (Hall Decl. ¶ 13); Ex. 11 (Nelson Decl. ¶ 12); Ex. 26 (D. Sanchez Decl. ¶ 23); Ex. 23 (Soria Decl. ¶ 4).

### D.     Petitioners Are Particularly Vulnerable

Because of their age and/or medical conditions, Petitioners are particularly vulnerable to serious illness or death if infected by COVID-19.

#### 1.     Ayman Rabadi

Mr. Rabadi is 59 years old; he will be 60 in May.  Rabadi Decl. ¶ 1.  He suffers from many health problems, and he had a heart attack about six years ago.  *Id.*  ¶ 4. Mr. Rabadi takes medication for high blood pressure, cholesterol, hypertension, diabetes, and other conditions.  *Id.* ¶ 6.  He has several stents in his heart.  *Id.* ¶ 4.  He has a tumor in one of his kidneys and suffers from an anal fistula.  *Id.* ¶¶ 4, 7.  Because under lockdown, he has limited access to showers, he is unable to properly clean his anal fistula and fears it will become infected.  *Id.* ¶ 7.  Mr. Rabadi suffered from a stroke in jail last year.  *Id.* ¶ 5.  Mr. Rabadi has made many requests for medical care over the past several months, but these requests have been ignored. *Id.* ¶ 9.  When medical staff started taking people's temperatures in his unit several weeks ago, they never asked him questions about his health. *Id.* ¶ 10. In the last week, no one has taken his temperature. *Id.*

Mr. Rabadi is scheduled to be released on July 19, 2020.  *Id.* ¶ 2.  If released, he will return to his family home of the past thirty years where he will live with his adult daughter and her family.  *Id.* ¶ 3.

#### 2.     Elodia Lopez

Ms. Lopez is 55 years old and is housed in the women's dormitory of the MDC. Lopez Decl. ¶ 1, 7. She suffers from a number of serious health conditions, including high blood pressure, high cholesterol, a pituitary condition, and Type II diabetes. *Id.* ¶ 2. Ms. Lopez takes insulin for her diabetes as well as daily medication for her high blood pressure and cholesterol.

*Id.* Ms. Lopez also has a serious lung infection, which she first discovered in November 2019. *Id.* ¶ 4. Her lung infection makes it difficult to breathe, causes her throat close, and gives her high fever and chills. *Id.* Since arriving at the MDC in January 2020, she has received no medication for the infection. *Id.* In response to her medical requests she has been given Vitamin D and told to buy medicine for pain. *Id.* Recently, Ms. Lopez is experiencing difficulty breathing, headaches, congestion, and depression. *Id.* ¶ 5.

Ms. Lopez arrived at the MDC in January 2020 and is scheduled to be released on July 28, 2020. Lopez Decl. ¶ 1. Ms. Lopez is serving a 15-month sentence in connection with a conviction for selling marijuana. Pet. ¶ 93. On April 30, 2020, her defense counsel was informed that she has been denied compassionate release. Lopez. Decl. Ex. 1. If released, Ms. Lopez will live with her daughter. Lopez Decl. ¶ 14.

### 3.    James Hair

Mr. Hair is 29 years old and suffers from multiple serious medical conditions. Hair Decl. ¶ 1. Mr. Hair has multiple sclerosis, which causes him headaches, numbness, and tingling and has caused him to have approximately 4 seizures in the past two years. *Id.* ¶ 4. Mr. Hair also suffers from asthma and uses an inhaler. *Id.* ¶ 6. In late 2019, Mr. Hair was taken to the hospital for an asthma attack. *Id.* At his previous facility, Mr. Hair was told after a chest and kidney scan that he requires follow up care for lung issues and abnormal cell growth on his left kidney. *Id.* ¶ 7. In late 2019, Mr. Hair began vomiting multiple times per week and frequently seeing blood in his vomit, which he has shown to staff at the MDC. *Id.* ¶ 10.

Mr. Hair told a doctor at the MDC about his abnormal lung and kidney scans, has put in numerous medical requests for trouble breathing, blood in his stool and vomit, pain in his lower back/kidneys, and a severe earache, but has received inadequate attention. *Id.* ¶¶ 7, 12. Over the last month, Mr. Hair has put in requests for medical care on an almost daily basis. *Id.* ¶¶ 17-27.

Most of these requests were ignored. *Id.* For example, on April 23, 2020, Mr. Hair told the woman who passes out medication that he was short of breath and his chest hurt and asked her to check his vitals but the nurse refused to do so and shut the door on him. *Id.* ¶ 29. Mr. Hair is currently experiencing shortness of breath and tightness in his chest. *Id.* ¶ 33. On April 22, 2020, Mr. Hair asked a doctor to test him for coronavirus, but the doctor refused to give him a test and discouraged him from asking for testing. *Id.* ¶ 34.

Mr. Hair is scheduled to be released on August 15, 2026. *Id.* ¶ 2. If released, Mr. Hair would live with his fiancé in Baltimore. *Id.* ¶ 3.

## ARGUMENT

To establish an entitlement to a preliminary injunction, the moving party must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tipping in favor of the moving party; and (4) that the public interest is served by an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 392 (S.D.N.Y. 2011). Although Petitioners maintain that an injunction is necessary to preserve the status quo—namely, their current health—Petitioners also can show the "substantial likelihood of success" necessary to justify a mandatory injunction. *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks and citation omitted).

## I. PETITIONERS FACE IRREPARABLE HARM IF THEY REMAIN CONFINED AT THE MDC UNDER CURRENT CONDITIONS

"The Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the

merits." *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002) (citing *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990)).  Harm is considered to be irreparable if it "cannot be redressed through a monetary award." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). The irreparable harm here is immense: Petitioners and the class face death or serious illness from COVID-19 if they remain incarcerated at the MDC under current conditions.

With confirmed COVID-19 infections already present among staff and incarcerated people housed at the MDC, it will be nearly impossible, absent release or preventative measures, to prevent widespread internal transmission.  The failure of the MDC to enable Petitioners and the class to practice social distancing and personal hygiene leaves them much more likely to be infected.  This risk is exacerbated by the fact that the MDC has not taken sufficient steps to ascertain whether the people who are held or work at the MDC already have COVID-19. *See, e..g., Boone v. Brown*, No. 05 Civ. 750 (AET), 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate constitutional violation); *Austin v. Pa. Dep't of Corr.*, Civ. A. No. 90-7497, 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing protocol for tuberculosis).  Once they contract COVID-19, Petitioners and other Vulnerable Persons will be at a substantially increased risk of death or serious illness because of their age and/or underlying medical conditions.  The putative class and Vulnerable Persons subclass are at imminent risk from the virus as well.

Being compelled to endure a substantially increased risk of serious illness and death will always constitute irreparable injury.  *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening

condition in their prison on the ground that nothing yet had happened to them."); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997) (irreparable injury found where closing of treatment program would lead to plaintiffs' continued abuse of alcohol and drugs, "resulting in death, illness, or disability"); *see also Stagliano v. Herkimer Central School District*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) (equitable relief justified by "obvious potential for such issues as developing chronic health issues or spreading contagious diseases.").

Moreover, the Second Circuit has repeatedly held that the alleged violation of constitutional rights amounts to irreparable injury. *See, e.g.*, *Johnson v. Connolly*, 378 F. App'x 107, 108 (2d Cir. 2010); *Johnson v. Miles*, 355 F. App'x 444, 446 (2d Cir. 2009); *Conn. Dep't of Envtl. Prot. V. O.S.H.A.*, 356 F.3d 226, 230-31 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). As discussed below, Petitioners have established that current MDC conditions violate the Fifth and Eighth Amendments.

Absent appropriate injunctive relief, Petitioners' lives are at risk. The harm that would flow from allowing them to remain at the MDC in current conditions is undoubtedly irreparable, requiring release and the institution of significant mitigating measures. Several courts have already found that the very risk Petitioners face here constitutes irreparable injury justifying release from custody. *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) (risk posed by COVID-19 infection constitutes irreparable harm); *Coronel v. Decker*, No. 20 Civ.2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (same for people with "serious underlying medical conditions"); *Castillo v. Barr*, No. 20 Civ. 605, ECF No. 32 at 10 (March 27, 2020) (risk of exposure to COVID-19 was irreparable harm justifying release from immigration custody). And others have found that similar conditions mandate injunctive measures that will ameliorate the risk. *Banks*, 2020 WL 1914896, at *11 (ordering injunctive

relief against local jail after concluding that "Plaintiffs' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm."); *Swain*, 2020 WL 1692668, at *2 (granting temporary restraining order requiring Miami-Dade County Jails to take specific measures to ameliorate risk of spread of COVID-19 and ensure testing "for anyone displaying known symptoms of COVID-19 in accordance with CDC guidelines."); *Cameron*, 2020 WL 1929876, at *2–3, *modified on reconsideration*, No. 20 Civ. 10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020) (granting injunctive relief to class of pretrial detainees and convicted individuals).

## II. PETITIONERS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS

Respondent is violating Petitioners' Fifth and Eighth Amendment rights by continuing to incarcerate them in conditions that expose them to a significant risk of transmission of an infectious disease that will prove deadly because of Petitioners' vulnerable conditions.

All people held in the MDC, whether convicted or not, are entitled to be protected from conditions of confinement that create a serious risk to health or safety. *See Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violate the Eighth Amendment); *Banks*, 2020 WL 1914896, at *11 ("Based on the current record, Plaintiffs have provided evidence that Defendants are aware of the risk that COVID-19 poses to Plaintiffs' health and have disregarded those risks by failing to take comprehensive, timely, and proper

steps to stem the spread of the virus.").[6]  The risk of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for Petitioners and the vulnerable class members described herein.  *See Helling*, 509 U.S. at 34  (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases); *Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019) (a serious medical need is "a condition of urgency such as one that may produce death, degeneration, or extreme pain.").  Respondent has not adequately protected Petitioners and the class from this risk of serious harm.

Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms."  *Helling*, 509 U.S. at 33.  The reach of the Fifth and Eighth Amendments includes "exposure of inmates to a serious, communicable disease."  *Id.*; *see also Jolly*, 76 F.3d at 477 ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease").  This Court need not "await a tragic event" to find that Respondent is maintaining unconstitutional conditions of confinement.  *Helling*, 509 U.S. at 33.  Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted).

Here, Petitioners are likely being exposed to COVID-19 while at the MDC, placing them at risk of death because of their vulnerable medical conditions.  Respondent is well aware of this

---

[6] The named Petitioners are convicted and therefore their treatment is governed by the Eighth Amendment.  Class members who are detained for pretrial purposes, however, are protected from deliberate indifference by the Fifth Amendment.  Although pretrial class members may be entitled to even greater protection from unsafe conditions than convicted class members, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."), for present purposes the distinction is immaterial because Respondent's continued detention of the class plainly violates the Eighth Amendment.

risk, having been alerted to it by the CDC, the Attorney General, the Second Circuit, and advocates such as the Federal Defenders. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020) (referring to "grave and enduring" risk posed by COVID-19); *see also Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention); *United States v. Little*, No. 20 Cr. 57, 2020 WL 1439979, at *4 (S.D.N.Y. Mar. 24, 2020) ("As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.").

In the face of this risk, Respondent has not taken sufficient steps to protect Petitioners or the other people who are incarcerated at MDC. Respondent has not even instituted a testing protocol, or other screening measures, that will enable him to understand the scope of the infection within the MDC and institute appropriate protective measures in response. The Second Circuit, almost 40 years ago, had no trouble holding, in reliance on *Estelle*, that the "failure to adequately screen newly arrived [inmates] for communicable diseases" amounted to deliberate indifference for both pretrial detainees and convicted individuals, "believing that it is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy." *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981); *accord Morales Feliciano v. Calderon Sierra*, 300 F. Supp. 2d 321, 341 (D.P.R. 2004) (neglecting to adequately screen for infectious disease implicates Eighth Amendment rights); Carty v. Farrelly, 957 F. Supp. 727, 737 (D.V.I. 1997) ("inadequate screening of incoming prisoners exposes prisoners to unreasonable health risks") In a facility of 1700 people, in the midst of a global

pandemic that can spread rapidly in confined spaces, in the city that is the epicenter of the pandemic, the dearth of testing represents the very kind of willful blindness that the Supreme Court equated with subjective deliberate indifference in *Farmer,* 511 U.S. at 843 n.8.

Nor has Respondent provided Petitioners and the class with the materials and conditions necessary to maintain basic personal hygiene to prevent transmission of the disease. Respondent has not taken medically indicated measures once he has identified an individual infected with COVID-19. One district court facing challenges to the medical care provided at a Vermont prison had no trouble finding that similar conditions violated the constitution. *Carty*, 957 F. Supp. at 737–38 (noting that 2 full-time and 2 part-time medical staff served 168 to 190 incarcerated people, and that sick call records indicate that people did not receive timely medical care).

Whether judged under the Fifth or Eighth Amendment, Respondent is holding Petitioners in violation of the Constitution by failing to protect them in the face of significant threats to their health and safety. Failing to take specific action to prevent spread of COVID-19 to high risk individuals can meet the objective requirement of the deliberate indifference test. *Coronel*, 2020 WL 1487274, at *4. Even where detention facilities have taken some measures to protect detainees – screening, providing soap and hand sanitizer, and increasing cleaning – it can amount to deliberate indifference when officials could not "represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another" and could not "provide the Court with any information about steps taken to protect high-risk detainees like Petitioners." *Basank*, 2020 WL 1481503, at *5 ("Confining vulnerable individuals such as Petitioners without enforcement of requisite social distancing and without specific measures to protect their delicate health "pose[s] an unreasonable risk of serious damage to [their] future health," and

demonstrates deliberate indifference.") (*quoting Phelps*, 308 F.3d at 185 (internal quotation marks and citation omitted)).

It is for this reason that, in response to the COVID-19 crisis, one federal court ordered the Miami-Dade County Jail to provide mitigation measures similar to those requested in the instant case. *Swain*, 2020 WL 1692668, at *2 (ordering injunctive relief regarding hygiene, testing, personal protective equipment, and medical care). Along similar lines, another federal court ordered the District of Columbia to take similar steps in their jails, including measures related to sick call and social distancing. *Banks*, 2020 WL 1914896, at *13-15.

The Supreme Court's decision in *Helling* is particularly instructive. In *Helling*, the Court recognized that an Eighth Amendment violation could be shown based on prison officials' tolerance of a potential future harm to health. 509 U.S. at 33 ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."). Continuing to detain Petitioners in the midst of the COVID-19 pandemic while failing to take measures to protect them and the putative classes poses a significantly greater risk than that faced by the plaintiff in *Helling*. COVID-19 is already inside the MDC. The facility has not taken adequate measures to ascertain the prevalence of the disease, stop its spread, or treat people who become ill. And Petitioners are at an increased risk because of their age and/or underlying medical conditions. As one court recently summed up, "Given the asymptomatic nature of transmission, the impossibility of adequate social distancing in communal detention spaces, and the inability or unwillingness to test all inmates and staff, [medically vulnerable people] remain[] at an unreasonable and substantial risk of infection and consequently of dire health consequences, including death." *Malam v. Adducci*, No. 20-10829, 2020 WL 1899570, at

*4 (E.D. Mich. Apr. 17, 2020).  Accordingly, Petitioners have established a substantial

likelihood of success on the merits of their claims.

**III.     THE COURT HAS THE AUTHORITY TO ORDER THE RELIEF SOUGHT BY PETITIONERS AND  THE BALANCE OF EQUITIES TIPS IN PETITIONERS' FAVOR**

Petitioners seek three categories of remedies: release; injunctive relief to ameliorate

unconstitutional conditions; and the appointment of a Special Master or court-appointed expert to

assist in facilitating these remedies.  The Court has authority to order all of this relief in the

context of this Section 2241 action.  Section 2241(c)(3) authorizes courts to grant habeas corpus

relief where a person is "in custody in violation of the United States."  The Second Circuit has

"long interpreted § 2241 as applying to challenges to the execution of a federal sentence,

including such matters as . . . prison conditions." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d

Cir. 2008) (internal quotation marks and citation omitted).  This includes challenges to detention

where conditions pose a threat to Petitioners' medical wellbeing.  *See Roba v. United States*, 604

F.2d 215, 218–19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a detainee's

transfer where that transfer created a risk of fatal heart failure). In this case, the unconstitutional

threat to Petitioners' health and life posed by being held in Respondent's custody is ongoing and

release from custody is accordingly an appropriate remedy.  *See Basank*, 2020 WL 1481503; *see

also supra* n. 10.

Short of release, appropriate injunctive relief is necessary to protect Petitioners and the

class from the significant risk of COVID-19 infection.  This includes adequate screening of

people who enter the facility, adequate testing measures, access to materials for personal

hygiene, a revised sick call procedure, and specific measure to protect Vulnerable Persons.

Venters Report, ¶ 59.

Recent case law establishes that both release from custody and appropriate injunctive relief are available on this record, for both pretrial detainees and convicted people. In *Wilson v. Williams*, No. 20 Civ. 00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020), the court granted a preliminary injunction ordering the respondent, warden of the Elkton Federal Correction Institution, to consider for release incarcerated people particularly vulnerable to the COVID-19 crisis. Just as at the MDC, the Elkton Warden had a paltry number of tests available to determine the prevalence of COVID-19 infections (although it had more confirmed positive cases and several deaths). *Id.* at *2 ("[W]ithout testing there is no way to know how many Elkton inmates have the virus.").

And in *Cameron v. Bouchard*, No. 20 Civ. 10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020), *modified on reconsideration*, No. 20 Civ. 10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020), the court entered an order on a TRO granting wide-ranging injunctive relief to a class of pretrial detainees and convicted individuals, including measures related to hygiene, protective equipment, testing, social distancing, and medical care. *Id.* at *2-3; *see also Swain*, 2020 WL 1692668, at *2 (granting TRO against Miami-Dade County Jail requiring similar measures). Petitioners request similar measures here.

Moreover, both the balance of equities and the public interest favor releasing Petitioners and/or providing injunctive relief. The government has no interest in maintaining an unconstitutional practice. *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017). And in this case, release would help ameliorate a regional medical crisis that is threatening to overwhelm local hospitals. The interest in having Petitioners serve the remainder of their terms at the MDC, rather than under home confinement, is slight compared to the substantial risk to Petitioners' health.

Even if Petitioners and other class members are released, it will not ameliorate the risks for the remainder of the people held at the MDC. Respondent already has identified more than 300 people Vulnerable Persons. Those individuals face the same risk of imminent harm as Petitioners and are entitled to immediate release or, if they remain in the MDC, and appropriate mitigation measures as well. The public interest clearly favors granting injunctive relief for whoever remains at the MDC, because "it supports public health." *Banks*, 2020 WL 1914896, at *12. For this reason, Petitioners respectfully request that this Court enter injunctive relief that will ameliorate those risks, and appoint a Special Master to (i) oversee implementation of the Court's ameliorative injunctive relief, (ii) assist Vulnerable Persons currently incarcerated at the MDC to pursue avenues for release, where appropriate, and (iii) make additional recommendations for ameliorative action at the MDC.

The Court has inherent equitable power to appoint a Special Master to help the Court bring the MDC's response to the coronavirus in line with the Constitution. "The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir.2011) (internal quotation marks and citation omitted). "[A]s with any other [equitable] remedial tool" a district court has "broad discretion" to appoint a Special Master. *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir.1994) (per curiam). In addition, Rule 53 of the Federal Rules of Civil Procedure provides an additional source of authority—supplementing the Court's inherent authority—to appoint a Special Master. That rule provides that "a court may appoint a master [] . . . to address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed.R.Civ.P. 53(a)(1)(C). The advisory committee notes to Rule 53 explain: "Courts have come to rely on masters to assist in

framing and enforcing complex decrees" and that "[t]he master's role in enforcement may extend to investigation." *Id.* advisory committee notes (2003 amendments).

Here, Petitioners seek the appointment of a Special Master to ensure compliance with any injunctive relief ordered by this Court aimed at ameliorating conditions at the MDC, including by assisting with developing pathways for release of Vulnerable People, where appropriate. For example, a Special Master could be a conduit to the courts for appropriate cases to be distributed to sentencing judges, prioritize the BOP's list of Vulnerable People, and systematically propose solutions on a group-wide basis to achieve faster, more consistent results. A Special Master with correctional health expertise will also assist the Court with the complexities of evaluating conditions at the MDC and will make recommendations to the Court based on evolving public-health knowledge regarding COVID-19. The Court can direct the Special Master's responsibilities, reporting schedule, and interaction with stakeholders in a manner that supplements existing frameworks that would otherwise move too slowly to address the immediate needs presented by the pandemic. This is well within the power of the Court. *See, e.g., United States v. State of Conn.*, 931 F. Supp. 974, 985 (D. Conn. 1996) (appointing a special master to review the care and treatment of residents in an institution for the mentally disabled, to formulate specific methods to implement the required changes, and to work with the parties to effectuate those changes).[7]

_____

[7] In the alternative, Petitioners respectfully request that the Court appoint an expert pursuant to Federal Rule of Evidence 706(a). *See Ledford v. Sullivan*, 105 F.3d 354, 358–59 (7th Cir. 1997) ("Generally, if scientific, technical, or other specialized knowledge will assist the trier-of-fact to understand the evidence or decide a fact in issue, a court will utilize expert witnesses[]" under Rule 706); 29 Wright & Miller, Federal Practice & Procedure § 6304 (2d ed. April 2020 update) ("The most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance."); *see also Scott v. Spanjer Bros., Inc.*, 298 F.2d 928, 930–31 (2d Cir. 1962) ("We believe that the appointment of an impartial medical expert by the court in the exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair trial of a lawsuit."); *Hart v. Cmty. Sch. Bd. of Brooklyn, New York School Dist. No. 21*, 383 F. Supp. 699, 764 (E.D.N.Y. 1974) (appointing expert/special master in complex school desegregation

## IV. THE COURT SHOULD EXERCISE ITS GENERAL EQUITY POWERS OR CONDITIONALLY CERTIFY THE CLASS TO AWARD CLASS-WIDE RELIEF

Formal class certification is not necessary in order to issue the requested emergency relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."). "It is well established that '[c]ertain circumstances give rise to the need for prompt injunctive relief for a named plaintiff or on behalf of a class' and that the 'court may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers.' " *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) *quoting Strouchler v. Shah*, 891 F.Supp.2d 504, 516–17 (S.D.N.Y.2012).

The Court need not certify or even conditionally certify the class in order to issue a preliminary injunction providing relief to everyone incarcerated at the MDC. As other courts have done in recent litigation seeking to enjoin the practices of detention facilities around the country in the wake of the COVID-19 pandemic, this Court may rely on its general equity power to grant class-wide preliminary relief. *See Cameron*, 2020 WL 1929876, at *2–3 (ordering several forms of class-wide injunctive relief concerning COVID-19 in jail without conditionally certifying class); *Swain*, 2020 WL 1692668, at *2 (S.D. Fla. Apr. 7, 2020) (same).

The Court could instead opt to conditionally certify the class and order class-wide preliminary relief. "[T]here is nothing improper about a preliminary injunction preceding a

---

case). Where a case involves "complex issues of infectious disease, public health, and correctional medicine," a court is well within its discretion to appoint a Rule 706 expert. *Reynolds v. Goord*, No. 98 Civ. 6722 (DLC), 2000 WL 825690, at *2 (S.D.N.Y. June 26, 2000).

ruling on class certification." *Wilson*, 2020 WL 1940882, at *6 (citation omitted) (granting class-wide preliminary injunction to conditionally certified class of everyone incarcerated in BOP prison and subclass of medically vulnerable individuals during COVID-19 pandemic); *Rivas v. Jennings*, 20 Civ. 02731 (VC), 2020 WL 2059848, at *1, *4 (N.D. Cal. Apr. 29, 2020) (granting conditional class certification and preliminary relief regarding immigration detention conditions during the COVID-19 pandemic). When conditionally certifying a class, the Court must be satisfied that the requirements of Rule 23 are met, though "[i]ts analysis is tempered, however, by the understanding that such certifications 'may be altered or amended before the decision on the merits.'" *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018). Here, the proposed class of all current and future people detained at MDC and the subclass of all current and future medically vulnerable people detained at the MDC easily meet the Rule 23(a) and Rule 23(b)(2) requirements for certification.

### A. The Proposed Class is Numerous

The proposed class is presumptively numerous. There are approximately 1,700 people housed at the MDC and approximately 380 are now on the medically vulnerable list. A proposed class of this size plainly satisfies the numerosity requirement. In the Second Circuit, a class of 40 or more members is presumptively numerous. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). The proposed class not only satisfies the numerosity requirement because of its size, but also because joinder of all potential class members is impractical based on contextual factors. *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014) (*citing Robidoux v. Celani*, 987 F.2d 931, 936 (2d. Cir. 1993)). The proposed class consists of individuals detained in jail, most of whom have limited financial resources and limited ability to sue independently. *See V.W. by & through Williams v. Conway,*

236 F. Supp. 3d 554, 574 (N.D.N.Y. 2017); *Dean v. Coughlin*, 107 F.R.D. 331, 332–33 (S.D.N.Y. 1985).

### B. Questions of Law and Fact Are Common to the Proposed Class

The questions of law and fact raised here are "common to the class," Fed. R. Civ. P. 23(a)(2), because their "resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Commonality requires the identification of an issue that by its nature "is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes v. Wal-Mart Stores, Inc.,* 564 U.S. 338, 350 (2011). A single common issue is sufficient to establish commonality. *Id.* at 359. The commonality requirement is perfectly met in cases, like this one, seeking injunctive relief to remedy constitutional violations. See *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001) ("[t]here is an assumption of commonality where plaintiffs seek certification of an injunctive class under Rule 23(b)(2) to right alleged constitutional wrongs.") And in the context of prisons and jails, courts routinely find common questions of law and fact when those incarcerated "have a common interest in preventing the recurrence of the objectionable conduct." *Inmates of Attica Corr. Facility v. Rockefeller*, 453 F.2d 12, 24 (2d Cir. 1971); see also *V.W*., 236 F. Supp. 3d at 575  (finding commonality because incarcerated plaintiffs alleged a "common course of unlawful conduct" and because litigation will be resolved by whether conduct should be enjoined).

The common question of law and fact to be resolved here is: whether Respondent's failure to take adequate steps to mitigate the risk of harm posed by COVID-19 to people incarcerated at MDC constitutes deliberate indifference in violation of the Eighth and Fifth Amendment to the Constitution and the Supreme Court's decision in *Helling*, 509 U.S. 33 (1993). This case satisfies the requirement of at least "a single common question" that is shared

by all members of the proposed class. All of the class members either have been, or will be, subjected to these common conditions, and a determination that Respondent's conduct is unconstitutional will therefore "resolve an issue that is central to the validity" of each and every class member's detention. *Dukes,* 564 U.S. at 350 (2011).

**C.     The Claims of the Named Plaintiffs are Typical of the Proposed Class.**

Rule 23's requirement that "the claims or defenses of the representative parties  [be] typical of the claims or defenses of the class," "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 .  That the extent of an incarcerated class member's exposure to particular prison conditions and the "exact nature of their injuries" will necessarily differ from those of the proposed class members" does not defeat typicality. *Butler v. Suffolk Cty*., 289 F.R.D. 80, 99 (E.D.N.Y. 2013) (citations omitted). As one court recently noted in the COVID-19 context, "[t]he likelihood that some people would need to be released as part of the effort to alleviate dangerous conditions at the jail … is not a reason to deny provisional class certification. *Rivas*, 2020 WL 2059848, at *1, *4.

**D.     The Named Plaintiffs and Class Counsel Will Fairly and Adequately Represent the Class**

The adequacy requirement under Rule 23(a)(4) "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit." *In re Frontier Ins. Grp.,*

*Inc., Sec. Litig*., 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (internal quotations marks and citation omitted). Here, the interests of the named class representatives are not in conflict with those of the class members. They have all been subjected to the same conduct and have brought this suit to remedy Respondent's woefully inadequate response to the pandemic which has rendered the conditions in which they are held unconstitutional. Additionally, class counsel here are "qualified, experienced and able to conduct the litigation" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp*., 222 F.3d 52, 60 (2d Cir. 2000), and also meet the requirements of Rule 23(g). Declaration of Katherine R. Rosenfeld re: Class Certification; Declaration of Betsy Ginsberg; Declaration of Alexander A. Reinert; Declaration of Yeugenia (Jane) Shvets.

### E. Petitioners Meet the Requirements of Rule 23(b)(2)

The proposed classes meet the Rule 23(b)(2) requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class" so that injunctive relief as to the entire class is appropriate. Fed. R. Civ. P. 23(b)(2). "'Civil rights cases seeking broad declaratory or injunctive relief. . . fall squarely into the category of [Rule] 23(b)(2) actions.'" *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (citation omitted). Courts have already certified or conditionally certified Rule 23(b)(2) classes of incarcerated people seeking injunctive relief, including both release from custody and risk mitigation, to remedy institutional failures to properly manage the COVID-19 pandemic. *See, e.g., Wilson*, 2020 WL 1940882, at *8; *Fraihat v. U.S. Immigration & Customs Enf't,* No. ED-CV 191546 (JGB) (SHKx), 2020 WL 1932570, at *20 (C.D. Cal. Apr. 20, 2020).  Here, Respondents' actions—and inaction—came in response to the risks of COVID-19 at MDC, a ground that applies to all Class and Subclass members. Respondent's deliberate indifference to the health and safety of all members of the Class and Subclass can be remedied only by declaring hisconduct in violation of

Petitioners' constitutional rights and granting injunctive relief to alleviate those risks. Rule 23(b)(2) is thus satisfied.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant Petitioners a preliminary injunction immediately releasing them from detention at the MDC to serve the remainder of their sentences in home confinement under such conditions as the Court deems appropriate, ordering injunctive relief to mitigate risks at the MDC, and appointing a Special Master to chair a Coronavirus Release and Mitigation Committee.

Dated: April 30, 2020
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:

/s/ Katherine Rosenfeld
Katherine Rosenfeld
O. Andrew F. Wilson
Samuel Shapiro
Scout Katovich
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

CARDOZO CIVIL RIGHTS CLINIC
Betsy Ginsberg
Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 1003
(212) 790-0403

Debevoise & Plimpton LLP

Yeugenia (Jane) Shvets
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Petitioners and Putative Class*