UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI by his Next Friend Migdaliz
Quinones; and JUSTIN RODRIGUEZ by his Next
Friend Jacklyn Romanoff; ELODIA LOPEZ; and
JAMES HAIR, individually and on behalf of all
others similarly situated,

                           Petitioners,

        -against-

WARDEN DEREK EDGE,

                          Respondent.

----------------------------------------------------------x

Civil Action No.
20-CV-1590
(Kovner, J.)
(Mann, M.J.)


**MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS'
MOTION FOR A PRELIMINARY INJUNCTION AND
IN OPPOSITION TO PETITIONERS' MOTION FOR CLASS CERTIFICATION**


RICHARD P. DONOGHUE
United States Attorney
*Counsel for Respondent*
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

May 7, 2020

James R. Cho
Seth D. Eichenholtz
Joseph A. Marutollo
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT ........................................................................................................................... 3

    I.       Applicable Standard for a Motion for a Preliminary Injunction ................................... 3

    II.     Petitioners' Motion is Procedurally Improper Because it Seeks the
             Equivalent of Final Judgment on the Merits ................................................................ 4

    III.    Petitioners Have Failed To Demonstrate A Substantial Likelihood of
             Success On The Merits ................................................................................................. 5

             A.     BOP has already taken sufficient steps to protect all inmates at the MDC...... 8

             B.     MDC's distribution of masks and promotion of social distancing has helped
                    to curtail any outbreak of COVID-19 ........................................................... 10

             C.     The MDC has sufficient testing procedures in place ..................................... 12

             D.     The MDC's sick call request system provides a mechanism for inmates to
                    communicate health issues to medical staff that are then triaged ................. 16

             E.     The MDC has provided adequate PPE and cleaning supplies to staff and
                    inmates to prevent the spread of COVID-19................................................. 17

             F.     BOP educates inmates regarding the spread of COVID-19 ........................... 18

              G.     BOP continues to protect staff members working at the MDC...................... 18

              H.     The Court should disregard the declarations of Jonathan Giftos and Jamie
                    Meyer ............................................................................................................ 20

    IV.    Petitioners Have Not Demonstrated Irreparable Harm, Or That The Public
             Interest Or Balance Of Equities Favor A Preliminary Injunction .............................. 20

    V.     Petitioners Fail To Establish That Class Certification Is Warranted......................... 26

             A.     Requirements for class certification .............................................................. 26

              B.     There are no questions of law or fact common to the proposed class............ 27

               C.     The claims of the named Petitioners are not typical of the proposed class.... 29

              D.     The proposed class is not ascertainable......................................................... 30

E.      The proposed class is overly broad ................................................................32

F.      Petitioners have not established adequacy ......................................................33

G.      The proposed class does not satisfy the requirements of Fed. R. Civ. P.
        23(b)(2)............................................................................................................34

CONCLUSION ........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andino v. Fischer*, 555 F. Supp. 2d 418 (S.D.N.Y. 2008) ...................................................3

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) ...........................................5

*Bell v. Wolfish*, 441 U.S. 520 (1979) ..................................................................................2

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015) ....................................26, 31

*Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010) .....................................................................31

*Cameron v. Bouchard*, No. 20-CV-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020),
    *modified on reconsideration*, No. 20 Civ. 10949,
    2020 WL 1952836 (E.D. Mich. Apr. 23, 2020) ............................................................25

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ..............................35

*Charles v. Orange County*, 925 F.3d 73 (2d Cir. 2019) ...................................................2, 6

*City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114 (2d Cir. 2011) .....................25

*Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986) ...................................................................7

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ...............................................34

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................................6

*Farmer v. Brennan*, 511 U.S. 825 (1994) .........................................................................6, 7

*Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147 (1982) .......................................................31

*Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423 (1974) ...........................................4

*Guerra v. Public Safety Concepts,* No. 4:05-CV-2322, 2007 WL 628430
    (E.D. Mo. Feb. 27, 2007) ............................................................................................29

*Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272 (D. Conn. 2013) .......................27

*Haitian Ctrs. Coun. v. McNary*, 969 F.2d 1326 (2d Cir. 1992) .........................................32

*Helling v. McKinney*, 509 U.S. 25 (1993) ...........................................................................6

*Hutchinson v. West*, No. 04-CV-0135F, 2004 WL 1083194 (W.D.N.Y. Apr. 2, 2004) .....................7

*In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992) ...........................33

*In re Fosamax Prods. Liability Litig.*, 248 F.R.D. 389 (S.D.N.Y. 2008)............................32

*In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 221 (D. Kan. 2010) ...................34

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017)........................................................26

*In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012).....................................32

*John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443 (5th Cir. 2007)..................................32

*Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y. 2007)...................................................29

*Kress v. CCA of Tennessee, LLC*, 272 F.R.D. 222 (S.D. Ind. 2010)................................29

*Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999) ...........................................7

*Livas v. Myers*, No. 20-CV-422, 2020 WL 1939583 (W.D. La. Apr. 22, 2020) .........2, 30

*M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216 (S.D.N.Y. 2016) ...............32

*Martinez v. Brown*, No. 08-CV-565, 2011 WL 1130458 (S.D. Cal. Mar. 25, 2011).........35

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .................................................................4

*Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986)......................................................27

*Messner v. Northshore Univ. HealthSys.*, No. 10–2514,
    2012 WL 129991 (7th Cir. Jan. 13, 2012) ...............................................................33

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .........................................4

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ......................................................26

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) ..........7

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ....................4, 20

*New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186 (E.D.N.Y. 2008).............35

*Pagan v. Abbott Labs.*, 287 F.R.D. 139 (E.D.N.Y. 2012)..............................................30

*Roba v. United States*, 604 F.2d 215 (2d Cir. 1979) .................................................21, 22

*Romero v. H.B. Auto. Grp., Inc.*, No. 11-CV-386, 2012 WL 1514810 (S.D.N.Y. May 1, 2012)......27

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394,
    2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017)..............................................................30

*Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982) .............................................................7

*Sale v. Haitian Ctrs. Coun., Inc.*, 509 U.S. 918 (1993).................................................32

*Sarsour v. Trump*, 245 F. Supp. 3d 719 (E.D. Va. 2017)................................................3

*Scaggs v. New York State Dep't of Educ.*, No. 06-CV-0799,
    2009 WL 890587 (E.D.N.Y. Mar. 31, 2009) ................................................................30

*Smentek v. Sheriff of Cook County,* No. 09 C 529, 2010 WL 4791509 (N.D. Ill. Nov. 18, 2010) ....33

*Southwood v. Credit Card Sol.*, No. 7:09-CV-183-F,
    2014 WL 10677478 (E.D.N.C. Mar. 27, 2014) ..........................................................30

*Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317 (11th Cir. May 5, 2020) .....................*passim*

*Tait v. Powell*, 241 F. Supp. 3d 372 (E.D.N.Y. 2017) ................................................................5

*Thompson v. Choinski*, 525 F.3d 205 (2d Cir. 2008) ................................................................21

*Toure v. Hott*, No. 20-CV-395 (LO), 2020 WL 2092639 (E.D. Va. Apr. 29, 2020) .........................6

*Turner v. Safley*, 482 U.S. 78 (1987) ................................................................23

*United States v. Pandrella*, 19 Cr. 1222 (E.D.N.Y. May 6, 2020).........................................................2

*United States v. Rabadi*, No. 13 Cr. 353, 2020 WL 1862640 (S.D.N.Y. Apr. 14, 2020) ...................6

*United States v. Sanchez-Gomez*, 138 S. Ct. 1532 (2018)..................................................................30

*United States v. State of Conn.*, 931 F. Supp. 974 (D. Conn. 1996) ......................................................24

*United States v. Yonkers Bd. of Educ.*, 29 F.3d 40 (2d Cir. 1994) .....................................................24

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................................................4, 5

*Valentine v. Collier*, No. 20-20207, 2020 WL 1934431 (5th Cir. Apr. 22, 2020) ...........................23

*Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343 (E.D.N.Y. 2013)......................................28

*Walco Investments v. Thenen*, 168 F.R.D. 315 (S.D. Fla. 1996)..........................................................29

*Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338 (2011) ...............................................................*passim*

*WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259 (2d Cir. 1996) .......................5

*Whitley v. Albers*, 475 U.S. 312 (1986)................................................................................5

*Wilson v. Williams*, No. 20-CV-00794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020)..................25

*Winter v. Nat. Resp. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................8, 15

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000)........................................................................7, 32

*Wright v. Giuliani*, No. 99-CIV-10091, 2000 WL 777940 (S.D.N.Y. June 14, 2000) ....................32

**Statutes**

18 U.S.C. § 3621 .................................................................................................................25

18 U.S.C. § 3626 .................................................................................................................2

18 U.S.C. § 3626(a)(3)(B) ...................................................................................................6

18 U.S.C. § 4001(b) ............................................................................................................25

18 U.S.C. § 4042(a) ............................................................................................................25

28 U.S.C. § 2241 ................................................................................................................24

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................................32

Fed. R. Civ. P. 12(b)(6) ......................................................................................................32

Fed. R. Civ. P. 23(a) .....................................................................................................28, 29

Fed. R. Civ. P. 23(b)(2) .................................................................................................29, 36

Fed. R. Civ. P. 65(d) ..........................................................................................................27

Fed. R. Civ. P. 65(d)(1) ......................................................................................................36

# PRELIMINARY STATEMENT[1]

Federal Bureau of Prisons (BOP) staff members at the Metropolitan Detention Center-Brooklyn (MDC) continue to work around the clock amidst this unprecedented global pandemic to protect the health and well-being of the inmates at their facility. These BOP staff members have worked tirelessly and successfully to control the spread of COVID-19. As recently as May 5, 2020, only six inmates out of a total of close to 1700 inmates have tested positive for COVID-19 in the preceding <u>two-month</u> period.[2] And Petitioners cannot point to a single MDC inmate who has needed hospitalization, or, for that matter, one who has suffered serious illness or even death.

Yet, against this backdrop of striking success, Petitioners demand that this Court grant extraordinary and emergency injunctive relief, claiming that BOP is exhibiting Eighth Amendment deliberate indifference to their COVID-19 medical needs, thereby entitling them to either compassionate release or home confinement. Petitioners' claimed constitutional violations should be soundly rejected and their motion for preliminary injunction should be denied. Their claims rest on unfounded allegations from inmates and unsupported theories relating to infection control espoused by their purported expert, whose theories are not grounded in science, the standard of care in the community, or evolving Centers for Disease Control and Prevention (CDC) guidelines. As shown below, Petitioners cannot meet any of the standards for the preliminary injunctive relief that they seek.

---

[1] References to the cited portions of the deposition transcripts of Health Services Administrator Stacey Vasquez (Dkt. No. 72, Ex. 1), Associate Warden Milinda King (Dkt. No. 72, Ex. 15), and Dr. Homer Venters appear as "Vasquez Tr.," "King Tr.," and "Venters Tr.," respectively. References to the expert reports of Dr. Venters, Jeff Beard, Ph.D., and Asma Tekbali, M.P.H., appear as "Venters Report," "Beard Report," and "Tekbali Report," respectively. References to the declarations of Ms. Vasquez, Associate Warden Caryn Flowers, and Ms. King appear as "Vasquez Decl.," "Flowers Decl.," and "King Decl.," respectively. The aforementioned documents (except for the Vasquez and King deposition transcripts, which already have been filed on ECF at Dkt. No. 72, Exs. 1 and 15) and the exhibits ("Cho Decl. Ex.") referenced herein are attached to the declaration of AUSA James R. Cho, filed herewith. References to the Petitioners' motion for a preliminary injunction appear as "PI Motion" or "Pet. Mot" (Dkt. Nos. 71-73), and the Amended Petition (Dkt. No. 60), as "Pet."

[2] https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200505_042614.pdf.

First, Petitioners have failed to show a likelihood of success on the merits of their claims. Respondent has put in place life-saving policies and practices that, to date, have prevented the spread of COVID-19 at the MDC. While these policies may not be precisely what the Petitioners want, they in no way violate the Eighth Amendment or demonstrate deliberate indifference. Petitioners' complaints about BOP policies do not come close to meeting the requisite standard of being, "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience," nor can Petitioners show that the BOP's ongoing and successful efforts to maintain the health and safety of inmates and staff during this challenging global health crisis amount to proof of "deliberate indifference." *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019). Indeed, BOP must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in [its] judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *United States v. Pandrella*, 19 Cr. 1222 (E.D.N.Y. May 6, 2020) (Brodie, J.) (denying application for release under 18 U.S.C. § 3142 because "there's no compelling evidence that [the defendant] will be infected with COVID-19 simply because he's at the MDC" and noting that "MDC has many procedures in place, and these procedures appear to be working," as the number of inmates infected with COVID-19 has "remained considerably low."); *Livas v. Myers*, No. 20-CV-422, 2020 WL 1939583, at *8 (W.D. La. Apr. 22, 2020) (denying petitioners' motion for release of purportedly vulnerable inmates from a BOP facility and dismissing action because, *inter alia*, court cannot serve as a "a de facto 'super' warden of [the BOP facility]").

Petitioners also have not demonstrated that the public interest or balance of the equities favor a preliminary injunction. Petitioners seek a Special Master who will essentially determine which convicted criminals and charged criminals (who already have been judicially determined to

be dangerous or flight risks) may be released from federal prison. Petitioners continue to provide no salient authority that would permit this Court to take the unprecedented step of giving a Special Master the authority that would otherwise be reserved to sentencing judges, and judges who have remanded dangerous charged defendants, in controlling their own criminal dockets. A preliminary injunction that would "transfer[] the power to administer the [jail] facility in the midst of the pandemic from public officials to the district court" must be flatly denied. *Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *4 (11th Cir. May 5, 2020) ("The injunction hamstrings [jail] officials with years of experience running correctional facilities, and the elected officials they report to, from acting with dispatch to respond to this unprecedented pandemic.").

Finally, Petitioners' motion for class certification must be wholly rejected here, as the proposed class lacks commonality and typicality, is not ascertainable, and is overly broad.

## STATEMENT OF FACTS

For a full recitation of the facts regarding BOP's Action Plan for COVID-19, Respondent refers the Court to his motion to dismiss the Amended Petition pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), or, in the alternative, motion for summary judgment (Dkt. No. 62, 62-1) ("Motion to Dismiss" or "Resp. Mot."). Resp. Mot. 3-6. Respondent responds to the factual assertions raised in the PI Motion in the Argument section below, and reserves the right to address any factual disputes more fully at the May 12 Preliminary Injunction Hearing ("May 12 Hearing").[3]

## ARGUMENT

## I. Applicable Standard for a Motion for a Preliminary Injunction

"[T]he standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases). A preliminary injunction

---

[3] Respondent also refers the Court to his prior briefing in opposition to Petitioners' motion for a temporary restraining order. Dkt. Nos. 18, 21, 22

"is an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quotation omitted). Under this standard, "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue . . . ." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010). Thus, an injunction should issue only where a plaintiff makes a "clear showing" and presents "substantial proof" that an injunction is warranted. *Mazurek*, 520 U.S. at 972. Put otherwise, Petitioners have the burden of proving the need for injunctive relief; Respondent bears no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974). And where, as here, "[a] plaintiff . . . seeks a preliminary injunction that will alter the status quo," the plaintiff must go beyond a showing of a mere likelihood of success but "must demonstrate a 'substantial' likelihood of success on the merits." *New York Progress*, 733 F.3d at 486 (citation omitted); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is ... to preserve the relative positions of the parties.").

## II.     Petitioners' Motion is Procedurally Improper Because it Seeks the Equivalent of Final Judgment on the Merits

Petitioners' motion seeks the identical relief, and the entirety of relief, as the Amended Petition itself seeks.[4] If the Court were to grant the preliminary injunction, there would effectively

---

[4] *Compare* Pet. Mot. 35 (relief requested: "[1] immediately releasing them from detention at the MDC to serve the remainder of their sentences in home confinement under such conditions as the Court deems appropriate, [2] ordering injunctive relief to mitigate risks at the MDC, and [3] appointing a Special Master to chair a Coronavirus Release and

be nothing left for the Court to do. Petitioners are thus essentially seeking summary judgment, rather than emergency provisional relief designed to preserve the status quo until the Court can fully evaluate the merits of the claims on a complete record. Courts, however, may not grant a "preliminary" injunction that effectively gives Petitioners a final judgment on the merits. *See, e.g.*, *Univ. of Texas*, 451 U.S. at 395 (inappropriate for court at the preliminary injunction stage to give a final judgment on the merits); *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261 (2d Cir. 1996) (purpose of a preliminary injunction not to give plaintiff ultimate relief it seeks). Here, the relief sought by Petitioners is neither temporary nor preliminary, but rather is the exact same ultimate relief they seek in their Petition. Accordingly, the requested preliminary injunction must be denied on these grounds alone.

## III. Petitioners Have Failed To Demonstrate A Substantial Likelihood of Success On The Merits

As an initial matter, Respondent fully incorporates his Motion to Dismiss into the instant opposition to Petitioners' motion for a preliminary injunction. And even assuming, *arguendo*, that this Court has jurisdiction here (which it does not, as set forth in Respondent's Motion at 13-24), Petitioners' request for a preliminary injunction must be denied on the merits.

Petitioners can succeed on their ultimate constitutional claims only if they can demonstrate that Respondent acted with "deliberate indifference" towards Petitioners' well-being by consciously disregarding an excessive risk of harm to their health or safety. *Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (internal quotation marks omitted)). This entails proving two elements: first, Petitioners must show, objectively, that

---

Mitigation Committee"), *with* Amended Petition (Dkt. No. 60) at Prayer for Relief (requesting [1] immediate release of Petitioners; [2] ordering injunctive relief to mitigate the risks at MDC; and [3] "Appointing a Special Master on an emergency basis to Chair a Coronavirus Release Committee.").

Respondent's actions "constitute an unnecessary and wanton infliction of pain or [are] repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). In the context of exposing prisoners to risk of disease, a claim must be dismissed if it does not pose a threat that is so severe that it would be "contrary to current standards of decency for anyone to be so exposed." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994) ("prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."). Second, the petition must show that the defendant "knows of and disregards an excessive risk to inmate health or safety," that is the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Farmer*, 511 U.S. at 837.

The elements of a conditions-of-confinement claim brought by inmates alleging inadequate medical care, "[i]n order to establish a violation of a right to substantive due process, a plaintiff must demonstrate . . . that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience;" this requires showing "(1) that [the inmate] had a serious medical need . . . and (2) that the Defendants acted with deliberate indifference to such needs." *Charles*, 925 F.3d at 85-86 (citation and internal quotation marks omitted); *Toure v. Hott*, No. 20-CV-395 (LO), 2020 WL 2092639 (E.D. Va. Apr. 29, 2020) (denying plaintiff-detainees' motion for a preliminary injunction due to a purported COVID-19 outbreak at a detention facility, as "[p]laintiffs have not clearly established the defendants are deliberately indifferent to the complained-of risk, because the officials are not disregarding that risk."). Even where "prison officials [ ] actually knew of a substantial risk to inmate health or safety" and that particular harm ultimately occurs, the officials "may be found free from liability if they responded reasonably to

the risk." *Farmer*, 511 U.S. at 844. In short, "officials who act reasonably cannot be found liable" because they did not disregard the risk. *Id.* at 845.

"[A] court cannot impose the same standards of medical care upon a prison as it would expect from a hospital." *Hutchinson v. West*, No. 04-CV-0135F, 2004 WL 1083194, at *3 (W.D.N.Y. Apr. 2, 2004); *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) (vacating preliminary injunction and explaining that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated;" so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation); *Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982) (the "Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves"), *vacated in part as moot*, 688 F.2d 266 (5th Cir. 1982).

At this preliminary juncture, and given Petitioners' request for affirmative changes to BOP policies, a heightened standard is applicable. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits.") (citations omitted). "First, the party must demonstrate that it will suffer irreparable harm in the absence of the requested relief." *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). Second, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," and would alter, rather than maintain, the status quo, injunctive relief is appropriate only if the moving party has a "clear" or "substantial" likelihood of success on the merits. *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000) (citation omitted). Finally, a party seeking injunctive relief must show "that the balance of equities tips in his favor, and that an injunction is in the public

interest." *Winter v. Nat. Resp. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As set forth below, Petitioners fail to meet the heightened standard that would warrant the extraordinary remedy of a preliminary injunction. In short, Petitioners cannot show that BOP was deliberately indifferent; instead, the evidence clearly shows that BOP has already taken critical steps to successfully prevent the spread of COVID-19 at the MDC. *Swain,* 2020 WL 2161317, at *4 ("evidence supports that [jail officials] are taking the risk of COVID-19 seriously").

**A. BOP has already taken sufficient steps to protect all inmates at the MDC**

Petitioners challenge the MDC's protocols for screening both inmates and BOP staff for COVID-19. Pet. Mot. 8. Petitioners allege that "[d]octors have not been present," "temperature checks are not taking place on a regular basis," and "daily temperature checks" are not taking place in the general population units." Pet. Mot. 8.[5] Petitioners further allege that in quarantined units, the daily rounds include only a temperature check, not a wellness check asking about symptoms. Pet. Mot. 8. Petitioners' assertions lack merit.

By way of background, the MDC is an administrative detention center that houses approximately 1700 inmates. Pet. ¶ 14. It is a high-rise facility with 17 housing units, including a separate Special Housing Unit ("SHU") and a women's only unit. Beard Report 10; King Tr. 95. The MDC houses inmates with all security classification levels from low to high security. Beard Report 9. Inmates at the MDC are divided into separate housing units. Beard Report 10. At the MDC, to avoid the risk of cross-contamination across units, inmates typically do not transfer between housing units. Vasquez Tr. 25, 182, 201. The MDC's Health Services unit provides medical care to inmates at the MDC. The Health Services Unit comprises 30 to 35 health care workers on staff at MDC, including four nurses, two IOP nurses, four nurse practitioners, three

---

[5] The Court should disregard Ms. von Dornum's declaration cited in Petitioners' Motion to the extent it is based on inadmissible hearsay evidence (Dkt. No. 60-1).

doctors, two pharmacists, an Assistant Health Services Administrator, a Health Services Administrator and two dentists. Vasquez Tr. 165-66. The MDC has medical staff coverage twenty-four hours per day, seven days per week. Vasquez Tr. 167-73.

Contrary to Petitioners' assertions, all inmates that arrive at the MDC undergo screening. Vasquez Tr. 102-05; Vasquez Decl. ¶ 6. If the inmate is asymptomatic, the inmate is housed in the intake unit and quarantined for 14 days. Vasquez Tr. 103, 109-10. If the inmate is symptomatic with COVID-19 symptoms, the inmate is placed in an isolation unit. Vasquez Tr. 106-07. In addition, all staff members similarly undergo screening before they are allowed into the MDC. Vasquez Tr. 130-31, 138-39. Additionally, MDC medical staff make twice-daily rounds in the quarantine and isolation units conducing temperature and wellness checks.[6] Vasquez Tr. 26-27, 38-40, 78-79; Vasquez Decl. ¶ 6. On the isolation unit, there is a medical room designated on that floor for medical exams. Vasquez Tr. 75:16-76:17; Beard Report 7. These twice-daily checks in the isolation and quarantine units include temperature and wellness checks. Vasquez Tr. 38-39, 78-79. Inmates are free to identify any symptoms they may be experiencing.[7] Vasquez Tr. 39-40. Further, during these twice-daily rounds, medical staff carry sick call request forms in the event any inmates seek to make a sick call request. Vasquez Tr. 48-49.[8] Throughout the institution, correctional staff make thirty-minute rounds on every unit. Vasquez Tr. 187. MDC's screening

---

[6] During the twice-daily medical rounds, if an inmate has a fever over 100.4, the inmate is isolated and the medical staff assesses the inmate's symptoms. Vasquez Tr. 41. If the inmate reports symptoms, but has no fever, the medical staff similarly assesses the inmate's symptoms. Vasquez Tr. 41. During the wellness check medical staff ask inmates how they are doing, and, to the extent, inmates only speak Spanish, a number of the medical personnel also speak Spanish, and have access to translation services. Vasquez Tr. 41-44; Vasquez Decl. p. 7.

[7] Petitioners claim that the emergency call buttons in some inmate cells do not work. Pet. Mot. 15. But even if the sick call button in some cells are not currently functioning, inmates still have multiple ways to summon medical assistance, including by reaching out to a BOP staff member, correctional staff, during the twice-daily medical rounds (Vasquez Tr. 78:23-79:9), and through paper or electronic sick call requests. Vasquez Decl. p. 4.

[8] MDC follows a symptom-based approach to releasing inmates from isolation. Vasquez Tr. 82:20-24. Inmates remain in the isolation unit for at least seven days after the onset of symptoms, and until at least 72 hours of improved symptoms, no fever, and no use of antipyretics as per CDC guidelines. Vasquez Tr. 81:19-82:4; Tekbali Report 5.

protocols are consistent with CDC guidelines and the standard of care. Tekbali Report 4-5.

Petitioners also argue that "Respondent's current practices in the MDC fail to identify and protect detainees who are particularly vulnerable to the effects of COVID-19." Pet. Mot. 13. But in the paragraph immediately preceding this allegation, Petitioners contradictorily state that the MDC has "*identified* more than 300" inmates who are "particularly at risk of complications" from COVID-19. Pet. Mot. 13 (emphasis added). Indeed, as set forth in the expert report of Jeffrey Beard, Ph.D., Respondent already has taken steps to identify individuals who may be at risk of developing COVID-19 related complications. Beard Report 3. Moreover, as Petitioners' putative expert, Dr. Homers Venters, admitted, high-risk detainees are not at any greater risk of contracting the COVID-19 than non-high-risk detainees. Venters Tr. 12:10-26; *accord* Vasquez Tr. 206-08 (MDC protects all inmates, not just high-risk inmates); Tekbali Report 2.[9]

### B. MDC's distribution of masks and promotion of social distancing has helped to curtail any outbreak of COVID-19

Petitioners claim the disposable masks given to inmates are not fit for reuse. Pet. Mot. 10. Petitioners claim staff are wearing masks inconsistently, Pet. Mot. 10, and that staff on the quarantine unit "do not regularly wear masks or gloves, coming and going from other areas throughout the facility." Pet. Mot. 10.

Petitioners' claim, however, is unfounded. BOP staff follow CDC guidance with respect to wearing personal protective equipment ("PPE"). King Tr. 86; Tekbali Report 5; Vasquez Decl. p. 6; King ¶ 19. For example, BOP staff are not required to wear gloves, but, instead are encouraged to wash their hands, per CDC guidelines, unless they are handling unsafe items, working in the isolation unit or expect to touch inmates. King Tr. 81, 83; Tekbali Report 6. Masks

---

[9] Dr. Venters recommends cohorting high-risk detainees together. Venters Tr. 104:6-10. The MDC does not cohort higher risk inmates. Vasquez Tr. 208. Further, cohorting is not necessary because the best intervention for higher risk inmates is to limit their contact with other inmates, which the MDC has been doing. Tekbali Report 3.

are distributed to BOP staff twice per week. King Tr. 69, 76; Vasquez Decl. p. 8. BOP staff wear masks unless they are able to social distance. King Tr. 71; Tekbali Report 7. Consistent with CDC guidelines, when BOP staff members are able to social distance, from each other, masks are not required. King Tr. 71; Tekbali Report 7; Vasquez Decl. pgs. 6, 8.

Petitioners further contend that staff are not adequately protected because not all staff members have been fit-tested for N-95 masks. As CDC guidelines make clear, however, N95 masks are reserved for health care professionals and first-responders. Tekbali Report 3. Indeed, Dr. Venters conceded that CDC guidelines do not specify that N95 masks must be used. Venters Tr. 137. Nonetheless, N95 masks are readily available to BOP staff at the MDC when needed. *See, e.g.,* Vasquez Tr. 50.

Additionally, every inmate at the MDC has a mask, which is distributed once per week; inmates can ask for replacement masks as well. King Tr. 69, 76; Vasquez Tr. 74; King Decl. ¶¶ 20-25. Inmates are permitted to exit their cells on Monday, Wednesdays, and Fridays, initially for thirty minutes, but now for one-hour each. King Tr. 87-88. When inmates are permitted to exit their cells, they are required—consistent with CDC guidance—to wear masks.[10] King Tr. 78, 86-87; Vasquez Decl. p. 6. MDC procedures for distributing masks to inmates and staff are consistent with the standard of care. Tekbali Report 5; King Decl. ¶ 20; Vasquez Decl. p. 8

Petitioners allege that both male and female inmates are unable to socially distance and therefore are susceptible to COVID-19. Pet. Mot. 11. But Petitioners' claims are not rooted in the facts. As background, most of the inmates at the MDC are double-celled, except inmates in the isolation unit and SHU. Given space and staffing limitations, the MDC is unable to accommodate all inmates in single cells. Regardless, CDC guidance provides for detention centers to cohort

---

[10] Dr. Venters conceded that CDC guidelines do not specify that N95 masks must be used. Venters Tr. 137. Tekbali agrees that the use of N95 masks for inmates is unnecessary and not consistent with guidelines. Tekbali Report 3.

inmates in light of space limitations. Vasquez Tr. 34, 38. To promote social distancing, the MDC limits the number of inmates that may exit their cells at any given time limiting the number to 10 inmates at staggered periods. King Tr. 87-89. Even Dr. Venters acknowledged that "staggering" is "appropriate." Venters Tr. 148; *accord* Tekbali Report 7.[11]

### C. The MDC has sufficient testing procedures in place

Petitioners assert that testing at the MDC is practically nonexistent. Pet. Mot. 6-8. As is well known, testing within New York City has been extremely limited given the lack of available tests. Vasquez Tr. 122. In light of the limited tests available, the CDC has instructed the public to self-quarantine if they develop COVID-19 symptoms. Tekbali Report 2.

Like the broader community, testing at the MDC has been limited. Vasquez Tr. 82. The MDC has submitted requests to LabCorp weekly for additional tests, but given the limited tests available, LabCorp has been unable to keep up with the demand for tests. Vasquez Tr. 115-17. Nonetheless, at the MDC, decisions to test inmates are clinical decisions made by MDC health care professionals and are based on a number of factors, including the severity of an inmate's symptoms. Vasquez Tr. 90, 117; Tekbali Report 2 ("decisions to test are based on clinical presentation and provider's discretion."); Vasquez Decl. pgs. 4, 5; ¶¶ 15-21. In the event that an inmate develops symptoms in a housing unit, and that individual is the first inmate to present with COVID-19 symptoms, the MDC tests that individual. Vasquez Tr. 117, 119. If the inmate tests

---

[11] Female inmates are housed in a dormitory-style women's unit. Vasquez Tr. 101; Flowers Decl. ¶ 15 Although their bunks may be less than six feet away from each other, the MDC has endeavored, where possible, to alternate bed assignments where one inmate sleeps on the top bunk, and the neighboring inmate would sleep on the bottom bunk. King Tr. 96-97. When female inmates arrive, they are initially quarantined and housed individually in single cells. Vasquez Tr. 100. After the quarantine period, assuming the inmate is asymptomatic, the female inmates are then transferred to the women's general housing unit. Vasquez Tr. 100-01. Female inmates are required to wear masks in the unit, if they are unable to social distance. King Tr. 96-97, 101; Vasquez Tr. 102; Flowers Decl. ¶¶ 17; 22-23. Given the size of the housing unit, and the number of female inmates, the inmates in the women's unit are able to engage in social distancing. Vasquez Tr. 102.

positive, the *entire* housing unit is placed under quarantine, and the remaining inmates are checked twice per day for symptoms. Vasquez Tr. 24-27, 27-28, 30-31, 85.[12] The inmate who tested positive is then transferred to an isolation unit and housed in a single cell. Vasquez Tr. 26-27, 34, 45. The decision to place inmates in the isolation unit is a clinical decision made by MDC medical staff based on an inmate's symptoms. Vasquez Tr. 56-58, 65, 89-90; Vasquez Decl. p. 5. Inmates placed in isolation either have tested positive for COVID-19 or are "presumed positive." Vasquez Tr. 56, 61-63, 118.

Symptomatic inmates, including the cellmate of the inmate who tests positive, are transferred to the isolation unit as well, and are also "presumed positive." Vasquez Tr. 31, 34, 36-37, 61-63, 77, 85, 90, 118. The MDC therefore follows CDC guidelines in identifying potential COVID-19 symptoms, including fever, cough, shortness of breath. Vasquez Tr. 119-20; Vasquez Decl. pgs. 5-6, ¶¶ 17-19. Decisions to transfer symptomatic inmates, who have not been tested, to the isolation unit are clinical decisions made by MDC medical staff, based, in part, on the severity of the symptoms. Vasquez Tr. 61, 65, 66, 120. The MDC transfers inmates to the isolation unit immediately without waiting for the tests results given that test results often take 1-2 days to arrive. Vasquez Tr. 61-62, 115.

Inmates that are presumed positive, in general, do not receive tests because the clinical management of the inmate is the same whether the inmate has tested positive or is presumed positive. Vasquez Tr. 118-19. Ultimately, the MDC will treat the inmate's symptoms regardless of whether they tested positive or are presumed positive. Vasquez Tr. 118-19. If the cellmate of an inmate, who has tested positive, is asymptomatic, the cellmate remains quarantined in his cell

---

[12] Inmates that come into the institution are placed under quarantine in the intake unit. Vasquez Tr. 25-26; 31. The MDC places inmates in quarantine for 14 days before they are transferred out of the MDC. Vasquez Tr. 25; 29-30. For the past month and a half, approximately seven units at the MDC, at various times, have been under quarantine. Vasquez Tr. 33.

alone.[13]  Vasquez Tr. 34, 85.  All other asymptomatic inmates remain in their unit and are not placed in isolation.  Vasquez Tr. 66.  Per CDC guidelines, asymptomatic inmates are not tested.  Vasquez Tr. 90, 129; Tekbali Report 2; Vasquez Decl. ¶¶ 15-21  If other inmates on the same housing unit develop symptoms, the BOP will presume those inmates are positive as well.  Vasquez Tr. 31-32.  Given the limited number of tests available, the MDC does not test the cellmate, but treats the inmate as positive for COVID-19 and treats the cellmate accordingly.  Similarly, if inmates on the same housing unit from which an inmate had a positive test, develop symptoms, then the MDC will presume those inmates as positive as well.  Vasquez Tr. 30-31.  The MDC's practice of isolating inmates, and presuming inmates positive is consistent with the standard of care in the community and given the CDC's guidance limiting the use of widespread testing.  Tekbali Report 4-5; Cho Decl. Ex. E; Flowers Decl. Ex. A.[14]

As of May 5, 2020, the MDC has tested 14 inmates.  During the pandemic, two inmates were sent to local hospitals due to acute conditions, *not* specifically for COVID-19 symptoms, and those inmates received tests, at the hospital.  Vasquez Decl. ¶ 8.  One tested positive for COVID-19; the other tested negative.  Vasquez Decl. ¶ 8.  The hospital, however, did not consider the inmates' conditions serious and discharged both inmates back to the MDC.  Vasquez Tr. 185-86.  Dr. Venters opined that "[i]f a person at MDC gets sick and they need to go to the hospital, they should go to the hospital."  Venters Tr. 147.  This is precisely what is occurring at the MDC.  Beard Report 5.  Further, Dr. Venters could point to no inmate whom he believed should be receiving treatment at a hospital rather than at the MDC.  Venters Tr. 147.  And even if an inmate were to

---

[13] Other than a cellmate of an inmate that had tested positive, no other inmates on a housing unit are considered a close contact with the inmate that tested positive because all inmates are currently locked down in their cells.  Vasquez Tr. 34-35.
[14] On May 7, 2020, the BOP announced efforts to expand rapid testing capabilities.
https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf.

go to the hospital for COVID-19, it would not, in and of itself, be sufficient to show deliberate indifference. *Swain*, 2020 WL 2161317, at *4 ("court treated the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk. In doing so, it likely violated the admonition that resultant harm does not establish a liable state of mind.").

Petitioners argue that MDC "artificially lowers the number of positive diagnoses and conceals the true extent to which the pandemic is spreading inside the MDC" by not testing all symptomatic inmates. Pet. Mot. 6.[15]  MDC's practice of presuming inmates as positive, however, rather than testing all symptomatic inmates—given the limited number of tests available both in the community and at the MDC—is entirely consistent with CDC guidelines and the standard of care. Tekbali Report 5.[16]

Petitioners further claim that "[p]hysicians have not visited housing units, medical staff will visit only if someone reports symptoms, which many people are afraid to do because, absent a transparent protocol for treatment, they are reasonably concerned that if they report feeling symptomatic they will be placed in solitary confinement." Pet. Mot. 14. The MDC's practice has been to isolate inmates who have tested positive for COVID-19 and the inmate's cellmate—

---

[15] Petitioners claim that some symptomatic inmates were not tested. Pet. Mot. 6. Petitioners, however, fail to identify whether the inmates were placed in the isolation unit, and presumed positive, or some other type of unit, and the type and severity of symptoms.

[16] Petitioners further advocate for "[b]roader testing of both staff and incarcerated people," Pet. Mot. 7-8, pointing to testing at New York City jails. However, county jails, like New York City jails, are different from the MDC. Beard Report 4-5. As the Court is aware, the MDC is located in Kings County, which has been hit particularly hard by the pandemic. In addition to other individualized steps that are being taken at the MDC, the MDC warden provides to Chief Judge Roslynn R. Mauskopf bi-weekly status reports concerning the incidence of infection of COVID-19 at MDC and the measures undertaken to mitigate the spread of COVID-19 within the MDC; the reports are posted on the Court's public website. The April 3rd status report from indicates that, as of that date, 2 inmates in the MDC had tested positive. The May 5th status report indicates that 6 inmates have tested positive. By comparison, on April 3rd, there were 15,700 confirmed cases in Kings County, which increased to 47,183 on May 4, 2020. Thus, there is the exact same increase during this period (200%) in the MDC and in Kings County generally. The county-by-county data is available at https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/, which is the data relied upon by the CDC (https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html). In other words, there is no evidence that the increase in the MDC inmate population is any greater than in the general population in the county surrounding the facility.

considering the cellmate presumptively positive. The MDC's practice is consistent with CDC guidelines and the standard of care. Tekbali Report 5. The MDC cannot be faulted for failing to treat the inmate's symptoms if the inmate does not report symptoms in the first instance.

### D. The MDC's sick call request system provides a mechanism for inmates to communicate health issues to medical staff that are then triaged

Petitioners allege that the sick call system is inadequate, and that the MDC "understate[s] the scale of infection at the MDC." Pet. Mot. 8. Petitioners also claim that the sick call system is deficient due to the length of time BOP takes to respond to requests. Pet. Mot. 15-16.

Again, the evidence shows that Petitioners' argument lacks merit. The MDC has a sick call system by which inmates can request to see medical staff by making a verbal request to staff or submitting either a paper copy or electronic sick call request to MDC medical staff. Vasquez Tr. 186-87. When MDC medical staff receive sick call requests—whether verbally from the inmate, or by paper or electronic sick call requests –the medical staff triage the requests. Vasquez Tr. 54, 188-90, 194; Beard Report 6. If the request reflects an acute or emergent condition, medical staff would respond immediately to the requests. Vasquez Tr. 54, 198. Further, in light of the pandemic, the MDC has additional temporary staff on hand to assist in triaging sick call requests. Vasquez Tr. 194. The MDC's sick call process is responsive to inmate complaints and certainly not deliberately indifferent to their needs.

Importantly, medical staff at the MDC are conducting twice-daily medical rounds in the quarantine and isolation units and conducing temperature and wellness checks on all inmates in those units. Vasquez Decl. p. 3. For all other inmates, medical staff conducts twice-daily rounds in those units as well. Beard Report 6. Inmates have had ample opportunity to meet with and talk to medical staff during those rounds. Correctional staff also conduct rounds every thirty minutes on every housing unit at which time inmates again can raise any medical concerns they may have.

### E. The MDC has provided adequate PPE and cleaning supplies to staff and inmates to prevent the spread of COVID-19

Petitioners claim that inmates have irregular access to basic hygiene supplies like soap, and that cleaning supplies have not been provided for cells. Pet. Mot. 9. Further, Petitioners contend that communally-used items like the phone, computer, and showers are not reliably cleaned between use. Pet. Mot. 9.

Contrary to Petitioners' claim, the MDC has more than an adequate supply of soap, sinks, water, personal hygiene products, toilet paper, cleaning supplies and PPE. King Tr. 31-34, 38-40, 46-48; *accord* Beard Report 6-10; Flowers Decl. ¶¶ 25-26; King Decl. ¶¶ 7-15. MDC staff conduct daily inventory to ensure an adequate supply of these products. King Tr. 32. Soap is made available to all inmates weekly, and upon request. King Tr. 26-28, 31; King Decl. ¶¶ 15-18. Additional personal hygiene materials are available to inmates through the commissary that staff members retrieve for inmates. King Tr. 46-48; King Decl. ¶¶ 3-10. Hand sanitizer is also available throughout the MDC, and the MDC has sufficient sanitizer in stock. King Tr. 35-37. Inmates are required to clean their own cells daily, and are provided cleaning supplies that they can keep in their cells. King Tr. 40, 42, 44-46. Further housing units are cleaned daily and more frequently, including high touch areas, by inmate orderlies or staff. King Tr. 40, 52-55. The MDC also uses a strong disinfectant and cleaning solution as result of the pandemic (*i.e.*, hdqC2). King Tr. 40, 53, 60-61; Beard Report 6, 8; Flowers ¶ 27; Vasquez Decl. p. 5.

With respect to phones and computers used by inmates, there are disinfectant spray bottles and wipes next to the phones and computers, which are placed there when inmates are released from their cells on Mondays, Wednesdays and Fridays. King Tr. 40, 57-58; Vasquez Tr. 35; Vasquez Decl. p. 6. Inmates are required to disinfect the phones and computers both before and after they are used. King Tr. 56-57; Beard Report 6, 8. If the inmate neglects to do so, BOP staff

members will wipe down the phones and computer before the next inmates uses those items. Showers also are disinfected before and after each use.  King Tr. 58-59.

MDC has also taken steps to increase cleaning throughout the facility.  In each housing unit, orderlies are tasked with cleaning all common areas in the unit.  The BOP has authorized the use of a stronger cleaning agent made available to all inmates.  Vasquez Decl. pgs. 5-6.  Whether the cleaning is performed by inmates or professional cleaners or staff is of no significance as there is no allegation that the inmates are somehow unable to clean as effectively as others, nor does the standard of care require the use of professional cleaners.  Tekbali Report 3.

### F.  BOP educates inmates regarding the spread of COVID-19

Petitioners contend that the BOP has failed to "educate" inmates about COVID-19.  Pet. Mot. 14.  On the contrary, the MDC has taken significant steps to educate inmates regarding the pandemic.  Flowers Decl. ¶¶ 3, 19; Vasquez p. 8. CDC guidance posters have been placed throughout the institution.  King Tr. 86-87; Beard Report 6.  Associate Warden King has met with all inmates at the institution both as a group, initially, and individual after the lock down to educate them about COVID-19.  King Tr. 86-87.  BOP has sent emails to all inmates educating them about infection control practices including wearing masks and social distancing.  King Tr. 86-87.

### G.  BOP continues to protect staff members working at the MDC

Petitioners contend that "[b]oth medical and custody staff move between quarantined units, the unit where people are being isolated, and the general population units."  Pet. Mot. 12. Petitioners, however, fail to mention that when staff enter the quarantine and isolation units, for example, they have PPE available to them, and if not available, are able to request PPE.  Vasquez Tr. 50-51, 59:15-61:4, 82:25-83:10; King Tr. 81.  In the event that staff are expected to come into contact with inmates in that unit, they wear appropriate PPE.  Vasquez Tr. 51:14-16, 59:15-61:4, 82:25-83:10; King Tr. 72-74; Beard Report 6, 7, 10.  On other occasions, because inmates are

locked in their cells, the full set of PPE is not necessary. Vasquez Tr. 51; King Tr. 75-76; Vasquez Decl. p. 6.

Petitioners argue that "[n]o one monitors staff for compliance with infectious disease protocols when they transfer between Units." Pet. Mot. 12. But Petitioners have no evidence that BOP staff are not complying with infectious disease protocols. Even Dr. Venters observed BOP staff removing PPE after visiting the isolation unit. Venters Tr. 80-81.

Petitioners further contend that "staff" are "not informed" when an inmate tests positive unless they "need to know." Pet. Mot. 12. Of course, due to privacy concerns, there is no reason for BOP staff, who may have had no interaction with an inmate, to know whether a particular inmate tested positive; in any event, inmates and BOP staff wear masks when they come into close prolonged contact as a pre-cautionary measure.

Petitioners further challenge the validity of temperature checks when staff members are screened at the entrance to the MDC. Petitioners posit that temperature checks may be artificially lowered because staff members are coming from the outside. Pet. Mot. 13. MDC screeners, however, often wait until the staff members have acclimated to the indoor temperature before taking temperature checks or they take the temperature from the staff members' necks, which are typically warmer. Vasquez Tr. 135-36; Beard Report 5. Further, temperature checks are not the only factor considered when screening staff, as screeners also ask staff if they have signs or symptoms of COVID-19. Vasquez Tr. 130-34; Cho Decl. Ex. D.

Petitioners further contend that "staff are not being asked about contact with people who have confirmed or presumed cases of COVID-19." Pet. Mot. 13. Given the prevalence of COVID-19 in New York, staff members are presumed to have come in contact with infected individuals. MDC, however, screens staff members for fevers or signs or symptoms of an infection and

proceeds accordingly.  Vasquez Tr. 130; Cho Decl. Ex. D; Vasquez Decl. p. 6.

**H.  The Court should disregard the declarations of Jonathan Giftos and Jamie Meyer**

Petitioners rely on the conclusory declaration of Jonathan Giftos (Pet. Mot. 3) asserting that in the "correction setting, the risk of contracting an infectious disease . . . is significantly increased."  Pet. Mot. 3.  The Court should disregard Giftos's generic declaration regarding the risk of contracting infectious diseases, as Judge Mauskopf did in *United States v. Amador-Rios*, No. 18 Cr. 398 (S-3) (E.D.N.Y. Apr. 12, 2020), Dkt. No. 99 (referencing Giftos Decl. ¶ 11) (rejecting defendant's reliance on Giftos's generic affidavit that did not actually address the conditions at the MDC or the defendant's dangerousness if released on bail).  Similarly, the Court should similarly disregard Petitioners' reliance on Jaimie Meyer's generic declaration as it does not address conditions at the MDC.  Pet. Mot. 3.

**IV.  Petitioners Have Not Demonstrated Irreparable Harm, Or That The Public Interest Or Balance Of Equities Favor A Preliminary Injunction**

In the absence of a convincing showing that Petitioners have a substantial likelihood of success on the merits, this Court may deny Petitioners' motion without even considering the other requirements for a preliminary injunction, namely that Petitioners are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *New York Progress,* 733 F.3d at 486.  But as shown below, consideration of these factors nevertheless does not strengthen Petitioners' motion.  The balance of equities and the public interest weigh in Respondent's favor.

Notably, Petitioners cite no legal authority empowering this Court to grant the extraordinary relief Petitioners seek, namely, a preliminary injunction which does not maintain the status quo but rather upends it entirely by (1) releasing the named Petitioners (with the release of hundreds of inmates to follow); (2) compelling the MDC's (and by association the BOP's)

response to the COVID-19 threat to conform to Dr. Venters's recommendations;[17] and (3) appointing a Special Master or unidentified "expert" to serve as a *de facto* monitor of the MDC. Petitioners' request is without any merit.

First, Petitioners concede that there is no legal authority in the Second Circuit empowering this Court to "release" Petitioners and thus commute, or otherwise vacate their criminal sentences or reverse detention decisions based on dangerousness and risk of flight.  Resp. Mot. 13-19. Instead, Petitioners cite to a number of inapposite cases involving the release of immigration detainees during the pendency of their immigration proceedings due to the COVID-19 threat, which have no bearing on the criminal inmates in custody at the MDC.  Pet. Mot. 26.

Next, the injunctive relief sought by the named Petitioners—an order to "ameliorate" alleged so-called "unconstitutional conditions" at the MDC based on three individual Petitioners' *habeas* petitions and Dr. Venters's recommendation—is not supported by Second Circuit jurisprudence addressing conditions of confinement claims brought by individual inmates under 28 U.S.C. § 2241.  Petitioners cite *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) and *Roba v. United States*, 604 F.2d 215, 218-19 (2d Cir. 1979), in support of their request for broad injunctive relief but neither decision supports Petitioners' expansive request for injunctive relief under the *habeas* statute.  In *Thompson*, the Second Circuit merely stated that "[t]his court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as the administration of parole, ... prison disciplinary actions, prison transfers, type of detention and prison conditions." *Thompson*, 525 F.3d at 209 (quotations and citations omitted) (remanding to the district court a *pro se* § 2241 petition raising a conditions of confinement claim).

---

[17] Dr. Venters set forth his recommended minimum standards for infection control at the MDC.  Venters Report ¶ 64 (Dkt. No. 72-1).  However, as set forth in the declaration of Ms. Vasquez, the MDC has already implemented those minimum standards.  Vasquez Decl. pgs. 2-11.

And in *Roba*, the Second Circuit acknowledged that "§ 2241 would be available [for] petitioner's challenge to his transfer while seriously ill [as] a challenge to the conditions of his confinement." 604 F.2d at 219.

Petitioners, however, cite to no authority allowing them to bootstrap class-wide relief in the form of an order to "ameliorate unconstitutional violations" (of which there are none) at the MDC based on the meritless § 2241 petitions of Rabadi, Hair, and Lopez. Vasquez Decl. ¶¶ 24-42; ¶¶ 43-66; ¶¶ 67-76. Nor do Petitioners cite to any authority in which the public interest favors the release of criminal inmates based on the recommendation of an expert paid by petitioners in a civil lawsuit, especially when other inmates are properly seeking this relief – the very same relief Petitioners are requesting here – from the judges who sentenced them. Petitioners also overlook the fact that, to date, many inmates previously housed at the MDC have filed, and been granted, compassionate release from their sentencing judges over the course of the pandemic.

Petitioners do not even reference the fact that three of the Petitioners—McBride, Chunn, and Rodriguez—are no longer incarcerated at MDC and that the three remaining named Petitioners—Rabadi, Hair, and Lopez—have pending compassionate release motions either before their sentencing judges or the BOP seeking the same relief they seek before this Court.[18] And one of the witnesses whom Petitioners intend to call at the May 12 Hearing—Dino Sanchez—also has a pending request for relief.[19] *United States v. Sanchez*, No. 19 Cr. 14 (E.D.N.Y.), Dkt. No. 139. In short, besides lacking jurisdiction here, this action is simply not the proper mechanism by which inmates at MDC may seek (and indeed, have sought) compassionate release.

---

[18] On May 4, 2020, Rabadi renewed his motion for compassionate release. *United States v. Rabadi*, No. 13 Cr. 353 (S.D.N.Y. May 4, 2020), Dkt. No. 95.

[19] On May 6, 2020, Petitioners filed the *Corrected Declaration of Dino Sanchez* and identified Mr. Sanchez as testifying witness for the preliminary injunction hearing. In light of Petitioners' late filing of Mr. Sanchez's declaration, Respondent reserves the right to address Mr. Sanchez's medical allegations in advance of the hearing.

Moreover, this Court cannot simply blindly follow the recommendations of Dr. Venters when Congress has delegated the management of federal prisons to the Executive Branch since 1891, when the federal prison system was created. *Swain*, 2020 WL 2161317, at *5 (granting stay of a preliminary injunction because, "[i]n short, the district court assumed the role of 'super-warden' that our decisions repeatedly condemn."); *Valentine v. Collier*, No. 20-20207, 2020 WL 1934431, at *5 (5th Cir. Apr. 22, 2020) (staying preliminary injunction because it would prevent jail officials from "responding to the COVID-19 threat without a permission slip from the district court."). The injunctive relief requested by Petitioners undermines the separation of powers by impermissibly injecting the judiciary into the management of federal prisons during times of crisis when the principle of separation of powers is arguably at its most important. Three Prisons Act, ch. 529, 26 Stat. 839 (1891). Since the creation of the BOP in 1930, Federal Bureau of Prisons Act, ch. 274, Pub. L. No. 71-218, 46 Stat. 325 (1930), Congress has delegated to BOP the management of federal prisons. 18 U.S.C. § 3621; 18 U.S.C. § 4001(b) (delegating "control and management" of federal prisons to Attorney General); 18 U.S.C. § 4042(a) (providing BOP "shall . . . have charge of the management and regulation of all Federal penal and correctional institutions"). As is underscored by the breadth of legislative action in the area, and Congress's decision to delegate day-to-day prison operations to those with appropriate expertise in the Executive Branch, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84-86 (1987). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 84. Instead, "[p]rison administration is . . . a task that *has been committed to the responsibility of [the Legislative and Executive] branches, and separation of*

*powers concerns counsel a policy of judicial restraint*." *Id.* at 85 (emphasis added). Here, separation-of-powers principles inherent in Congress' delegation of running federal prisons to the Attorney General and BOP should cause the Court hesitation before simply accepting Dr. Venters's recommendations.

In addition to having the Court categorically accept Dr. Venters's opinions, Petitioners seek to appoint a "Special Master" to supplant BOP and Respondent's role in the management of the MDC. Pet. Mot. 28. This Court, however, lacks the ability to appoint a Special Master to essentially sit as an Article III judge and evaluate which inmates may be released and which may not, especially when any inmates seeking such relief can (and have) appropriately request(ed) this relief from the judges who sentenced them. Resp. Mot. 22-25.

Importantly, Petitioners fail to cite to any cases in which a Special Master was appointed at this early stage of the proceedings. Indeed, none of the three cases cited by Petitioners in support of their Special Master argument (Pet. Mot. 28-29) address circumstances in which a district judge appointed a Special Master at the preliminary injunction stage. Pet. Mot. 28-29, citing *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) (addressing a special master appointment in the context of a *permanent* injunction and default judgment); *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 42 (2d Cir. 1994) (addressing a special master appointment following a post-discovery, lengthy bench trial spanning from 1983 to 1984); *United States v. State of Conn.*, 931 F. Supp. 974, 975 (D. Conn. 1996) (addressing a special master appointment in the context of a consent decree). Petitioners' failure to cite any similar cases was also evident at the TRO phase, as the Court acknowledged that it has not "found circumstances where a special master has been appointed just at the very outset of litigation through a TRO, and I am reluctant to do that here." Apr. 8, 2020 Tr. 20.

Interestingly, one of the three cases that Petitioners rely on—the Second Circuit opinion styled *City of New York v. Mickalis Pawn Shop, LLC* (Pet. Mot. 28)—actually bolsters *Respondent*'s argument that a Special Master cannot be appointed here. Pet. Mot. 28. In *Mickalis Pawn Shop, LLC*, the Second Circuit concluded that the district court erred in giving "sweeping delegations of power" to a Special Master in violation of Fed. R. Civ. P. 65(d), as "[s]erious constitutional questions arise when a master is delegated broad power to determine the content of an injunction as well as effectively wield the court's powers of contempt." *Mickalis Pawn Shop, LLC*, 645 F.3d at 145. "If the master makes significant decisions without careful review by the trial judge, judicial authority is effectively delegated to an official who has not been appointed pursuant to article III of the Constitution." *Id.* (quoting *Meeropol v. Meese*, 790 F.2d 942, 961 (D.C. Cir. 1986)). Similarly, here, there is no basis to argue that a Special Master can mete out judgments better reserved for Article III judges, nor does the Court have the authority to delegate the discretion and power of those Article III judges sitting in this and other districts to a Special Master.

Finally, and perhaps sensing the lack of merit to their request for a Special Master, Petitioners state—for the first time in this litigation—that they would seek, in the alternative, the appointment of "an expert pursuant to Federal Rule of Evidence 706(a)." Pet. Mot. 29. As Petitioners provide no detail about this proposal and failed to even raise this claim in their Amended Petition, it is not clear what this supposed, less-qualified expert would do, apart from presumably ensuring that (a) an unnecessary layer of bureaucracy is added to the BOP and sentencing court review process and (b) unnecessary litigation will result. Petitioners again fail to cite to any case in which such an "expert" has been appointed at this preliminary phase of the proceedings. Pet. Mot. 29. Petitioners' application must be denied.

**V.      Petitioners Fail To Establish That Class Certification Is Warranted**

As Petitioner have now formally moved to certify their class, Pet. Mot. 30-35, their motion should be denied.  Petitioners' putative class—which is defined as "all current and future people detained at MDC and the subclass of all current and future medically vulnerable people detained at MDC," Pet. Mot. 31—do meet the requirements for certification.   As set forth in Respondent's motion to dismiss (Resp. Mot. 33-35) and below, Petitioners' putative class fails to satisfy the requirements of Fed. R. Civ. P. 23(a) or 23(b)(2).

**A.      Requirements for class certification**

Rule 23 requires that for a class to be certified, the proposed class must "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *see also Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 349 (2011). The Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23.'" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).   "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24-25.  In addition to the Rule 23(a) prerequisites, a party seeking class certification must satisfy one subsection of Rule 23(b).  Because Petitioners seek to certify a class pursuant to Rule 23(b)(2), they must show that Respondent has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart*, 564 U.S. at 360.  Moreover, it is Petitioners who "bear[] the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers*, 624 F.3d at 547.

**B. There are no questions of law or fact common to the proposed class**

Rule 23(a)(2) requires that there be "questions of law and fact common to the class." To show commonality, "[w]hat matters . . . is not the raising of common 'questions' – even in droves – but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*

As is evident from the discussion in Parts I through IV above, the named Petitioners cannot plausibly argue that there are common contentions among them. Each named Petitioner stands in a unique procedural and factual posture. Vasquez Decl. ¶¶ 24-42, 43-66, 67-76. And if these named Petitioners are meant to constitute a cross-section of the proposed class, then that class can surely be expected to represent the same diversity of procedural postures and factual allegations as is found among the named Petitioners themselves. In other words, the named Petitioners themselves amply demonstrate the lack "of a common thread tying the putative class members' claims together." *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 285 (D. Conn. 2013); *Romero v. H.B. Auto. Grp.*, Inc., No. 11-CV-386 (CM), 2012 WL 1514810, at *18 (S.D.N.Y. May 1, 2012).

Petitioners seek to fuse a hodgepodge of pretrial, post-conviction, and post-sentencing inmates into a putative class, despite the fact that these inmates have different criminal charges or convictions, different reasons for having been sentenced or determined to be dangerous or risks of flight, different lengths of remaining periods of imprisonment, and different disciplinary histories. These inmates pose different dangers to the community and have different risks of flight, have different ages and medical histories, and will rely on different resources should they be released from custody. All these differences are acknowledged by the adjudication of the compassionate release applications; Petitioners commenced suit just six weeks ago with four named Petitioners,

two of whom were released by their sentencing judges under the compassionate release statute; and currently Rabadi and Lopez could secure compassionate release by the time the Court conducts the preliminary injunction hearing. The same holds true for the Petitioners' proposed class. Indeed, the proposed class members do not even have similar medical backgrounds, as they all have vastly different risk profiles for COVID-19 based on preexisting conditions, age, and a host of other factors. *See* CDC Guidance, People Who are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The Court acknowledged these myriad issues at the April 1st TRO hearing; this Court questioned if Petitioners' action could be "an appropriate class action when there are . . . individual issues that would go to release, individual issues that could go to the medical circumstances." *See* April 1, 2020 Tr. 113:3-6.

The Court therefore should not certify Petitioners' class, as such a class cannot "generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (the "common contention [] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). There is simply no basis to find a common contention among the putative class members that could be resolved with one common answer. *Wal-Mart*, 564 U.S. at 361-62 ("[T]he relief sought must perforce affect the entire class at once") (emphasis added); *Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 353 (E.D.N.Y. 2013) (finding no commonality where putative class definition "requires a series of individualized findings of facts and law"). In sum, whether any particular class member will be released under the proceeding proposed in Petitioners' motion is an individualized—not a common—question, involving wide factual variation. Such "[d]issimilarities within the proposed class" defeat

commonality.  *Wal-Mart*, 564 U.S. at 530.

**C.  The claims of the named Petitioners are not typical of the proposed class**

Rule 23(a)(3) requires that "the claims … of the representative parties are typical of the claims … of the class."  This provision logically requires that the named Petitioners themselves be members of the class if it were certified.  *Walco Investments v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996) (citing *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147 (1982)).

Here, three of the named Petitioners (Chunn, Rodriguez, and McBride) are not even members of the proposed class, as they have been released from the MDC.  Moreover, typicality requires that the named Petitioners' claims be typical of each other and overlap factually and legally in a manner indicative of the claims of unnamed class members.  *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (typicality requirement is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 82 (E.D.N.Y. 2007) (typicality requires "that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claim as to that of the other members of the proposed class.'").

As illustrated in the preceding section, Petitioners have no basis to allege the unity or alignment of interests, either among themselves or with the other members of the proposed class, necessary to meet this requirement.  *Kress v. CCA of Tennessee, LLC*, 272 F.R.D. 222, 229 (S.D. Ind. 2010) (typicality not satisfied for "[c]laims of inadequate medical care" because such claims "by their nature require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances, such as preexisting medical conditions"); *Guerra v. Public Safety Concepts*, 4:05-CV-2322, 2007 WL 628430, at *2-*3 (E.D. Mo. Feb. 27, 2007) (typicality not satisfied where plaintiffs' "allegations regarding the medical care provided to inmates [] are too broad to demonstrate a point

of commonality"). Simply stated, in light of their widely-varying factual circumstances and procedural postures, Petitioners cannot represent "typical" claims of any single class.

Petitioners' claims of typicality are in any event self-defeating. For if the claims of the named Petitioners are typical of the rest of the class, then the defenses to those claims also apply classwide. *Pagan v. Abbott Labs.*, 287 F.R.D. 139, 146 (E.D.N.Y. 2012) (typicality requirement is meant to "ensure that the class representative is not subject to a unique defense which could potentially become the focus of litigation."). As set forth in his motion, all of Petitioners' claims must be dismissed under Fed. R. Civ. P. 12(b)(1) or alternatively, Fed. R. Civ. P. 12(b)(6). The same claims would be dismissed, based on the same defenses, if asserted by any class member who is not a named Petitioner. There is no point in certifying a class if the claims of each class member must be dismissed at the pleadings stage. *Cf. United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) ("Normally a class action would be moot if no named class representative with an unexpired claim remained at the time of class certification."); *Livas v. Myers*, No. 2:20-CV-00422, 2020 WL 1939583, at *1 (W.D. La. Apr. 22, 2020) (dismissing putative class action challenge to conditions of confinement at federal prison due to lack of subject matter jurisdiction).

### D. The proposed class is not ascertainable

The key to class certification is defining the class in a way that makes administrative sense. *Scaggs v. New York State Dep't of Educ.*, No. 06-CV-0799 (RRM) (WDW), 2009 WL 890587, at *2 (E.D.N.Y. Mar. 31, 2009); *Wright v. Giuliani*, No. 99-CIV-10091 (WHP), 2000 WL 777940, at *10 (S.D.N.Y. June 14, 2000) ("The definition of the class is of primary importance, since it 'enables courts to accurately determine whether the proposed class satisfied the other requirements of Rule 23.'"), *aff'd*, 230 F.3d 543 (2d Cir. 2000).

It would thus be impossible to objectively ascertain the members of this proposed class, particularly since the class as defined by Petitioners is not limited to certain inmates at MDC but

instead defines the class as "all current *and future people* detained at MDC and the subclass of all current *and future medically vulnerable people* detained at MDC." Pet. Mot. 31. This requirement makes the proposed class a moving target, especially as consideration for inmates' requests for bail, compassionate release, or other forms of relief from incarceration remain ongoing, and inmates are receiving such relief from their sentencing judges. *Brecher*, 806 F.3d at 25 n.3 (district court impermissibly certified class where "identity of class members will remain fluid even following entry of judgment, since nothing in the new class definition freezes the class composition at any designated time.").

Indeed, there is no defined class period or temporal limitation that would make the putative class ascertainable, as it appears to extend to all inmates who may ever pass through MDC in the future. It would be impossible to concretely identify all the members of the class as more inmates will inevitably enter (and exit) MDC in the future. *Brecher*, 806 F. 3d at 25 (a class is not sufficiently definite and readily identifiable if it "has no limitation on time or context" and has "ever-changing composition" of membership such that "would make determining the identity of those [members of the class] impossible."); *see, e.g., Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288, at *5 (S.D.N.Y. Apr. 4, 2017) (denying class certification because the class definition lacked "an expressly defined class period" and "any meaningful temporal limitation at all"); *Southwood v. Credit Card Sol.,* No. 7:09-CV-183-F, 2014 WL 10677478, at *2 (E.D.N.C. Mar. 27, 2014), *aff'd sub nom. Taylor v. Bettis*, 693 F. App'x 190 (4th Cir. 2017) (denying a class certification motion because the proposed definition—"all persons in the United States who gave money to one or more Defendants for debt relief or credit repair services"—was imprecise, overbroad, and did not include a temporal limitation) (citations omitted).

Although Rule 23 "contains no express requirement regarding ascertainability, courts within the Second Circuit have held that the rule impliedly prohibits certification of a class that is not identifiable by reference to objective criteria." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012); *see also In re Fosamax Prods. Liability Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) ("Rule 23 contains the additional, implicit requirement that an ascertainable class exists and has been properly defined"). Because Petitioners have provided no evidence to show that they can meet this requirement, their motion fails. *Cf. John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings").

### E.  The proposed class is overly broad

Here, Petitioners "seek to represent a class consisting of all current and future detainees in custody at the MDC during the course of the COVID-19 pandemic," which may exceed well over 1700 individuals. Pet. ¶ 110. Regardless of the actual number, Petitioners' more significant problem with numerosity is that the class as defined is wildly overbroad. Under Petitioners' definition, every inmate who is currently at MDC or who may pass through MDC at some point in the future is part of their putative class. This manifest overbreadth in itself disqualifies the proposed class from certification under Rule 23. *Haitian Ctrs. Coun. v. McNary*, 969 F.2d 1326, 1337 (2d Cir. 1992) (noting that "an over-broad framing of the class may be so unfair to the absent members as to approach, if not amount to, deprivation of due process"), *cert. granted, judgment vacated on other grounds sub nom. Sale v. Haitian Ctrs. Coun., Inc.*, 509 U.S. 918 (1993); *M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 233 (S.D.N.Y. 2016) ("The Second Circuit has cautioned against certifying overbroad classes, even under Rule 23(b)(2), which requires a less precise definition than Rule 23(b)(3).").

Moreover, Petitioners' proposed class definition would include all present and future MDC

inmates as class members, even if they never have a serious medical need. Such a class "is defined too broadly to permit certification" because it includes "a great number of members who," by definition, could not suffer a Fifth or Eighth Amendment violation in regard to MDC medical care. *Messner v. Northshore Univ. Health Sys.*, No. 10–2514, 2012 WL 129991, at *16 (7th Cir. Jan. 13, 2012); *cf. Smentek v. Sheriff of Cook County*, No. 09 C 529, 2010 WL 4791509, at *8 (N.D. Ill. Nov. 18, 2010) (limiting class definition to "[a]ll persons presently confined at the Cook County Jail who are experiencing dental pain and who have waited more than seven days after making a written request for treatment of that pain without having been examined by a dentist.").

### F. Petitioners have not established adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999). It is difficult to see how the named Petitioners could "have an interest in vigorously pursuing the claims of the class" when three of the six Petitioners are no longer in MDC custody and the remaining three continue to seek to be released. It is particularly implausible that the released Petitioners would be "vigorously pursuing the claims" of other inmates at MDC, or those who have not yet even entered in MDC. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("no class may be certified that contains members lacking Article III standing"). It is also the case that the proposed class, if certified, would include entire groups of individuals that do not have a single representative among the named Petitioners, including any inmate who has not yet been convicted.

Additionally, Petitioners' counsel is not an adequate or appropriate representative of the proposed class. For a proposed class to be certified, "class counsel must be qualified, experienced, and generally able to conduct the litigation. *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). Respondent certainly acknowledges the lengthy experience of

Petitioners' counsel in civil matters. But the issue is not Petitioners' counsel's experience; rather, Petitioners' counsel do not represent Petitioners or the putative class members in their respective criminal proceedings. These inmates are already represented by counsel, and these criminal attorneys are making their own decisions regarding whether to seek bail, compassionate release, or some other type of relief from incarceration for their clients. Permitting Petitioners and the putative class to get two bites of the same apple—first with their criminal attorneys before their sentencing judges, and then with their civil attorneys in the present action—is barred by the doctrine of *res judicata* and must not be permitted by the Court.

### G.  The proposed class does not satisfy the requirements of Fed. R. Civ. P. 23(b)(2)

In addition to satisfying the Rule 23(a) prerequisites, a party seeking class certification must satisfy one of the subsections of Rule 23(b). Because Petitioners here seek to certify a class pursuant to Rule 23(b)(2), they must show that Respondent has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart*, 564 U.S. at 360. As discussed in the preceding sections, Petitioners can make no such showing here.

The proposed class must be "sufficiently cohesive that any class-wide injunctive relief will satisfy the requirement of Rule 65(d) that every injunction 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'" *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 221, 225 (D. Kan. 2010) (quoting Fed. R. Civ. P. 65(d)(1)). Thus, "to satisfy Rule 23(b)(2) at the class certification stage, plaintiff[] must describe in reasonably particular detail the injunctive relief which [he] seek[s] so that the Court can at least conceive of an injunction which would satisfy the requirements of Rule 65(d) and Rule 23(b)(2)." *Id.* "Put another way, because Rule 23(b)(2) classes seek only injunctions and because any classwide injunction must satisfy Rule 65(d), the Court cannot certify a Rule 23(b)(2) class if it

finds that: (1) a putative class' proposed injunction is too general to pass Rule 65(d) muster or (2) the allegedly wrongful conduct of the defendant cannot be corrected without specific tailoring of the injunction to individual members." *Martinez v. Brown*, No. 08-CV-565, 2011 WL 1130458, 13 (S.D. Cal. Mar. 25, 2011).

Petitioners fail to explain how this case satisfies the requirements of Rule 23(b)(2), or how their proposed injunctive relief could possibly satisfy Rule 65. Indeed, as noted above, the broad injunction that Petitioners request would be exactly the kind of "obey the law" injunction that Rule 65 prohibits. *New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186, 189 (E.D.N.Y. 2008) ("[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.") (citation omitted). Since Petitioners cannot satisfy Rule 23(b)(2), their motion for class certification fails.

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' motion for a preliminary injunction, deny Petitioners' request for class certification and grant the Respondent any such other and further relief as this Court may deem proper and just.

Dated: Brooklyn, New York
     May 7, 2020
                                    RICHARD P. DONOGHUE
                                    United States Attorney

                        By:           /s/
                                    James R. Cho
                                    Seth D. Eichenholtz
                                    Joseph A. Marutollo
                                    Paulina Stamatelos
                                    Assistant U.S. Attorneys
                                    *Attorneys for Respondent*
                                    (718) 254-6519/7036/6288/6198