UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

HASSAN CHUNN, *et al.*,

                    Petitioners,         Civil Action No.
                                           20-CV-1590
         -against-                  (Kovner, J.) (Mann, M.J.)

WARDEN DEREK EDGE,

                    Respondent.

----------------------------------------------------------x

## <u>DECLARATION OF HEALTH SERVICES ADMINISTRATOR<br>STACEY VASQUEZ</u>

      In accordance with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned, Stacey Vasquez, do hereby make the following declaration, under penalty of perjury, pertinent to the above-styled cause of action:

      1.     I am currently employed by the United States Department of Justice, Federal Bureau of Prisons, as the Health Services Administrator at the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). As part of my duties and responsibilities, I have access to various records maintained in the ordinary course of business at MDC Brooklyn, including all records of medical evaluations and treatment provided to MDC Brooklyn inmates.  I certify that the Attachments referenced herein are maintained in the ordinary course of business and are true and accurate to the best of my knowledge. I serve as an advisor to the administration regarding overall administrative management and operations of health services.  I also supervise staff assigned to the medical department in the performance of their non-clinical duties.

2.      I submit this Declaration as a preliminary response to the April 30, 2020 document entitled "Facility Evaluation: Metropolitan Detention Center COVID-19 Response," signed by Dr. Homer Venters ("Dr. Venters's Report").  I reserve the right to expand on my responses, including with respect to any potential testimony, both at or before the May 12, 2020 Preliminary Injunction Hearing in this matter.

3.      I am aware of certain inmates' claims relating to their respective living conditions, access to personal protective equipment (PPE) and medical needs.  I am aware of inmate Elodia Lopez, Federal Register Number ███████ James Hair, Federal Register Number ███████ Ayman Rabadi, Federal Register Number ██████4.  This declaration is also submitted in response to the claims of the following inmates: (i) Elodia Lopez in the *Declaration of Elodia Lopez* ("Lopez Decl.") dated April 30, 2020; (ii) James Hair in the *Declaration of James Hair* ("Hair Decl.") dated April 30, 2020; and (iii) Ayman Rabadi in the *Declaration of Ayman Rabadi* ("Rabadi Decl.") dated April 30, 2020[1] (collectively "the Named Petitioners" or "the Inmates") regarding their medical needs.  *See infra* Part II.

## I.      Initial response to Dr. Venters's Report

4.      In ¶ 64 of Dr. Venters's Report ("¶ 64"), Dr. Venters states that "[g]iven the severity of the COVID-19 outbreak, and the clear guidelines outlined by the CDC, I would have expected that MDC implemented the following simple procedures in order to slow the spread of COVID-19."  Dr. Venters then discusses, in ¶ 64 subparts (a) through (s), all of the procedures that Dr. Venters believes MDC should have taken.  In ¶ 65 of his report, Dr. Venters recommends that MDC implement these practices as soon as possible.

---

[1] On May 6, 2020, Petitioners filed the *Corrected Declaration of Dino Sanchez* ("May 6 D. Sanchez Decl.") and identified Mr. Sanchez as a testifying witness for the preliminary injunction hearing scheduled for May 12, 2020.  In light of Petitioners' filing of the May 6 D. Sanchez Decl. at ECF No.  76, I reserve the right to supplement my declaration to address Mr. Sanchez's medical needs while at the MDC in advance of the hearing.

5.      As discussed below, ¶ 64 is fundamentally flawed, as MDC is already carrying out practices and procedures to slow the spread of COVID-19.

6.      My responses to Dr. Venters's assertion in ¶ 64 subparts (a) through (s), are set forth below:

a)      "Screening of all detainees for multiple COVID-19 signs and symptoms, even when individual temperatures are within normal limits."

**Response:**     All new detainees and returning inmates are screened by MDC Brooklyn Health Services staff, using the national inmate screening tool, before entering the institution.  Additionally, twice-daily rounds are occurring in all of the units, during which time the inmates have access to medical to report anything they need addressed.

b)      "Screening for all detainees who arrive at the MDC consistent with CDC guidelines, including for those returning from hospital admissions, and those who are transferred from other correctional settings."

**Response:**     All new detainees and returning inmates are screened by MDC Brooklyn Health Services staff, using the national inmate screening tool, before entering MDC Brooklyn.

c)      "Adoption of a standardized COVID-19 surveillance tool which includes COVID-19 symptoms and signs, including temperature checks, to be administrated twice daily by nursing staff to all incarcerated persons who possess high-risk factors, patients in quarantine, and patients in isolation."

**Response:**     MDC Brooklyn performs twice-daily temperature and wellness checks on all isolated and quarantined inmates. Twice-daily rounds are made in all units to ensure access to medical care.

3

d)  "All patients who are suspected or confirmed to have COVID-19 should receive a standardized clinical evaluation at least daily by nursing staff in a clinical setting and not cell-side."

**Response:**      In order to reduce the spread of COVID-19, we are performing the twice-daily checks cell side. All needed questions are asked by medical staff.  If there is something that we cannot perform cell side, we will transport the inmate to the health services room on the floor.

e)  "Same-day review of every sick-call slip and electronic submission that will (i) trigger immediate (same day or next morning) assessment for COVID-19 and (ii) provide data that creates a facility wide symptom tracking dashboard that health care staff will use."

**Response:**      MDC Brooklyn has nationally set form tracking mechanisms that we are using to track all isolated and quarantined inmates.  Any inmates reporting symptoms related to COVID-19 are initially assessed by the medical staff member making rounds.  If there is a need to further evaluate the inmate, the inmate is brought out of the cell and assessed further. We are also following our regular sick call procedures for all other issues.

f)  "Identifying, cohorting and testing of all detainees who possess risk factors for serious illness or death from COVID-19."

**Response:**      This was assessed very early while preparing for the COVID-19 pandemic.   MDC Brooklyn does not have open empty units to move 390 high risk inmates to house together. We are appropriately monitoring and looking at risk factors when units are designated as quarantine based off of a symptomatic inmate being identified.

g) "Quarantine of all high-risk detainees into units with routine checks for COVID-19 signs and symptoms, including temperature."

**Response:**    This was assessed very early while preparing for the COVID-19 pandemic. MDC Brooklyn does not have open empty units to move 390 high risk inmates to house together. We are appropriately monitoring and looking at risk factors when units are designated as quarantine based off of a symptomatic inmate being identified.

h) "All quarantine units should follow CDC guidelines for management of COVID-19 including the use of appropriate PPE, cleaning of common surfaces, and exclude individuals not suspected to or confirmed to have COVID-19; including twice daily sign and symptom surveillance including temperature."

**Response:**    MDC Brooklyn has appropriate PPE per CDC guidance for all quarantine units. All common areas are being cleaned daily with high disinfectant spray. We do not house symptomatic inmates/tested positive inmates in quarantined units; they are housed in isolation. We make twice daily rounds performing wellness and temperature checks in all quarantine and isolated units.

i) "Testing of patients who possess more than one sign and/or symptom of COVID-19."

**Response:**    Testing is a clinical decision. Inmates are evaluated and treated as indicated even if a presumed positive case is identified. Testing does not change our clinical management of the symptoms.

j) "Testing of staff who possess (i) risk factors for serious illness or death from COVID-19; or (ii) more than one sign and/or symptom of COVID-19."

**Response:**     Like all members of the public, staff can obtain testing in the general community.  But staff members are still subject to the same strict screening protocols upon entry at MDC.

k) "Require that all staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas."

**Response:**     All staff have been instructed regarding what and when PPE should be worn in a given situation.  Additionally all common areas have CDC guidance on what PPE needs to be worn.

l) "Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and computers) between each use."

**Response:**     All inmates at MDC Brooklyn are provided Hdqc2 cleaning chemical free of charge. All high touch areas are disinfected between uses.

m) "Repair emergency call-buttons in cells in which those do not work; in the interim, conduct frequent medical rounds in those units where there are malfunctioning call buttons."

**Response:**     MDC Brooklyn submitted a request to the region and the funding for this project was denied. Nonetheless, correctional staff make, among other things, 30-minute rounds daily.  Daily medical rounds are conducted as well; twice daily medical rounds are conducted in the quarantine and isolation units.

n) "Training for all staff and orderlies on the importance of reporting health-related problems among detainees to medical staff."

**Response:**      There are town halls and fliers handed out weekly to all inmates that address their access to health care. Staff have been briefed multiple times, including via email, regarding how to report. Additionally, staff are screened daily before entrance using the national staff screening tool.

    o) "Rotation of Spanish-speaking health staff, so that access to medical staff is maximized."

**Response:**      Currently we have a Spanish speaking medical staff member here 7 days a week. There have been no issues with Spanish speaking inmates not being able to convey their issues. Additionally we have language line as well to ensure translation if there is not an interpreter on hand.

    p) "Ensure that each incarcerated person receives, free of charge, adequate personal hygiene supplies for hand washing, disinfectant products effective against the virus that causes COVID-19 for daily cleanings; and access to daily showers and daily access to clean laundry."

**Response:**      Inmates are provided with soap upon request, however most inmates choose to buy from commissary based off personal preference. Hdqc2 is provided for daily cleaning. Monday, Wednesday, and Friday showers are provided per BOP policy due to shelter in place rules in effect. Inmates have daily access to clean laundry.

    q) "Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible at the jail's current population level, so that social distancing can be accomplished."

**Response:**      During weekly town halls, MDC Brooklyn encourages CDC social distancing guidance. Inmates are under shelter in place rules and secured in their cells to help ensure this is happening.

     r)   "Appropriate facility staff should orient other staff and detained people on proper use of masks and gloves and other PPE. Detained people to be provided with adequate access to masks and gloves at no cost to them and the facility is to provide replacements when masks those masks become damaged."

**Response:**      Staff have been informed and there are CDC guidance fliers out in all common areas for staff and inmates about the appropriate use of PPE. Inmates are provided masks weekly and cloth masks have been issued which will be washed and reused.  If there is an issue with one of their cloth masks, the staff member or inmate can request a replacement.

     s)   "Weekly COVID-19 information sessions for detainees and correctional staff by a member of the MDC health team, that cover the status of the outbreak, efforts to mitigate the spread of COVID-19 and should take questions. This may include distributing a written document."

**Response:**      Weekly town halls are performed with written information handed out during this time. Staff are making rounds to ensure any and all questions are bring answered as needed.

**II.**    **The MDC implements guidance by the BOP, the Centers for Disease Control and Prevention, and the New York State Department of Health**

     7.    MDC Brooklyn continues to follow the policies and guidance issued by the BOP's Central Office, the New York State Department of Health ("NYDOH"), and the CDC, as they relate to the care, containment, and prevention of COVID-19.

     8.    Since March 1, 2020, no inmate has been sent to a hospital specifically for treatment

of COVID-19 symptoms. The BOP has sent two inmates to the hospital to address other acute conditions. One inmate was sent to the hospital due to acute shortness of breath. At the hospital, the inmate tested positive for COVID-19. A second inmate was sent to a hospital for diagnostic testing (*i.e.*, a chest x-ray) due to suspected pneumonia. The inmate was diagnosed with pneumonia. This second inmate also was tested at the hospital for COVID-19; that COVID-19 test came back negative.

9. The CDC has issued guidance relating to the Management of Coronavirus Disease 2019 ("COVID-19") in Correctional and Detention Facilities. This interim guidance was based on what is currently known about the transmission and severity of COVID-19 as of March 23, 2020. *See* **Attachment A – Interim CDC Guidance.**

10. The CDC acknowledged that the guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions. *Id.* at 1 and 23.

11. The CDC further acknowledged incarcerated persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced. *Id.* at 2.

12. The CDC defines social distancing as the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease. *Id. at 4*. Social distancing strategies can be applied on an individual level, a group level, and an operational level. *Id.*

13. An individual is considered to be a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case. Considerations when assessing close

contact include the duration of exposure and the clinical symptoms of the person with COVID-19. *Id.* at 3.

14.     The CDC indicated that, in correctional facilities, medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated. *Id*. at 22.

15.     Clinicians are strongly encouraged to test for other causes of respiratory illness. *Id.* at 23.

16.     The CDC has also issued guidance for Evaluating and Testing Persons for Coronavirus Disease (COVID-19). ***See* Attachment B – CDC Guidance Regarding Evaluating and Testing.**

17.     The CDC acknowledges clinicians should use their judgment to determine if a patient has signs and symptoms compatible with COVID-19 and whether the patient should be treated. *Id.* at 2.

18.     Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases includes inquiring about fever, cough, or difficulty breathing. ***See Attachment A at 26.***  The CDC has identified the following individuals as high priority for COVID-19 testing:  hospitalized patients; healthcare facility workers, workers in congregate living settings, and first responders with symptoms; residents in long-term care facilities or other congregate living settings, including prisons and shelters, <u>with</u> symptoms; and persons identified through public health cluster and selected contact investigations. *Id* at 2.

19.     CDC guidance has indicated there is a wide range of symptoms of COVID-19. ***See* Attachment C – Coronavirus Disease 2019.**   The CDC indicates symptoms may appear 2-14 days after exposure to the virus. *Id.*  The CDC has identified the following symptoms as suggesting a potential COVID-19 viral infection include: cough and shortness of breath or difficulty

breathing, or at least two of the following:  fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell. *Id.*

20.     The New York State Department of Health issued Updated Interim Guidance: Protocol for COVID-19 Testing Applicable to All Health Care Providers and Local Health Departments dated April 26, 2020 ("NY DOH Guidance").  ***See* Attachment D – NY DOH Updated Interim Guidance.**

21.     According to the NY DOH Guidance, diagnostic and/or serologic testing for COVID-19 shall be authorized by a health care provider when an individual is symptomatic or has a history of symptoms of COVID-19 (*e.g.*, fever, cough, and/or trouble breathing), particularly if the individual is 70 years of age or older, the individual has a compromised immune system, or the individual has an underlying health condition; an individual has had close (*i.e.*, within six feet) or proximate contact with a person known to be positive with COVID-19;  an individual is subject to a precautionary or mandatory  quarantine; an individual is employed as a health care worker, first responder, or other essential worker who directly interacts with the public while working; or an individual presents with a case where the facts and circumstances – as determined by the treating clinician in consultation with state or local department of health officials – warrant testing.  *Id.*

### III.     The MDC provides the Inmates with medical care in response to their complaints.

22.     I reviewed the Inmates' electronic sick call requests relating to their claims in the declarations dated April 30, 2020.

23.     I also reviewed the Inmates' medical records.

### A.  Ayman Rabadi

24.     Mr. Rabadi is fifty-nine years old and is scheduled to be released on July 19, 2020.

25.     Mr. Rabadi arrived at the MDC on December 12, 2019.

26. 

27.

28.

29.

30.     Inmates are encouraged to supplement their Bureau health record with outside medical records for continuity of care.

31. 

32.

33.

34.

35.

36.     On March 10, 2020, Mr. Rabadi, despite being present in his housing unit, and the

unit officer announcing Mr. Rabadi's name on the speaker system repeatedly, Mr. Rabadi did not

appear for his sick-call appointment.

37.     On April 3, 2020, the MDC denied his compassionate release request, and by administrative note April 20, 2020, I noted in his record that the MDC determined that Mr. Rabadi did not meet medical qualifications for a terminal or debilitated medical condition.

38.     ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████

39.     ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

40.     On May 4, 2020, MDC informed Mr. Rabadi that he was scheduled to be seen in connection with these requests.

41.     Mr. Rabadi complains that the MDC has recently accepted new inmates from Allenwood, Pennsylvania into his housing unit but MDC has no information verifying his claim. No inmates from Allenwood were moved into his unit.

42.     ███████████████████████████████████████

█████████████████████████████████████

**B.  James Hair**

43.     Since Mr. Hair's arrival at the MDC, he has received consistent care by MDC staff in response to his medical complaints.

44.     ███████████████████████████████████████

█████████████████████████████████████████████████



45.

46.

47.

48.

49.



50.

51.

52.

53.

54.



55.

56.

57.

58.

59.

60. █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████.

61. █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████-
███████████████████████████

62. █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████

63. █████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

64.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

65.   Mr. Hair is scheduled to be seen by a healthcare provider on May 8, 2020.

66.   There is no record that Mr. Hair requested a COVID-19 test but under CDC guidance he does not need one. Nor does CDC guidance require the MDC to test everyone in Mr. Hair's housing unit for COVID-19 symptoms.

**C.    Elodia Lopez**

67.   Ms. Lopez is 55 years old, and she arrived at the MDC on January 15, 2020.  Ms. Lopez is scheduled to be released on July 28, 2020.

68.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

69.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████,

███████████████████████████████████████████.

70.   With respect to Ms. Lopez's electronic sick-call requests, ██████████████████.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████

71.   ████████████████████████████████████████████████

█████

72.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████.

73.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████.

74.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████

75. 

76.      Ms. Lopez complains that a Lieutenant who worked on her unit tested positive for COVID-19, and that the MDC did not ask her if she had contact with the Lieutenant.  Lieutenants, however, do not work in the female housing unit; although they complete rounds in  the women's housing unit, they do not remain there for a lengthy period of time.  Furthermore, privacy concerns protect the identities of individuals who have tested positive to COVID-19.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 7th day of May 2020, in Brooklyn, New York.

Stacey Vasquez
Health Services Administrator
Federal Bureau of Prisons
MDC Brooklyn