# Cho Decl. Ex. B

# JEFFREY A. BEARD, Ph.D.

May 6, 2020

James R. Cho
Assistant U.S. Attorney
U.S. Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th floor
Brooklyn, New York 11201

      Re:    *Chunn v. Edge*, No: 1:20-CV-01590-RPK-RLM

Dear AUSA Cho:

      I have been retained by the United States Attorney's Office for the Eastern District of New York as an expert witness in the case of *Chunn, et.al. v. Warden Derek Edge*, Case No: 1:20-CV-01590-RPK-RLM. I have reviewed the actions taken by the Bureau of Prisons in general and MDC-Brooklyn specifically in response to the novel COVID-19 virus. I have also toured MDC-Brooklyn in order to determine the actual responses taken by that facility.

**Qualifications in Prison Management and Prison Practices**

      I began my career in corrections in 1972. I worked for the Pennsylvania Department of Corrections (DOC) for 38 years. For the first 22 years, I worked in 3 different correctional facilities in Pennsylvania. I started as a psychological services associate, followed by serving as a supervisor, and then as a deputy superintendent in my first institution.

      I was subsequently promoted to superintendent and activated a new institution before taking over one of Pennsylvania's largest institutions in the aftermath of two serious prison riots. I served as a superintendent for a total of about 8 years.

      I then moved to DOC headquarters, where I first worked as a regional deputy and then as executive deputy. For the last 10 years of my career in Pennsylvania, I was the Secretary of Corrections.

      Following my retirement from Pennsylvania DOC, I became an independent consultant for the National Institute of Corrections, various companies, and for the California Department of Corrections and Rehabilitation (CDCR), working on a number of outstanding lawsuits. In 2012, I was appointed Secretary of Corrections for CDCR and worked in that position for 3 years. Since 2016 I have served as an independent consultant and expert witness for various companies and state and county systems, including the New York City Department of Corrections, Los Angeles County Corrections, New York State Department of Corrections and Community Supervision, and the Virginia Department of Corrections.

      I have a bachelor's degree in psychology, a master's degree in counseling, and a Ph.D. in counseling all from Penn State University. Since 1977, I have been a licensed psychologist in

1

**Beard 1**

Pennsylvania, but the license is currently in inactive status.

**Overview**

A review of the documents filed in this case reflects that the Bureau of Prisons (BOP) had a pandemic influenza plan in place since at least October of 2012. The plan is quite comprehensive and has six distinct phases to be implemented to respond to any pandemic. A review of the plan reflects that it is comprehensive and that it would allow the BOP to respond in a thoughtful manner. Many of the terms that are being used more and more frequently as this pandemic evolves such as social distancing, PPE, isolation, quarantine, frequent hand washing, etc. are clearly outlined, defined and are a part of that plan. The pandemic influenza plan gave the BOP a starting point and essentially a head start as they developed their specific plans to respond to the COVID-19 outbreak.

The BOP implemented phase 1 of the plan in January of this year when there was initial reporting regarding the presence of an outbreak of a new virus in China. Phase 1 consists of getting information from various sources such as the CDC and the World Health Organization (WHO) and doing some initial planning. As late as the third week of February, WHO was indicating that they believed the outbreak could be contained and that it was less infectious than the seasonal influenza.

On March 13, 2020 -- two days after WHO declared a pandemic -- the BOP initiated phase 2 of its pandemic plan. This phase included suspending all social and legal visits, stopping volunteers and non-essential contractors from entering facilities, and cancelling tours. BOP also began screening all new inmates. Those that were asymptomatic with defined risk factors were quarantined and those who were symptomatic were isolated.

On March 19, 2020, as a part of implementing phase 2 of its pandemic plan, MDC-Brooklyn began screening staff with a questionnaire and temperature check. It also took steps to reduce inmate contact by, among other things, limiting congregate gathering.

On March 18, 2020, phase 3 of the plan was implemented by the BOP. For MDC-Brooklyn this required them to ensure that sufficient cleaning, sanitation and medical supplies were inventoried. It was reported in Lt. Cmdr. D. Jordan's declaration (Jordan Declaration), who is the Quality Improvement/Infection Control Officer at MDC-Brooklyn, that MDC-Brooklyn has cleaning, sanitation and medical supplies on hand.

On March 26, 2020 the BOP implemented phase 4 of the plan, which required all new inmates to be screened and to have a temperature check. All symptomatic inmates were isolated, and <u>all</u> other arriving inmates to the MDC were quarantined for 14 days.

On March 31, 2020, the BOP implemented phase 5 and began confining all inmates to their cells/quarters for 14 days. They contacted the U.S. Marshals Service and worked to decrease inmate intake into the facilities. Inmates were allowed out in small groups with social distancing for commissary, exercise, laundry, showers, telephone and trust fund use. MDC-Brooklyn began this phase on April 1, 2020 as directed.

On April 14, 2020 the BOP enacted phase 6 which essentially extended phase 5 to May 18, 2020.

MDC-Brooklyn staff members took a number of other steps as well. They have been providing ongoing education about the novel COVID-19 to both staff and inmates. They have ordered enhanced cleaning and medical supplies. They have identified high risk inmates in their population by screening for those over age 65 and those with existing health conditions that can adversely affect how someone responds to the novel COVID-19. Medical staff report to each housing unit twice a day to conduct sick call and provide medication. If an inmate in a housing unit has symptoms and is isolated, the rest of the unit is quarantined for 14 days. All inmates have access to a sink and water and are provided soap on request. All common areas are cleaned at least daily. Each unit is stocked with cleaning and sanitation supplies and inmates receive disinfectant for cleaning their cell. All staff have access to soap and hand sanitizer. And all staff and inmates were provided masks on April 5 and again on April 12.

The availability of a pandemic influenza response plan allowed the BOP to rapidly adapt the plan for COVID-19 and respond to the growing COVID-19 pandemic in a coordinated way throughout their correctional system once it had been determined that a pandemic existed. The actions that the BOP took were consistent with what other large correctional systems did to respond to this outbreak. But in many ways BOP's response at MDC-Brooklyn was more comprehensive and better thought out because, unlike many correctional systems, BOP had a comprehensive plan framework already in place. For instance, a State system may take certain steps (such as temperature checks on social visitors); another State system would ban social visitors; and then the first State system would backtrack and ban visitors. In other cases, a State system would take a deliberate step to deal with the outbreak and then a number of other States would begin doing the same thing. Some States have only recently adopted some of the mitigation strategies that the BOP has had in place for weeks. The BOP, however, had a plan, tailored it to the current pandemic, and followed it.

Dealing with an infectious outbreak in a correctional setting is not easy due to the large number of people in a relatively small area. There are, however, a number of things that can be done to mitigate the impact, which MDC-Brooklyn has done here.

First, a correctional facility can reduce the number of people who come into a facility. Typically, systems would look at social and legal visits, volunteers, non-essential contractors and other visitors in order to reduce the chance that the virus will get into the facility. Many State and County facilities have initiated limits in this area. This was a part of the BOP pandemic plan at MDC-Brooklyn and was put in place early in its response to the outbreak.

Second, correctional facilities should look at inmate intake into their facilities. Ideally, a facility would like to do what California has done and simply close down intake for a period of time. If that is not possible, then the facility would need a process to deal with those who do enter into that system. Pennsylvania, for instance, has taken a facility that they were closing and turned that into a reception center where they could isolate and quarantine new inmates. Here, the BOP stopped all interfacility transfers and then, initially, began a process to screen inmates to determine who was symptomatic who BOP isolated and who was asymptomatic but had certain risk factors

3

**Beard 3**

who BOP then quarantined. Within two weeks, the BOP at MDC-Brooklyn then moved to requiring all asymptomatic inmates to be placed in quarantine. And less than one week later, the BOP asked the U.S. Marshals Service to decrease intake to only those where there was no other alternative. This had been part of the MDC-Brooklyn plan and it moved quickly to minimize the risk in this area.

Third, for those staff and essential contractors who must come in, the correctional facility needs a plan to deal with them. Many correctional systems have put in place screening tools to catch those that have symptoms of the virus including measuring their temperature before they are admitted. They are also looking for those who may have been exposed to novel COVID-19. This was one of the early actions taken by the BOP at MDC-Brooklyn. Staff and essential contractors must pass the screening and temperature check in order to be admitted.

Fourth, correctional systems are taking a number of steps to protect staff and inmates in the facility. This usually begins with education about the virus, how to best prevent catching it and what to do if one thinks they may have it. In addition to actual education typically notices are placed around the facility. In addition, systems are making sure that there is an adequate supply of soap and cleaning/sanitation supplies and generally soap is provided free to inmates upon request. Most systems are also increasing cleaning of showers and common areas. Medical visits to housing areas are more frequent in order to catch symptomatic inmates as soon as possible and to reduce movement in the facility. Many systems are also providing both staff and inmates with face masks. In reviewing the BOP action plan and the Jordan Declaration, these things have been put in place throughout the BOP, including at MDC-Brooklyn.

Fifth, many correctional systems have procedures in place to deal with symptomatic inmates and those that have been exposed to them. Again, this is an integral part of the BOP's plan where it immediately isolated any symptomatic inmates and then quarantined anyone who had been exposed to them to reduce the spread of the virus.

Finally, a number of correctional systems are looking at ways to reduce the inmate population so that they can both protect the most vulnerable and make it easier to allow for social distancing within the facility. County jails have had an easier time doing so and some have been making significant reductions in the 25% to 50% range for several reasons. First, the County judges generally have more latitude to modify a sentence and they are readily available to the County prisons. Second inmates who are serving time in County jails are generally the less serious offenders who are serving shorter sentences. Many would be eligible for release in the near future anyway. So, it is easier for them to release large numbers of inmates without a significant impact on public safety. The County personnel would also be more aware of the presence or absence of community support for the offender.

The State systems are, in many cases, looking at releasing less serious offenders, particularly those that are nearing release and parole violators. While some have released up to several thousand offenders this generally represents a small percentage of the total inmate population. The California Department of Corrections and Rehabilitation, for instance, with an inmate population of 118,000 has expedited the release on parole of about 3,500 inmates. New York Department of Corrections and Community Supervision with an inmate population of about

42,000 inmates has released about 1,100 technical parole violators. The Pennsylvania Department of Corrections with an inmate population of 45,000 inmates which is expediting parole and giving temporary reprieves to some inmates has reduced their population by about 1,150 inmates over a month. State systems are working to reduce their inmate populations, but these reductions generally fall within the 1% to 3% range -- far below what many County systems have been able to do. Their inmates generally have longer sentences, more serious crimes, and it is more difficult and time consuming to ensure that appropriate release plans exist. In general, they do not specifically focus on the older inmates or those with underlying medical problems because many of them have been in prison for a number of years and are serving time for serious crimes such as murder and sex offenses. Few would be eligible from a public safety perspective.

The BOP's inmate population is more like the State systems than the County jails. Thus, it would face some of the same difficulty to first identify suitable inmates from a public safety perspective and to make sure that it had release plans that would not put the inmate or the public at risk. BOP is looking at reducing its prison population by moving more inmates to home confinement. In addition, it has been advised to prioritize home confinement placements to those inmates that have novel COVID-19 risk factors.

As of April 26, the BOP has placed an additional 1,576 inmates in home confinement. It has about 171,000 inmates with over 143,000 in BOP custody. Just as many State systems are doing, the BOP is releasing some inmates to mitigate the impact of novel COVID-19. The main difference being that the BOP is focusing more on those at greater risk than just generally trying to reduce its inmate population as some State systems are doing. The BOP has also been careful to require a 14-day quarantine period for any inmate who is to be released to home confinement. This slows down the release process, but it provides protection for the communities who receive the inmates. At least one other State that I am aware of did not do so and released an inmate who was positive for the COVID-19 virus to an area that had a low rate of COVID-19 infections.

**Inspection of MDC-Brooklyn**

On April 28, 2020, I visited and toured MDC-Brooklyn in order to see, first-hand, what it was doing at that facility to deal with the novel COVID-19 outbreak. When I arrived at the facility, I was screened (like all individuals including staff who enter the facility) for symptoms of COVID-19. The screening consisted of a series of questions and a temperature check. This was all recorded on a preprinted form and kept in a booklet. There were numerous completed forms in the booklet, and it was evident that this was being routinely done on everyone who enters the facility. I then met briefly with the Warden before beginning my tour.

The tour started in the health services area of the facility. That area consisted of a number of exam rooms, dental clinic, eye exam room, x-ray and treatment areas. At the time of my tour the area was not being used on a routine basis in order to limit inmate movement throughout the facility. Thus, just as in the community at large, routine dental, and eye exams were not being conducted. Inmates are being seen on the housing units for sick call and other needs. Each housing unit has a private medical exam room. However, the medical area was still available should there be serious medical issue pending transport by ambulance to a local hospital. Since the facility does not have an infirmary any inmate who needs to be medically monitored or treated on an ongoing

basis would be transferred to a hospital.

It was later indicated that as, of May 5, 2020, 14 inmates, housed at MDC-Brooklyn, had been tested for COVID-19 and 6 were positive. In addition, MDC-Brooklyn has had 5 other cases that were presumed positive because of symptoms and exposure all of whom were placed in isolation. They remained in isolation until they met the criteria established by the Centers for Disease Control (CDC) for release. None of these inmates required transport to a hospital for treatment, although other inmates had been transported to the hospital for other acute conditions

The medical staff are currently conducting sick call and pill line twice a day on each housing unit and they are conducting temperature and wellness checks twice a day on all inmates in quarantine and isolation. MDC-Brooklyn's medical personnel consist of doctors, nurses, and nurse practitioners and it was indicated by the health services administrator that the current staffing is adequate to handle the 1600 to 1700 inmates that are currently at MDC-Brooklyn. It was also indicated that the BOP has enough Personal Protective Equipment (PPE) for its staff. I observed one nurse in a gown, face shield, gloves and a mask as she was preparing to see inmates. I saw another nurse as he was preparing to enter a housing unit with a cart that contained both medical supplies and PPE.

As we moved through the facility, I noted that hand sanitizer and COVID-19 signage was available outside of all the elevator entrances. Since the facility is a nine-story facility, elevators are the primary way to move from floor to floor. Thus, all staff would have regular access to hand-sanitizer and would be regularly reminded about the COVID-19 virus. I also noted that all staff and all inmates had and were using their masks as we moved through the facility. It is evident that this has become a part of their regular daily routine. Additionally, inmates are only let out of their cells on Monday, Wednesday and Friday for showers, telephone and computer use. They limit it to 10 inmates at a time so that social distancing can be maintained.

The first housing unit that I visited was the cadre unit, which houses inmates who are assigned to MDC-Brooklyn as workers. I noted the medical exam room prior to entering the unit. This is a small group of less than 200 inmates, as the rest of the inmate population are essentially transients that are either at the facility as pretrial detainees or as holdover cases for appeal of their sentences, or en route to designated facilities. The unit was clean, and orderly. The inmates who were on the unit did not appear to have any concerns and seemed well adjusted. I looked in a number of cells and each cell had at least one bar of soap, and some had more than one, as well as other cleaning materials. There was also an adequate amount of toilet paper in the cells. I asked a staff member about cleaning material and the frequency and he took me to the inmate workers. They produced the cleaning/disinfectant that had been diluted and put into spray bottles and indicated that it is used on the telephones, computers and to clean common areas. They also indicated that the same cleaner/disinfectant is given to inmates to clean their cells. The material used was hdqC2. In the documents reviewed for this case, the BOP had a significant order for hdqC2 and empty spray bottles to use once the product has been diluted as per the directions. It appears they have received and deployed that product. Staff also indicated that they recently starting using hdqC2 as opposed to what they were using before because it was a more powerful disinfectant. This facility does not have a central dining area and, as such, inmates would generally eat at tables on the housing units as the food is brought from a central preparation area. However,

due to the need for social distancing at this time all inmates are fed in their cells.

I then toured the housing unit where inmates who require quarantine are being housed. I noted the medical exam room on the floor. I was informed that any inmate who comes into the facility for any purpose, even if they had only been out to court, is housed in this unit for 14 days. Every inmate who was quarantined had a sign on the door noting the date they started and the date they would complete quarantine. It also noted the protective gear required by staff who would come in contact with the inmate. It was indicated that when they are let out for showers and to use the telephone and computer, they are only let out with others who have the same start/stop quarantine dates. The staff on the unit showed me the cleaning material, which was the same as on the cadre unit and indicated that it was used by the workers housed on that unit to disinfect showers, telephones and computers after each use by an inmate. The same diluted material was provided to inmates to clean their cells. In fact, I observed an inmate cleaning his cell during my visit to the housing unit. I also noted soap in the cells. The unit itself was very clean and orderly and I saw no inmates who voiced any concerns. I would note that from my experience if an inmate has concerns that are not being handled appropriately by staff, they are generally not reluctant to speak up, particularly when unknown visitors come to their housing area.

I then went to the housing unit where inmates who required isolation are housed. The first thing that I noted was a medical cart immediately outside the unit that contained PPE for use by staff that would be having contact with any inmate in isolation. I also noted a medical exam room outside the unit. The housing unit was two tiers with the second tier being reserved for any inmate in isolation. At the time of my visit, I was informed that the last two inmates who were in isolation had been released and they had no new cases. The first tier housed a few inmates who were there for non-isolation reasons and in the event that they do have future isolation cases they are kept totally separate from those cases. Again, the housing unit had cleaning material, soap was present in the cells, and regular cleaning was occurring as noted in the other housing units.

I then toured the Special Housing Unit (SHU). A medical exam room is present as you enter the unit. There was some debris in the area in front of some of the cells because they had a minor cell fire. Apparently, an inmate found a way to set some things on fire and they were just cleaning up from that event. Again, there was hand soap available in all the cells that I looked into and there was a pile of hand soap in a storage area on the housing unit. The size of the bar was bigger than what one gets in most hotels and would certainly be enough for multiple uses. A staff member took me into a vacant cell and indicated that they were cleaned between uses and inmates were provided with material to clean their cells. Some of the inmates in this unit were more demanding than those on the other units but their behavior was no different than what I have seen in other SHU units over the years. The unit itself was not particularly noisy and the few inmates who wanted to know who I was were more interested in compassionate release than conditions on the unit.

**Dr. Venters's Facility Evaluation and Deposition**

I have had an opportunity to review Dr. Venters's facility evaluation of MDC-Brooklyn and his deposition transcript in this case. I have some observations relative to his findings.

In paragraph number (#) 2 of his report, Dr. Venters indicates that when MDC staff screen inmates for COVID-19, they only do a temperature check. This was based on his observation of one nurse for a couple minutes and some inmate statements. The Vasquez deposition, however, indicates that when she conducted such checks, she always opened the cell door and asked the inmates how they were doing. There was no evidence that Dr. Venters tried to obtain information relative to what other staff may do during such assessments.

In #4 of his report, Dr. Venters indicates that there is a lack of adequate cleaning material and in #42 of his report, he indicates that there are gaps in obtaining cleaning material. However, in his deposition on page 62 lines 13-20, Dr. Venters states that inmates did, in fact, get cleaning solution and only a few indicated any difficulty getting refills.  Further, on page 63 lines 1 to 6, Dr. Venters indicated that he did not know why an inmate may be refused a refill. Also, on page 70 lines 1 to 20, Dr. Venters indicated that he did not see anyone with bar soap and he only saw a few hand sanitizer stations. He further noted he saw no soap in the shower. There is no documentation that he confirmed his questions with MDC, or that he asked inmates about cleaning supplies or their availability.

As I have noted in my report, and contrary to Dr. Venters's report, I observed bar soap in all the cells that I looked into.  I also saw other cleaning material, such as spray bottles and liquid soap. I asked inmate workers to show me what they used to clean the common areas and what inmates received to clean their cells. They showed me bottles of hdqC2, which staff indicated was a more effective and stronger cleaner/disinfectant that they had recently received to replace what they had been using. I then asked staff to show me what they had on hand within the unit and I was shown additional cleaning solution. As to hand sanitizers, they were present in staff bathrooms and at the entrance to the elevators on every floor I visited. It was also unsurprising that hand soap was not in the showers because inmates generally use bar soap when they bathe. Inmates are given their own bar soap because shared soap in the shower could cause the spread of germs.

In #41 and #42 of his report, Dr. Venters also talks about the adequacy of cleaning in common areas and he says that he was told by several detainees that they had not observed cleaning of the phones. There is no indication that he talked with the inmates responsible for this cleaning. He also does not note the disinfectant spray bottles, which, as he acknowledged at his deposition, were present in the common areas.  In my discussions with both staff and inmate workers, I was told that the phones and computers were cleaned after each use on the intake (quarantine unit) and the cadre unit. In addition, it was noted that spray bottles would be available if individual inmates wanted to clean any area themselves.

In #18 of his report, Dr. Venters indicated that several inmates stated that they had not been screened before entry into the facility. He does not indicate when they arrived. My understanding from the Jordan Declaration and via discussions with staff differ from what these inmates allegedly told Dr. Venters. On March 13, 2020 MDC-Brooklyn began screening all new inmates. Any symptomatic inmate was moved to isolation. Any asymptomatic inmate who had a high-risk contact was quarantined. Then on March 26, 2020 MDC-Brooklyn began quarantining all new inmate arrivals for 14 days. This included inmates who had briefly left the facility for court, hospital, etc. Staff in fact said that even if inmates were gone for 30 minutes they would be quarantined upon their return.

8

Beard 8

In #43 of his report, Dr. Venters indicated that he saw staff in the isolation unit only wearing surgical masks instead of N95 masks. In reviewing CDC guidelines, I note that it only recommends use of N95 masks for staff who are coming into direct contact with a symptomatic inmate. In #45, Dr. Venters indicates that symptomatic inmates are not receiving N95 masks. Again, a review of CDC guidelines reflects that it only recommends a mask, not an N95, for inmates even if they are symptomatic.

In #46 of his report, Dr. Venters talks about the lack of an exam room on the isolation unit. But, contrary to Dr. Venters's report, all of the units that I visited (including the isolation unit) had an exam room in immediate proximity to the unit. In the case of the isolation unit, the exam room is located about five feet or so immediately outside the unit.

In #47 of his report, Dr. Venters discusses an inmate who was not symptomatic who was placed on the isolation unit for other reasons; Dr. Venters argues that this violates CDC guidelines. But the CDC guidelines do not state that only symptomatic inmates can be housed on the same unit. Instead, the CDC guidelines state that, ideally, symptomatic inmates should be housed in a cell with four solid walls and a door with no openings. That is the kind of cell that symptomatic inmates are housed in, as the door has a solid glass window. Additionally, the inmates are separated by tier, since only symptomatic inmates are housed on the second tier of this unit.

In #48 of his report, Dr. Venters indicates that the inmates were yelling about cold cells. However, I was in a cell on the cadre unit and the SHU; neither cell was cold. In addition, on the four units that I visited (isolation, intake (quarantine), cadre and SHU), no inmates were yelling anything about being cold, nor were they yelling about not having soap or cleaning material, or about any COVID-19 related issue. The few inmates who engaged me were interested if I could do anything for them relative to compassionate release or home confinement.

In my over 40 years of correctional experience and having toured over 100 jails and prisons some multiple times, I have found that if staff are not doing their job, the inmates will let you know. This is especially true when one is not from that facility. If the staff are doing their job, they are generally not interested in the visitor and they will engage staff about their concerns. Outside of the compassionate release and home confinement issue, I found that the inmates engaged staff at MDC-Brooklyn about day-to-day concerns.

In Dr. Venters's deposition on page 104 lines 6-10, he indicates that those identified inmates who are at higher risk of an adverse response to the virus should be placed in a cohort. In my opinion, Dr. Venters's proposal is not a viable action from two perspectives.

First, from a correctional perspective, the diverse nature of the population and the need to provide separation between inmates for a number of reasons would make this impractical. MDC-Brooklyn has pretrial inmates, inmates who are back on appeal, inmates transferring between institutions, and cadre inmates. They have minimum, low, medium and maximum-security inmates. They have gang members from the same and different gangs that may need to be separated. And they have those that need to be protected, such as sex offender inmates, mentally ill inmates, and others that may be more vulnerable or have a high-profile case. Then at least 25 percent of the

overall population fall into the high-risk category. There is simply no way to do what Dr. Venters is suggesting and also to protect everybody.

Second, from the medical perspective, the inmates have been essentially isolated together on individual housing units for many weeks. Today if an outbreak occurs on a unit you can isolate the symptomatic and quarantine the rest of that housing unit for 14 days, which is what MDC-Brooklyn is prepared to do. If MDC-Brooklyn were to move everyone around so that it could cohort the high risk, there is a chance that you could spread the disease throughout the facility during these wide-spread transfers.

**Conclusion**

Based on my review and analysis of this case, my inspection of MDC-Brooklyn, and my background, education, and over forty-years of experience in prison management, I conclude that MDC-Brooklyn is effectively implementing practices that protects inmates and staff alike from the coronavirus.

MDC-Brooklyn is a clean, well-run correctional facility with dedicated professional staff. The facility is well maintained and in good shape especially considering that most of its inmates are transients and there is usually a high rate of turnover. Detention facilities like MDC-Brooklyn are much more difficult to maintain due to the constant turnover and it takes a hands-on administration and dedicated staff to keep things running smoothly.

MDC-Brooklyn staff members are screening all staff and anyone else who comes into the facility. They have reduced inmate movement into the facility and anyone who does come in is screened then quarantined for 14 days. They have greatly reduced inmate movement within the facility, inmates are largely confined to their cells and when they are out of their cells, they are in small groups on their housing units to facilitate social distancing. Because MDC-Brooklyn has 17 separate housing areas not counting the SHU, they are better able to quarantine, and isolate groups of inmates should an outbreak occur on any specific unit. A large amount of soap and an enhanced cleaner/disinfectant was ordered a month or so ago and is readily available on the housing units. They have inmate workers on each housing unit who are responsible for regular cleaning of the common areas, showers, telephones and computers. Both staff and inmates confirm that this is happening and that inmates can get appropriate cleaner/disinfectant for cell cleaning. They have adequate medical staff to complete all required tasks each day and the staff have sufficient PPE as required. They have established guidelines as to what PPE are required in different situations based upon CDC guidelines. Hand sanitizer and soap is readily available for staff in restrooms and by all elevator entrances. Finally, all staff and inmates have been provided with masks and they are regularly worn.

They have isolated and treated the 6 inmates who tested positive and the 5 presumed positive and they have all been released from isolation. On the date of my visit, they had no identified symptomatic inmates. The BOP appears to have moved rapidly and have used the mitigation strategies that other systems have used. MDC-Brooklyn has put in place these strategies that hopefully will continue to mitigate any potential outbreak at that facility.

      I reserve the right to supplement this report should additional information become available to me. Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

      Sincerely,

*[signature]*

Jeffrey A. Beard, Ph.D.

11

**Beard 11**