UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI, by his Next Friend
MIGDALIZ QUINONES; JUSTIN RODRIGUEZ,
by his Next Friend JACKLYN ROMANOFF;
ELODIA LOPEZ; and JAMES HAIR,

individually and on behalf of all others similarly
situated,

Petitioners,

-*against*-

WARDEN DEREK EDGE,

Respondent.

No. 20 Civ. 1590

**DECLARATION OF
KATHERINE ROSENFELD**

---

I, Katherine Rosenfeld, an attorney duly admitted to practice in the Eastern

District of New York, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.  I am a partner at Emery Celli Brinckerhoff & Abady LLP.  Along with the Cardozo Civil

Rights Clinic, Alexander A. Reinert, and Debevoise & Plimpton LLP, we represent the

Petitioners and putative class.

2.  I submit this declaration in support of Petitioners' motion *in limine*.

3.  Attached as Exhibit 1 is the transcript of Telephonic Proceedings of April 13, 2020 in this

action.

4.  Attached as Exhibit 2 is the transcript of Telephonic Proceedings of April 25, 2020 in this

action.

5.  Attached as Exhibit 3 is an email from Respondent's counsel to Petitioners' counsel

dated April 28, 2020.

6.  Attached as Exhibit 4  is Respondent's Letter to Petitioners dated April 24, 2020.

7.   Attached as Exhibit 5 and filed under seal are seven paper sick-call requests in which incarcerated people in the MDC reported COVID-19 symptoms, as excerpted from BOP_SCR 889-922 produced by Respondent to Petitioner on April 29, 2020.

8.   Attached as Exhibit 6 is Respondent's Letter to Petitioners dated April 29, 2020.

9.   I confirm that all of the documents exhibited to this declaration are true and correct copies.


Executed on:   May 9, 2020
                        Lake Pleasant, New York                   _____/s/_____

                                                                                  Katherine Rosenfeld

# EXHIBIT 1

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3
                              : 20-CV-01590 (RPK)
4  HASSAN CHUNN, et al         :
                               :
5          Petitioners,        :
                               : United States Courthouse
6                              : Brooklyn, New York
      -against-                :
7                              :
                               : April 13, 2020
8  WARDEN DEREK EDGE,          : 1:00 p.m.
                               :
9          Respondent.

10 - - - - - - - - - - - - - - - X

11      TRANSCRIPT OF CIVIL CAUSE FOR PETITION
              FOR WRIT OF HABEAS CORPUS
12    BEFORE THE HONORABLE JUDGE RACHEL P. KOVNER
            UNITED STATES MAGISTRATE JUDGE
13
               A P P E A R A N C E S:
14
   For the              EMERY CELLI BRINCKERHOFF & ABADY LLP
15 Petitioners:            600 Fifth Avenue, 10th Floor
                           New York, NY 10020
16                      BY: KATHERINE RUTH ROSENFELD, ESQ.

17                      BENJAMIN N. CARDOZO SCHOOL
                           55 5th Avenue Eleventh Floor
18                         New York, NY 10003
                        BY: BETSY R. GINSBERG, ESQ.
19 For the Respondent:  UNITED STATES ATTORNEYS OFFICE
                        EASTERN NEW YORK
20                         271 Cadman Plaza East
                           Brooklyn, NY 11201
21                      BY: JAMES R. CHO, ESQ.
                           JOSEPH ANTHONY MARUTOLLO, ESQ.
22                         SETH EICHENHOLTZ, ESQ.

23 ALSO PRESENT, DIERDRE VON DORNUM, ESQ.
   Court Reporter:  SOPHIE NOLAN
24                  225 Cadman Plaza East/Brooklyn, NY 11201
                    NolanEDNY@aol.com
25 *Proceedings recorded by mechanical stenography, transcript
   produced by Computer-Aided Transcription*

SN      OCR      RPR

Telephonic proceedings                    2

1          (Telephonic conference.)

2          THE COURT:  This is *Chunn versus Edge*.  It's

3    20-CV-1590 and I would ask the parties state their

4    appearances.

5          MS. ROSENFELD:  Katherine Rosenfeld and Betsy

6    Ginsberg for petitioners.

7          THE COURT:  Great.

8          MR. CHO:  Your Honor, if I may, James Cho for the

9    Government and I can introduce my team as well.  We have Seth

10   Eichenholtz, U.S. Attorney's Office, Joseph Marutollo, U.S.

11   Attorney's Office; Paulina Stamatelos, U.S. Attorney's Office;

12   Lisa Olson, DOJ Federal Program; Kieran Howard (phonetic),

13   Bureau of Prisons Regional Counsel and Holly Pratesi

14   (phonetic), Bureau of Prisons.

15          I'm James Cho, U.S. Attorney's Office.

16          THE COURT:  We also have Judge Mann on the line too.

17          MS. VON DORNUM:  Dierdre von Dornum.  I just joined.

18          THE COURT:  Okay.  So I know we've had a bunch of

19   calls in this case, but I will just repeat my general

20   conference call request which is, if you are speaking, if you

21   could identify yourself at the start so the court reporter can

22   take it down and try not to overlap with each other that would

23   be helpful because that's hard to take down.

24          So I think we have a bunch of matters relating to

25   discovery to talk about and I think the first bucket of them

Telephonic proceedings                    3

1   are whether discovery should be allowed given that this is a

2   habeas, whether discovery should be expedited and whether

3   discovery should be stayed.  So they are all pretty closely

4   related questions I think, but that's sort of the first bucket

5   of things that I have.

6            Well, I have read submissions that were put in on

7   this up until an hour ago and I see that the Government just

8   put in a submission maybe a half an hour ago and I received

9   that -- because my ECF doesn't update immediately, I received

10  it five minutes ago and I've sort of scanned it, but I have

11  not read it in great detail.  So let me turn it over on those

12  three issues to you all; if there is anything you want to add

13  from the submissions that were put in as of Saturday night,

14  including the Government if there is anything you want to call

15  to my attention from this letter that wasn't developed in the

16  earlier submissions.

17           MR. CHO:  The letter we submitted to Your Honor

18  about a half an hour ago was in response to your order from

19  Saturday asking us to be prepared to discuss objections to the

20  discovery requests.  So we outlined, I think in great detail,

21  our overall objections to the discovery demands.  Certainly

22  our position is; one, we intend to dismiss and certainly no

23  discovery is necessary on a motion to dismiss.  So we want to

24  request a stay of discovery for that reason, but also in

25  federal habeas cases, courts generally do not provide for

1   discovery in those types of cases, and again this is a habeas

2   case as well.

3          THE COURT:  Got it.  Okay.

4          Since I read your letter on this, is there anything

5   else you want to add on whether the discovery should be

6   allowed, whether discovery should be expedited or whether

7   discovery should be stayed?

8          MS. GINSBERG:  No, Your Honor.  I don't think we

9   have anything to add and I would say that I have also only

10  scanned the respondent's long letter that we only just

11  received and didn't actually know it was coming in our earlier

12  meet and confer today, so I would be happy to respond to any

13  of the objections they raised here, but we haven't gone

14  through their letter thoroughly yet.

15         THE COURT:  Okay.  So on the issue of whether to

16  allow discovery, I take the point that habeas petitioners are

17  not entitled to discovery as a matter of ordinary course under

18  the ordinary civil rules.  I think both the Government and the

19  petitioners agree, though, that there this is a good cause

20  standard under which courts can allow discovery and so here

21  I'm citing *Gracie versus Cramley* (phonetic) which is a Supreme

22  Court case and it says:  Where specific allegations before the

23  court show reason jato believe that the petitioner may, if the

24  facts are fully developed, be able to demonstrate that he is

25  entitled to relief, it's the duty of the court to a provide

1   the necessary facilities and procedures for an adequate

2   inquiry.

3          So under that I think courts look to whether if --

4   depending on how the evidence were developed, if petitioner

5   could have a claim that that's something the courts consider

6   in deciding whether to authorize discovery.  So here I think

7   that the may standard is a relatively low bar and the things

8   that the petitioner is seeking discovery on are things that

9   are relevant to an Eighth Amendment claim could potentially

10  make out an Eighth Amendment claim at least potentially under

11  a may Standard.

12         So petitioners should put forward evidence in their

13  TRO papers suggesting there is some basis for disputing some

14  important things about the conditions of the compliance at the

15  MDC; the inmates saying they don't have access to soap.  You

16  have numbers suggesting that there is very, very little

17  testing going on at a facility that is recently large.  I

18  don't remember the exact number in the most recent report, but

19  it's on the order of about seven people tested in the most

20  recent report.  It's a large facility I think of about 1,500

21  or so people.  And then you have the petitioners putting

22  forward in their TRO paperwork some inmate accounts suggesting

23  that there are people who are symptomatic and not being

24  tested.

25         As you all know, there are a bunch of conditions of

1   confinement cases being litigated now during the COVID

2   epidemic and I do think these questions of testing protocols

3   and access to soap and sanitation are the kinds of things that

4   courts are treating as a potential basis for an Eighth

5   Amendment claim where one recent case focused very

6   specifically on those two things where I think a TRO was

7   issued recently.

8           So I'm not myself addressing making any decision

9   obviously about the merits of any of those claims, but I think

10  we're not talking about a may standard.  I think we are

11  talking about a relatively low bar because this here is good

12  cause to allow some discovery into those things.

13          The respondent has argued some about the TRO in this

14  case and highlighted that I didn't issue a TRO, but it does

15  seem to me that there's a very different standard for a TRO

16  than just for authorizing discovery.  It's a pretty high bar

17  to get a mandatory injunction at the very start of your case,

18  but I think the standard to submit evidence that may support

19  your claim at the end of the day is a lower one.  So that's as

20  to whether discovery should be allowed and I think it's

21  reasonable to have some discovery here.  There is due cause

22  for some discovery here.

23          So then I think the next issue is that should

24  discovery be expedited and here again I think it is a

25  reasonableness or a good cause standard and one of the cases

1    that I look to is Judge Lynch case, *Ayyash versus Bank*

2    *Al-Madina*, 233 FRE 325, SDNY 2005.  So looking at the cases

3    under -- certain cases addressing expedited discovery, it

4    seems like it's a reasonableness or good cause is a flexible

5    standard.

6          One thing that courts sometimes look to is whether a

7    preliminary injunction request is pending or being made,

8    expedited a factor but is not sufficient in and of itself.

9    Other things they look at are the purpose of the discovery and

10   the burden on the opposing party and here it seems to me like

11   this is a pretty narrow discovery request being made and we

12   can talk more about whether any specific pieces of it are

13   burdensome or unreasonable.

14         But this is a relatively limited request seeking

15   information that's relevant to the claims and I don't think

16   it's going to be especially burdensome and, of course, it is a

17   somewhat time-sensitive matter in light of the epidemic.  So I

18   think there's good reason to move forward quickly in this case

19   in light of that.  So it seems to me like there's good reason

20   to have expedited discovery here.

21         So then the question is -- and obviously these

22   factors are all pretty overlapping, but the stay of discovery

23   question involves a number of similar factors.  The

24   petitioners argue that a good cause standard applies to this

25   also and I don't take respondent to be disputing that there's

Telephonic proceedings                              8

1   a good cause standard for a stay of discovery because they

2   cite -- as setting out the standard that they want for stay of

3   discovery, they cite this case *Spencer Trask Software and Info*

4   *Services*, 206 FRD-367, and that's a good cause standard case.

5          So starting from that case, it says and other cases

6   say as well:  A stay pending a motion to dismiss is by no

7   means automatic.  You shouldn't routinely stay discovery

8   simply because a motion to dismiss has been filed.  Instead,

9   you should consider the breadth of discovery sought, the

10  burden of responding to it and the strength of the dispositive

11  motion as a basis for the stay application.

12         So those are basically factors that I've talked

13  about before with respect to burden and breadth and the only

14  additional factor is the strength of the dispositive motion

15  and here I think the petitioners are right that basically the

16  respondent hasn't told us a lot about what the motion is going

17  to be and that makes it hard to conclude much about the

18  strength of the motion at this point.

19         The arguments that the Government was making at the

20  TRO stage were mostly merits arguments which is completely

21  appropriate to the TRO stage, but it's not clear to me that

22  any of those -- obviously a motion to dismiss, there's a

23  relatively limited set of arguments that can be made on that

24  type of motion and it's not clear to me from papers that I've

25  seen at this point what the strength of a motion to dismiss

Telephonic proceedings                                    9

1   will be.

2            And so, taking into account all those factors, I

3   don't think that a stay is appropriate, you know, as with some

4   of the earlier discovery points that respondent has alluded

5   to, denial of the TRO as one of the reasons to stay discovery,

6   and again I would say a mandatory TRO is very, very hard to

7   get and I don't think a plaintiff's inability to meet that

8   high standard with respect to the particular relief that we

9   are seeking on a particular record shows that respondent has a

10  meritorious motion to dismiss which I think is the real

11  question when what is being sought is a stay in order to

12  litigate a motion to dismiss.

13           So that's where I am on those preliminary issues

14  which is, just to recap, under a good cause standard some

15  discovery here is appropriate and it's appropriate to expedite

16  that discovery.  And based on what I know now, I'm not

17  inclined to stay the discovery.  So insofar as there is a stay

18  request pending now, I would deny it.  That kind of moves us

19  to the scope and timing issues unless there is anything else

20  you all want to talk about on those preliminary matters.

21           Okay, go ahead.

22           MR. CHO:  Nothing from the Government at this time.

23           THE COURT:  Okay.  I think that what I am

24  anticipating on scope and timing is that I'm hoping we can

25  develop a little bit more what the objections are and I'm

1    anticipating that we may issue -- I may jointly with Judge

2    Mann issue, an order on some of those issues.  I may play more

3    of a secondary role in talking through some of these discovery

4    questions beyond this call because Judge Mann has expertise in

5    these matters that exceeds my own.

6            But maybe a place to start will be -- and I think

7    part of this may be addressed in the letter that the

8    Government filed, so I'm just flagging that you may need to

9    recapitulate some of it because I haven't had the opportunity

10   to read it thoroughly and I think your friends on the other

11   side may not have either, but if I'm right about the document

12   demands, the three things that are being requested are the

13   testing protocols from February 1st to date at MDC for

14   COVID-19, documents that show how much soap was received at

15   the facility from February 1st to date, and sick call requests

16   from March 13th to date in redacted form.

17           Maybe it would make sense for us to talk about each

18   of those in sequence.

19           Is there an objection to the testing protocols?

20           MR. CHO:  I can go through our objections, which I

21   also outlined in our letter as well, but for document request

22   number one requesting testing protocols, those protocols are

23   already being produced to the Court pursuant to Administrative

24   Order 2020-14.  That order specifically says the BOP needs to

25   produce protocols for screening and testing inmates which is

Telephonic proceedings                    11

1  exactly what the petitioners are seeking here in document

2  request number one.

3         So we would obviously object on the grounds that

4  that information is already available to petitioners on the

5  Court's website and that information will continue to be

6  updated pursuant to that administrative order.  So that was

7  the basis for our objection initially to that request.

8         THE COURT:  If I remember right, I think that in

9  their earlier letter petitioners suggested that the

10 information that you're providing to the Court in the letters

11 doesn't really say what the protocols are; it doesn't say

12 whether you're testing people when they're symptomatic or what

13 criteria your applying when you are deciding whether to test

14 people.  I don't want to get into a fight about whether or not

15 what you are filing was contemplated in the administrative

16 order which I think is part of what petitioners are raising,

17 but I take it that petitioners' request is basically tell us

18 what criteria you're applying to test people.

19        Is that something you think you are already

20 disclosing?

21        MR. CHO:  Yes, Your Honor.  The request that was

22 filed on Friday all it says is testing protocols for COVID-19

23 in effect at the MDC and that's also what the administrative

24 order requires as well; protocols for testing inmates.  So it

25 it's almost verbatim.  They don't ask for anything else on top

Telephonic proceedings                12

1   of that.

2           MS. GINSBERG:  Your Honor, while the letter response

3   to the administrative order talks some about the screening

4   protocols, they do not explain what the testing criteria are.

5   They say how many people have been tested but that's not the

6   testing protocol and criteria.  And so we're not here either

7   to talk about whether they are in compliance to such order,

8   but rather this is information that we need in this case.

9           THE COURT:  So do you want to respond to that with a

10  clarification of what they're looking for in some explanation

11  of, when people are tested, what the criteria are for that?

12  That doesn't seem like what you're providing already and it

13  seems that's what they're looking for.

14          MR. CHO:  Well, I can certainly refer to our

15  responses to the administrative order, but again I can only

16  rely upon what they ask for and they only asked for testing

17  protocols and we believe we've already responded to those

18  requests.  I mean, we can certainly meet and confer with

19  petitioners on that request but, I mean, their demand says

20  what the says and it's identical to what the administrative

21  order requires.

22          JUDGE MANN:  I lost power this morning, so I can't

23  even access ECF.  So I haven't seen the Government's letter at

24  all, let alone not had enough time to review it.  So I'm at a

25  great disadvantage, but I guess a more-pointed question I

Telephonic proceedings                    13

1    would ask is this:  Since the demand is not -- it's not an

2    interrogatory, it's a request for documents, is it the

3    Government's position that there are no responsive documents

4    regarding testing protocols and the criteria used to determine

5    when to administer tests other than what is set forth in the

6    response to Judge Mauskopf's administrative order?

7              MR. CHO:  At this time the Government is not

8    prepared to say there are or not additional documents, but we

9    certainly know the documents that have already been produced

10   to the Court are certainly responsive because they're asking

11   for same information.  But I can't say, as we sit here today,

12   that there are no additional documents.

13             JUDGE MANN:  Well, since petitioners' counsel

14   indicated that what they're looking for specifically would be

15   documents that set forth what the testing criteria are, let's

16   just drill down on that particular area.  I take it you're not

17   disputing that what's been posted on the website, the Court's

18   website, does not contain such criteria; can you say whether

19   or not there are documents that specify the testing criteria?

20             MR. CHO:  I'm not sure whether the responses from

21   BOP don't address that.  I'm not exactly sure.  I'd have to go

22   back and check the submissions that have already been provided

23   to the Court.  So I can't say for sure whether they do or do

24   not address that question.

25             MS. GINSBERG:  Your Honor, I'm looking at the April

Telephonic proceedings                    14

1   9th letter to Judge Mauskopf now and there is nothing in there

2   about testing criteria at all.  The fact that the Court asked

3   for this doesn't mean that it's here and I think also Judge

4   Mann pointed out to the extent that there are documents

5   setting forth what those criteria are, we would ask for those.

6              MR. CHO:  Your Honor, if I may, I think the nature

7   of our discussions now reflects the reason why perhaps this

8   call may be premature with Your Honor because, look, we have

9   submitted our objections.  We haven't had a chance to meet and

10  confer in-depth with petitioners and they're raising

11  additional inquiries now that we were not aware of before this

12  call.  So I don't know how productive it will be having a

13  discussion with Your Honors on all of these points without

14  having had those discussion.

15             Because, again, their request on Friday was very

16  short.  It just said testing protocols and now they're seeking

17  information on testing criteria which is different from what

18  they had requested before.  So I just don't know how

19  productive an ongoing discussion on each of these requests

20  will be at this time without at least having the parties have

21  a chance to talk about these issues and the Court having not

22  seen our letter.

23             JUDGE MANN:  Well, I certainly would and must defer

24  to Judge Kovner on this, but my own view is it might be useful

25  just to air some of these issues to help focus the parties in

SN        OCR        RPR

Telephonic proceedings                    15

1  their discussions and to assist the two judges in coming up

2  together with some rulings.

3           MS. GINSBERG:  Your Honor, the parties spoke today

4  and we inquired as to whether there was anything else to meet

5  and confer about.  This isn't new.  I don't actually think

6  we're asking for something different right now, I think the

7  protocol for testing includes the testing criteria and we

8  would certainly like to hash this out now as much as possible

9  given the need for expedited discovery here.

10          THE COURT:  So let's at least talk through -- it

11  sounds like testing protocols, the Government is not certain

12  whether there are more written documents that exist beyond

13  what's been given to the Court or submitted to the Court; is

14  that right?

15          MR. CHO:  That's correct, Your Honor.

16          THE COURT:  Okay.  And the objection I'm hearing is

17  basically that insofar as what's being requested is for

18  protocols and that it's protocols and information that has

19  been submitted to Judge Mauskopf.

20          Judge Mann, do you want to ask anything else about

21  that?

22          JUDGE MANN:  Well, I guess the one thing I would

23  want clarification from petitioners, in addition to testing

24  criteria, is there other information that you are seeking in

25  your document demand number one, that is not addressed in the

SN        OCR        RPR

Telephonic proceedings                          16

1    reports to Judge Mauskopf that have been posted?

2            MS. GINSBERG:  Yes.  What I see in those letters to

3    Judge Mauskopf is the number of people tested and the number

4    of people testing positive.  So what we're looking for is

5    their protocol, what procedures they follow in deciding who

6    and when to test and how someone might request a test.  So I

7    don't see any of that laid out in those responses to Judge

8    Mauskopf.  And, so, we assume there must be a document that

9    lays out what those are and whether that's a memo or an e-mail

10   or something telling the people at MDC here is who you test.

11   And, obviously, if no such written document exists, we would

12   want to know that as well.

13           It strikes me as odd that at this stage in the

14   litigation that the respondent isn't aware as to whether

15   there's any document laying out what the testing protocol is.

16           THE COURT:  Just to drill down on what you're

17   seeking from the defense is what other criteria are being

18   applied besides when testing occurs and how would you request

19   a test; is that right?

20           MS. GINSBERG:  Yes, Your Honor.

21           JUDGE MANN:  I believe also petitioners indicated

22   what procedures were followed regarding who and when to test

23   and how requested.  And the Government at the present time is

24   unaware whether there are any such documents apart from the

25   letter sent to Judge Mauskopf, so I don't think the Court can

SN        OCR        RPR

Telephonic proceedings                    17

1   decide anything at this point except ask the Government to

2   look into that.

3            MR. CHO:  Your Honor, should we talk the second

4   request?

5            THE COURT:  I was asking about the second request,

6   which was documents to show how much soap was received at the

7   MDC from February 1st to date.

8            MR. CHO:  Your Honor, so, one overarching argument

9   or objection that we have to the extent they're seeking

10  information dealing with all inmates at the MDC and not just

11  the two remaining petitioners Rodriguez and Rabadi.  In their

12  letter from Saturday, they say they are not seeking classwide

13  discovery nor have they moved for class certification at this

14  time.  So one overarching objection we raised in our letter is

15  that to the extent any discovery touches on information

16  dealing with all inmates at the MDC that that request is

17  overly broad and not important to the needs of this case.

18            In terms of specifics as to soap at the MDC, there

19  are different departments within the MDC that order soap

20  separately.  Our records dealing with purchases and shipments

21  of soap at the MDC are not maintained centrally or

22  electronically.  So there's some difficulty on the part of MDC

23  to provide a quick response to that request for all soap

24  shipments to the MDC at this time.

25            So we will certainly continue to discuss this

Telephonic proceedings                    18

1   question with the BOP, but that was our initial objection to

2   that overbroad request.  But certainly to the extent that

3   there are documents available dealing with soap shipments, we

4   will provide those responsive documents if they are not

5   privileged.

6            JUDGE MANN:  How many different departments at the

7   MDC put in orders for soap?

8            MR. CHO:  At this time I don't know a specific

9   number.

10           JUDGE MANN:  When you say they're not maintained

11  centrally, I assume we're not talking about the Bureau of

12  Prisons, you're saying they're not maintained centrally even

13  within MDC?

14           MR. CHO:  That's correct.  There are district

15  departments within the MDC that make purchases as they see fit

16  and there's not one centralized purchasing department or

17  entity that could purchase soap at MDC.

18           JUDGE MANN:  But you don't know how many departments

19  there are, so you don't know -- you're saying that it's

20  burdensome, but you don't know if there are two versus fifteen

21  different departments?

22           MR. CHO:  Right.  Again, we just got the request.

23  They're still checking but that's the information that I've

24  been provided at this time.

25           JUDGE MANN:  And you also say that it's not

                    SN        OCR       RPR

Telephonic proceedings                    19

1    maintained electronically.  They don't have any record of

2    invoices for example?  Nothing is maintained electronically?

3              MR. CHO:  Well, they're asking for shipments and

4    what was received at the MDC.  They're not asking for

5    invoices.  So certainly a request could be made for soap, as

6    I'm sure all of us know now, we may make a request now, but we

7    may not have the shipment anytime soon.  So they're asking

8    only for shipments and I'm not 100 sure -- I mean, we're

9    trying to uncover the invoices but I'm not exactly sure of the

10   shipments and how that would be recorded.

11             JUDGE MANN:  But there may be an electronic record

12   that is invoices?

13             MR. CHO:  There might be, but there may not be as

14   well.  I'm not 100 percent sure because if an individual

15   orders an online shipment that may be saved electronically but

16   I'm not sure.

17             JUDGE MANN:  So I take it you don't know, if there

18   is an electronic record of the invoices, whether those

19   invoices would have anything on it about estimated delivery

20   date or actual delivery date?

21             MR. CHO:  That's correct.

22             MS. GINSBERG:  One of the reasons why we think this

23   request is particularly important and quite narrow is that we

24   have been receiving reports that there hasn't been soap handed

25   out on the units in at least a week.  And, you know, certainly

Telephonic proceedings                          20

1    it seems like this information would be on invoices when it

2    was shipped.  There may even be records of distribution within

3    the facility.

4           I would also note that BOP is on this call and to

5    the extent that they can provide additional information, that

6    could potentially move things along more quickly.

7           MR. CHO:  I do want to note, Your Honor, that we're

8    dealing with only two petitioners here and to the extent they

9    have not received soap, they can certainly provide evidence to

10   the Court in terms of which soap they have been able to use or

11   what soap they have received.  So, again, this broad request

12   for all soap deliveries to the MDC is just far beyond the

13   scope of the current litigation.

14          THE COURT:  Well, it's true that the petitioners can

15   submit their own evidence about a lack of soap, including a

16   lack of soap for these two individuals.  The Government has

17   submitted a declaration that soap is being distributed and I'm

18   thinking the Government would argue that it's to the two

19   individuals here.  If it's just focusing on the two

20   individuals' claims, wouldn't evidence about whether soap was

21   or was not being brought into the facility bear on whether

22   these two individuals are getting soap or not?

23          MR. CHO:  Your Honor, whether shipments of soap are

24   coming into the MDC, it's different from whether these two

25   petitioners are getting soap.  Right?  So it may be coming in

Telephonic proceedings                                    21

1   or certainly be there and if these petitioners aren't getting

2   soap, then we don't see the relevance of shipments of soap to

3   the MDC.

4          THE COURT:  Well, let's say that evidence showed

5   that no soap had been delivered to the MDC from February 1,

6   2020 to date and let's say that the Government was drawing on

7   the declaration that individuals were getting soap and the two

8   named petitioners were saying that they were not getting soap,

9   isn't the evidence about whether any soap came into the MDC

10  during that period be relevant to assessing those claims?

11         MR. CHO:  Well, an argument can also be made if the

12  MDC already had soap there is no need for additional soap

13  shipments to be sent to the MDC.

14         THE COURT:  There are other things you could argue.

15  I guess it would depend on whether you might be able to put

16  forward evidence that there was soap in the facility, you

17  might not.  It just seems like the evidence is relevant to

18  these two individuals' claims even though you might make

19  argument that the best explanation is the lack of soap orders

20  or something else.

21         MR. CHO:  Understood, Your Honor, but what we say in

22  our letter is we will look for responsive documents and if any

23  documents do exist, we will produce those documents.

24         THE COURT:  Okay.

25         Judge Mann, is there anything else you wanted to ask

Telephonic proceedings                    22

1   on the soap issue?

2        JUDGE MANN:  Nothing beyond what Your Honor has

3   already stated.

4        THE COURT:  So then I think the final document

5   request is that sick calls requests made from March 13th to

6   the present in redacted form to omit the person's name and

7   number.

8        MR. CHO:  Your Honor, if I may correct that?

9        THE COURT:  Yes.

10       MR. CHO:  So, initially our response to both

11  Rodriguez and Rabadi have indicated to the SDNY judges that

12  they are asymptomatic.  So presumably they would not have made

13  any sick call requests.  So their request for sick call is far

14  beyond the scope of this litigation and we would certainly

15  object to sick call requests for all other inmates at the

16  MDC -- at any given time there are 1,700 inmates at the MDC --

17  for a couple of reasons.

18       First, sick call requests touch upon an inmate's

19  private, confidential medical history and they have privacy

20  rights which are not implicated in this case because they are

21  nonparties to this litigation.  And so the BOP certainly

22  objects to producing sick call requests for anyone other than

23  these two petitioners.

24       JUDGE MANN:  I'm sorry, I just wanted to ask one

25  question that goes to the HIPAA argument that you're making.

Telephonic proceedings                          23

1   HIPAA, doesn't that relate to information with an identifiable

2   patient so that if it's redacted it would not come within the

3   HIPAA privacy requirements; isn't that correct?

4          MR. CHO:  Understood, but to the extent we go

5   through these sick call requests whether they have a name on

6   there or not, or a registration number, we don't know whether

7   that information could still implicate a certain inmate.  For

8   example, if people know a certain inmate has a certain

9   condition which is reflected in the sick call request, people

10  may still be able to figure out who the inmate is based on the

11  conditions identified in the sick call request.

12         But I do want to add, in our letter to the Court,

13  that we are prepared to produce medical records for these two

14  inmates Rabadi and Rodriguez.  We submitted to petitioners'

15  attorneys this morning a HIPAA release for their medical

16  records and we will conduct a search for any sick call

17  requests that those two inmates have made.  But in terms of

18  sick call requests generally, there are many methods by which

19  an inmate can request a sick call.

20         They can make an oral request to a BOP staff member,

21  they can get a staff member a hard copy piece of paper

22  requesting sick call or they can also submit a request

23  electronically using the Trulincs system.  So many of those

24  methods would be maintained in the inmate's own medical

25  record.  So it would require the BOP to respond to this

Telephonic proceedings                    24

1    request to go through all 1,700 inmates' medical records and

2    other documents that those inmates may have to identify

3    whether sick call requests were made.  And, again, with the

4    electronic systems there are certain records that are

5    maintained electronically and an inmate could send an

6    electronic request through Trulincs, but again those are

7    requests made by the inmates and we would have to go through

8    those inmates' e-mail accounts to identify at those sick call

9    requests.

10         THE COURT:  If somebody submits a sick call request

11   through one of these methods, then at the point at which they

12   are authorized by BOP and before a doctor sees them, I would

13   think there is some central channeling mechanism, a doctor or

14   another staff member --

15         MR. CHO:  Well, when an inmate makes these sick call

16   requests, it's the BOP position that they want to address

17   those concerns as soon as they can.  So either they may be

18   scheduled to see a medical professional or the medical

19   professional may respond immediately to their request without

20   there being any paperwork or paper trail reflecting that

21   request being made and the response to that request.

22         So there are many ways for inmates to receive

23   medical care and that's why the BOP does it this way so if

24   there are any issues an inmate can seek relief through the

25   sick call process because they are given multiple avenues by

SN          OCR          RPR

Telephonic proceedings                    25

1   which to make those requests.

2          THE COURT:  Just to make sure I understand this,

3   just to go one by one, let's just set aside the oral requests

4   for a moment.  If somebody submits a hard copy request, is

5   that request maintained anywhere after that aside from the

6   individual person's file?

7          MR. CHO:  It could be or may not be.  I know those

8   requests are then sent to the medical unit to schedule but

9   what happens beyond that it may be maintained or it may not be

10  maintained.  The important thing is that the inmate gets seen

11  by a medical professional.  I think that's what the BOP's

12  primary concern is.

13         THE COURT:  I understand that, but I am trying to

14  figure out what kinds of records exist and how they might be

15  compiled.  So I'm wondering if you know whether once somebody

16  submits a hard copy request if there is a folder used to hold

17  the sick call requests -- whether there's a centralized

18  compilation of it or not.

19         MR. CHO:  There may be, but I'm not sure.

20         THE COURT:  Okay.  And then through the Trulincs

21  system, I'm sure these requests are kept in the individual

22  e-mail account but I would think that they are also kept in

23  the account of the recipient.

24         MR. CHO:  Right.  The thing is those requests can be

25  made to multiple people, it doesn't have to be just one

SN        OCR        RPR

Telephonic proceedings                    26

1    person.  For example, an inmate can make a request to their

2    unit team who are not medical professionals.  They can make a

3    request to the medical staff.  So there are many different

4    repositories by which the call can be made but certainly those

5    are electronic so conceivably there's a way to retrieve those

6    electronic documents.  But I believe in petitioners' letters

7    they said they're not seeking ESI or electronic data at this

8    time but certainly there is a mechanism by which sick call

9    requests are made electronically but through multiple choices.

10          THE COURT:  I was just asking, you can make a

11   request to multiple sources if you're an inmate; if you're a

12   recipient for a request like that, do you send it to a single

13   centralized source?

14          MR. CHO:  That's the thing, Your Honor, I don't

15   think it's necessarily centralized.  The reason why they do it

16   this way is to make sure inmates have multiple ways to seek

17   relief or to be seen by a physician.  So certainly we can look

18   into where these requests are sent ultimately, whether it's

19   the medical unit or some other unit, but again there are

20   multiple avenues by which they can make these requests and I

21   don't necessarily think it's centralized.

22          MS. GINSBERG:  Your Honor, my understanding is that

23   it is somewhat centralized.  My understanding is that BOP has

24   taken a position that all sick call requests are made

25   electronically and that they all end up in a centralized

1   location electronically.  Obviously BOP can get back to us on

2   exactly how that goes, but my understanding is that's how it

3   goes.  If there happens to be hard copy requests that somehow

4   don't get logged electronically, we're not asking that the

5   respondent go through individual medical records to look for

6   those although my understanding is that also medical records

7   are maintained electronically.

8           Our request here is to be able to look at how

9   medical care is being delivered during this epidemic to

10  understand whether people who need care are able to get care

11  including the petitioners.  So, we have said that they are at

12  heightened risk for infection and have said that the facility

13  is unable to care for them should they become infected and,

14  so, the ability for the medical system to handle these

15  requests and to address them in a timely way is critical to

16  our claim.

17          Certainly to the extent that we're able to ask about

18  some of this in the 30(b)(6) deposition, it may obviate the

19  need certainly for looking through individual medical records

20  to get at this information.  Although, to the extent that it's

21  all centralized and electronic, we think that should be easy

22  enough to gather.

23          THE COURT:  Do you have a response to the HIPAA

24  claim?

25          MS. GINSBERG:  My understanding on HIPAA is

Telephonic proceedings                    28

1   consistent with what Judge Mann said which is that where the

2   documents are deidentified there is no HIPAA concern.  It is

3   also true that HIPAA contains a provision that allows for the

4   court order of confidential medical information.  However, I

5   don't think that matters here because we're not asking for

6   anything that would violate HIPAA, Your Honor.

7           THE COURT:  Judge Mann, is there anything else you

8   want to ask about this medical request issue?

9           JUDGE MANN:  I don't think so.

10          THE COURT:  Okay.  So should we talk about the

11  30(b)(6) at this point?

12          MR. CHO:  Sure.

13          MS. GINSBERG:  Sounds good, Your Honor.

14          THE COURT:  Again, Government, this might be

15  something that you have addressed in the submission that

16  recently came across ECF.  So you may just need to

17  recapitulate any thoughts you have.

18          MR. CHO:  Sure.  So in the 30(b)(6) notice we

19  received yesterday afternoon they set forth nine topics and by

20  my count 46 subparts for a total of 55 distinct topics.

21  Certainly our position is initially based on our read of the

22  30(b)(6) notice that the request is overly broad and very far

23  reaching.  In their letters they say they only seek to depose

24  a witness but presumably, based on the 55 topics they have

25  identified, I don't believe it would be possible to identify

SN      OCR      RPR

Telephonic proceedings                    29

1   just one witness who can address all 55 issues.

2           On top of that, we did have a brief meet and confer

3   this morning regarding 30(b)(6).  Many of these requests or

4   many of the topics in the 30(b)(6) could be responded to

5   through other discovery methods either through document

6   requests or interrogatories.  For example, in topic one they

7   ask for total numbers of employees that can be responded to in

8   either a document request or an interrogatory.  Topic number

9   two talks about housing units and to identify housing units.

10  Again, that can be responded to in a document request as well

11  and the other topics as well.

12          They seek housing assignments.  For example in topic

13  three; medical care available at MDC in topic four; procedures

14  in topic five; rules and regulations in topic six; more

15  procedures in topic eight; and removal in topic nine.  Again,

16  those are more akin to requests for documents or

17  interrogatories and we think those are more-preferred methods

18  to be able to respond to those requests for information.

19          THE COURT:  It sounds like there was a meet and

20  confer about the Rule 30(b)(6) this morning.  I don't know if

21  petitioners have thought about whether some of these requests

22  could be handled through document requests or interrogatories.

23          MS. GINSBERG:  Sure, Your Honor.  You know, what

24  respondent has just said is that document requests and

25  interrogatories are the preferred way of handling this.  I

1  think that means it's their preferred way of handling this,

2  but it's certainly not our preferred way.  And the reason it's

3  not our preferred way is because we're looking for expedited

4  discovery.  We think that 30(b)(6) is the most efficient way

5  to do this.

6           The respondent has said that we have lots and lots

7  of topics in here.  We could have noticed this 30(b)(6)

8  deposition with the topics just being, you know, the MDC's

9  response to COVID-19.  The reason that we laid it out as we

10  did was because we thought that would help expedite things.

11  If we told the respondent everything that we intend to ask

12  about in the deposition, it would allow them to prepare more

13  quickly, to understand what it is we're looking for in the

14  deposition rather than just seeking more generally about the

15  response to COVID-19.

16           In terms of the number of witnesses, it's up to them

17  whether they decide to present one witness who either has

18  knowledge of these topics or who obtains knowledge of these

19  topics or whether it's easier for them to just include

20  different people to talk about the topics that they're most

21  familiar with.  When, during the meet and confer I asked

22  whether there wasn't an individual who was tasked with

23  responding to the MDC -- responding to COVID-19 on behalf of

24  the MDC, they didn't know and I think that is an important

25  thing for them to know and if there is someone I would imagine

Telephonic proceedings                                31

1   that that person has knowledge of these topics and could speak

2   to these topics.

3            THE COURT:  Judge Mann, is there anything you want

4   to ask about this 30(b)(6) issue?

5            JUDGE MANN:  Not beyond what's been discussed and I

6   obviously want to take a look at what the Government submitted

7   earlier today.

8            Maybe I should ask, Mr. Cho, does your letter of

9   this afternoon address these specific 30(b)(6) topics?

10           MR. CHO:  We do in general form, Your Honor, given

11   the time.  We had less than 24 hours to review it before this

12   call.  We noted our initial objections generally to what we

13   saw in the 30(b)(6) notice, but what I do want to apprise Your

14   Honor is based on our meet and confer.  We're not objecting to

15   the 30(b)(6) objections, but we do object to the scope of the

16   requests as made and I indicated to petitioners' counsel that

17   to the extent they can further limit their request they may be

18   more productive for us to be able to identify appropriate

19   30(b)(6) witnesses.  We don't have a blanket objection to

20   depositions generally, but we do object to the scope and the

21   breadth of the topics that they're seeking at this time and we

22   invited them to further limit their requests.

23           JUDGE MANN:  Speaking for myself, I'm actually

24   surprised to hear the Government say that the preferred way

25   would be by responses to interrogatories or document demands

SN        OCR        RPR

Telephonic proceedings                           32

1    because if there are someone who is tasked or a group of

2    individuals tasked with responding to COVID -- for example,

3    take item number two, they may know off the top of their heads

4    the response to that question about the housing units; whereas

5    it would seem to me that it might be more burdensome to say,

6    okay, go search for documents or having to write out responses

7    to interrogatories that are then sworn to by that individual.

8           Now, I personally think that item number one that

9    might be -- since we're talking about numbers, that an

10   individual may not remember it, that one is more appropriate

11   for an interrogatory, but for some of the others I'm a little

12   puzzled that the Government would think that it's less

13   burdensome to have to go search for documents, whether it's to

14   produce the documents or whether it's to then provide

15   interrogatory responses, so I would just ask the Government

16   to, you know, to clarify and respond to that.

17          MR. CHO:  Sure, understood.

18          Well, with respect to topic number two where they

19   are seeking information dealing with housing units, again,

20   typically when it deals with housing units those are documents

21   where certain inmates are located.  So one specific BOP

22   official may not actually know where all inmates are housed at

23   any given time at the MDC because there's always movement

24   within the MDC.  So essentially documents can show where

25   inmates are being housed at any given time but a BOP official

Telephonic proceedings                    33

1  may not know where any single inmate is at any given time.

2         JUDGE MANN:  Well, I assume that in responding to

3  that whether whatever form the discovery demand is in, you are

4  not going to be searching for the records relating to

5  individual inmates.  So that -- wouldn't there be someone who

6  knows what the MDC -- where the MDC has been placing

7  individuals who are in isolation or quarantine without having

8  to go search records?

9         MR. CHO:  Well, in topic two they talk about people

10  placed in isolation, people admitted to the facility, people

11  transferred within the MDC.  So these are inmate-specific

12  decisions and I understand Your Honor's perspective of what

13  about entire units, but I'm not sure if a response can be

14  given that way because one inmate may be in an isolation unit

15  today, in a quarantine unit tomorrow, in the SHU the next day.

16  And so that fluctuates based on the inmate himself or herself.

17         So I think this just goes to the point of how the

18  request is extremely broad and it's going to be difficult for

19  us to ascertain exactly what they're seeking.  Right?  We are

20  open to them limiting their request perhaps to the two

21  particulars because that's easy.  We can retrieve that

22  information quite quickly, but for all 1700 inmates at the MDC

23  that's a different story.

24         MS. GINSBERG:  Your Honor, I think it's hard to

25  imagine how to interpret topic number two as asking to be told

Telephonic proceedings                                34

1   where each individual person at the MDC is being housed.  What

2   we want to know is which units specifically are being used for

3   isolation, for quarantine, for exposure, where new people

4   being admitted to the facility are being housed and for how

5   long; where people are being transferred within the MDC.  So I

6   don't -- I don't think that that's a reasonable interpretation

7   of what we're asking for here.

8           JUDGE MANN:  I get your point about A and B.  I

9   understand those to mean you are asking which units are on

10  isolation or quarantine, which units are new people being

11  assigned to.  I'm not sure I understand what C is asking.

12          MS. GINSBERG:  So, Your Honor, I think with C what

13  we want to know is about movement within the facility

14  particularly from intake into other units and between

15  isolation and non-isolation, quarantine and non-quarantine,

16  because our understanding is that at least some of that has

17  been happening inappropriately in a way that might further the

18  spread of infection in the facility.

19          JUDGE MANN:  Let me ask counsel for petitioners, is

20  it the name of the unit that you're interested in or the

21  general question of whether or not there is a specific housing

22  unit or units in which -- in which quarantined or isolated

23  individuals are placed due to suspected COVID-19 exposure and

24  so on with respect to B and C.  Is it you want to know whether

25  there are particular units being used for those purposes or

Telephonic proceedings                          35

1   whether there is no specific unit?

2         MS. GINSBERG:  Well, I think it's both whether there

3   is such a unit or are such units and also which units are so

4   designated.

5         JUDGE MANN:  Sorry, I'm hung up on this one piece of

6   it but what is C?  Is there a specific unit to which people

7   are being transferred from -- I'm not sure I understand it.

8   Is there a sentence you could give me that rephrases that

9   request?

10        MS. GINSBERG:  Can I try my hand at it?  Just

11  transfers within the MDC went from general population to the

12  SHU.  I assume that's what it's getting at are their

13  intra-facility transfers, am I correct?

14        MS. ROSENFELD:  Judge, just to jump in because I

15  think I may have written this confusing sentence.

16        Yes, that's exactly right, Judge Mann.  So we

17  understand, that is right, people come into unit 41 through

18  intake and then they're transferred.  They went to unit 42 and

19  then some people from unit 42 went to unit 72.  So we just

20  want to understand during the recent time period where

21  intra-facility transfers have occurred, which unit.

22        MR. CHO:  Your Honor, just to let you know and it is

23  an issue that we haven't really addressed yet, but there are

24  obviously security concerns dealing with where certain inmates

25  are placed.  Certain inmates cannot be placed on the same

Telephonic proceedings                    36

1   unit; for example, they may be cooperators for the Government

2   in criminal cases or there are other reasons why certain

3   inmates can't be located within units with other inmates.

4          So again, as I read topic number two, while there

5   may be general questions about certain types of units,

6   ultimately where inmates are placed is an inmate-by-inmate

7   specific inquiry that we can't ignore because decisions are

8   often made based on a lot of criteria including separating

9   information, because inmates can't be placed next to each

10  other due to they are being cooperative with the Government

11  for other reasons.  So those are inmate-by-inmate inquiries.

12         JUDGE MANN:  But I take it petitioners aren't asking

13  for you to identify particular inmates and explain why they

14  were placed in certain locations.  Right?  They're just asking

15  you to say where inmates are placed in these particular

16  categories; whether they're in isolation or quarantine, when

17  new people are admitted to the facilities and then to explain

18  or to say where inmates have been transferred to and from.  So

19  are you asserting that that implicates security concerns?

20         MR. CHO:  Well, not just topic two, but I think one

21  overarching question that petitioners are seeking here is why

22  certain decisions were made.  So I don't think you can divorce

23  that inquiry from these attorneys' concerns.  Right?  I think

24  that's one of the inquiries that they have in these requests

25  overall; that they want to know why certain decisions were

SN        OCR        RPR

Telephonic proceedings                    37

1   made, why certain inmates were placed in certain areas within

2   the MDC.

3           JUDGE MANN:  I don't know how many inmates there are

4   now.  I know it was over 1,700.  Is it down to 1,500 now?

5           MR. CHO:  No, it's still hovering around 1,700 as of

6   the past couple days, Your Honor.

7           JUDGE MANN:  Do you happen to know just ballpark, of

8   the 1,700 inmates, how many of people are subject to

9   separation orders or requests or something similar that would

10  be one of these overriding concerns that you have just

11  referred to?

12          MR. CHO:  Your Honor, that information is looked at

13  for every single inmate.  Those are part of every inmate's

14  file.  They look at those concerns for everyone.  It's not

15  just a select few.

16          MS. GINSBERG:  Your Honor, I don't know why we're

17  talking about this.  We're not asking for any information

18  about a particular individual.  We're asking more generally

19  here how they are housing people with exposure, with symptoms,

20  who are newly admitted to the facility or moved around the

21  facility.  We're not asking about the particular placement of

22  a named individual.  So I don't think any of what we've asked

23  for here contemplates any of these attorneys' concerns that we

24  are talking about.

25          THE COURT:  Did you have anything else to the

Telephonic proceedings                              38

1   30(b)(6) issue?

2              MR. CHO:  Not at this time, Your Honor.

3              THE COURT:  Judge Mann, do you have anything else on

4   this point?

5              JUDGE MANN:  No other questions at this time.

6              THE COURT:  So then I think the other discovery

7   request is the notice of entry.  I'm looking at the letter and

8   I see there's some discussion of that subject again, but I

9   have only just scanned it so I would be grateful if the

10  Government would tell us where they are.

11             MR. CHO:  Sure.  Initially, we object on the grounds

12  that petitioners have already submitted to the Court for

13  expert reports dealing with conditions at the MDC for which

14  they claim petitioners should be released.  So any additional

15  inspection of the MDC is unwarranted because these four

16  experts, including the one they want to go back to the MDC for

17  an inspection, have already expressed their unqualified

18  opinions as to conditions at the MDC and in none of those

19  expert reports have they said that they need an inspection of

20  the MDC to come to their conclusions about how conditions are

21  at MDC and that would warrant release of these petitioners.

22             So our additional objection was on the grounds that

23  no expert inspection is necessary and would be duplicative of

24  what is already in before Your Honor in terms of their expert

25  declaration.

Telephonic proceedings                                  39

1           We had specific requests on top of that and I can go

2     through those one by one.  Certainly some of the requests from

3     the inspection for logbooks and posted orders can be responded

4     to in a document request or interrogatory, so an inspection

5     would not be necessary for that request.  The request is not

6     limited by any specific time period or duration or scope or

7     nature.  Another objection is that the petitioners' attorneys

8     and their expert want to confidentially interrogate

9     incarcerated individuals.

10          There are two regulations that require a process --

11    well, I take that back.  They also want to inquire of staff

12    members as well.  So with respect to the staff members, there

13    is a process by which under the Touhy regulations that they

14    need to make a request to the DOJ to talk to any staff

15    members.  But it's the Government's position that there should

16    not be any discussion with staff members while they're working

17    at the MDC and, in fact, one of the orders that they

18    referenced in their Saturday letter, one of the orders

19    specifically forbids the attorneys to conduct any interviews

20    of inmates or staff members and that was cited in their letter

21    to the Court.  That was the *Mack versus City of New York* case,

22    number 14-CV-3321 in the Southern District of New York, docket

23    number 36.

24          But with respect to interviews of inmates, certainly

25    the inmates have a right to privacy and not be subjected to

Telephonic proceedings                                40

1   such interviews and we're not quite sure what the term

2   "confidential" means, whether it means respondents cannot be

3   present during those interviews.

4           We also note that presumably all these criminal

5   defendants or inmates have had or currently have criminal

6   defense counsel and there's no indication here that they would

7   allow their criminal defense lawyers to be present during

8   these confidential interviews, and we certainly object to any

9   confidential interviews on the grounds that we cannot

10  ascertain who these individuals talked to during this

11  inspection, if they are indeed confidential.

12          Now, the request asking for an inspection of the

13  entire MDC, including units were these two petitioners have

14  never been housed, we certainly object to the breadth of an

15  inspection of the entire MDC.  For example, they identify the

16  women's unit.  These petitioners have not been housed in the

17  women's unit, for example, and certainly the conditions at the

18  MDC is fluid and constantly changing and any inspection on one

19  given day would have limited relevance to this litigation

20  going forward because conditions do change every day.

21          And one more point, and this is obviously an

22  overarching argument we have in our objections, that this is a

23  secure facility with both minimum and maximum security inmates

24  and classifications and allowing an open-ended inspection of

25  the entire MDC including interviews of inmates and BOP staff

Telephonic proceedings                    41

1  would be extremely burdensome and disruptive to the security

2  of the facility.

3          THE COURT:  I want to give the petitioners an

4  opportunity to respond to any of the points there that they

5  want to, but three particular things I'm wondering if you

6  could address are the utility of the site inspection by

7  Dr. Venters given that he's already opined on these issues

8  without having conducted a site visit, and then the issue of

9  interviewing inmates and interviewing staff members including

10  the Touhy issue and the counsel issue, and I would be

11  interested if you have any site inspection cases where that

12  has been ordered and then if there's any cases where scope of

13  the facility issue giving access to the other staff.

14          MS. GINSBERG:  So, with respect to the need for the

15  inspection, of course we have experts who presented

16  declarations to the Court about their understanding of

17  COVID-19 and what was happening at the MDC, but my guess is

18  that if we were to present these experts at a PI hearing they

19  would be questioned about their knowledge of specifically what

20  is going on right now at the MDC and we would want them to be

21  able to testify with some particularity about what they see at

22  the MDC.  These Rule 34 inspections are quite common in prison

23  litigations when we are talking about processes and procedures

24  in medical care and certainly nobody has claimed that

25  Dr. Venters is not a qualified expert to do this.  And, of

Telephonic proceedings                    42

1   course, having him be able to really evaluate and look at what

2   is happening in the facility as someone with those

3   correctional health and epidemiological experience, I think

4   would provide great knowledge to the Court.

5           So I don't think it would be duplicative of what

6   he's already put in or the other experts have already put in

7   because none of them have had access to the facility and I

8   think maybe my colleague wanted to also jump in on this point.

9           MS. ROSENFELD:  I did, thanks Betsy.

10          Dr. Venters has not opined at all about conditions

11  within the MDC.  If you look at his declaration, it's a very

12  short declaration that we put in on an expedited basis, but

13  basically at paragraph 5 he talks about -- he's informed that

14  there's one prisoner and two staff members who are positive

15  and he opines on sort of epidemiologically where he would

16  expect infections to be generally, and then in paragraph 6 he

17  opines very generally about best practices for facilities

18  managing COVID epidemics.

19          There is nothing in Dr. Venters' declaration about

20  MDC in particular, how they're handling this.  It was a

21  statement in general of best practices for disease management

22  within jails; so the Government is not correct that

23  Dr. Venters has already opined on conditions within MDC.  He

24  did run the jailhouse system at Riker's Island for many years

25  in many capacities, including during other infectious disease

SN        OCR       RPR

Telephonic proceedings                    43

1   outbreaks.  And as my colleague said, having this expert go

2   into the facility and see what is actually going on, how is

3   social distancing being implemented there, where are medical

4   staff in relation to where people are living, those kinds of

5   things are extraordinarily useful and it can very easily and

6   straightforwardly be done without interruption to the

7   facility.

8            As Your Honor is probably aware, last winter there

9   was a court-ordered inspection that involved Judge Torres and

10  MDC, but Ms. von Dornum, who is also on the phone, conducted a

11  two-person inspection under a court order.  I think she said

12  it was around two hours.  They were accompanied by several BOP

13  officials who are on this call.  It was very uneventful and

14  not disruptive in any way.  So we certainly think that, given

15  the long practice of allowing medical experts to go into

16  prisons to gain the kind of firsthand knowledge that you can

17  only gain by seeing and being somewhere in an orderly and

18  careful way is appropriate here.

19           MS. GINSBERG:  Your Honor, as to the question to

20  employees that we've included in the notice of inspection,

21  this is something also that happens regularly.  In a case that

22  I think we cited in our letter, *United States versus Dearie,*

23  the civil division of the Justice Department took the position

24  that this is permissible under the rules, that it's important

25  in order to allow the expert to understand how processes

SN        OCR        RPR

Telephonic proceedings                         44

1   within -- in that case it was a jail -- worked, and it's

2   something that in my 20-plus years of civil litigation

3   experience happens all the time.

4          On the Touhy issue, my understanding is that what

5   those regulations address are testimony and we're not asking

6   for testimony.  We're not asking that those statements go into

7   the record, but it's really important for the expert to be

8   able to speak to people in the facility, to say, hey, what is

9   this; hey, what do we use this area for, to enable him to

10  actually conduct the inspection properly.  So I don't think

11  that falls under Touhy.

12         With respect to what respondent called confidential

13  interrogation -- and I would reject that characterization.

14  We're not looking to interrogate anyone -- anyone our expert

15  would speak to, they would speak to voluntarily.  And in

16  response to their concern about not ascertaining who they

17  spoke to it would be in plain sight, but I think the reason

18  that it's important that these are confidential and what I

19  mean by that is it's really out of the earshot of the rest of

20  us.

21         I think some people are fearful of reporting things

22  right now.  They're fearful they're going to end up in the SHU

23  if they say they have symptoms.  They worry about retaliation

24  if they report conduct and so in order to protect them we

25  would like our expert to speak to them somewhat

Telephonic proceedings                              45

1  confidentially.  We are not asking for a private room.  We're

2  talking about in-unit conversations out of earshot of the rest

3  of the tour.

4          You know, in terms of the criminal defense counsel

5  issue, I'm not sure this would be an issue that criminal

6  defense counsel would be concerned about and of course we have

7  Ms. von Dornum from the Federal Defenders who could certainly

8  speak to whether her office would object to any of this.  I

9  would also note that BOP employees spoke to the two

10 petitioners outside of their criminal defense counsel and

11 outside of our presence.  So that concern doesn't --

12 doesn't --

13         JUDGE MANN:  Well, can I ask you just one question

14 more specifically about that?  As you all know, the EDNY and

15 I'm sure at SDNY, folks are getting many, many bail

16 applications that raise conditions of confinement issues and

17 also compassionate release applications is raising those

18 issues.  So I guess I'm wondering if there were interviews

19 that were being conducted about the nature of the conditions

20 over there, it seems like you would be talking to people about

21 the kind of issues that they may have pending and requests to

22 the court about in their own cases.

23         MS. GINSBERG:  It's certainly possible and I'm not

24 sure -- I mean, we could certainly try to figure out a way to

25 avoid those issues and we could certainly ask people about,

Telephonic proceedings                    46

1   you know, whether they have submitted any requests or have

2   attorneys representing them in those circumstances so that we

3   don't ask them about things in which they're already

4   represented.  We could also speak to people who are

5   represented by the Federal Defenders Office on consent from

6   the Federal Defenders that they are fine with us speaking with

7   clients at their office.

8         MS. VON DORNUM:  Your Honor, I apologize for jumping

9   in.  First of all we would consent to our clients, even those

10  with pending motions and perhaps particularly those with

11  pending motions, being interviewed and I can do that on a

12  formal basis if that's useful, but when I went on the blackout

13  tour of the MDC ordered by Chief Judge Irizarry, I went with

14  EDNY U.S. Attorney's Office Investigator John Ross.  He and I

15  walked around the facility, as counsel mentioned, for a couple

16  of hours, escorted by staff.

17        He and I went up to each cell together and explained

18  to the inmates exactly who we were and what we were going to

19  ask about and said to each person you do not have to talk to

20  us if you are at all uncomfortable, here is what we're asking,

21  it could be publicly reported.  And I would note that when

22  Judge Torres went that I was with her again, three days later

23  led by a troop of prosecutors, she also just made very clear

24  to people that you don't have to talk to me at all, that

25  that's totally up to you.

Telephonic proceedings                    47

1          So there could be some objections, but I do think

2    there are ways around that and we could also obviously inform

3    defense lawyers in advance of when the expert would be going

4    and that they could tell us if there are people they did not

5    wish to be spoken to.  So I think there are definitely ways

6    around that issue.  And of course, although we would be

7    talking about conditions, we would not talking about their

8    cases which is as you know some part of what the compassionate

9    release motions hits on is the 3553(a) factors and I think

10   those are the sensitive parts for the inmates, not whether

11   they've been getting soap or not.

12          And just in terms of the inconvenience or burden to

13   the facility, when I walked around with Investigator Ross and

14   we were escorted by legal counsel and one of the assistant

15   wardens, we were there for several hours and did not seem,

16   even in the SHU, to disconcert any of the staff.  We didn't

17   get in anyone's way, we went exactly where they told us, but

18   we were by direct order of the chief judge able to speak

19   directly to inmates and to staff and both did speak to us.

20   And as Ms. Ginsberg says, I do believe only two gave testimony

21   and the BOP legal counsel did not object to us talking to

22   staff and staff came up to us and volunteered information as

23   they may well wish to do here.

24          But just to say I think it could be accomplished

25   without too much disruption and we came basically unannounced

Telephonic proceedings                    48

1    on a couple of hours notice, so this would be with even more

2    notice, but it did not, as far as I know or as far as anyone

3    has ever said, caused any problems for the facility.

4            JUDGE MANN:  Well, was there an order in Chief Judge

5    Irizarry's case?  Do you know the docket in that case?

6            MS. VON DORNUM:  Yes, I do, it was an administrative

7    order.  I believe it's docketed on the court website under

8    administrative orders.  It's from January -- I'm sorry, it's

9    from February 2nd and there was no case.  It was during the

10   blackout and she just ordered us in.

11           I think at the very outset -- I don't know if it was

12   Ms. Ginsberg or Ms. Rosenfeld, you had mentioned that there

13   was another case that you were relying on but my phone chose

14   that moment to be a little bit indistinct, so I wanted to ask

15   you about that again on the interviewing issue.

16           MS. GINSBERG:  Yes.  That's *United States versus*

17   *Erie County*.  It's a 2010 Western District of New York case.

18           MS. VON DORNUM:  Okay.

19           MS. GINSBERG:  That was brought by the United States

20   Department of Justice.

21           MS. VON DORNUM:  Okay.

22           MS. GINSBERG:  Your Honor, just one final point.  We

23   included a number of cites in our letter to cases where we, as

24   lawyers, have gone into the facility and we also described a

25   case where we went to the Riker's Island facility with expert.

Telephonic proceedings                    49

1   The cases where lawyers have gone to tour jails for the

2   purpose of understanding where a specific incident might have

3   occurred, like an incident of excessive force; obviously

4   different than the medical expert inspection.  And the Macks

5   case was one of those cases where lawyers went to simply look

6   at photographs of a place where an incident of violence had

7   occurred and so there was no need for interviews.  I just

8   wanted to draw a distinction.

9          THE COURT:  Yes.

10         MS. GINSBERG:  Your Honor, I think some of the other

11  orders included would be more akin to what we are talking

12  about.  Your Honor also asked about, you know, orders

13  generally and one thing I would note is that in a lot of

14  cases, and certainly in the most recent Rule 34 inspection

15  that I did, there would be no order because oftentimes the

16  parties negotiate these including with staff interviews and

17  confidential prison interviews.  Certainly the last time I did

18  this all of that was included in the ultimate Rule 34 notice,

19  but never an order from a court.

20         THE COURT:  The warrant issue --

21         MR. EICHENHOLTZ:  Your Honor?

22         THE COURT:  Yes.

23         MR. EICHENHOLTZ:  If I may quickly, Seth Eichenholz

24  from the Government.  I was the discovery officer in the civil

25  division for a long time and I just wanted to weigh in very

SN       OCR       RPR

Telephonic proceedings                    50

1    briefly on the Touhy issue.  Obviously Touhy would not apply

2    to these inspections in state and city facilities the

3    plaintiffs are referring to.  I also am not clear whether

4    Touhy would apply in the context of which Ms. von Dornum is

5    referring to where it's outside of litigation.

6           But within litigation, Touhy regulations apply to

7    documents, information and testimony about those documents.

8    So I do believe that they would apply in this case and I think

9    it's an issue that -- I'm sure Your Honor isn't ruling at this

10   moment about it, but it is an issue that I don't think should

11   be dismissed as easily as I heard from petitioner.

12          MS. VON DORNUM:  Your Honor, I was just going to ask

13   that when I returned with Judge Torres it was under active

14   litigation in *United States versus Winston Perez* and she

15   directly interviewed a number of staff, including the warden,

16   the SHU tenant, the electrician.  It was all on the record

17   with a court reporter and there was no Touhy objection

18   lodged -- but there were many, many prosecutors there so that

19   is not to say that one could not be lodged, but she did

20   exactly that and on the record with a court reporter during

21   that litigation.

22          JUDGE MANN:  So, Mr. Eichenholtz, the text that you

23   read -- which I think you're quoting from the regs or

24   paraphrasing it -- was documents, information or testimony

25   about those documents and where is it that you think this

Telephonic proceedings                    51

1    would fall within that group?

2          MR. EICHENHOLTZ:  I believe it would be information.

3    Information because it's not sworn testimony.  So it would be

4    providing information about BOP's policies and procedures

5    which, pursuant to the Touhy regs, is not information and not

6    documents, but it was in the possession, custody and control

7    as an individual but rather in the United States and they

8    would be providing that information in the context of their

9    role as an employee of the United States, or in this case the

10   BOP.

11          It doesn't have to be a complicated process in terms

12   of seeking approval and the regulations I think would tend to

13   allow for approval in certain situations, but you can't just

14   walk up to a BOP staff member.  It would be the Government's

15   position that for information we need to know who is going to

16   be approached in advance and the Government would need the

17   opportunity to approve that individual to provide that

18   information.

19          THE COURT:  Well, let me ask petitioners, I think

20   the last question I had to you all in response to the

21   objections that the Government had raised was the issue of the

22   physical scope of the toured facility and I wanted to know if

23   you wanted to respond to that and the women's unit does seem

24   like the place where that argument is especially strong

25   perhaps, although I understand the Government is making a

1    broader argument.

2           MS. GINSBERG:  On the women's area, I think our

3    concern with the MDC generally is that there are staff moving,

4    staff and other employees, moving around the facility, and

5    just as they cannot unfortunately limit the virus to one place

6    within the facility, we wouldn't want to limit our inspection

7    because clearly what they're doing in other parts of the

8    facility impact where the petitioners are going to be.

9           That said, we would certainly be open to some

10   narrowing and not going to actually every single housing unit,

11   but, for example, maybe not going to the women's unit and

12   having the opportunity to request certain housing units based

13   on what we understand they're doing in those different housing

14   units.

15          THE COURT:  Judge Mann, do you want to go down any

16   the notice and --

17          JUDGE MANN:  I'm sorry, Judge Kovner, was that

18   addressed to me because you were very indistinct.

19          The only additional question that I would ask is,

20   apart from the objections that the Government has articulated

21   in its letter and during this proceeding, do you have any

22   specific objections to the proposed expert, Dr. Venters, in

23   terms of his qualifications?

24          MR. CHO:  We may, Your Honor, but we haven't had a

25   chance to fully vet and evaluate his credentials.

Telephonic proceedings                              53

1       THE COURT:  Okay.  I appreciate you all talking

2   through the discovery issues.  I think you all submitted kind

3   of different proposed timing on different events in this case

4   and I wonder if you all have a thought on how to proceed.  Do

5   you want us to evaluate and so order a schedule or do you want

6   to meet and confer about it further or how do you propose that

7   we proceed?

8       MS. GINSBERG:  Your Honor, I think our preference

9   would be, given the need for expedited discovery that the

10  Court has acknowledged, that the Court enter a discovery

11  schedule that we don't meet and confer on this and we just

12  move forward with discovery.

13      MR. CHO:  Your Honor, I think it would be productive

14  for us to have additional time to meet and confer with

15  petitioner's counsel.  As we have said today, there are a lot

16  of open issues.  We're seeking further limitation in terms of

17  their discovery requests.  I think it would be more productive

18  for us to have that opportunity to meet and confer like a

19  normal course to kind of hash out some of these issues before

20  coming back to Your Honor for a discovery schedule.

21      THE COURT:  The timing that you all proposed, it

22  seems to have certain dates and then -- I think the third

23  entry on here is respondent provides responsive documents or

24  objections and discovery demands and responses or objections

25  to notice of inspection.  So it seems like that schedule was

Telephonic proceedings                    54

1   contemplating that you would already have an additional

2   opportunity to come back.

3          Well, do you want more time?  Because it seems like

4   you are going to have some time built into the schedule for

5   raising objections to the petitioners' discovery demands if

6   you want to under either parties' schedule, so do you want

7   more time even before a schedule is set?

8          MR. CHO:  Well, we set forth our schedule on Friday

9   taking into account anticipated discovery demands from

10  petitioners.  Again, I'm trying to streamline discovery here

11  and if we can work out some things I think that's great.  But,

12  you know, we set forth our schedule in our letter on Friday so

13  that's our position today but certainly we would be open to

14  trying to resolve some these issues beforehand.

15         MS. GINSBERG:  Your Honor, we appreciate that in the

16  normal course we would take more time to meet and confer and

17  of course we would do that, but I think that where we are

18  right now in this case and in the world is anywhere but normal

19  and we have been really trying to move things along and I

20  think that having a schedule set now that does build in some

21  additional time to have the Court hear objections on discovery

22  issues, allows for whatever the Government might need there,

23  but also allow them to press forward and to take this

24  discovery.  And I think my colleague also has something to add

25  there.

1        MS. ROSENFELD:  Yes, I just wanted to let you know

2   that we think it's -- the expedited schedule to be set by the

3   Court is incredibly important.  We are happy to confer with

4   counsel once the schedule is set to work on issues as they

5   come up, but we do think a schedule is needed.  Just today we

6   received information from people at the facility who reported

7   that there were multiple ambulances at the facility this

8   weekend; that officers are telling symptomatic persons that

9   there are not enough tests, that the fifth floor and the

10  eighth floor are on quarantine with conditions being extremely

11  bad; dirty, garbage not being collected; that there is no soap

12  or toilet paper on Unit 72; that there are serious staff

13  shortages such that the assistant warden was handing out

14  commissary on Unit 72 on Friday; that people were making

15  medical requests for attention that are not being responded

16  to.  This is all just information that was trickled down to us

17  today.

18        So I know that the Court is aware of this, but we

19  feel that it is urgent.  There are now four reported positive

20  tests at the MDC as of April 12th and 12 staff members.  So we

21  feel that every day that goes by that we're not getting

22  information and moving forward is a lost day.

23        JUDGE MANN:  Would Judge Kovner prefer if I just

24  sign off now so as to not disrupt the rest of the proceedings?

25        THE COURT:  Absolutely not, unless you want to.  I'm

Telephonic proceedings                                  56

1    fine with the beeping.

2            JUDGE MANN:  All right.  Well, again I apologize.

3            I do have one question and I think this should be

4    one that maybe we can just take it off the checklist and that

5    is, is the Government going to be seeking to serve any

6    discovery demands on petitioners?

7            That's one of the items that's included in the

8    proposed case management plan containing deadlines.

9            MR. CHO:  Yes, we do intend to serve discovery, Your

10   Honor.

11           JUDGE MANN:  All right.  I would just add that, in

12   terms of going forward, there were a number of questions that

13   came up and Mr. Cho indicates that he didn't have the answers

14   and I think it would be very useful to get answers to those

15   questions very quickly because that may determine the scope of

16   the discovery and how much time is needed.

17           MR. CHO:  Understood, Your Honor.

18           THE COURT:  So unless Judge Mann has anything else

19   on this, maybe we should take all of this under advisement at

20   this point.

21           JUDGE MANN:  I don't have anything further.

22   Fortunately, no beeps either.  I guess the one

23   non-discovery-related thing that is on my list is the issue of

24   timing for a motion to dismiss and I think the Government

25   proposed a schedule for that.

Telephonic proceedings                    57

1        Government, is that still a schedule you want or is

2   that something that is contingent on -- that you don't want me

3   to order at this point?

4        MR. CHO:  Yes, that's still the schedule that we

5   would like, Your Honor.

6        JUDGE MANN:  Okay.

7        And Ms. Ginsberg, is that schedule amenable to you?

8        MS. GINSBERG:  Yes, Your Honor, it is.

9        JUDGE MANN:  Okay.  So then that's at least one

10  thing I can quickly accomplish.

11       THE COURT:  Anything else from either side?

12       MS. GINSBERG:  No, Your Honor, not from Petitioners.

13       MR. CHO:  And nothing for the Government, Your

14  Honor.

15       JUDGE MANN:  Well, thanks again.  I appreciate you

16  all jumping on this call and spending so long and also all of

17  your work over the holiday period.

18       MS. GINSBERG:  Thank you, Your Honor.

19       MR. CHO:  Thank you, Your Honor.

20       THE COURT:  Thank you.

21       JUDGE MANN:  Goodbye.

22

23       (Matter adjourned.)

24

25                    - ooOoo -

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
CHUNN, et al.,                : 20-cv-01590-RPK-RLM
            Plaintiffs,       :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
                              :
EDGE,                         : April 25, 2020
            Respondent        : 11:00 AM
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
AND
THE HONORABLE RACHEL B. KOVNER
UNITED STATES DISTRICT JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Plaintiff**:        **Betsy R. Ginsberg, Esq.**
                              **Alexander A. Reinert, Esq.**
                              Benjamin N. Cardozo School
                              55 5th Avenue, Eleventh Floor
                              New York, NY 10003

                              **Katherine R. Rosenfeld, Esq.**
                              **Scout Katovich, Esq.**
                              **O. Andrew F. Wilson, Esq.**
                              Emery Celli Brinckerhoff
                              & Abady LLP
                              600 Fifth Avenue, 10th Floor
                              New York, NY 10020

**For the Defendant**:        **James R. Cho, Esq.**
                              **Seth Eichenholtz, Esq.**
                              **Joseph A. Marutollo, Esq.**
                              **Paulina Stamatelos, Esq.**
                              U. S. Attorney's Office
                              271 Cadman Plaza East
                              Brooklyn, NY 11201

**Transcription Service**:    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  This is Judge Mann on the line.

2    I'm conducting a telephone discovery hearing in Chung v.

3    Edge, 20-cv-1590.  Before I have the parties state their

4    appearances on the record, just a couple of preliminary

5    observations.

6          Judge Kovner is on the line.  She wants to be

7    able to keep abreast of all the developments in the case,

8    but she has asked me to take the lead in conducting this

9    proceeding.

10          Also, I do understand that we do have a

11    representative of the media on the line, and I would just

12    remind you that you are not permitted to make recordings

13    of this court proceeding.

14          Could counsel for petitioners please state

15    their appearances.

16          MS. ROSENFELD:  Good morning, Judge Mann.

17    This is Katie Rosenfeld for petitioners.  Also on the

18    line and speaking for petitioners is Betsy Ginsberg, and

19    also on the line but not speaking today are Andrew

20    Wilson, Alexander Reinert and Scout Katovich for

21    petitioners.

22          THE COURT:  All right.  And who is on on behalf

23    of the respondent?

24          MR. CHO:  Good morning, your Honors.

25          James Cho with the United States Attorney's

3

Proceedings

1    Office.  I'm joined by my colleagues Seth Eichenholtz,

2    Deputy Chief Field Division, United States Attorney's

3    Office, Joseph Marutollo, Deputy Chief Field Division,

4    United States Attorney's Office, and Paulina Stamatelos,

5    Assistant United States Attorney's, United States

6    Attorney's Office, Eastern District.

7             THE COURT:  And do we have any representatives

8    of the Bureau of Prisons on the line?

9             MR. CHO:  Not today, your Honor.

10            THE COURT:  All right.  I guess unlike the rest

11   of us, they take Saturday off.

12            The purpose of this proceeding was to address

13   the petitioner's April 20th letter which is docket entry

14   number 54, to quash Dr. Venters' deposition, the

15   respondent's demand or notice of deposition of Dr.

16   Venters, a letter that also raises issues regarding other

17   discovery demands by respondents and the government's

18   response of April 22nd, docket enter number 57 to that

19   letter.

20            Literally minutes ago, I was looking at the

21   docket in this case, and I saw that last night at 10:30,

22   petitioners filed another motion that they asked to have

23   addressed at this hearing, and the government this

24   morning filed its response.

25            I had a very brief opportunity to review those

4

Proceedings

1   letters.  I hope we'll be able to at least address some

2   of those issues, but I can't promise you that they're

3   going to be resolved today, given the limited amount of

4   time that the Court has to consider these issues.

5         So let's turn first to the petitioner's April

6   20th motion to quash the notice of deposition, and the

7   other issues that are raised in that letter.  The

8   government's response argues that -- opposes the motion

9   to quash, and then with respect to the remaining issues,

10  argues that the Court's consideration of those issues, is

11  premature because the parties haven't completed their

12  meet and confer regarding those issues.  The letter

13  refers to future conferrals.  So let me see whether we

14  can move on from this contretemps.

15        Have the parties conferred further on these

16  other issues?  That is the respondent's demands for

17  depositions, interrogatories, and document demands of

18  petitioners?

19        MR. CHO:  Your Honor, I can address that for

20  the government, if you would like.

21        THE COURT:  All right.

22        MR. CHO:  So we did receive responses to our

23  interrogatories, and requests for documents, I believe on

24  Tuesday in the evening.  So we're in the process of

25  reviewing those materials.

Proceedings

5

1     There's still a pending issue.  We did serve

2  notices of depositions on the petitioners that are still

3  incarcerated, and we've had an exchange of emails, even

4  as recently as this morning regarding logistics for those

5  depositions.  So those are still ongoing discussions that

6  we don't think are ripe for the Court at this point.

7     THE COURT:  All right.  Ms. Rosenfeld, I heard

8  you chomping at the bit.

9     MS. ROSENFELD:  Your Honor, the issue of the

10  duplicative nature of the requests for interrogatories,

11  document demands, and depositions of the petitioners, I

12  think is ripe for the Court because we have now been

13  conferring about it since Tuesday, and I don't believe

14  that respondent has been willing to withdraw the requests

15  for interrogatories and document requests and depositions

16  of the petitioners who are incarcerated.

17     So I think from our perspective, we have sent

18  emails suggesting certain logistical issues around the

19  deposition process, and of course we're certainly willing

20  to work with everybody on the other team to produce the

21  client's for depositions but I think we do need the Court

22  to address the question of the multiple discovery devices

23  that they seemed to want to pursue.

24     THE COURT:  Well, respondent notes in their

25  letter of April 22nd that they haven't moved to compel.

6

Proceedings

1          MS. ROSENFELD:  We responded, your Honor, to

2     the discovery -- to the interrogatories in the document

3     requests in full because we did not want to not respond

4     to these pending requests, and follow the schedule that

5     the Court had set for them.

6          So we've already spent considerable time

7     responding to the interrogatory and document requests for

8     the petitioners, the original petitioners.

9          I think the question now is is there going to

10    be subsequent, you know, letters, and motion practice,

11    about the sufficiency of those responses, and should we

12    also be required to now spend more time responding to

13    additional interrogatories and document requests that

14    were served for Ms. Lopez and Mr. Hair.

15         THE COURT:  I'm sorry, there have been

16    additional notices --

17         MS. ROSENFELD:  There have been, yes.

18         THE COURT:  -- or you're just saying there --

19         MS. ROSENFELD:  No, no, there -- your Honor,

20    I'm sorry to interrupt you, your Honor.

21         THE COURT:  All right.  So for the two

22    additional petitioners, there now have been sets of

23    discovery demands served on them.

24         MS. ROSENFELD:  Correct, your Honor, last

25    night, I think at around 11, or maybe it was earlier.

7

Proceedings

1  There was a lot going on last night.

2          And so we -- I do think that the parties can

3  work together to resolve, I hope the deposition

4  parameters, and the issues around, you know, how long,

5  and what access for preparation and what safe conditions

6  our clients can be produced in, but I do think that given

7  the nature of this proceeding, and given the timing, it

8  isn't reasonable or appropriate to have all of these

9  different tools going on at the same time, and we'd like

10  to focus on one or the other.

11          We're happy to do the depositions, we're happy

12  to do the interrogatories for the new petitioners, but I

13  haven't heard respondent be willing to confer further on

14  the double nature of the request, so I do think it's ripe

15  for the Court to decide that today.

16          THE COURT:  They may not have responded --

17          UNIDENTIFIED SPEAKER:  (Indiscernible).

18          THE COURT:  They may not have responded, but

19  they have not moved to compel, correct?

20          MS. ROSENFELD:  Correct, your Honor --

21          THE COURT:  So let me --

22          MS. ROSENFELD:  -- but we did respond to them.

23          THE COURT:  Well, you've now responded, and

24  they haven't moved to compel.  So certainly let's put

25  aside the two additional petitioners with respect to, I

8

Proceedings

1  believe it's Rabadi and Rodriguez.  Petitioners have now

2  responded.  The parties are conferring with respect to

3  the parameters of the depositions of these individuals.

4  So there really is no issue before the Court, absent a

5  motion to compel by respondent.

6        So what needs to be resolved with respect to

7  Rabadi and Rodriguez?

8        MS. ROSENFELD:  The part -- for today, I think

9  I agree with you, there is nothing else because the

10 parties are conferring about the depositions, although if

11 the respondent could clarify that they don't intend to

12 have further motion practice on that, I think it would be

13 helpful to know how everybody should proceed in terms of

14 scheduling their depositions.

15       THE COURT:  All right.  Mr. Cho, I was going to

16 ask that.  You say that it's premature to address these

17 issues because respondent has not moved to compel.  With

18 respect to Rabadi and Rodriguez, is it your intention to

19 move to compel?  You've now had their responses since

20 Tuesday, which seems like years, given the time line in

21 this case.

22       MR. CHO:  Your Honor, this is James for the

23 government.

24       These are all discovery devices that are

25 permitted in discovery, and pursuant to the Court's prior

9

Proceedings

1   orders on discovery.  We're looking at it holistically.

2   Petitioners have indicated today on this call that we are

3   still working out details for the named petitioner's

4   depositions.  So they go hand-in-hand.  If we can figure

5   out the logistics for those depositions, we may not need

6   the necessity for moving to compel on their responses

7   which again, we're still meeting and conferring over

8   these issues, so we don't want to waste the Court's time

9   dealing with something that the parties can work out

10  ourselves.

11         But in the event we can't figure out the

12  logistics for the depositions, then there may be a basis

13  for a motion to compel because the interrogatory

14  responses, document production would be inadequate in the

15  absence of a deposition.  So it's not one or the other.

16  I think we look at this holistically.

17         THE COURT:  Ms. Rosenfeld, I don't know whether

18  you're in a position to say at this time, but have

19  petitioners thought about who they're going to be calling

20  as witnesses at the preliminary injunction hearing,

21  because the expedited discovery is intended to give the

22  parties sufficient information to be able to go forward

23  at the hearing that is scheduled for May 12th.  It is not

24  to take full discovery on all issues, and on the complete

25  case.  So let's talk about who is going to be a witness

10

Proceedings

1  at the preliminary hearing.

2      MS. ROSENFELD:  Yes, your Honor.  We agree that

3  that is the length of this, and at this point, any of our

4  petitioners who are incarcerated as of the date of the

5  hearing, we believe will testify.  So as of today, that's

6  Mr. Rabadi, Ms. Lopez, Mr. Hair, and Mr. Rodriguez is

7  still incarcerated as of today, but I understand when I

8  saw him on Thursday at the inspection, that he's going to

9  potentially be released on Monday to a halfway house.  So

10  we --

11      THE COURT:  I'm sorry, which petitioner will be

12  released?

13      MS. ROSENFELD:  Mr. Rodriguez.  Mr. Rodriguez,

14  I believe is going to be released on Monday to a halfway

15  house.  So --

16      THE COURT:  And if that happens, does that mean

17  -- if in fact, he's released on Monday, does that mean

18  that you will not be calling him as a witness at the

19  hearing?

20      MS. ROSENFELD:  I don't know, your Honor.  I

21  certainly can say for the three people who will still be

22  incarcerated as of the hearing, we will definitely call

23  them.  I don't believe we would need to call all of the

24  released petitioners, but we may want to call one, or

25  two, or we can certainly give respondent, you know,

11

Proceedings

1    advanced notice of that far ahead, for the reasons you

2    describe.  I just don't think on this call, we're sure

3    about which of the released people we might want to

4    testify about conditions that existed as of the date of

5    their release.

6           Your Honor, there is, I guess, with respect to

7    these depositions, also the issue of whether -- actually,

8    I'll just stop there, yeah.

9           THE COURT:  Mr. Cho, did you want to respond?

10          MR. CHO:  Sure.  Obviously, we want to know who

11   their witnesses are, so we can take the deposition

12   discovery on those witnesses in advance.  Obviously, if

13   they're not going to have someone testify at the hearing,

14   more likely than not, we're not going to take their

15   deposition, so if Rodriguez is being let go on Monday,

16   then I anticipate we will withdraw that notice of

17   deposition.  So again, that's moot, and again, it's not

18   ripe for this Court's intervention at this point because

19   of these moving targets, right?  If they're not going to

20   have him testify, then we're likely not going to depose

21   them, I mean that moots that issue.

22          THE COURT:  And in terms of the logistics of

23   the deposition, does the government -- the respondent

24   have plans as to how these depositions would take place,

25   and the availability of the equipment needed to conduct

12

Proceedings

1  remote depositions?

2          MR. CHO:  Yes, your Honor.  Again, this James

3  from the government.

4          We're trying to make this as easy and efficient

5  as possible.  So we propose just a telephone deposition,

6  that's it, where we could all get on a call with all the

7  parties by phone, just like the way we're doing it now

8  for these depositions, just like the inmate calls into

9  the Court for bail hearings, and whatnot as well, it

10 would be the same exact mechanism by which we would

11 conduct these depositions.

12          THE COURT:  Well, this is news to me because

13 the Court has not been conducting bail hearings with the

14 inmates participating telephonically.  If they're in

15 custody  in the cases before me, their lawyers have

16 waived their participation, and the telephonic hearings

17 have been with counsel, but not with the inmates.  So

18 that's one of the reasons that I asked logistically how

19 you plan to go forward with depositions.

20          MR. CHO:  If I may then, let me clarify.  Maybe

21 it wasn't bail hearings, but I know there have been some

22 court proceedings where defendants have participated

23 remotely in those court proceedings.  I know my

24 colleague, Seth Eichenholtz has been working on the issue

25 with the Federal Defenders in making them available for

13

Proceedings

1   these legal calls.  So they do have access to telephones.

2          MR. EICHENHOLTZ:  Your Honor, this is --

3          THE COURT:  How long -- yes?

4          MR. EICHENHOLTZ:  -- Seth Eichenholtz.

5          THE COURT:  Mr. Eichenholtz?

6          MR. EICHENHOLTZ:  Yes, I was just going to

7   weigh in very quickly because this has, for the most

8   part, been my life for the past three weeks.

9          Yeah, so what's happened is there's a protocol

10  in place for both the Eastern and the Southern District

11  that's permitting, and it started kind of last week, but

12  in earnest, this past week, that's producing telephone,

13  and/or video appearances by inmates for criminal

14  proceedings in court.  I believe the time slots are 9

15  a.m., 10 a.m., and noon, every morning.

16         I know that there were some telephonic hearings

17  from the EDNY this past week, and we're moving towards

18  the system as Mr. Palmer gets the EDNY with a Zoom -- I

19  think it's Zoom for Government System, where inmates will

20  be able to do video appearances, as well.

21         I think the government -- you know, there is

22  limited capacity, unfortunately, at MDC to make these

23  appearances, and so that is, I think the one piece that

24  I'll work with Mr. Cho, and the rest of the team on our

25  end, then petitioners to try and find the time when we

14

Proceedings

1   can have -- our vision would be, the petitioners appear

2   by phone, you know, but it's the exact same facility.

3   They'd appear by phone.

4           We'd also, you know, I know that counsel also

5   wants some prep time, so we try and work out all those

6   details, but that is, I think the vision that we have the

7   inmates appear as they have been for the past week or so

8   for court appearances.

9           THE COURT:  Well, before we move on from this

10  issue, let me just make the following observation.  I was

11  on arraignment duty this past week.  It was very busy.

12  There is a written protocol in place for video

13  conferencing capacity from the MDC, and the MCC.  It is -

14  - at this point in time, it's only a written document.

15  It's aspirational.  It was not in place this last week.

16          When, and if it is up and running, it will be

17  -- for the MDC, it will be video conferences on the hour,

18  Monday, Wednesday, and Friday in the mornings.  The MCC

19  will be for Tuesdays and Thursdays.  So we're not talking

20  about availability at the MDC every day of the week.  So

21  I just want to make that observation, so when the parties

22  get to the point of addressing logistics, if that's the

23  video conferencing capability that you're planning to

24  use, just be aware of its limitations.

25          Also, does this mean that the respondent

15

Proceedings

1  anticipates that those depositions would be no more than

2  an hour each?

3          MR. EICHENHOLTZ:  Your Honor, Seth Eichenholtz

4  again.

5          I just wanted to point out that the reason that

6  those are -- it's only available from MDC on Mondays,

7  Wednesdays, and Fridays, is because the SDNY certainly

8  has Tuesdays and Thursdays.

9          And so I think that we'd need -- right, we'd

10  need to find either some slack time, or sometime where

11  staff would be available outside of those hours, which is

12  pretty limited, but we'd have to work on that.

13          I would defer to the rest of the team.  I think

14  we're still conferring regarding timing of the

15  deposition, but obviously, we're aware --

16          THE COURT:  Timing, you mean the duration?

17  You're talking about the duration of the deposition.

18          MR. EICHENHOLTZ:  Yes, duration.

19          MR. CHO:  Your Honor, this is James.

20          I can address the duration.  We've indicated to

21  the other side that we intend these depositions to be

22  fairly short, and efficient, and streamlined.  So we

23  don't anticipate an all-day deposition.  Given the

24  expedited nature of these proceedings, I can't say it's

25  going to be an hour.  I think we suggested perhaps two

16

Proceedings

1   hours, just to build in some leeway, but I do anticipate

2   these to be very short depositions.

3          MS. ROSENFELD:  Your Honor, may I respond

4   briefly to some of this?

5          THE COURT:  Yes.

6          MS. ROSENFELD:  So I just want to sort of step

7   back for a second.  I think there are two issues here

8   that we're talking about; one is the discovery that's

9   appropriate in advance of the preliminary injunction

10  hearing, maybe there's three.

11         One is, the disclosures that need to be made in

12  advance of the hearing about who will testify at the

13  hearing and how, which the parties have not yet conferred

14  about, and then the other, I guess, is the hearing

15  itself.

16         With respect to this proceeding, we commenced

17  it on Friday, March 27th.  At that time we commenced with

18  next friends, for two of our petitioners because we were

19  not able to speak to them. So Mr. Rabadi, for example,

20  was commenced via next friend of his common-law-wife, Ms.

21  Quinones (ph.).

22         We have now spoken to our clients by phone

23  once, and at the MDC yesterday, or on Thursday, I was

24  able to speak to Mr. Rabadi and Mr. Rodriguez through the

25  food slot of their cell doors for about five or ten

17

Proceedings

1   minutes with other counsel close-by.

2          So this is obviously an extraordinary

3   proceeding.  In the context of a pandemic we're saying is

4   threatening the health and safety of the people who are

5   incarcerated and work at the MDC.  And so we very

6   intentionally sought very expedited discovery, and very

7   limited discovery, three kinds of documents, one

8   deposition.

9          The respondents are attempting really to

10  conduct full discovery here, your Honor, and the idea

11  that these depositions are going to occur, I don't --

12  it's not clear to me how we would be able to meet with

13  our clients to prepare them, that they would be in a safe

14  and hygienic space for these depositions.  I think we can

15  confer about that, but the issue does remain for the

16  Court's decision with respect to the two new petitioners

17  as to whether the duplicative sets of discovery is

18  appropriate, and I do think that the context here which

19  is that we've spoken to Ms. Lopez and Mr. Hair, once by

20  phone.  We have almost no access to our own client.

21          And so we want to provide information, but

22  we've also suggested that, you know, we might provide

23  declarations in advance of the hearing, and similarly

24  accept those, and that testimony might be on direct

25  through declaration, and then cross at the hearing.

18

Proceedings

1         But the government doesn't seem to be willing

2    to concede that this type of proceeding, and these sort

3    of exigent circumstances mean that none of us are going

4    to have perfect advanced information about all of the

5    facts in advance of the hearing, when we have to do our

6    best.

7         And so I do think the Court's guidance on

8    whether the duplicative discovery as to new petitioners

9    would be helpful today.  We obviously have an ongoing

10   duty to supplement our discovery responses that we made

11   last Tuesday.  So the fact that they may opt only to

12   proceed with depositions doesn't remove our obligation to

13   continue to supplement, if those are in fact correctly

14   serve.

15        Mr. Cho also said that they want to depose

16   everybody who is going to testify at the hearing which

17   again, sounds like normal, full discovery in advance of

18   trial, not in advance of an expedited preliminary

19   injunction hearing.

20        THE COURT:  All right.  The petitioners are

21   arguing that the discovery that's being sought by

22   respondent is the equivalent of full discovery.  They've

23   made that argument this morning.  They made it in their

24   letters, and they're seeking expedited discovery on an

25   expedited -- and they're seeking full discovery on an

19

Proceedings

1   expedited time line.

2           This court is not at this point going to get

3   into specifics of the document demands, the

4   interrogatories, the scope of the depositions. I think it

5   would be premature to do that, and in particular with

6   respect to the new petitioners, there hasn't been any

7   written application made.  The Court has not been

8   provided with the discovery demands that have been served

9   on them, although I presume I will be hearing that

10  they're the same as those that were served on Rabadi and

11  Rodriguez.

12          In any event, at this point in time, I'm not

13  going to be down into the weeds with the parties, but I

14  will say this, that the test that most courts apply in

15  determining whether to allow expedited discovery, and if

16  so, the scope of that discovery, is a flexible standard,

17  a reasonableness, and good cause.

18          And in that connection, the Court should

19  balance the need for expedited discovery against the

20  breath and the burden of the discovery that's being

21  sought.

22          This is a case in which the respondent is

23  seeking full discovery from the petitioners on an

24  expedited basis when the petitioners are in lockdown in a

25  federal facility, and their attorneys have limited access

20

Proceedings

1  to them.  And under the circumstances, this is the -- the

2  scope of what they've sought is not reasonable.  The

3  demands for purposes of preparing for preliminary

4  injunction hearing are overly broad.  So the parties are

5  to go back and confer in good faith to narrow what

6  petitioners are required to do, in order for the

7  government to have what it needs to prepare for the

8  preliminary injunction hearing.

9          All right.  Let's now address Dr. Venters'

10  deposition.  Let me ask counsel for respondent does

11  respondent anticipate calling any experts at the

12  preliminary injunction hearing?

13          MR. CHO:  We haven't seen Dr. Venters' report

14  yet.  So we're not sure what he's going to say.  Again,

15  this is James for the government.

16          So a lot of it depends on the opinions that he

17  articulates in his report.  If there are certain

18  opinions, or theories that he expresses for which we

19  require a rebuttal expert, then we would anticipate

20  identifying an expert, yes.

21          But if the opinions he expresses can be

22  addressed by the witnesses that we already have on behalf

23  of the BOP, then experts -- rebuttal experts may not be

24  necessary, but again, that depends on what he articulates

25  in his report.

21

Proceedings

1          THE COURT:  Well, if that's the case, when do

2    you -- when would you be serving a rebuttal report and

3    would the petitioners have an opportunity to depose

4    respondent's rebuttal expert?

5          MR. CHO:  I have to look at the dates.  I

6    believe their report is due on April 30th.  So on

7    Thursday.  So we would need at least a few days to

8    identify an expert, and to provide a rebuttal to that.

9    But it would certainly be our intention if we do identify

10   an expert, and produce a report, to make him or her

11   available for a deposition in advance of any preliminary

12   injunction hearing.

13         THE COURT:  Ms. Rosenfeld, do you want to

14   address that?

15         MS. ROSENFELD:  Oh, I'm sorry, your Honor, I

16   was on mute.

17         I think when we first served the case

18   management plan, we suggested to Judge Kovner that we

19   would serve an expert report by date X, and we would make

20   the expert available for testimony at the hearing, and

21   it's our view that that's still the appropriate procedure

22   for this kind of hearing for both sides.  I mean, I think

23   we -- in the normal course of regular discovery, we would

24   have a report, and we would have depositions, and we

25   would have all of the things that Mr. Cho is seeking, but

22

Proceedings

1  given this type of proceeding, it seems excessive, and we

2  just feel that the parties should get each other's

3  reports.  If they're going to have a rebuttal report, and

4  read them, and prepare a cross, and do the testimony at

5  the preliminary injunction hearing, and just get to the

6  merits.

7         You know, we are very anxious to have the

8  preliminary injunction hearing occur on the schedule that

9  Judge Kovner set, the conditions at the facility are bad,

10  and every extra step here that's going to create more

11  delay, and more time, and more burdens, it seems

12  unnecessary.

13         MR. CHO:  Your Honor, I need to correct myself,

14  and I apologize.  This is James for the government.

15         I'm looking back now again at the discovery

16  order, docket number 43, and it provides in here that our

17  expert report would be due May 5th.  That day may have

18  changed because I think the briefing on the preliminary

19  injunction motion may have fluctuated, but the current

20  discovery order or at least as of April 14th, provided

21  for a date by which our expert report would be due, so I

22  apologize for getting that.

23         THE COURT:  All right.  I'm looking at the

24  docket entry 43, and I see that that document does

25  include a reference to a deadline for any expert report

23

Proceedings

1  by respondent.  I will make this observation, and that is

2  both the petitioners' deadline for any supplemental

3  expert report, and the deadline for respondent's expert

4  report were the same dates as for the respective

5  submissions on the preliminary injunction.

6        Judge Kovner has granted the request for two

7  additional days for the briefing on the preliminary

8  injunction.  She was not asked to, and did not address

9  the dates for serving any expert reports, so I don't know

10 what her intent would be or what the parties' intent

11 would be but it may well be that those deadlines were

12 also moved, but her order didn't address that, and I

13 don't believe the parties' submissions did either.

14       MR. CHO:  I think the intent was for those

15 dates to include both the brief and the reports.  I think

16 that's what we had consented to.

17       MS. ROSENFELD:  That's correct.  That was also

18 the intention that the date for the submission for each

19 side would be moved back by two days.

20       THE COURT:  So if --

21       MS. ROSENFELD:  So we're (indiscernible) --

22       THE COURT:  -- that's the case, and if Judge

23 Kovner agrees, then we're talking about respondent's

24 expert report would be due by May 7th, which is a

25 Thursday, and then have the hearing scheduled for the

24

Proceedings

1   following Tuesday, the 12th.

2          So when would the deposition, if there were

3   going to be depositions, when would the deposition of

4   respondent's expert take place?

5          MR. CHO:  Well, one, I'm not sure whether we're

6   going to actually have an expert on that.  So that's

7   still up in the air, but assuming we do identify an

8   expert, we would certainly endeavor to make him available

9   at any point in time between now and -- I'm sorry,

10  between and the 7th, and the 12th, whether it's during

11  the day, evenings, or even weekends, but again, I would

12  have to check, assuming we'd get an expert on the

13  expert's availability, but I think we would anticipate

14  making him available at any point in time before the

15  preliminary injunction hearing itself.

16         MS. ROSENFELD:  And your Honor, I guess this

17  just sort of -- I think your questions point out why we

18  think this is unnecessary.  I mean, each expert would be

19  deposed, then there's a transcript, then people are going

20  to have briefing based on the transcript, or there's some

21  submission to the Court in advance of the preliminary

22  injunction hearing about whatever information was gleaned

23  from these depositions.

24         It just adds an additional layer of unnecessary

25  inquiry here.  I mean, I think everybody on this call is

25

Proceedings

1   a good lawyer, and we can get the reports, and we can

2   question the experts at the hearing on Tuesday.  I just

3   think that adding these depositions, and the need for

4   transcripts, and digesting of them, and presenting the

5   evidence from the transcripts to the Court is not

6   appropriate for this type of expedited proceeding, and

7   again we're very concerned that the hearing not be

8   delayed in any way.

9        And how would these depositions be conducted?

10  Are we talking about telephonic hearings -- video

11  conference -- not hearings, depositions?

12       MR. CHO:  Your Honor, this is James from the

13  government.

14       We anticipated for Dr. Venters' deposition can

15  either by video, telephone, whatever is easiest for all

16  the parties.  We're open to any mechanism by which we

17  conduct those depositions.

18       THE COURT:  Does anyone else want to be heard

19  on this issue?

20       MR. CHO:  And one more thing, we also, given

21  the timing, we even suggested if it's easier for them to

22  depositions after hours, or even on weekends, we would

23  make ourselves available at any point in time to conduct

24  his deposition.

25       MS. ROSENFELD:  And --

Transcriptions Plus II, Inc.

26

Proceedings

1          THE COURT:  All right.

2          MS. ROSENFELD:  -- and while we appreciate

3    that, the sentiment, you know, we don't want to -- we

4    don't think it's necessary, and frankly, we don't want to

5    ask Dr. Venters or your expert to be available in the

6    evening, on the weekends, for a deposition that we don't

7    think is even necessary.

8          THE COURT:  All right.  I'm prepared to address

9    this dispute.  The petitioners have moved to quash the

10   deposition of Dr. Venters.  Respondent contends that

11   conducting this deposition will streamline the hearing

12   testimony by eliminating the need to go into exploratory

13   areas that they would do as part of discovery, as opposed

14   to a focused cross-examination.

15          I will say that the respondent has cited a

16   series of cases supporting the propriety of expert

17   depositions, all or at least most of those do not deal

18   with the preliminary injunction context.  So what we have

19   here is a very compressed time line, and whether or not

20   given that very compressed time line, it makes sense to

21   have the parties conducting depositions.

22          The Court believes that it is not prepared to

23   quash Dr. Venters' deposition.  However, it is this

24   Court's view that having him prepare a complete,

25   supplemental expert report that he signed, and made

27

Proceedings

1   available for deposition is, under the circumstances, and

2   given the expedited nature of the discovery, duplicative

3   and unnecessary.

4          Judge Kovner did not expressly address whether

5   or not the parties were required to serve signed expert

6   reports by their experts.  The parties had proposed

7   deadlines for filing -- for serving expert reports,

8   deadlines that corresponded with their briefing of the

9   preliminary injunction issue, but she did not require it,

10  and has not addressed it.

11         And it seems to me that given the fact that

12  this needs to be a streamlined discovery process, that it

13  makes more sense that if there is going to be a

14  deposition, that then the expert -- in lieu of providing

15  all the expert discovery that is normally required, if an

16  expert is retained for litigation purposes, and that's

17  set forth in Rule 26(a)(2)(B), that in lieu of that, and

18  in order to assist the examining party in preparing for

19  depositions, it's appropriate for the Court to say that

20  the parties can instead utilize the procedures that are

21  set forth in Rule 26(a)(2)(C) which usually applies to

22  experts who are not retained specifically for litigation

23  purposes.

24         The most typical example of that would be a

25  treating physician who is going to serve as the expert in

28

Proceedings

1  a personal injury action.  So if we are -- since we are

2  talking about expedited discovery in a very compressed

3  time line, if Dr. Venters is going to have to be made

4  available for a deposition, to have him first write out

5  all his opinions in a detailed report, and then be

6  deposed on that in order to assist the government to

7  prepare for a hearing thereafter, it seems like a lot of

8  make-work, and unnecessary.

9       And therefore, it's this Court's ruling that

10  the parties can confer and decide, does respondent want a

11  written from Dr. Venters, or do they want his deposition?

12  And if they want his deposition, then petitioners need

13  only provide the information provided under Rule

14  26(a)(2)(C), which is counsel's summary of the expert's

15  -- the matters on which the expert will opine.  I mean,

16  that's a very (indiscernible) but the parties should

17  comply with Rule 26(a)(2)(C).

18       And similarly, with respect to the respondent's

19  expert, if any, the parties should confer and petitioners

20  should determine whether or not they want to signed

21  report from the expert, or whether they want to take a

22  deposition of the expert.

23       And I would further note that with respect to

24  26(a)(2)(C), there is not a need to provide the kind of

25  detailed background information that normally would be

29

Proceedings

1  provided for specially retained expert such as a list of

2  all proceedings in which the expert has testified for the

3  last four years.

4          Respondent already has Dr. Venters' very

5  lengthy CV, and to require him, and the petitioners to

6  have to produce a list of every proceeding in which he's

7  testified in advance of the preliminary injunction

8  hearing is unnecessary.

9          Does that mean that that discovery would not be

10  available down the road in the event that this case goes

11  forward in the future?  No.  When we get to full

12  discovery, that's information that could be made

13  available at that point.

14          Is there anything else we need to address with

15  respect to the deposition of Dr. Venters?

16          MR. CHO:  Your Honor, just --

17          MS. ROSENFELD:  I -- go ahead, James.

18          THE COURT:  I'm sorry.

19          MR. CHO:  Your Honor, James from the

20  government.

21          Quick question.

22          THE COURT:  Yes.

23          MS. ROSENFELD:  If we go the route of just the

24  written reports by Dr. Venters, and not the deposition,

25  would his testimony at the preliminary injunction hearing

30

Proceedings

1  be confined to the four corners of his report, and

2  nothing else?

3          THE CLERK:  Hello, Judge Mann?

4          MR. CHO:  She may have fallen off.

5          THE CLERK:  I'm going to try to get Judge Mann

6  back on the line.

7          MR. CHO:  I heard some beeping.

8          THE CLERK:  Yes.  I'm going to text her now.

9  (Pause)

10          THE COURT:  This is Judge Mann back on the

11  line.  My call failed.  I'm sorry for the interruption.

12          What I started to say is that there is

13  precedent on this issue.  I'm not going to start making

14  rulings now with respect to what clarifying testimony

15  exceeds the scope of what's in the report, but for the

16  most part, yes, an expert who serves a written report may

17  not then at a hearing or trial, opine on matters not

18  addressed in the expert, signed report.

19          MR. CHO:  Well, thank you, your Honor.

20          THE COURT:  And I don't know, Mr. Cho, whether

21  respondent is prepared to state at this time whether you

22  still want to have a deposition of Dr. Venters?

23          MR. CHO:  I will need to confer with my folks,

24  and I'll get back to the petitioners regarding that.

25          THE COURT:  All right.  Please, I know all of

31

Proceedings

1  you (indiscernible) much as, but please try to do that

2  quickly because the petitioners will need to know that

3  for their own scheduling purposes.

4          MR. CHO:  Understood, your Honor.  Thank you.

5          THE COURT:  All right. Is there anything else

6  we need to address with respect to docket entry 54 and

7  57?

8          MS. ROSENFELD:  This is petitioners -- Katie

9  Rosenfeld for petitioners.

10          I don't think so, your Honor.  I think as long

11  as we hear from the respondent, as you suggested, you

12  know, as soon as possible, on Monday or on Tuesday

13  morning about their decision, then that makes sense to

14  us.

15          THE COURT:  All right.  So that then brings us

16  to the dispute that was first raised late last night, and

17  again this morning regarding the 30(b)(6) protocol, and

18  just for the record, the petitioners' letter is docket

19  entry 64 -- I'm sorry, docket entry 63.  The government's

20  response of this morning is docket entry number 64.

21          The first issue concerns the protocol at the

22  30(b)(6) depositions on Monday, and in reading the

23  government's response, it seems to me there really isn't

24  a dispute here.  The government I think has agreed to

25  five hours for the 30(b)(6) deposition of one witness,

32

Proceedings

1   and two hours for the other.

2          And petitioners have indicated that they

3   believe that they could complete their depositions within

4   those time frames.  So is there a dispute here?

5          MS. GINSBERG:  Your Honor, this is Betsy

6   Ginsberg for petitioners.

7          I think the dispute is that we agreed to five

8   hours on the condition that the respondent not make

9   objections or instruct the witness not to answer, if they

10  believe that questions are outside the scope of the

11  30(b)(6) notice, and we were just hoping to avoid having

12  to call the Court during the course of the deposition for

13  things like that, to really try to streamline this, so

14  that the witness, and the attorneys for both sides can do

15  this as quickly as possible.

16         And you know, unfortunately, there have been

17  many discovery disputes to-date in this case, and I'm

18  certainly not trying to lay blame on any party here but

19  would like to avoid prolonging the time -- the total time

20  of the deposition, if we can avoid those kinds of

21  disputes, and just deal with them after the fact if they

22  arrive.  And certainly petitioners don't anticipate

23  asking anything outside the scope, but we may not agree

24  as to what is within the scope of the notice.

25         THE COURT:  Well, the Court has a different

33

Proceedings

1  view of the government's position on this issue, than the

2  petitioners do.  I'm looking at their letter of this

3  morning in which they quote Rule 30(c)(2), and they state

4  that "An objection will be made at the time of the

5  examination, but the examination still proceeds.  The

6  testimony is taken subject to any objection."

7          So the way I understood the respondent's

8  position, and I will ask Mr. Cho if this is correct, if

9  the government objects, that the examination, the line of

10 inquiry, exceeds the scope of the 30(b)(6) notice, the

11 government would say objection, beyond the scope, and

12 then the witness answers.

13         So let me ask Mr. Cho, if my understanding of

14 respondent's position is correct.

15         MR. CHO:  Yes, that's our general practice

16 again, your Honor.  And again, this is James for the

17 government.

18         But again, I can't say carte blanche at this

19 point that if the question is far beyond the scope of the

20 deposition notice, that there may not be additional

21 challenges or objections to those types of questions, but

22 typically as with any deposition, it's fact finding.  So

23 we will note the objection for the record, and move on,

24 and let the witness answer, if the witness is able to,

25 but again, what they want us to do is not object in

34

Proceedings

1    advance, and not note it on the record, and I think that

2    would be prejudicial, and unwieldy for us to triage down

3    the road was that question objectionable or not.  We'd

4    rather make the objection right then and there.  So to

5    the extent the questioner can rephrase their question, if

6    necessary, then they will have notice of that objection,

7    and can rephrase the question if they do not intend to go

8    beyond the scope of the 30(b)(6) notice topics.

9            So I think it's more efficient to actually make

10   the objection right then and there, so they can modify

11   their questions as they think necessary to avoid that

12   objection.

13           THE COURT:  And indicated in Rule 30, when an

14   objection is made, the examination still proceeds, and

15   the testimony is taken subject to the objection.  The

16   exceptions to that rule under which -- pursuant to which

17   a witness could be directed not to answer, are so

18   limited, and here we're talking about a request for

19   privileged information, for example, or a question that

20   is so outrageous, if one of these witnesses was asked

21   when did you stop beating your spouse, I mean obviously

22   that's so beyond the pale, but if it's simply a quibble

23   about whether or not an inquiry is beyond the scope, then

24   the appropriate procedure is to note the objection,

25   preserve it, and move on with the witness providing a

35

Proceedings

1   response.

2           And I believe that with that guidance from the

3   Court, I would assume that that issue about the 30(b)(6)

4   protocols has been resolved.  I do think that not

5   requiring the respondent to even note an objection at the

6   time of the testimony, is as the respondent noted, more

7   likely to result in further litigation down the road.  So

8   if there is an objection to a line of inquiry being

9   beyond the scope of the notice, the respondent -- counsel

10  for the respondent should note that objection on the

11  record.  The testimony should be provided, and there

12  could subsequently be a motion to strike, but I presume,

13  and insist that petitioners will proceed in good faith,

14  and certainly will stay within the confines of the

15  30(b)(6) notice.

16          MS. GINSBERG:  Yes, your Honor.  This is Betsy

17  Ginsberg again.

18          And we certainly have no problem with the

19  respondent making contemporaneous objections, and as long

20  as they are willing not to instruct the witness on

21  anything other than privilege or outrageous questions,

22  that's fine.  I didn't get that from what Mr. Cho said

23  but certainly your Honor has made that clear.

24          THE COURT:  But that is not a license for

25  petitioners to stray beyond the limits of the 30(b)(6)

Proceedings

36

1   notice.

2          MS. GINSBERG:  No, your Honor.  We have no

3   intention of doing that.  We just want to make sure that

4   things go smoothly on Monday.

5          THE COURT:  And with that guidance from the

6   Court, does that resolve the parties' dispute regarding

7   the 30(b)(6) deposition protocol?

8          MS. ROSENFELD:  It does, your Honor.  I do want

9   to -- and I apologize for this, but just go back to our

10  conversation about Dr. Venters because I may have missed

11  something, and I just want to make sure I understand the

12  respondent has a deadline for informing us, whether they

13  are planning to request a written report or a deposition

14  because we need to inform Dr. Venters as soon as possible

15  to get that.

16         THE COURT:  Let me ask Mr. Cho, I appreciate

17  that you want to talk with the rest of the team, can you

18  let petitioners know by Monday morning?

19         MR. CHO:  I think Ms. Rosenfeld had said Monday

20  or Tuesday was fine.  I think Tuesday would be safer

21  because we're in depositions all day Monday, 30(b)(6)

22  depositions, so I may not have an opportunity to have a

23  chance to communicate with my team, and the BOP.  So at

24  least perhaps till Tuesday.

25         THE COURT:  Tuesday morning.

37

Proceedings

1          MR. CHO:  Thank you, your Honor.

2          MS. ROSENFELD:  Thank you, your Honor.

3          THE COURT:  All right.

4          MR. CHO:  And one clarification, on the

5    30(b)(6) depositions, so it is limited to five hours for

6    Vasquez, and two hours for King?  I think that's what the

7    Court's ruling is.

8          THE COURT:  I think the parties had agreed on

9    that, provided that there weren't going to be -- from

10   petitioners point of view, that there weren't going to be

11   a lot of interruptions, and I believe that by addressing

12   the 30(b)(6) deposition protocol, that the issue of

13   having constant calls to the Court has now been

14   eliminated, and petitioners have now accepted the five-

15   hour time limit on Ms. Vasquez's deposition, and the two

16   hour time limit for Ms. King's deposition.

17         MR. CHO:  All right.  Thank you, your Honor.

18         THE COURT:  And those both are going to be

19   going forward on Monday?

20         MR. CHO:  Yes.

21         MS. ROSENFELD:  Yes, your Honor.

22         THE COURT:  All right.  And the remaining issue

23   that was raised in letter filed by petitioners' last

24   night, and in the response of respondent from this

25   morning, concerns the production of paper sick call

38

Proceedings

1    request.  Respondent, among other, objects to that, notes

2    that that was not part of Judge Kovner's ruling, which is

3    true, but also notes that BOP does not have documents

4    responsive to this request going back to March 13th,

5    2020.

6           And given the fact that this just came up in a

7    motion late last night, I don't know whether respondent's

8    counsel has answers to questions that I have, but to the

9    extent how far back do responsive documents go?

10          MR. CHO:  So this is James for the government.

11          These are living documents.  So an inmate may

12   submit a sick call request, and a health services

13   provider may go and pick up the request.  They will then

14   triage the request, and decide this is urgent, and the

15   inmates complaints are acute, and may go see the inmate

16   immediately, or if it is not an acute situation, may

17   input the request into the scheduling system.

18          I heard beeping, I just want to make sure Judge

19   Mann, are you still there?

20          THE COURT:  Yes, I'm still here.  I don't know

21   who is lost.  Maybe my law clerk can tell as the host.

22          THE CLERK:  I'm sorry, Judge, I don't know who

23   the specific person who left was.

24          MR. CHO:  Okay.

25          THE COURT:  Judge Kovner, are you still there?

39

                    Proceedings

1              JUDGE KOVNER:  I am still here.

2              THE COURT:  And are Ms. Rosenfeld and Ms.

3    Ginsberg still there?

4              MS. ROSENFELD:  I'm here, your Honor.

5              MS. GINSBERG:  We are, your Honor.

6              MR. CHO:  All right.  So then I guess I can

7    continue.

8              THE COURT:  Mr. Eichenholtz, are you there?

9              MR. EICHENHOLTZ:  I am --

10             THE COURT:  Mr. Eichenholtz?

11             MR. EICHENHOLTZ:  I am -- yes, I am here, your

12   Honor.  I'm here.

13             THE COURT:  I think we have a quorum.

14             MR. CHO:  I think we do, your Honor.

15             THE COURT:  So why don't we proceed.

16             MR. CHO:  All right.  Sure.  I will continue

17   then.

18             THE COURT:  Maybe we were boring the reporter.

19             MR. CHO:  I think that's probably the case,

20   yes.

21             So because these are living documents, it's

22   hard to ascertain exactly how long they are retained, but

23   they are acted upon when they're received.  So if they

24   don't retain them because once they either see the

25   inmate, or input the inmate's name into the scheduling

40

Proceedings

1  system, they are then discarded as is their normal

2  protocol because they've either -- they've acted on it in

3  some way.

4          So that's why there are no documents available

5  because they don't go back in time.  There's no filing

6  system to retain these hard copy documents.

7          So I can't say for sure how far back they go.

8  For example, if they schedule someone today, they may

9  discard the request today, but if it took them a day or

10 two to put them in the schedule, or to see the inmate, it

11 may still be lingering for a day or two, but I can't say

12 for sure how far back they go.

13         THE COURT:  When you say that they were put

14 into the scheduling system, is that electronic?

15         MR. CHO:  So the way it works is if the

16 inmate's condition is not acute, and doesn't require

17 immediate attention, there's a queue and that queue is

18 electronic, yes, but what they put in there is

19 essentially the inmate's name, so they know if someone

20 needs to go see the inmate, and that's how they -- it's

21 basically first in, first out.  So that's how they know

22 who to go see first based on who is in the schedule, but

23 yes, that schedule --

24         THE COURT:  And --

25         MR. CHO:  But that schedule changes, for

41

Proceedings

1   example, if they're seeing on that list today, once they

2   see the inmate, they take them off the list because

3   they've been seen.  So it changes constantly.  It's not a

4   static document.

5          THE COURT:  And the electronic queue, all it

6   indicates is the inmate's name, and not the complaint of

7   the inmate?

8          MR. CHO:  I have to confirm that.  It may have

9   a note, but it may not be extremely detailed, but I can't

10  say for sure how much information is contained in that

11  schedule.

12         THE COURT:  And you say that the queue is

13  changing constantly, but is there a database that would

14  show the queue for the last month, for example, or at

15  least in the near past with the -- possibly with the

16  complaint.

17         MR. CHO:  That's an IT question, dealing with

18  ESI.  I have to dig deeper into that.  I don't know the

19  answer to that.  The sting though is again, it's not --

20  it deals with inmates that may not have acute conditions,

21  right?  If an inmate needs immediate attention, they will

22  go see the inmate immediately without even putting that

23  person on the queue.  Again, these providers are triaging

24  these sick call requests, and deciding, okay, this inmate

25  can wait a day or two to be seen by a provider, or I need

42

Proceedings

1   to go see the inmate right now, and they won't even put

2   that inmate in a schedule.  They will act on that sick

3   call immediately.

4           THE COURT:  I will hear from petitioners'

5   counsel.

6           MS. ROSENFELD:  So I think that there's no

7   dispute that we had originally asked for all the sick

8   call requests, and then the government indicated that

9   they had a lot of objections to that, and we agreed to

10  accept only the electronic ones.

11          You know, as Ms. Ginsberg said at that

12  conference, I looked at the transcript, it was our

13  understanding at that time that they were all put in

14  electronically, so we thought we would get the entire

15  universe that way, and we didn't want to create

16  duplicative, you know, work.

17          It's now become very clear that everybody is --

18  that a number of people are putting in sick call

19  requests, just on paper.  So we spoke to one person on

20  Thursday, who had been making sick call requests, and

21  putting them in the box on the unit, and never -- and not

22  by email, or in addition to email.

23          So it does seem that there is a universe of

24  documents that show the sick call requests that have been

25  made, that are relevant to our case, especially after

43

Proceedings

1  March 27th, that should have been preserved after we

2  filed this lawsuit about the adequacy of medical care.

3          So we do want the paper sick call requests.

4  I'm not completely clear from what Mr. Cho said, where

5  those documents are, to be honest, your Honor.  It sounds

6  like in some cases they're saying that they throw them

7  out, and in some cases, they say that -- I think what he

8  is saying is that they are not kept in a hard copy form.

9  That would be very surprising, your Honor, and I did have

10  a chance to speak to Dr. Venters this morning.  He says

11  that the sick call requests are considered part of the

12  medical record, and should be maintained.  They could be

13  scanned, and then discarded, but they can't simply note

14  that a request was made without the original request

15  being visible and available, and that's consistent with

16  what I've seen in other medical records where the

17  original sick call request which as your Honor notes,

18  would explain what the complaint is, and why the person

19  wants sick call, is preserved, so that the -- you know,

20  it's part of the medical record, that information, and

21  also to make sure that the person was seen.

22          You know, if they haven't maintained those

23  documents, I guess that's one thing, and there's nothing

24  we could do about it.  Up until today, we would ask that

25  they be preserved going forward.  If there is an

44

Proceedings

1    electronic log of the paper requests, as your Honor was

2    inquiring about, and Mr. Cho said that he would ask for,

3    we certainly would ask that that be produced, and again,

4    that doesn't seem burdensome, if it's an electronic

5    document, but I guess I am just still stuck on the fact

6    that the paper sick call request, and correctional health

7    according to our expert, are part of the medical record,

8    and should never be discarded without being scanned or

9    maintained, and I am not completely clear if that is

10   what's going on at MDC.

11          THE COURT:  Well, the Court is not clear

12   either, and I gather that Mr. Cho has not had a

13   sufficient opportunity to consult with his client about

14   the underlying facts.  So at least this magistrate judge

15   is not prepared to rule on this issue.  The parties need

16   to meet and confer further.

17          To the extent that these paper sick call

18   requests are in fact incorporated into inmate's files,

19   petitioners should understand that the Court would not be

20   inclined to require the MDC to go through 1,700 files to

21   try and locate these hard copy sick call requests.

22          Now I appreciate that the petitioners are

23   claiming that the paper requests -- that the electronic

24   sick call requests that they've gotten may not reflect

25   the same concerns as the hard copy sick call request

Transcriptions Plus II, Inc.

45

Proceedings

1  because the sicker the inmate is, the less likely the

2  inmate is to leave his or her cell to be able to access

3  the electronic device in order to put in an electronic

4  request.

5        So the Court is not saying that these are

6  duplicative, and you're not entitled to -- this is

7  information that you're not entitled to.  The question is

8  how burdensome is it.  Is the documentation preserved?

9  How burdensome would it be no only to locate it but then

10  to have to redact hard copy sick call requests.

11        I think the parties need to confer further.  To

12  the extent that the paper sick call request, or at least

13  some of them are preserved, there may be a way of getting

14  a sampling but again, I'm not prepared to rule at this

15  time.  The issue is not properly teed up for the Court.

16        All right.  Is there anything further?

17        MR. MARUTOLLO:  Your Honor, this is Joseph

18  Marutollo from the government.  I just have one --

19        THE COURT:  Yes.

20        MR. MARUTOLLO:  -- clarifying question.  Just

21  going back, and apologies to go back to this, but with

22  respect to the proposal regarding any expert depositions,

23  and the expert report, just to clarify, so if the --

24  either party decides to forgo an expert report, that

25  party would then be expected to have the witness appear

46

Proceedings

1  for a deposition, and the witness would then have to

2  provide the summary of facts and opinions as detailed in

3  Rule 26(a)(2)(C), as well as the subject matter on which

4  the witness will testify.  Is that a fair summary, your

5  Honor?

6            THE COURT:  Counsel will provide what is

7  required under Rule 26 for witnesses who are not -- who

8  normally, it would apply only to witnesses that are not

9  specifically retained for litigation purposes, an in-

10 house expert, or a treating physician, for example, and

11 those would be provided on the governing deadline.

12 Again, I'm a little uncertain as to whether or not those

13 deadlines have been pushed back for two days.

14 (Indiscernible) think the deadlines have, and Judge

15 Kovner can agree or disagree, but whatever the operative

16 date is --

17            JUDGE KOVNER:  Sorry, I don't know if I should

18 jump --

19            THE COURT:  Sure.

20            JUDGE KOVNER:  Could I address that?  I mean, I

21 took the parties' submissions to be -- that they wanted

22 on consent to extend the deadlines for their briefs in

23 support of, or in opposition to a preliminary objection,

24 "including any supplemental expert report," was the way

25 it was framed in the initial scheduling order.  I took

47

Proceedings

1  the parties to be on consent, extending each of those

2  deadlines by two days.  So that's my understanding of

3  what they were seeking, and what I was agreeing to.

4        THE COURT:  Thank you. So we now have a

5  definitive ruling.  Those dates have been pushed back two

6  days.  But by the new deadline, the proponent of that

7  expert will have to provide the report that's required

8  under Rule 26 for experts who are not specially retained.

9        And later in the litigation, if those experts

10  would be trial witnesses, or would be producing

11  information in connection with summary judgment motions,

12  then there can be full discovery, and if need be,

13  although if there are already depositions of them, I

14  don't know if that's necessary, but that's an issue for

15  another day.  This is simply what is the examining party

16  entitled to in advance of the preliminary injunction

17  hearing.

18        MR. MARUTOLLO:  Thank you, your Honor.

19        MS. ROSENFELD:  Your Honor, I have one follow-

20  up question on the sick call request.  This is Katie

21  Rosenfeld.

22        We don't believe that the respondent should be

23  disregarding sick call requests that are being made in

24  the facility in the middle of this pandemic, and in the

25  middle of this litigation.  We think that those are

48

Proceedings

1    materials that should be preserved, and are relevant to

2    this case, if not as a matter of appropriate medical

3    record-keeping, and certainly as evidence in this case.

4           And so we would ask the Court to direct the

5    respondent not to discard or throw away the paper sick

6    call request going forward from today, if they have been

7    engaged in that practice.

8           THE COURT:  Petitioners have made that request.

9    It's an appropriate request.  I'm not going to opine now,

10   whether or not the failure to preserve previously, you

11   know, given the circumstances under which the Bureau of

12   Prisons is operating, I'm not saying that that's

13   spoliation of evidence but going forward, it certainly

14   would be a better practice for the Bureau of Prisons, the

15   MDC, to retain those written documents.

16          But what we're dealing with now is what

17   petitioners are entitled to receive in advance of the

18   preliminary injunction hearing, and again, there's

19   insufficient information to determine what exists, and

20   how burdensome it would be to produce those documents in

21   advance of the hearing.  So the parties should further

22   confer, and try to come to some agreement.

23          MS. ROSENFELD:  Thank you, your Honor.

24          MR. CHO:  Thank you, your Honor.

25          MS. ROSENFELD:  Your Honor, I'm sorry, one last

49

Proceedings

1  question.  Because of the time-frame that we've all been

2  discussing, we do want Dr. Venters to have the

3  opportunity, if there is going to be a production, to

4  review it because we think it would assist him in

5  evaluating what's going on in the facility, could the

6  provide a status update if there's one needed or resolve

7  it by a date certain such as Tuesday?

8            THE COURT:  Mr. Cho?

9            MR. CHO:  I will endeavor to do so, your Honor.

10  Again, we're in depositions all day Monday, so in between

11  break, I will endeavor to track down the information that

12  they are seeking.  So I will endeavor to get back to them

13  on Tuesday.

14            THE COURT:  Well, respondent did note in

15  response to one of petitioners' argument, that

16  petitioners have six attorneys working on the case, and I

17  believe that respondent has at least four, so if you're

18  going to be defending the depositions, then perhaps one

19  of your colleagues could be making the inquiry, and I'll

20  expect a status report by Tuesday.

21            MR. CHO:  Thank you, your Honor.

22            MS. ROSENFELD:  Thank you, your Honor.

23            THE COURT:  All right.  Anything else?

24            MS. ROSENFELD:  No, your Honor.  Thank you for

25  your time.

50

Proceedings

1          THE COURT:  All right.  Let me just ask Judge

2     Kovner if there's anything that she wants to add before

3     we conclude the proceeding?

4          JUDGE KOVNER:  Nope, I'm good.  Okay, thanks so

5     much.

6          THE COURT:  All right.  Thank you, all, and

7     everyone take care.  This proceeding is concluded.

8          MR. CHO:  Thank you, your Honor.

9          MS. ROSENFELD:  Thank you, your Honor.

10         THE COURT:  Goodbye.

11              (Matter Concluded)

12                  -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

51

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **27th** day of **April**, 2020.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.

# EXHIBIT 3

## Chunn

### Cho, James (USANYE) <James.Cho@usdoj.gov>
Tue 4/28/2020 3:56 PM

**To:** Katie Rosenfeld <Krosenfeld@ecbalaw.com>
**Cc:** Marutollo, Joseph (USANYE) <Joseph.Marutollo@usdoj.gov>; Eichenholtz, Seth (USANYE) <Seth.Eichenholtz@usdoj.gov>; Stamatelos, Pauline (USANYE) <Pauline.Stamatelos@usdoj.gov>; Betsy Ginsberg <betsy.ginsberg@yu.edu>; Alexander A Reinert <areinert@yu.edu>; Scout Katovich <SKatovich@ecbalaw.com>; Andrew Wilson <awilson@ecbalaw.com>; Sam Shapiro <sshapiro@ecbalaw.com>

Ms. Rosenfeld,

We want to get back to you regarding the questions raised at Saturday's Court conference before Judge Mann regarding petitioners' request for paper sick calls since March 13th.
As an addendum to our April 25 filed letter, it is not the practice for MDC to retain paper sick call requests as they are akin to appointment requests, not medical records, and for infection control purposes to the extent the documents may be contaminated.  In response to paper sick call requests, medical providers triage the requests and either see the inmate immediately if the symptoms are acute, or place the inmate in an online scheduling system to be seen at a later time.  No single health care provider adds an inmate's name to the schedule, and the paper sick call requests are not retained once inmate names are added to the scheduling system.  The schedule is not static and changes daily as inmates are examined by providers and their names are removed from the schedule; further new inmates are added to the schedule daily.  The schedule does not allow for the BOP to go back in time to determine who was on the schedule at some period time in the past given that the schedule changes daily.  In light of petitioners' request for paper sick call requests, the MDC is retaining those requests at this time.
Per the Court's Order, in a status letter, we can notify the Court of the information outlined above.  To the extent further discussion is warranted, we are happy to confer further, and can note the same in our letter.  Let us know if you have any further questions or would like to discuss further.

James R. Cho
Assistant U.S. Attorney
Chief, Bankruptcy Litigation
U.S. Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th floor
Brooklyn, New York 11201
718-254-6519 (direct)
718-254-7483 (fax)
james.cho@usdoj.gov

# EXHIBIT 4



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 24, 2020

**By E-mail**

Katherine Ruth Rosenfeld
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020

Re:     *Chunn, et al. v. Warden Derek Edge*,
Civil Action No. 20-cv-1590 (Kovner, J.) (Mann, M.J.)

Dear Ms. Rosenfeld:

We write to respond to your emails dated April 23 and 24, 2020, and pursuant to your request that we respond by today.

### I.     Hard-Copy Sick Call Requests

First, with respect to Petitioners' request for hard copy sick call requests, the parties have already addressed this issue with Court, and the Court has already denied Petitioners' request for hard copy sick call requests.  Petitioners previously represented to the Court that they "seek only sick-call requests logged *electronically*."  Dkt. No. 43 at 5 (emphasis added).  After hearing argument on this issue, the Court required Respondent to produce "all sick-call requests for medical care submitted *electronically* by persons incarcerated at the MDC from March 13, 2020 to April 13, 2020, in redacted form that omits names and DIN numbers."  Dkt. No. 43 at 5 (emphasis added).  The Court did not require production of hard copy sick call requests.  In response, Respondent fully complied with the Order and has already produced *888 pages* of sick call requests submitted electronically for the relevant time period.

Petitioners now contend, "We believe it's important for Dr. Venters to review the full universe of sick call requests, both electronic and paper, from March 13th to date."  Petitioners claim that some inmates submitted only hard copy sick call requests.  Petitioners were well aware at the time of the Court's discovery conference on April 13th -- at which time the parties addressed the production of sick call requests -- that inmates made sick call requests via hard copy or electronically or both.  Petitioners already agreed, and the Court already approved, production of the *electronic* sick call requests only -- not hard copy.

Petitioners have failed to explain why the universe of 888 pages of sick call requests already produced is in any way deficient and not representative of all the sick call requests made -- whether electronic, hard copy or otherwise.  Petitioners have not stated any reason for production of the hard copy sick call requests other than some unfounded belief that the hard copy request

would be "important."  Petitioners do not claim that the nature of the hard copy sick call requests would differ to any significant extent from those submitted electronically.  Petitioners do not contend that inmates would complain of some symptoms via hard copy sick call requests, but would not complain of those same symptoms in electronic sick call requests.  As such, production of hard copy sick call requests would largely be duplicative of sick call requests submitted electronically -- that have already been produced.

Notwithstanding the above objections to Petitioners' request, BOP does not have documents responsive to this request going back to March 13, 2020.  BOP does not retain hard copy sick call requests, unless, for clinical reasons, the sick call requests are made a part of the inmate's own medical file.  When the hard copy requests are submitted to any of the BOP health care providers, the provider -- at the provider's discretion -- may immediately see the inmate based on the nature of the complaint raised in the sick call request.  The provider, however, does not retain the hard copy sick call request after seeing the inmate.  Alternatively, if, after reviewing the hard copy sick call request, the provider determines based on his or her clinical judgment, that the inmate does not present with any acute medical condition that warrants immediate attention, the provider would add the inmate's name to a sick call queue or schedule to be seen at a later time by a medical provider.  Each provider at the MDC has access to the queue and there is no centralized repository of hard copy sick call requests.  The provider does not retain the hard copy sick call request once the inmate has been entered into the schedule for infection control reasons to the extent the document may be contaminated in any way.  Further, the schedule changes daily.  As inmates are seen by a medical professional, they are removed from the schedule; new inmates are also added after they submit their sick call request.

## II.    Confidentiality Issues

Second, Petitioners contend that the 888 sick call requests submitted by non-party inmates at the MDC should not be marked confidential.  The sick call requests are confidential records of inmates of non-parties to this action, and are entitled to protection from public disclosure.  Even though Petitioners' attorneys may not be able "personally identify" specific inmates from the records, does not mean that other inmates at the MDC or members of the public similarly are not able to identify the inmate based on the complaints raised in the sick call requests.  Nothing in the parties' agreed-upon protective order, So Ordered by the Court, precludes Petitioners from using the sick call requests in this litigation.  Further, the protective order already excludes "[s]tatistics, numerical summaries, compilations of data, and other summary data gathered from the Sick-Call Documents."

Petitioners have not articulated any reason why each specific inmate's sick call requests, that includes highly personal and confidential medical information, is of "public concern" or "import" and should be made public.  For example, if an inmate complains of an itch related to a sexually transmitted disease, Respondent fails to comprehend how making such a sick call request publicly available is of "public concern."  The privacy interests of the inmates who submitted sick call requests and are not parties to this litigation dictate that their records remain confidential, consistent with the Court's prior order.  Dkt. No. 43 at 4 ("Privacy interests can be further addressed through a protective order limiting any dissemination of the redacted sick-call requests.").

2

We are available, at your convenience, to meet and confer over any of these issues.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By: _____/s/_____
James R. Cho
Seth D. Eichenholtz
Joseph A. Marutollo
Paulina Stamatelos
Assistant U.S. Attorneys
(718) 254-6519/7036/6288/6198
james.cho@usdoj.gov
seth.eichenholtz@usdoj.gov
joseph.marutollo@usdoj.gov
pauline.stamatelos@usdoj.gov

cc:      All Counsel of Record (by email only)

3

# EXHIBIT 5







# EXHIBIT 6



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 29, 2020

**By E-mail**

Katherine Ruth Rosenfeld
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020

Re:    *Chunn et al. v. Warden Derek Edge,* Civil Action No. 20-cv-1590 (Kovner, J.)

Dear Ms. Rosenfeld:

In response to your April 28 email regarding sick-call requests, and without waiving any objections, please see below:

**Petitioners' Request No. 1:**  Can you please advise if Respondent will agree to produce copies of the paper sick call requests from April 24, 2020 (the date that we understand preservation began and shredding ceased) through May 8, 2020 and/or the date of the PI hearing[?]

**Respondent's Response:** Respondent will produce paper copies of the sick call requests, subject to the same redactions as the already-produced electronic sick call requests, for the two-week period from April 25, 2020 to May 9, 2020.

**Petitioners' Request No. 2:**  The Court inquired on Saturday regarding whether the MDC maintains or can produce an electronic log of who was seen in response to a sick-call request or any other summary document, if not the actual paper requests.  Is that available? Please confirm.

**Respondent's Response:** Exams by medical providers are maintained in each individual inmate's own medical records.  Those records may reflect whether the inmate was seen as a result of a sick call request, or otherwise, but, that would require a review of each individual inmate's medical records, which is burdensome and not proportionate to the needs of the case. To the extent that Respondent is able to identify an electronic log showing who was seen in response to a sick call request, Respondent will produce those logs, if any exist.

**Petitioners' Request No. 3:** Can you please advise regarding whether or when a litigation hold was communicated to the MDC regarding the sick-call requests?

     **Respondent's Response:** MDC has been advised to retain the sick-call requests.

**Petitioners' Request No. 4:** Can you please provide a blank copy of a sick call request so we can see what the document looks like?

     **Respondent's Response:** Attached is a blank sick call request Bates numbered BOP 237.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:         /s/
James R. Cho
Seth D. Eichenholtz
Joseph A. Marutollo
Paulina Stamatelos
Assistant U.S. Attorneys
(718) 254-6519/7036/6288/6198
james.cho@usdoj.gov
seth.eichenholtz@usdoj.gov
joseph.marutollo@usdoj.gov
pauline.stamatelos@usdoj.gov

Enclosure

cc:     All Counsel of Record (by email) (w/ enclosure)