UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI by his Next Friend Migdaliz
Quinones; and JUSTIN RODRIGUEZ by his Next
Friend Jacklyn Romanoff; ELODIA LOPEZ; and
JAMES HAIR, individually and on behalf of all
others similarly situated,

                                 Petitioners,

             -against-

WARDEN DEREK EDGE,

                      Respondent.

-----------------------------------------------------------x

Civil Action No.
20-CV-1590
(Kovner, J.)
(Mann, M.J.)

# MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTIONS *IN LIMINE*

RICHARD P. DONOGHUE
United States Attorney
*Counsel for Respondent*
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

May 10, 2020

James R. Cho
Seth D. Eichenholtz
Joseph A. Marutollo
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 2

    I.     Petitioners' Desperate Motion To Preclude Objective Evidence
          Through An Unfounded "Spoliation" Sanction Must Be Denied .......................... 2

          A.    Background Regarding Sick Call Requests ................................................ 2

          B.    Standard for a Motion for Spoliation Sanctions ........................................ 4

          C.    Petitioners Cannot Establish a Duty to Preserve Written Sick
               Call Reports When the Information is Preserved in the Medical
               Records System ........................................................................................ 4

          D.    Petitioners Cannot Establish That Any Failure to Preserve
               Records Was Done With a Culpable State of Mind .................................. 6

          E.    Petitioners Cannot Show Relevance or Prejudice ..................................... 8

          F.    Even if a Spoliation Sanction Were Warranted—and it is not—
               Petitioners are not Entitled to the Relief They Seek ................................ 10

    II.    Petitioners' Motion to Exclude Respondent's Epidemiology and
          Infection Preventionist Expert is Without Merit .................................................. 11

          A.    Federal Standards for the Admission of Expert Testimony ...................... 11

          B.    Ms. Tekbali is Qualified to Testify as an Expert Witness ....................... 12

          C.    Ms. Tekbali's Methodologies Are Reliable and Will Assist the
               Court in Reaching a Decision ................................................................... 17

          D.    Ms. Tekbali's Opinions are Relevant to the Case and Will
               Assist the Court in Reaching a Decision .................................................. 18

CONCLUSION ............................................................................................................... 19

## PRELIMINARY STATEMENT

Upon learning of the first COVID-19 cases in the United States in January 2020, the Federal Bureau of Prisons ("BOP") immediately took action to prevent the introduction and spread of COVID-19 in BOP institutions across the nation, including at the Metropolitan Detention Center-Brooklyn ("MDC"). From January 2020 through the present, the BOP has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization, the Centers for Disease Control and Prevention, the Office of Personnel Management, the Department of Justice, and the Office of the Vice President. As a result of BOP officials' round-the-clock efforts at MDC, COVID-19 has been effectively contained at the MDC. Indeed, largely as a result of these efforts, Petitioners cannot point to a single MDC inmate who has needed hospitalization in connection with the pandemic, or, for that matter, to a single inmate who suffered serious illness or even succumbed to COVID-19.

Despite BOP's extraordinary efforts in combatting COVID-19 at the MDC, Petitioners filed the instant action, baselessly charging that Respondent was deliberately indifferent to the safety of MDC's inmates. The petition was based on unfounded allegation, speculation, and hearsay. Likely knowing their petition was a factual and legal house of cards unlikely to withstand scrutiny, Petitioners sought to buttress their claims by hiring Dr. Homer Venters. After conducting a purported "inspection" of the MDC that predominantly involved speaking with a small group of inmates handpicked by Petitioners' counsel, Dr. Venters reflexively adopted the handpicked inmates' allegations without any scrutiny or examination of objective evidence. He then issued a declaration based on the unchallenged statements and unsurprisingly reached a conclusion mostly in accord with the petition.

Countering these allegations, Respondent submitted robust, factual evidence in the form of declarations from MDC staff, documents, and independent-minded experts who based their opinion on experience and medical guidance, which shows the true extent of MDC's strikingly successful efforts

to mitigate the risk of COVID-19 to inmates and staff alike.

Petitioners now find themselves on the eve of the first proceeding which will test the veracity of their arguments, faced with credible evidence that brings the allegation and speculation previously animating their claims to the point of collapse.  In a desperate, last-ditch attempt to prevent Respondent from introducing the evidence fatal to Petitioners' claims, Petitioners bring the instant motions *in limine* seeking, for various reasons, preclusion of the very evidence that will demonstrate the efforts MDC has undertaken.  First, Petitioners seek a sanction for supposed spoliation of evidence because MDC staff discarded written sick call requests after entering the information contained in these documents into the MDC's electronic medical records system.  The requested sanction, unsurprisingly, is to preclude the Respondent from submitting evidence as to the adequacy of his COVID-19 response, which could essentially allow Petitioners to prevail despite such compelling evidence.  As discussed in more detail below, there was no spoliation of evidence, there is no basis for a sanction here, and even if there were, such a disproportionate proposed sanction is not appropriate or proportional.

Additionally, as set forth below, Petitioners' motion *in limine* seeking to preclude the expert testimony of Ms. Asma Tekbali, M.P.H—an epidemiologist and infection preventionist currently working on the frontlines of combatting the COVID-19 pandemic in one of the nation's leading hospitals—should be swiftly rejected by the Court.

## ARGUMENT

I.    **Petitioners' Desperate Motion To Preclude Objective Evidence Through An Unfounded "Spoliation" Sanction Must Be Denied**

A.    **Background Regarding Sick Call Requests**

MDC has a system in place whereby there exist several avenues through which an inmate can request an appointment with a medical provider, known as a "sick call."  *See* Excerpt of Deposition of BOP Health Services Administrator Stacey Vasquez ("Vasquez Dep."), annexed to the Declaration of

Petitioners' counsel, Dkt. No. 72 ("Vasquez Dep.") 186-87. The preferred method for these requests is

to file an electronic request through the inmate e-mail system using TRULINCS.  *See* Excerpted Section

of Inmate Handbook, annexed to the Declaration of Seth Eichenholtz, as Exhibit A at 23-24 (discussing

episodic care and emergency medical treatment); *see* Vasquez Dep. 188.  However, an inmate can make

an oral request for sick call to any staff member (who make rounds every 30 minutes in all the units

during this pandemic), or health care provider (who are currently making rounds twice daily in the

quarantine and isolation units and at least once daily in the other units), or submit a written request on

a sick call form.  *See* Vasquez Dep. 48-49, 75, 187; *see also* Vasquez Declaration, Dkt. No. 80

("Vasquez Decl.") 4-5. When health care providers make rounds, they also carry with them paper sick

call requests to give to inmates if requested, and they collect sick call requests.  *See* Vasquez Dep. 186-

88.  Once the health care provider receives the sick call request, the provider triages the sick call request

and may examine an inmate immediately, if necessary.  *See* Vasquez Dep. 186-90, 54.  Otherwise, the

health care provider enters the information contained in those forms into the BOP's medical records

database in order to schedule the inmate for sick call.  *See* Vasquez Dep. 187-90. The sick call schedule

contains the inmate name and register number, and may include a brief synopsis about the inmate's

complaint – in substance the information contained on the form.  *See* Vasquez Dep. 188.  The form is

then discarded as the information lives in the medical records system.[1] *See* Vasquez Dep. 188-94.  After

the inmate is seen by medical staff, the information about the nature of the inmate's medical complaints

is contained in an "encounter note" in the inmate's medical records moving forward.  *See* Vasquez Dep.

---

[1] Health Services Administrator Vasquez noted that it is "not a good infectious disease practice" to prolong
the retention of these paper documents, particularly to the extent the inmate writing the document claims to be infected
with COVID-19.  Vasquez. Tr. 196.  Petitioners attempt to cast nefarious motives behind this common sense concern
by calling it a "shifting" explanation of why records are not preserved.  *See* Pet. Mot. at 9-11. Far from shifting, it is
just *another* reason that MDC chooses not to keep the paper documents when the substance of the request is already
preserved in its medical records system.  Petitioners' hyperbolic characterization to the contrary rests on the unfounded
assumption that there can be but one reason that these records are not maintained once the information is entered into
the medical records system.

190-91.

### B.      Standard for a Motion for Spoliation Sanctions

Spoliation is commonly defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably forseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *see also Saul v. Tivoli Systems, Inc.,* 2001 U.S. Dist. LEXIS 9873 (S.D.N.Y. 2001).   When a party requests an adverse inference charge based upon the spoliation of evidence, courts engage in a three-step process to analyze the legitimacy of the claim.  *See, e.g., Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).   Specifically, the party must establish the following: "(1) the party *having control over the evidence* had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed 'with a culpable state of mind'; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Id.* at 107 (emphasis added) (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001)).   The burden of establishing these elements falls upon the party seeking the adverse inference charge.   The party requesting sanctions has the burden of establishing the elements of spoliation by a preponderance of the evidence.  *See, e.g., Distefano v. Law Offices of Barabra H. Kastos, PC*, No. 11-CV-2893 (PKC)(AKT), 2017 WL 1968278, at *17 (E.D.N.Y. May 10, 2017).   Here, Petitioners have the burden of establishing each of the three elements required for a sanction.   They can establish none.

### C.  Petitioners Cannot Establish a Duty to Preserve Written Sick Call Reports When the Information is Preserved in the Medical Records System

At the outset, courts must first determine whether the party against whom the adverse inference charge is sought was under an affirmative duty to preserve the evidence in question.  *See Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19, 24 (E.D.N.Y. 1996) (quotations omitted); *Barsoum v. NYC Housing Authority*, 2001 U.S. Dist. LEXIS 3814, at *6 (S.D.N.Y. 2001); *Henkel Corp. v. Polyglass USA, Inc.*,

194 F.R.D. 454, 2000 U.S. Dist. LEXIS 9423 (E.D.N.Y. 2000). The duty to preserve such evidence begins when litigation is "pending or reasonably foreseeable." *Micron Technology, Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1321 (Fed. Cir. 2011) (citing *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) and *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). This is a flexible fact-specific standard that allows the court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry. *Id.* A duty to preserve documents is not triggered from the mere existence of a potential claim. *Id.* (citing *Trask–Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681–82 (7th Cir. 2008)).

As part of this inquiry as to whether a duty exists, the Court must determine the relevant scope of the party's obligation to preserve evidence. *Zubulake v. USB Warburg, LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). As the Court noted in *Zubulake*, "[m]ust [an entity,] upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, 'no.'" *Id.* at 271. Also, courts have held that spoliation sanctions are not warranted where, as here, the information is stored in other places. *Raymond v. City of New York*, 15 Civ. 6885 (LTS)(SLC), 2020 WL 1067482, at *10 (S.D.N.Y. Mar. 5, 2020) (citing *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 359 (S.D.N.Y. 2012); *Paluch v. Dawson*, No. 06 Civ. 01751, 2009 WL 3287395, at *3 (E.D. Pa. Oct. 13, 2019)).

In their motion, Petitioners focus only on the date any obligation to preserve documents is triggered, and wholly fail to grapple with the issue of whether the paper sick call requests at issue are part of a reasonable scope of the duty to preserve when the substantive information contained in those forms is entered into the medical records system. *See* Pl. Mot. at 12-13. As discussed earlier, the underlying written requests are disposed of because they are duplicative, unnecessary to maintain, and as part of infection control methods. Under these circumstances, Petitioners cannot establish that

Respondent had a duty to preserve the written records because the substance of the information contained in these documents is stored in the medical records system.

### D.  Petitioners Cannot Establish That Any Failure to Preserve Records Was Done With a Culpable State of Mind

And even assuming Respondent was under an obligation to preserve these written requests (which he was not, as evident by Respondent's full compliance with Court orders in this matter), Petitioners cannot show that Respondent acted with a "sufficiently culpable state of mind" when MDC personnel continued to engage in the established routine of preserving written sick call information by entering the information from the form into the medical records system, not by preserving the requests in document form.  Showing such a state of mind is an essential element of a motion for sanctions. *Caltenco v. GH Food Inc.*, 2018 WL 1788147, at *5 (citing *Estate of Jackson v. Cty. of Suffolk*, 12 Civ. 1455 (JFB) (AKT), 2014 WL 1342957, at *11 (Mar. 31, 2014), *R&R adopted*, 12 Civ. 1455 (JFB) (AKT), 2014 WL 3513403 (E.D.N.Y. July 15, 2014)). While negligence can suffice to meet such a standard, the finding of such culpability is extremely fact specific because "failures to produce or preserve can occur 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'"  *Id.* (quoting *Wandering Dago Inc. v. New York State Office of Gen. Servs.*, No. 13 Civ. 1053 (MAD), 2015 WL 3453321, at *11 (N.D.N.Y. May 29, 2015)).

Here, Respondent has fully complied with the Court order regarding production of sick call requests, and voluntarily expanded that production since. In accordance with the Court's order, Respondent disclosed 888 electronic sick call documents to the Petitioners.  Further, once Petitioners raised—for the first time—the specific concern about preservation of the paper sick call requests *in addition to* the data already in the inmate's medical records during an April 25 conference before Judge

Mann,[2] MDC has preserved each and every properly submitted written sick call request.[3]  Finally, MDC *voluntarily* agreed, at Petitioners' request, to produce paper sick call records, which included all written requests from April 25 through May 9.[4]  In fully responding to the Court's discovery order and expanding the production after the order, Respondent showed diligence, not negligence.

Further, Petitioners argue Respondent has a culpable state of mind because MDC did not change their practice of disposing of written sick call documents after entering the substance of the information into the medical record system when they knew inmates might have less ability to file sick call requests electronically.[5]  This limitation, they posit, should have resulted in MDC automatically changing its sick call processing to preserve the documents associated with written requests.  However, it is completely understandable that against the backdrop of producing all electronic sick call reports in compliance with the Court's order, and managing to do so while also addressing the urgent matters that arise at MDC during a global health emergency, MDC did not consider changing its written sick call

---

[2] During that conference, Judge Mann stated:  "I'm not going to opine now, whether or not the failure to preserve previously, you know, given the circumstances under which the Bureau of Prisons is operating, I'm not saying that that's spoliation of evidence but going forward, it certainly would be a better practice for the Bureau of Prisons, the MDC, to retain those written documents." Tr. Apr. 25, 2020 Hearing at 48:12-15.

[3] Petitioners argue that they failed to more aggressively pursue production of these written forms during an earlier conference on April 13 because they assumed that inmates could only request sick call through an electronic system (Pt. Motion, p. 7), but that argument is undermined by the transcript of the April 13 proceedings before the Court upon which they rely in their motion.  During that conference, counsel for the Respondent made clear that there are occasionally written sick call requests, and those requests may not be preserved after entered into the medical records system.  Counsel explained that inmates who wanted to request sick call "can make an oral request to a BOP staff member, they can get a staff member **a hard copy piece of paper requesting sick call** or they can also submit a request electronically using the Trulincs system."  Transcript of the April 13, 2020 Conference, p. 23 (emphasis added).  Counsel later expanded on the retention of written requests, stating that "those requests are then sent to the medical unit to schedule but what happens beyond that it **may be maintained or it may not be maintained**. The important thing is that the inmate gets seen by a medical professional. I think that's what the BOP's primary concern is." *Id.* at p. 25 (emphasis added).  Petitioners did not during that conference demand that MDC start to maintain the documents and the Court only ordered the production of electronic requests because it was assumed that those requests would be simplest to obtain from a centralized system.  *Id.* at 25.

[4] Notwithstanding the above, Respondent will endeavor to search for, and produce, any supplemental paper sick call requests between April 1 and April 24 prior to the May 12 hearing.

[5] It is important to note that this phase of the response started on April 1, *after* the start of this litigation.  April 1 Declaration of Associate Warden Melinda King, ECF Docket No. 21.

processing practice solely for litigation purposes and where it knew the information is already preserved in its medical records system.

Under these circumstances, where there is absolutely no evidence of negligence, bad faith, or gross negligence, Petitioners cannot establish a "culpable state of mind." *Singh v. Penske Truck Leasing Co., L.P.*, No. 13 Civ. 1860 (VSB)(GWG), 2015 WL 802994, at *5 (S.D.N.Y Feb. 26, 2015).

### E.  Petitioners Cannot Show Relevance or Prejudice

Petitioners also cannot show that these sick call requests are relevant and that the documents' loss is prejudicial to their claims.  Where the moving party acted only negligently, relevance is established when a party "sets forth with any degree of specificity, the materials which would have been helpful in prosecuting [their] claims. Relevance cannot be established solely on the basis of conjecture. Nor can a finding of relevance be grounded solely on the basis that some evidence in the custody of key witnesses no longer exists." *Alter v. Rocky Point School Dist.*, No. 13-CV-1100 (JS)(AKT), 2014 WL 4966119, at *11-12 (E.D.N.Y. Sept. 30, 2014).  Prejudice is established where spoliation *substantially* denies a party the ability to support or defend their claim. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 479 (S.D.N.Y. 2010).

Here, the proffered reason behind Petitioners' need for sick call records is to ascertain the kinds of medical complaints that inmates had and whether those complaints evidenced Petitioners' allegations that COVID-19 was a greater issue at MDC than shown in the number of inmates who actually tested positive for the disease.  Respondent's robust production in response to this order already provides Petitioners a sense of the kind and number of complaints that were made to MDC compared to the numbers of inmates tested.  Under these circumstances where Petitioners can rely on the existing production to obtain the information needed, spoliation sanctions are not permitted.  *See Raymond*, 2020 WL 1067482, at *10; *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1327 (S.D. Fl. 2010) (denying motion for sanctions because "the allegedly spoliated evidence is not

crucial to the plaintiff's claims because the plaintiff would still be able to prove its case through additional already obtained evidence.")

When determining whether Petitioners are prejudiced by a failure to retain the fraction of requests that were in written form but ultimately entered into the MDC medical records system, it must be emphasized that MDC produced 888 electronic sick call requests for the period of March 13-April 13, 2020, a period of approximately 5 weeks – or approximately 178 electronic requests per week.  By comparison, for the week of April 24 through May 1, there were only 36 written sick call requests, and this during a time where Petitioners allege that there is an increase in use of written sick call requests. This strongly suggests that written sick call requests comprised only a small fraction of inmate sick call requests for MDC, even after the April 1 implementation of Phase V of the COVID-19 response. Further, Petitioners offer no basis to believe that the information originally contained in the sick call reports is not preserved in the MDC's medical records system.  Under these facts, Petitioners cannot possibly show prejudice and relevance in any missing written sick call reports

Petitioners claim they are prejudiced because they are "no longer able to establish with accuracy how many people reported symptoms of COVID-19 and requested medical care for those symptoms during the time period at issue" (Pt. Mot., p. 17), but indeed that was never possible to begin with given privacy issues and time constraints – inmates can use various methods to request care, including verbal requests to staff, which may be reflected only in their individual medical records.[6]  The Court, however, recognized that it is unrealistic to expect MDC to search for and preserve every sick call request in every

---

[6] Notably, sick call requests are of limited value to this end in that they do not indicate MDC medical staff's response to the request, the results of an objective medical exam that gives greater insight into the inmate's actual medical condition, nor the individual's ultimate diagnosis.  The full details of both the inmate medical complaint and the staff's response is contained in the inmate medical records for each encounter with MDC medical staff.  To the extent that limited information is important, it remains preserved, along with the information contained in inmates' medical records.

form when it ordered the disclosure of only the electronic sick call records.  April 14, 2020 Order, ECF

Docket No. 43, pp. 3-4.

Given the disclosure of all relevant electronic records (which were quite voluminous), and the

additional, good faith productions made since, Petitioners cannot show prejudice and relevance merely

because they will not be able to consider prior to the preliminary injunction hearing some of the sick

call requests made by some inmates in written form.

### F.  Even if a Spoliation Sanction Were Warranted—and it is not—Petitioners are not Entitled to the Relief They Seek

Petitioners seek a sanction wholly disproportional to the consequence of the allegedly spoliated

evidence.  Despite the voluminous information about sick call requests already available to Petitioners,

they argue that Respondent must be precluded from offering *any* evidence to counter their baseless

allegation that MDC does not have an adequate sick call response system.  Pt. Mot., pp. 23-24. Such a

drastic sanction is akin to precluding Respondent from presenting any substantive defense on the issue

of providing medical care to inmates, and would unjustly prejudice Respondent.  *See Schmid v.*

*Milwaukee Elec. Tool Corp*., 13 F.3d 76, 79 (3d Cir. 1994) (holding that the court should impose "the

least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered

by the victim").  Dispositive sanctions require a showing of "'willfulness, bad faith, or fault on the part

of the sanctioned party.'" *Dahoda v. John Deere Co*., 216 F. App'x 124, 125, 2007 WL 491846, at *1

(2d Cir. 2007) (quoting *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999)).

Petitioners have not made such a showing here and are not entitled to any sanction, let alone one that

would serve to preclude Respondent from presenting his case at the May 12 hearing.

II.     **Petitioners' Motion to Exclude Respondent's Epidemiology and Infection Preventionist Expert is Without Merit**

   A.     **Federal Standards for the Admission of Expert Testimony**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, a court must first determine "whether the expert is qualified to testify." *Zaremba v. General Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004).  The Second Circuit "has interpreted this qualification liberally." *Thomas v. YRC Inc.*, No. 16 Civ. 6105, 2018 WL 919998, at *6 (S.D.N.Y. Feb. 14, 2018) (citing cases); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*, 769 F. Supp. 2d 269, 283 (S.D.N.Y. 2011) ("An expert should not be required to satisfy an overly narrow test of his own qualifications.").

Once the qualification threshold is met, the judge's task is to "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  Specifically, in determining admissibility under *Daubert*, judges are charged with a gate-keeping function pursuant to Rule 702 whereby they must determine (1) whether the theory or methodology underlying the testimony is reliable and (2) whether the expert's theory or methodology is relevant in that it "fits" the facts of the case.  *See Daubert*, 509 U.S. at 590-91.  The judge's "gate keeping" obligation applies not only to "scientific" testimony but to "technical" and "other specialized" knowledge as well.  *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999).

"A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  *Schoolcraft v. City of New York*, No. 10 Civ. 6005, 2015 WL 6444620, at *1 (S.D.N.Y. Oct. 23, 2015) (quoting Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702).  As the *Daubert* court explained, "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  509 U.S. at 596 n. 10. "Doubts about the usefulness of an expert's testimony should be resolved in favor of admissibility." *Marmol v. Biro Mfg. Co.*, No. 93-CV-2659, 1997 WL 88854, at *4 (E.D.N.Y. Feb. 24, 1997) (Johnson, J.) (citations omitted).

### B.    Ms. Tekbali is Qualified to Testify as an Expert Witness

Contrary to Petitioners' flippant description of Ms. Tekbali (Pl. Mot. 1, 20), Ms. Tekbali has a deep background in epidemiology and infection prevention.  *See Curriculum Vitae* of Asma Tekbali, bearing Bates No. 113 annexed to the Declaration of Seth Eichenholtz, as Exhibit B ("Tekbali 113"). The court considers the "totality of a witness's background when evaluating the witness's qualifications to testify as an expert." *Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007). After obtaining a Bachelor of Science degree in Biology, English, and Chemistry from Texas Woman's University, Ms. Tekbali obtained a Certificate in Epidemiology and Population Health from the Mailman School of Public Health at Columbia University, and a Masters in Public Health focusing on Global Health and Bioethics from New York University.  *See* Tekbali 113.  Ms. Tekbali has also completed a Post-Baccalaureate Research Training Program at the Human Genome Sequencing Center at Baylor College of Medicine.  *Id.*

Ms. Tekbali, moreover, has had significant practical experience as an epidemiologist and infection preventionist, including on the frontlines of the current COVID-19 pandemic.

An infection preventionist is considered to be a hospital epidemiologist.  *See* Declaration of Asma Tekbali, annexed hereto, ¶ 4. Epidemiologists focus primarily on the patterns and statistics of diseases, how infections can be spread, and investigating outbreaks. Tekbali Decl. ¶ 3. Infection preventionists do all of the above in a hospital setting to improve the quality of patient care and maintain the safety of hospital staff.  *Id.* ¶4.   There is a deeper clinical aspect for infection preventionists; they are the authority for physicians and nurses when it comes to isolating patients or performing tests. Tekbali Decl. *Id.* It is not uncommon for infection preventionists to be involved in clinical care and to engage directly with patients. *Id.* Furthermore, infection preventionists are heavily involved in nearly every aspect of hospital safety, including food preparation and linen services.  *Id.*

Ms. Tekbali currently works at Lenox Hill Hospital/Northwell Health as an epidemiologist focused on infection prevention.  *See* Tekbali 113.  Ms. Tekbali's previous work experiences include working as a laboratory test developer at a prominent clinical diagnostic laboratory in New York, as a diagnostic laboratory scientist at a genetic testing laboratory, and as a lead microbiologist for a county government.  *See id.*

Prior to the COVID-19 pandemic reaching New York City, Ms. Tekbali was involved in Lenox Hill Hospital's emergency management plan in anticipation of the pandemic.  Tekbali Decl. ¶ 5.   To date, Ms. Tekbali's Northwell Health employer is believed to have treated the most COVID-19 patients in the world. *Id.*  Ms. Tekbali has been on the frontlines of COVID-19 at the very epicenter of the pandemic, and has the current and relevant experience when it comes to the prevention of COVID-19. Tekbali Decl. *Id.*  ¶ 6.  She has consulted on many patient cases related to homeless shelters, group homes, and nursing homes.  *Id.* ¶ 9.

Ms. Tekbali and her colleagues in the epidemiology department make the final determination on all infection control matters within the hospital. *Id.*  ¶ 7.  Physicians are required to speak with Ms.

13

Tekbali for guidance on patient isolation, testing, and safe discharge. *Id.* Along with her colleagues, Ms. Tekbali's decision holds authority over the physician's decision. *Id.* ¶ 7.

Additionally, as an infection preventionist, the scope of Ms. Tekbali's work goes beyond statistical analysis of the hospital's infections. *Id.* ¶ 10. Ms. Tekbali is closely involved in the clinical management of a patient, and often has the opportunity to speak directly to patients alongside their providers. *Id.* Medical providers often call Ms. Tekbali directly to consult on a testing decision based on a patient's symptom presentation. *Id.* ¶ 11. For example, Ms. Tekbali advises a physician on whether symptoms are consistent with tuberculosis. *Id.* Furthermore, if patients show symptoms consistent with an infectious disease that their provider has not noticed, Ms. Tekbali looks through their medical records and provides a recommendation on isolation and what tests to order. *Id.* A patient may need guidance on isolation practices, mask usage, or have questions about laboratory testing; these patients frequently request to speak directly with Ms. Tekbali. *Id.* ¶ 10. Ms. Tekbali also consults with and advises a diverse group of departments at the hospital, including food services, linen services, sanitation, and engineering on infection control matters. *Id.* ¶ 8.

Further, Northwell has published more research on COVID-19 than any institution in the world. *Id.* ¶ 12. Indeed, Ms. Tekbali has been published on epidemiological issues related to COVID-19 in a leading, peer-reviewed journal in the field, the AMERICAN JOURNAL OF OBSTETRICS & GYNECOLOGY. Tekbali Decl. ¶ 12, Tekbali 113. The AMERICAN JOURNAL OF OBSTETRICS is ranked second out of 183 obstetrics & gynecology journals,[7] with one of the highest impact factors of 6.120 in 2018-19.[8] Tekbali Decl. ¶ 12.[9]

---

[7] *See* https://www.scimagojr.com/journalrank.php?category=2729.
[8] *See* https://academic-accelerator.com/Impact-Factor-IF/American-Journal-of-Obstetrics-and-Gynecology.
[9] In contrast, it does not appear that Petitioners' expert has published any peer-reviewed articles in connection with COVID-19.

Ms. Tekbali's educational background, work experience, and publication experience thus amply qualifies her to provide an expert opinion as an epidemiologist and infection preventionist in this case. *See Allstate Ins. Co. v. Gonyo*, No. 8:07-cv-1011, 2009 WL 1212482, at \*4 (N.D.N.Y. Apr. 30, 2009) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" (quoting Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702)); *see also Kumho Tire Co.*, 526 U.S. at 152 (noting that expert testimony may be based on professional studies or personal experience).

Although Petitioners argue that Ms. Tekbali is not qualified to provide opinions "regarding appropriate medical care for COVID-19 and infectious disease prevention in correctional settings" and as an expert on "appropriate medical care," those assertions necessarily fail. *See* Pl. Mot. at 21-22. Petitioners squarely ignore Ms. Tekbali's significant experience as an epidemiologist working on the forefront of combatting the COVID-19 outbreak at one of our nation's leading medical hospitals. *See* Tekbali 1, 113; *Point Productions A.G. v. Sony Music Entertainment, Inc.*, No. 93 Civ. 4001, 2004 WL 345551, at \*4-5 (S.D.NY. Feb. 23, 2004) (denying motion to preclude testimony of expert whose "credentials relate almost entirely to his work and professional experiences"). In her current role at Lenox Hill Hospital/Northwell Health, Ms. Tekbali focuses on overseeing the COVID-19 guidance, including advising providers on proper utilization of personal protective equipment, monitoring infections, reporting outbreaks, and appropriately isolating patients to stop the spread. *See* Tekbali 1, 113. Indeed, Ms. Tekbali is deeply versed in issues related to the COVID-19 pandemic and is overwhelmingly qualified to opine on that topic. Ms. Tekbali is certainly qualified to reach conclusions on how incarcerated individuals should be housed and how their movements should be restricted from an infection control standpoint. Indeed, Ms. Tekbali's profession calls for the ability to adapt guidance for a facility's unique capabilities. Tekbali Decl. ¶ 9.

Petitioners' argument, moreover, that Ms. Tekbali cannot opine on whether MDC was taking appropriate steps to contain the spread of COVID-19 because she lacks expertise in "correctional settings" is nonsensical.  *See* Pl. Mot. at 21-22.  An expert need not possess "specialized knowledge" in every subcategory of information that touches on her opinions.  *See Packard v. City of New York*, No. 15 Civ. 7130, 2020 WL 1479016, at *3-*4 (S.D.N.Y. Mar. 25, 2020).  Indeed, courts have consistently denied motions to preclude expert testimony, reasoning that such specialized knowledge is not a necessary qualification.  *See, e.g.*, *Packard*, 2020 WL 1479016, at *3-*4 (holding that an expert witness lacking particular knowledge pertaining to training of NYPD officers could nevertheless offer his opinion regarding the effect that the provision of training to police officers can be expected to have on their actions); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308–09 (S.D.N.Y. 2015) (holding that a witness with expertise in business valuation need not have specific expertise in the apparel industry in order to testify to the valuation of an apparel-related enterprise).  Here, Ms. Tekbali is qualified to offer her opinion in this case because, as discussed above, she has significant experience and a strong educational background as an epidemiologist, and has worked directly and published on COVID-19 related issues.  Ms. Tekbali need not have any specialized knowledge on correctional settings to be able to opine on COVID-19 issues at MDC.  Rather, her experience as an epidemiologist working on COVID-19 issues amount to all of the "specialized knowledge" necessary to qualify her as an expert here.  *See Packard*, 2020 WL 1479016, at *3-4.

Ultimately, Petitioners' contentions regarding Ms. Tekbali's qualifications and expertise fail because they all go to the weight of the evidence and are a subject for cross-examination, not admissibility.  *See, e.g., Daubert*, 509 U.S. at 596 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [allegedly] shaky but admissible evidence."); *McCullock v. H.B. Fuller Co.*, 61 F.3d

16

1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [the expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). The only appropriate remedies are thus a "vigorous cross-examination" and "the presentation of contrary evidence" in court—not preclusion. *See, e.g.*, *Thomas v. YRC Inc.*, No. 16 Civ. 6105, 2018 WL 919998, at *6 (S.D.N.Y. Feb. 14, 2018) (denying motion to preclude expert testimony because "[g]iven that the rejection of expert testimony is the exception rather than the rule, 'vigorous cross-examination' and 'the presentation of contrary evidence' are the appropriate remedies for plaintiff's concerns regarding [defendant's expert's], not preclusion").

**C.    Ms. Tekbali's Methodologies Are Reliable and Will Assist the Court in Reaching a Decision**

Ms. Tekbali's opinion is rooted in a thorough review of the record, reliable principles of epidemiology, and specific guidance from the Centers for Disease and Control and Prevention ("CDC") and the NYC Department of Health regarding COVID-19. Ms. Tekbali's testimony will assist the Court in interpreting the testimony of various witnesses and declarants, including Dr. Venters. Indeed, Respondent intends to offer into evidence Ms. Tekbali's expert report (which is already attached to Respondent's opposition to Petitioners' motion for a preliminary injunction) to further assist the Court in its assessment regarding MDC's protocol and practice in containing the disease.

Petitioners mischaracterize Ms. Tekbali's methodology by stating that her report is "devoted to restatements of website information from the CDC or the NYC Department of Health." *See* Pl. Mot. at 21. But it is hardly surprising that Ms. Tekbali, a trained epidemiologist and infection preventionist, would reference and discuss specific guidance from the CDC and NYC Department of Health in reaching her conclusions regarding MDC's practices regarding COVID-19. *See* Tekbali 2-7. Indeed, Dr. Venters's failure to do the same in his report does not make Ms. Tekbali's report deficient. Moreover, these sources form the basis of a reliable methodology because they are "of a type reasonably

relied on by" epidemiologists working on COVID-19 issues and in her field. *See Packard*, 2020 WL 1479016, at *4 (expert's opinion and methodology reliable where it was not based on "traditional scientific methods" because it was based on data "of a type reasonably relied on by experts in various disciplines of social sciences").

Petitioners' criticism of Ms. Tekbali's methodology on the basis that "she lacks a factual basis for reaching conclusions about actual practice at the facility" is also fatally flawed. *See* Pl. Mot. at 24-25. That contention, as well as the arguments regarding Ms. Tekbali's reliance on CDC and NYC Department of Health guidance on COVID-19, are improperly raised in their motion to preclude, because those argument address the *weight* of Ms. Tekbali's testimony. Petitioners' remedy is cross-examination of Ms. Tekbali or the presentation of contrary evidence in Court—not preclusion of Ms. Tekbali's entire testimony. *See e.g.*, *Daubert*, 509 U.S. at 596 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [allegedly] shaky but admissible evidence."). The Court should thus allow Ms. Tekbali to testify regarding her opinion in this case.

### D.    Ms. Tekbali's Opinions are Relevant to the Case and Will Assist the Court in Reaching a Decision

Ms. Tekbali has offered relevant opinions regarding the protocols and practices pertaining to the prevention of the spread of COVID-19 at MDC. There can be no dispute that Ms. Tekbali's testimony on the steps taken at MDC to prevent the spread of COVID-19 is relevant to Petitioners' claim regarding the alleged conditions and spread of COVID-19 at MDC. Indeed, Respondent would be deeply prejudiced if Ms. Tekbali is not permitted to opine on the steps taken at MDC, as that defense is essential to Respondent's defense of this case.

Moreover, Ms. Tekbali's specialized expertise in combatting the COVID-19 outbreak and minimizing the spread of infection will be helpful to the Court. Ms. Tekbali's analysis evaluates the

recommended guidance regarding preventing the spread of COVID-19 and the policies and practices in place at MDC.  Ms. Tekbali's analysis is relevant to many of the central issues in this case, and she should be permitted to testify.  Petitioners concede as much.  Petitioners nowhere contest the relevance of Ms. Tekbali's testimony, or the extent to which her testimony will aid the Court.  *See* Pl. Mot. at 20-25.  Petitioners, rather, are challenging the weight of Ms. Tekbali's testimony—arguments improperly raised in a motion to preclude, and best addressed only through cross-examination or the admission of evidence in Court.  *See e.g.*, *Daubert*, 509 U.S. at 596.  The Court should thus allow Ms. Tekbali to testify and introduce relevant and helpful evidence in this case.

Finally, even if, *arguendo*, the Court were inclined to preclude Ms. Tekbali (which it should not, for the reasons described above), since the Court will be the trier of fact, the Court should defer ruling on the application until after it has heard the expert testimony at trial. As stated in *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423, 485-486 (S.D.N.Y. 2002) (citing *Colon v. Bic USA, Inc.*, 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001):

> [The party's] *Daubert* challenges were raised just prior to trial and this trial was conducted as a bench trial, the court elected to hear the *Daubert* proof during the trial itself . . . . Although courts often hold pretrial evidentiary hearings in the context of Rule 104(a) rulings on the admissibility of expert testimony, "[n]othing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony."

*See also Leith v. Lufthansa German Airlines*, 1995 WL 699708, at *1 (N.D. Ill.) ("Waiting until trial to deal with both issues, admissibility and causation, does not carry with it the possible contamination of the fact-finding process, as there will be no jury and the court will hear the issue once in any event.").

## **CONCLUSION**

Accordingly, for the reasons set forth above, Petitioners' motion *in liminie* should be denied, and Respondent granted such further relief as the Court deems just and proper.

Dated:  Brooklyn, New York
        May 10, 2020                                RICHARD P. DONOGHUE

United States Attorney
*Counsel for Respondent*
Eastern District of New York
271-A Cadman Plaza East, 7th Fl.
Brooklyn, New York 11201

By:      /s/

James R. Cho
Seth D. Eichenholtz
Joseph A. Marutollo
Paulina Stamatelos
Assistant U.S. Attorneys
*Attorneys for Respondent*
(718) 254-6519/7036/6288/6198
james.cho@usdoj.gov
seth.eichenholtz@usdoj.gov
joseph.marutollo@usdoj.gov
pauline.stamatelos@usdoj.gov