UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI, by his Next Friend MIGDALIZ QUINONES; JUSTIN RODRIGUEZ, by his Next Friend JACKLYN ROMANOFF; ELODIA LOPEZ; and JAMES HAIR, <br><br>individually and on behalf of all others similarly situated,<br><br>     Petitioners,<br><br>    -*against*-<br><br>WARDEN DEREK EDGE,<br><br>     Respondent. | No. 20 Civ. 1590 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 790-0403

## INTRODUCTION

Respondent's opposition to Petitioners' Motion for Preliminary Injunction relies on meritless legal arguments and self-serving declarations that do not rebut the substantial evidence already presented by Petitioners, much of which comes from people who are living out this crisis on a daily basis at the MDC and who are seeking nothing other than protection from harm in the face of a global pandemic. The Court should grant Petitioners' requested preliminary injunction.

## ARGUMENT

To establish an entitlement to relief at this preliminary stage, Petitioners need not "prove [their] case in full," *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), but need only show that they have a likelihood of succeeding on their Eighth Amendment claim, that they will suffer irreparable harm in the absence of an injunction, and that the balance of equities are in their favor, *see, e.g.*, *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011).

Respondent does not contest that the risk of exposure to and contraction of COVID-19 is serious enough to constitute an objectively serious harm under the Eighth Amendment. Respondent's claim that a preliminary injunction would interfere with the smooth functioning of the MDC is undermined by his contention—which Petitioners vigorously dispute—that he already is taking many of the steps that Petitioners have established are necessary.

Respondent's factual contentions are principally based on aspirational goals expressed by the MDC's Rule 30(b)(6) witnesses, not on actual practices, and many are contradicted by those same witnesses. Respondent cannot rebut the substantial first-hand accounts of dozens of different people housed in different units and floors from inside the MDC. Tellingly, Respondent does not even discuss those declarations, even though "hearsay testimony is

admissible to support the issuance of a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 48 (2d Cir. 2010).[1]

## I.  RESPONDENT'S LEGAL ARGUMENTS ARE WITHOUT MERIT

Respondent begins by making the bold claim that Petitioners' entire request for preliminary injunctive relief must be denied, because it "effectively gives Petitioners a final judgment on the merits."  Resp. Mem. Opp. Prelim. Inj. ("Resp. Mem.") 5.  Respondent has no support for this proposition.  Neither of the cases he cites suggests that the Court cannot grant preliminary relief that overlaps completely with the relief sought at final judgment—indeed, such preliminary relief is common in the civil rights context.[2]  *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 471 (2d Cir. 1996) (affirming district court's grant of preliminary injunctive relief in prison civil rights case); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (upholding preliminary injunction that granted plaintiffs "substantially all the relief they ultimately sought" (quotation marks and citation omitted)).

As this Court knows, the standard for evaluating Petitioners' claims is not whether Respondent's conduct "shock[s] the contemporary conscience," Resp. Mem. 2, 6 (*citing Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019)), but deliberate indifference, which includes both an objective and a subjective prong.  There is no real dispute about the objective prong.

---

[1] For this reason, among others, Respondent's suggestion that the Court disregard declarations submitted by Petitioners as "hearsay" is misplaced.

[2] In *Camenisch*, the Supreme Court merely concluded that it lacked jurisdiction to consider a mooted preliminary injunction decision because a decision on a motion for preliminary injunction is not a final judgment on the merits. 451 U.S. at 394-95.  And *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.* simply stands for the proposition, in a case involving intellectual property rights, that a court should not grant a preliminary injunction that would "effectively and permanently terminate" the rights of the opposing party.  101 F.3d 259, 262 (2d Cir. 1996).  That is not the case here, where a grant of Petitioners' request for injunctive relief could be revisited at a later stage, after full discovery and a full hearing on the merits.

2

Respondent effectively concedes, as he must, that the risk of exposure to and contraction of COVID-19 is serious enough to constitute an objectively serious harm.

Respondent claims that he has not been deliberately indifferent, relying on generalized facts not responsive to Petitioners' extensive submissions, and asserting that "BOP has already taken critical steps to successfully prevent the spread of COVID-19 at the MDC." Resp. Mem. 8. As set forth below, Respondent's litany of BOP policies cannot rebut the fact that Respondent has no grasp on the actual scope of the pandemic inside the MDC, because it fails to track, screen, test, treat, or otherwise respond to people who are symptomatic with COVID-19. In an injunctive case, deliberate indifference is determined by prison officials' "attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994).[3]

The remainder of Respondent's legal arguments either do not join issue with Petitioners' contentions or are irrelevant. Respondent relies on the arguments made in his motion to dismiss, but as Petitioners demonstrate in their opposition to that motion, none of Respondent's arguments casts doubt on the Court's jurisdiction, nor do they address Petitioners' entitlement to injunctive relief (as opposed to relief from custody). *See generally* Pet'rs. Mem. Opp. Mot. Dismiss (Dkt. 85). Indeed, Respondent does not attempt to distinguish the numerous cases that

---

[3] Moreover, if there is reason to believe that Respondent's COVID-19 response is motivated by litigation and could change or stop absent court intervention, as the evidence of pre-inspection preparations suggest, (*see* Reinert Ex. 1 (Sanon Decl. ¶¶ 21-22)), the Court should not hesitate to order appropriate injunctive relief based on the entirety of the factual context before it. *See, e.g.*, *Mays v. Dart*, No. 20 Civ. 2134, 2020 WL 1987007, at *29 (N.D. Ill. Apr. 27, 2020) (converting TRO to preliminary injunction despite apparent compliance with TRO because "without a court order, there is at least a possibility that these important measures could slip to the wayside, despite the Sheriff's best intentions"); *Abbott Labs. v. Adelphia Supply USA*, No. 15 Civ. 5826, 2015 WL 10906060, at *13 (E.D.N.Y. Nov. 6, 2015) (granting preliminary injunction despite remedial efforts by defendant because they did not "eliminate all cognizable dangers of a recurrent violation.").

have granted relief similar to that sought by Petitioners here.[4] Respondent also continues to mischaracterize Petitioners' Special Master request. A Special Master need not be vested with any authority that dilutes this Court's power, and appointing a Special Master is well within this Court's discretion. Pet'rs. Mem. Supp. Prelim. Inj. ("Pet'rs. Mem.") 28-29 (Dkt. 73).

Finally, Petitioners have fully addressed Respondent's arguments regarding class-wide relief in opposition to his motion to dismiss. There is nothing extraordinary about ordering class-wide relief for a class of current and future incarcerated people, making untenable Respondent's ascertainability argument. *See, e.g.*, *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 101 (E.D.N.Y. 2013) (class including future detainees met ascertainability requirement); *see also Nunez v. City of New York*, No. 11 Civ. 5845, 2015 WL 10015955, at *2 (S.D.N.Y. July 10, 2015) (certified class of all present and future people detained in New York City jails). Further, Petitioners seek only conditional certification of the class at the preliminary injunction stage, not formal class certification. *Contra* Resp. Mem. 26. The Court can conditionally certify the class, with the understanding that it can alter or amend the certification before a final decision on the merits, *see Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018), because the Rule 23 requirements are easily met here. Pet'rs. Mem. 31-35. And Respondent does not even respond to the authority cited by Petitioners establishing that this Court has the power to order class-wide relief even if does not conditionally certify the class. Pet'rs. Mem. 30-31.

## II. RESPONDENT'S FACTUAL CONTENTIONS DO NOT REBUT PETITIONERS' SUBSTANTIAL EVIDENCE

In their moving papers, Petitioners presented overwhelming evidence, including more than 30 declarations from people inside the MDC, to establish Respondent's deliberate

---

[4] Respondent notes, correctly, that the Eleventh Circuit recently issued a stay in one COVID-19 case, but the court's decision was based on legal errors by the district court and plaintiff's failure to adduce evidence of deliberate indifference. *Swain v. Junior*, No. 20 Civ. 11622, 2020 WL 2161317, at *4-5 (11th Cir. May 5, 2020).

indifference. Pet'rs. Mem. 6-16. Respondent does not dispute much of this evidence. Respondent concedes that the MDC has tested only a paltry number of incarcerated people, and that it has no set protocol for when a test is indicated. Vasquez Tr. 120. Respondent concedes that the number of positive tests it has reported to this Court understates the number of people who have contracted COVID-19 at the MDC, even as the government continues to repeat those figures in submissions filed throughout the Southern and Eastern Districts. Vasquez Tr. 62-63; *United States v. Rodriguez*, 16 Cr. 167, Dkt. 331 (S.D.N.Y. April 7, 2020) (opposing compassionate release for Petitioner Rodriguez based, in part, on the low number of positive tests within the MDC).[5] And Respondent concedes that it does not track the reporting of symptoms consistent with COVID-19 in the facility and that he has no idea how many people have reported symptoms consistent with COVID-19. Vasquez Tr. 65-66; 94-95; *see also* Reinert Ex. 2 (Resp.'s Response to Interrogatory 1(f) (April 27, 2020) (confirming that BOP does not track COVID-19 symptoms)). Other federal facilities, where testing has been expanded, report much higher incidence of COVID-19 infection. *See* 70% of inmates test positive for coronavirus at Lompoc federal prison, L.A. Times (May 9, 2020).[6]

Respondent ignores the declarations submitted by Petitioners and, bizarrely, takes positions that contradict his own witnesses. Petitioners submitted ample information that the MDC has failed to test, or treat as presumptively positive, numerous people who have reported symptoms consistent with COVID-19. Pet'rs. Mem. 6 (citing declarations). And Respondent has essentially conceded that this is true. Vasquez Tr. 65-66. Respondent has even conceded

---

[5] Respondent conflates the number of positive tests that it reports to Chief Judge Mauskopf with the "incidence of infection" at the MDC. Resp. Mem. 15 n.16. As Respondent's own witnesses have testified, the number of positive tests does not include presumed positives or people who have reported symptoms consistent with COVID-19.

[6] Richard Winton, *70% of Inmates Test Positive for coronavirus at Lompoc federal prison*, L.A. Times, May 9, 2020. https://www.latimes.com/california/dtory/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates.

5

that one tell-tale symptom of COVID-19—loss of a sense of taste or smell—is not treated as an emergent condition and will be responded to on average within two and a half weeks. Vasquez Tr. 195-96.  One Petitioner repeatedly reported symptoms consistent with COVID-19, but was never tested or put in isolation, and upon his release from the MDC, had antibody testing indicating that he had in fact contracted COVID-19.  Reinert Ex. 3 (Rodriguez Decl. ¶¶ 7, 17).

Respondent has engaged in these practices even for people it has identified as at high-risk of COVID-19 complications.  Respondent concedes that it has taken no additional steps to protect Vulnerable Persons from COVID-19.  Vasquez Tr. 207-209.  Respondent has even declined to investigate whether someone is positive with COVID-19 in dorm-style housing units where social distancing is fundamentally impossible, not because it is medically indicated but because of fear of creating panic in that setting.  Pet'rs Mem. 7.

Nor has Respondent rebutted the evidence of inadequate screening throughout the MDC. Respondent's own 30(b)(6) witness confirmed Petitioners' evidence that daily temperature checks are not taking place in the general population units.  Vasquez Tr. 48; 210-12.  Respondent claims that medical staff are performing "twice-daily rounds" in general population, citing Dr. Beard's report (Resp. Mem. 16), but even if Dr. Beard had any basis for drawing that conclusion, he makes no such claim.  *See* Beard Report at 6 (stating that medical staff pick up sick calls and run pill lines in general population).  Petitioners have provided evidence that staff screening is ineffective as well. Pet'rs Mem. 13; Reinert Ex. 1 (Sanon Decl. ¶¶ 10-13).

Although Respondent claims that it conducts both temperature checks and wellness checks in the quarantine and isolation units, Petitioners have submitted ample evidence to the contrary.  Pet'rs. Mem. 8.  Respondent has not rebutted that with evidence from anyone with personal knowledge.  Even if wellness checks are occurring (as Respondent asserts but has never

6

documented), they are woefully insufficient. As Respondent's witness explained, medical staff allegedly take only one hour to complete temperature and wellness checks on a unit of 124 people, checks often are done through the food slot, and medical staff do not have any particular questions they are expected to ask other than how the person is feeling. Vasquez Tr. 43, 81; *see also* Reinert 11 (Supplemental Declaration of James Hair ¶ 17). Nothing supports Respondent's contention that incarcerated people "have had ample opportunity to meet with and talk to medical staff during those rounds." Resp. Mem. 16.

Respondent does not make any effort, through expert testimony or otherwise, to respond to Petitioners' substantial evidence that the MDC's sick call system is broken and defective. Venters Rep ¶¶ 16-33. Respondent simply states that it has a sick call system and that the medical staff "triage the requests." Resp. Mem. 16. Respondent alleges that emergent medical conditions are responded to immediately (despite conceding that the emergency call buttons do not work in many cells), but their support for that position is based on policy, not on actual practice. Vasquez Tr. 52, 54 (basing answers on what policy is and not what she has observed). Petitioners' numerous declarations show that Respondent's actual practice is one of indifference, not urgency. Pet'rs. Mem. 15-16; *see also* Reinert 11 (Supplemental Declaration of James Hair ¶¶ 3-6, 17.)

Respondent cites the deposition of A.W. King in support of its arguments that the MDC is complying with relevant guidelines regarding PPE. But throughout her deposition, A.W. King testified only to *expectations* of staff and incarcerated people regarding what PPE should be worn, not the reality of what was in fact taking place. *See* King Tr. 70, 73 (describing "expectation" that staff should be wearing PPE); *id.* at 81 ("any staff who go up [to the isolation unit] knows that they should be wearing PPE"); *id.* at 77 (stating that "officers shouldn't be

7

allowing [people] to come out of their cells without masks"); *see also* Vasquez Tr. 96 (no one monitors staff compliance with appropriate infections disease protocol when they move between units). Testimony regarding "expectations" of whether people working or housed at the MDC are wearing certain PPE does not contradict the evidence presented by Petitioners that people at the MDC do not in fact have access to and are not wearing appropriate PPE.

The same is true of testimony regarding cleaning practices at the MDC, which focused on procedures and expectations, not reality. *See e.g.*, King Tr. 54 ("right now it is our expectation for [orderlies] to clean daily"); *id.* at 56 (describing "expectation" that incarcerated people clean common area regularly); *id.* at 56 (describing "expectation" that computers will be cleaned after each use). Again, none of this contradicts Petitioners' evidence that routine cleaning between use of common areas is not in fact taking place.

With regard to personal hygiene and cleaning supplies, A.W. King similarly testifies only to the theoretical availability of these items. *See, e.g.,* King Tr. 24 (attesting to opportunity to request soap from unit team). But even A.W. King admits that the MDC's procedures do not ensure that people have soap, and that the MDC is not providing people with greater access to soap during the pandemic than it ordinarily does. *See* King Tr. 26 (testifying that soap is only provided to those who ask); *id.* at 27 (stating that MDC has not changed its schedule for restocking soap on units) *id.* at 35 (confirming that there is no hand sanitizer in units).

Respondent makes other factual claims that are unsupported or contradicted by his own witnesses. It is simply not the case that any person who has COVID-19 symptoms is placed in isolation, (Resp. Mem. 9). *See* Vasquez Tr. 65-66 (reporting that there are people who have expressed COVID-19 symptoms who have not been placed into isolation). Even according to the sick-call records that still exist, Respondent has received more than 150 reports of COVID-

8

19 symptoms since March 13, yet, by its own calculation, it has placed only 19 people in isolation to date. Reinert Ex. 2 at 3 (response to Interrogatory 1(a)). Since MDC has shred hundreds of requests for medical care made since the pandemic began, Respondent does not even know who, when, or how many people even reported such symptoms to date. As Ms. Vasquez confirmed, there are no written guidelines that mandate who the MDC tests, and they have not tested, or even presumed as positive, every person who presents with COVID-19 symptoms. Vasquez Tr. 120. And while Respondent has identified a group of high-risk incarcerated people, Respondent has not taken any additional steps to protect them from COVID-19. Respondent has conceded that they do not cohort the high-risk group together because the group is too large to do so. Vasquez Tr. 207-09.

As for social distancing, again Respondent claims to have promoted social distancing but has provided no evidence that incarcerated people are in fact able to social distance when they are on the unit. Ms. Vasquez confirmed that the computers on each unit cannot be used while people practice social distancing and that she can only presume people social distance because they have been instructed to. Vasquez Tr. 83-84; *see also* King Tr. 97-101 (describing factors that make social distancing impossible in women's unit).

Respondent does not rebut Petitioners' evidence establishing that the MDC's screening procedures are inadequate. First, when Respondent determines that an incarcerated person is positive for COVID-19 (either through a test or through being deemed presumptively positive), the MDC deems only the person's cell-mate to be in "close contact" with him for purposes of follow-up and contact tracing. Vasquez Tr. 85-87. This approach ignores the impossibility of social distancing at the MDC. *See* Vasquez Tr. 83-84. Sanchez Decl. ¶¶ 13-18. (two sick people on unit who were later tested and presumed positive had contact with many in unit for five days

9

before receiving medical care). Second, contrary to Respondent's claims that staff are screened for fever or symptoms (Resp. Br. at 19), only a fever bars staff from entering a facility. And Respondent concedes that he does not ask staff whether they have been exposed to people who have the disease and are therefore at risk of spreading the disease, even if they are asymptomatic. (Vasquez Tr. 136, 139).

Finally, the opinions of Respondent's two experts, neither of whom have any medical expertise, do not justify denying a preliminary injunction. As Dr. Homer Venters notes in his supplemental declaration (filed herewith), Respondent's experts fail to meaningfully address multiple findings in his report, especially those that relate to the medical care that is actually being provided to those within the MDC, the MDC's broken sick call system, the MDC's protections for high-risk individuals, and the lack of care for people in isolation units. *See* Reinert Ex. 6 (Supplemental Declaration of Dr. Homer Venters).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant their motion for preliminary injunction.

Dated: May 11, 2020
       New York, New York

                                          EMERY CELLI BRINCKERHOFF
                                          & ABADY LLP

                                          By:    /s/ Katherine Rosenfeld
                                          Katherine Rosenfeld
                                          O. Andrew F. Wilson
                                          Samuel Shapiro
                                          Scout Katovich
                                          600 Fifth Avenue, 10th Floor
                                          New York, NY 10020
                                          (212) 763-5000

                                          CARDOZO CIVIL RIGHTS CLINIC
                                          Betsy Ginsberg

10

                    Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 1003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 1003
(212) 790-0403

Debevoise & Plimpton LLP
Yeugenia (Jane) Shvets
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Petitioners and Putative Class*

11