# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI, by his Next Friend MIGDALIZ QUINONES; JUSTIN RODRIGUEZ, by his Next Friend JACKLYN ROMANOFF; ELODIA LOPEZ; and JAMES HAIR, <br><br>individually and on behalf of all others similarly situated, <br><br>Petitioners, <br><br>-*against*- <br><br>WARDEN DEREK EDGE, <br><br>Respondent. | No. 20 Civ. 01590 <br><br>**SUPPLEMENTAL REPORT OF DR. HOMER VENTERS** |

1. I have reviewed the expert reports of Dr. Jeffrey A. Beard dated May 6, 2020 ("Beard-I") and Ms. Asma Tekbali dated May 6, 2020 ("Tekbali-I"). I have also reviewed the Assessment of Metropolitan Detention Center, Brooklyn, New York, COVID-19 Response by N.C. English dated May 2, 2020 ("MDC 1-13"). In addition, I have also reviewed the documents referenced in this supplemental report, specifically declarations of people incarcerated at the MDC filed in this case, copies of paper sick-call records from April 24 through April 28, 2020.

2. My original report contained numerous observations of deficiencies in the MDC COVID-19 response, which can be synthesized into three main points. None of the points made in the expert reports provide convincing or meaningful rebuttal of these three central concerns.

    a. The BOP sick call system fails to respond appropriately to COVID-19 complaints among detained people, either to provide timely and adequate

    care, or integrate these complaints into tracking of the COVID-19 outbreak inside the facility.

  b.  The BOP has failed to implement adequate protections for people known to be at high risk for serious illness and death from COVID-19.

  c.  People identified as having COVID-19 do not receive regular medical encounters or care.

3.  With regard to the concern that the BOP utilizes a broken sick call system at MDC that fails to provide timely and adequate response for individual patients with symptoms of COVID-19 and also fails to integrate sick call information into tracking of the outbreak.

  a.  Neither expert rebutted reports by detained people that the housing area temperature checks have slowed in frequency from twice daily, to less than daily.

  b.  Neither expert addressed or explained the lack of sick-call information being retained into patient records or being utilized for tracking of the outbreak. The National Commission on Correctional Health Care, which accredits some BOP facilities, addresses the retention and documentation of sick call requests in the following manner: "Without documentation of these steps, it is not possible to evaluate the responsiveness of your sick-call system, and if you are seeking accreditation, to determine if you are in compliance. Request slips are usually filed in the health records and begin the documentation trail. If you do not file the slips in the record, a log may be kept to monitor the stages of the response. The log needs to include the request date, date and result of triage, date of the sick-call visit

                if required, etc." The NCCH further identifies that "you should have documentation of compliance, either through the health records or through logs spanning three years."[1]

       c.    This correctional standard of retaining sick call records is not limited to facilities that receive NCCHC accreditation. For example, in the New York City jail system (in which most facilities are not NCCHC accredited), retention of sick call information is mandated for three years as a matter of local law via the NYC Board of Correction Standards.[2]

4.    Neither expert rebutted the specific instances reported by persons I spoke with concerning their repeated attempts to receive care when reporting clear COVID-19 symptoms through the sick call process. Neither expert provided any data to indicate that MDC is able to track who requests sick call, who receives sick call encounters, when they occur, and whether their encounters are clinically appropriate. I reviewed an additional approximately 30 declarations by people detained at the MDC, and 21 of them reported that they had submitted sick-call requests that were not responded to.[3] I also reviewed 32 of the paper sick call requests submitted since MDC agreed to start retaining those records, and found 7 that included complaints of COVID-19 symptoms.

5.    Neither expert adequately addressed the lack of symptom screening in housing area temperature checks, other than to reference undefined and undocumented "wellness

---

[1] https://www.ncchc.org/documentation

[2] http://library.amlegal.com/nxt/gateway.dll/New%20York/rules/title40boardofcorrection/chapter3healthcareminimumstandards?f=templates$fn=default.htm$3.0$vid=amlegal:newyork_ny$anc=JD_T40C003

[3] Declaration of K. Rosenfeld that includes declarations by people detained in MDC, among which the following reported submitting sick call requests that were not responded to: A. Rabadi; C. Castillo; D. Needham; D. Sanchez; H. Chunn; H. Soria; J. Deutsch; J. Dixon; J. Hair; J. Olivera; J. Singer; K. Nelson; L. Whitley; R. Molina; R. Pierson; R. Watson; T. Carpenter; T. Miller; V. Sojos-Valladares; W. Finch; and Y. Platt.

checks." If there is such an encounter as a wellness check, nursing staff should document that it occurs, and they should have standardized questions they ask. Simply directing staff to "check on" or otherwise ask if someone is "ok" as they pass through a unit is not productive, and in my experience overseeing health staff who conducted housing area rounds in 13 jails, this type of approach is not a meaningful way to detect, respond to and track health symptoms.

6. My concern in this respect is based on conversations with detained people who reported that they had COVID-19 symptoms when their temperatures were taken and despite reporting them to the nursing staff conducting temperature checks, they were ignored. CDC guidelines for correctional health settings ("Verbal screening and Temperature Check") are clear that symptoms of COVID-19 should be elicited as well as temperature.[4] This is the practice on intake and should be the practice in housing areas. Multiple detainees reported that they were not asked about, and even were ignored when they reported, common symptoms of COVID-19, including shortness of breath. If the MDC seeks to know the full extent of COVID-19 inside the facility, it should elicit and address the COVID-19 symptoms of patients in the manner clearly prescribed by the CDC. I reviewed an additional approximately 30 declarations by people detained at MDC, and 13 of them reported that they only been screened through temperature checks, not symptom checks.[5]

7. This repeated lack of response to COVID-19 symptoms was reported but the only two patients in the isolation unit at the time of my inspection, and they made clear that the lack

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html

[5] Declaration of K. Rosenfeld that includes declarations by people detained in MDC, among which the following reported having their temperature checked but not being asked about COVID-19 symptoms; E. Lopez; H. Chunn; H. Soria; I. Hall; J. Deutsch; J. Dixon; K. Nelson; R. Pierson; S. Bynum; T. Carpenter; T. Miller; V. Sojos Valladares; and Y. Platt.

4

of response to their repeated complaints of COVID-19 symptoms likely cause increased risk of exposure to other detained people and staff in their original housing area.

8. The combination of a broken sick call system, and inadequate housing area screenings likely results in an underappreciation of the true extent of COVID-19 infection in the MDC. The rapid spread of COVID-19 throughout correctional facilities is no longer a disputed outcome. In Chicago and New York City jails, where testing is not universal, already 12.3% and 9.6% respectively of detained people have tested positive. In the MDC, only 6 cases of COVID-19 have been detected, despite 36 cases among staff. Based on my review of other settings, while the absolute number of staff versus detainee cases may not be the same, I would expect the rates of increase to be roughly similar. Instead, at the MDC, we see that the number of cases among detained people remains flat, despite ongoing reporting of COVID-19 symptoms and rising levels amongst staff.



9. Given the rapid and overwhelming spread of COVID-19 throughout correctional facilities, it is inconceivable to me that present practices and data from the MDC reflect anything other than the undetected spread of this virus.

5

10. I have also reviewed the declaration of Justin Rodriguez, who I initially spoke with during my inspection on April 23. Mr. Rodriguez reports that he was in a shared cell in housing area 53 in March 2020 when he started to feel ill, including symptoms of shortness of breath, feeling feverish, chills, weakness and loss of sense of smell, all of which are symptoms of COVID-19 according to the CDC.[6] Mr. Rodriguez reports that he asked for sick call slips 5 or 6 times from correction officers as well as the nurses who passed to take his temperature each day. His requests were never met and he was both unable to obtain a sick call slip to fill out, and also unable to get any medical attention for his COVID-19 symptoms. He reports experiencing these symptoms for approximately 2 weeks, and being told by security staff "If you don't have a fever, you can't get no medical attention." Mr. Rodriguez was ultimately transferred to the isolation unit because of an elevated temperature, after spending approximately two weeks experiencing COVID-19 symptoms, being on a housing area with other detained people and staff, and never receiving assessment or care. Once on the isolation unit, Mr. Rodriguez reports being locked in his cell for 24 hours per day, with the exception of a shower every three days, and without any medical encounters occurring. He reports being discharged home where he took a COVID-19 antibody test which was positive, the results of which I reviewed. This case is a disturbing example of how patients who are ill with COVID-19, and who report their symptoms to health staff, are actively ignored unless they happen to have an elevated temperature at the time health staff pass by. This case also clarifies the manner in which MDC's broken sick call system, and reliance on temperature-only screenings denies individual COVID-19 patients the care they need, and also dramatically increases the risk of COVID-19 transmission to staff and other detained people.

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

11. I have also reviewed the statements by MDC staff concerning the availability of COVID-19 tests. The deposition of HSA Vasquez indicates that MDC has access to 9-10 COVID-19 tests. This represents an unacceptable and far too low capacity for testing. Many BOP facilities have tested and identified hundreds of COVID-19 cases across the nation. In New York City, testing is now being offered to anyone who thinks they may have or did have COVID-19. Given the lack of clarity and competence surrounding responding to obvious COVID-19 symptoms among detained people at the MDC, there is a pressing need to immediately expand testing for COVID-19, as I outlined in my original report.

12. Neither expert report provided convincing rebuttal of my concern that the BOP has failed to implement adequate protections for people known to be at high risk for serious illness and death from COVID-19. The CDC and the BOP itself acknowledge that a subset of detained people is at increased risk of serious illness and death from COVID-19. As people held in BOP facilities have started to die from COVID-19 infection, the BOP itself has identified that many of these people were in high risk groups based on their pre-existing health problems.[7]

13. While there maybe be disagreement about the exact definitions used to identify people who are at high risk, there is no dispute that some people are high risk. For example, Taklabi report states that pregnant women are not considered high-risk, but the BOP's own pandemic influenza plan, and the Department of Homeland Security's own COVID-19 plan do identify pregnant women as high-risk.[8] Nonetheless, the MDC has failed to enact any increased level of protections for these patients, despite full knowledge of who they are, and that they face increased risk for serious illness or death. The specific measures I called for to address this issue

---

[7] https://www.bop.gov/resources/press_releases.jsp
[8] EOIR Interim Guidance April 4, 2020 and https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf

7

include: (i) testing of high-risk patients; (ii) placement of high-risk patients into specialized housing areas based on their test results; (iii) twice daily sign and symptoms checks; and (4) increased infection control training and practices for staff working in these units.

14. Both expert reports challenge the very idea of cohorting high risk patients as an infection control response. Cohorting patients based on risk factors is an essential and common practice in correctional settings, including in outbreak response. I have managed numerous outbreaks in correctional settings and view this as a critical tool in protecting the most vulnerable patients. Even the BOP's own pandemic influenza plan anticipates that patients may be cohorted based on chronic health problems such as diabetes.[9] This approach is not only important to create increased levels of protection, but to provide higher levels of screening and surveillance. Cohorting high-risk patients does not mean that they are to be transferred from single cell settings to open dorms. In fact, the use of single cell housing areas for high risk patients is beneficial, but the MDC's practice of having high-risk patients spread throughout the facility, and often in double bunk cells, means that there is no special or heightened surveillance of their health status. This is especially important given the failures of the MDC to provide screenings in these areas, including the lack of symptom screening and the lapses even in their sole area of focus, temperature screening.

15. The two expert reports did not address the lack of care for people in the isolation unit identified as having COVID-19. Review of medical records and speaking with people on the isolation unit reveal that once identified as having COVID-19 or being identified as a potential case, detained people are denied basic daily health encounters and kept locked in their cells. Brief temperature checks and occasional questions from staff are implemented, but there is

---

[9] https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf

8

no regular health encounter that involves having a person leave their cell and be examined by a nurse or doctor for their lung and heart sounds, blood pressure and other essential elements required to determine whether their COVID-19 illness is getting better or worse.

16. The lack of basic type of daily health encounter may stem from the lack of a clinical examination space on the unit, but the responses from BOP and their experts on this matter have varied from attempting to establish that an adequate health encounter could take place inside a person's cell, to opining that having a clinical examination space outside the unit could be adequate. Whatever the response, it seems clear from medical records and speaking with people in the isolation unit that neither of these things is actually occurring; patients are not taken out of their cells each day for a clinical encounter outside the unit, and staff are not entering their cells to attempt a clinical encounter there (which would be ill-advised and inadequate).

17. This deficiency leaves patients already identified as having COVID-19 without basic clinical assessments. When I inspected the facility, I spoke with Mr. Victor Sojos Valladares in the isolation unit. He reported that while held in the isolation unit for having tested positive with COVID-19, shortness of breath, fever and multiple other symptoms, he went ten days without a clinical encounter. During this time, he reported that not one single health professional listened to his lungs or heart, despite his initial presentation of shortness of breath.

18. This approach stands in stark contrast to BOP's own pre-existing pandemic influenza plan which identifies the need for daily and structured clinical assessments of persons identified as being ill.[10] The CDC states clearly in their COVID-19 clinical guidance that "Clinicians should be aware of the potential for some patients to rapidly deteriorate one week

---

[10] https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf

9

after illness onset."[11] Without conducting daily structured encounters with COVID-19 patients, the BOP remains unable to detect when this clinical deterioration would occur, and increases the risk of serious illness and death among these patients.

19. This approach to conducting basic medical encounters is also clearly outlined in NCCHC standards, which identify that when nursing staff conduct basic triage of patients, they should include the following: "The area must be of adequate size, provide auditory or visual privacy, have a sink and water, and have washable hard surfaces. Equipment nurses use for sick-call evaluation includes the health record, thermometer, stethoscope, sphygmomanometer, handheld light, exam gloves, dressing supplies, germicidal solution and reference material."[12] This level of equipment and ability to conduct daily encounters is likely even less than what is required for care of COVID-19 patients because of the high likelihood that these patients will require emergency administration of oxygen, transfer via stretcher to the main clinic or treatment rooms of the facility, and may require other emergency care including use airway management. Nonetheless, it is clear that even basic triage encounters are not possible within the isolation unit of MDC.

    a. While the examination space outside the isolation unit is close in physical proximity, that proximity misses the point of the infection control risks. Every time a person with COVID-19 leaves the isolation unit, there is a significant risk of transmission of virus outside the unit. This risk is even higher in the MDC given the other failures mentioned above. The risk posed by movement also appears to be appreciated by the MDC itself,

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html
[12] https://www.ncchc.org/cnp-screening-sickcall-triage

    given the apparent practice of simply leaving COVID-19 people in their cells and not conducting any meaningful clinical assessments of them (uncontested point #3 above).

  b. While the BOP's own team found that N95 masks were present on the PPE cart of the isolation unit, none were present when I inspected the facility on April 23, 2020, and staff were not wearing them. If a patient were indeed taken to the clinical examination room outside the isolation unit, they would do so without an N95 mask.

  c. The CDC guidelines acknowledge that some facilities may not be able to adequately implement medical isolation. In this circumstance, the guidelines state that "Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care."

20. The expert reports proffered by the MDC do not allay my fears that practices inside the MDC are causing many people with symptoms of COVID-19 to be denied assessment and care, and that both high-risk patients and those who do become identified as having COVID-19 are not being adequately protected.

21. I do not agree with or take solace in the stance of the experts that the lack of a death among detained people at MDC is somehow proof of the adequacy of the COVID-19 response. While I have numerous other specific rebuttals to points made in the expert reports, this supplemental report addresses the areas I am most concerned reflect an ongoing lack of appreciation of the severity of deficiencies in the MDC COVID-19 response.

22. I reaffirm my prior list of priorities for remediation of the COVID19 response at MDC.

Dated: May 11, 2020
      Port Washington, New York

_____
HOMER VENTERS, M.D.