UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI, by his Next Friend MIGDALIZ QUINONES; JUSTIN RODRIGUEZ, by his Next Friend JACKLYN ROMANOFF; ELODIA LOPEZ; and JAMES HAIR,<br><br>individually and on behalf of all others similarly situated,<br><br>          Petitioners,<br><br>        -against-<br><br>WARDEN DEREK EDGE,<br><br>          Respondent. | No. 20 Civ. 01590<br><br>**PETITIONERS' PROPOSED FINDINGS OF FACT** |

Petitioners, by and through their undersigned counsel, respectfully submit the following proposed findings of fact.

### Inadequate COVID-19 Testing

1.    MDC inmates have received only 16 tests since the beginning of the COVID-19 pandemic, at least 3 of which were given by outside hospitals.[1] As of April 27, the MDC had only received 20 tests over the course of the COVID-19 pandemic.[2]

---

[1] 05/19/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center, *available at* https://www.nyed.uscourts.gov/covid-19.

[2] Ex. 26 (Vasquez Depo) Tr. 115:3-14.

2.      The MDC has represented that it has at all times had an adequate number of tests.[3]  However, it has not had enough tests to test every inmate with COVID-19 symptoms.[4]

3.      The number of positive tests at the MDC is not indicative of the number of detained people who have COVID-19 at the MDC, because the MDC has no idea how many people in the MDC have COVID-19 symptoms.[5]

4.      The MDC's reports of positive COVID-19 test results provide an artificially low picture of the total number of people with COVID-19 in the facility. MDC admits that there are at least five prisoners it presumes were positive that it did not test.[6]

---

[3] Ex. 26 (Vasquez Depo) Tr. 122:17-20 ("So my question is whether at any point so far in the pandemic MDC has had operated without an adequate number of tests? A. No.").

[4] Ex. 80 (Response to Interrogatory No. 1) ("Inmates with COVID-19 symptoms as evaluated by MDC medical staff, are housed in the isolation unit. As of March 13, 2020, when the MDC first started to house inmates in the isolation unit as a result of the COVID-19 pandemic, a total of 19 inmates have, at some point, been housed in the isolation unit."); Ex. 76 (Decl. of Justin Rodriguez) ¶¶ 7, 15-18 (reporting COVID-19 symptoms while at MDC, and a positive COVID-19 antibody test upon release).

[5] Ex 26 (Vasquez Depo) Tr. 65-66 (there are people who have expressed symptoms of COVID who have not been placed in isolation and she has no idea how many such people there are); May 12 Tr. 207 (Ms. English admits she did not find out how many people had been placed in isolation for COVID-19 symptoms at the MDC. "I looked at processes." Ms. English did not find out how many people had been identified as presumptive positives at the MDC.).

[6] Ex. 26 (Vasquez Depo) Tr. 62-63.

5.     There are more prisoners in the MDC who are or were positive for COVID-19, but were not tested.  At least eleven inmates have complained that they were not administered COVID-19 tests, even though they reported COVID-19 symptoms.[7]  At least one of those inmates, Justin Rodriguez, repeatedly reported symptoms consistent with COVID-19 to the MDC staff, but was never tested or put in isolation.  Upon his release, Mr. Rodrigeuz had antibody testing indicating that he had contracted COVID-19.[8]

6.     Respondent has used the MDC's artificially low positive test results to argue that detained people should not be granted compassionate release.[9]  Courts have accepted this argument.[10]

---

[7] Exs. 28, 30, 33, 35, 44, 47, 55, 65, 66, 76, 81.

[8] Ex. 76 (Decl. of Justin Rodriguez) ¶¶ 7, 15-18; Ex. 71 (Rodriguez positive COVID-19 antibody test results).

[9] *United States v. Rodriguez*, 16-cr-00167-LAP, Dkt. 331 (S.D.N.Y., April 7, 2020) ("As of today, the MDC – where Rodriguez is housed – reported a total two inmates who tested positive for COVID-19. The MDC houses 1,734 total inmates. *See* BOP website for MDC Brooklyn.  That means that approximately 0.12% of MDC inmates have been confirmed to have COVID-19. . . All of these steps belie any suggestion that the BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates.").

[10] *Id.* Dkt. 335 (order denying request for release, and repeating the Government's contention that as of April 7, "the MDC – where Rodriguez is housed – reported a total two inmates who tested positive for COVID-19").

7.      Respondent has no consistent standard for deciding when to test detained people for COVID-19.  It maintains that the decision to test is "a clinical decision made at the institutional level."[11]

8.      Analysis of MDC sick call requests produced in this litigation confirm that inmate reports of COVID-19 symptoms far outnumber the COVID-19 tests that have been administered at MDC.  210 sick call requests reporting at least one COVID-19 symptom were submitted.[12]  This number does not include those paper sick call requests that MDC destroyed, which could reasonably be expected to contain a higher proportion of COVID-19 symptoms than electronic requests, as sicker inmates would be less likely to leave their cells and use the computer to make an electronic request.

9.      Respondent's expert Dr. Beard agrees with the current CDC guidance for testing that designates residents and staff in "prisons with symptoms" as "HIGH PRIORITY" for testing – and testified that they should be tested, if possible. [13] Petitioners' expert Dr. Venters also agrees, stating that "[g]iven the systemic concerns with addressing the sick-call system in MDC, heavy consideration should be given to testing all people detained in MDC."  He notes that while doing so may take time to implement: "it is essential to implement a phased testing of detained people, starting with high risk patients and those who present with COVID-19 systems."[14]

---

[11] Ex. 26 (Vasquez Depo) Tr. 120.

[12] Ex. 9; Ex. 24; Ex. 78.

[13] May 12 Tr. 284:16-286:5.

[14] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 27.

10.    A shortage of tests and test reagents is not an impediment to broader testing at the MDC. [15]   Many large correctional systems are testing their prison populations.  Even as of late March, the New York City Department of Correction was testing all symptomatic and some asymptomatic individuals detained in the city's jails.[16] Respondent's own correctional expert testified that he was aware that many correctional systems had "stepped up" their testing and were testing more broadly.[17]

11.    Respondent does not test its staff for COVID-19, despite staff having requested such tests. [18]

12.    The MDC does not test its staff even though, as both parties' experts acknowledge, the virus comes into the facility and moves through the facility because staff contract the virus in the community and then come into the facility and move throughout it, interacting with detained people.[19]

---

[15] May 12 Tr. 160: 25; 161: 1-3. Dr. Venters noted that lack of access to testing was not a current impediment to testing, but probably was an impediment six weeks prior to the hearing.

[16] Ex. 34 (Cohen Decl.) ¶ 5-6.

[17] May 13 Tr. 411: 23-25; 412: 1-5.

[18] Ex. 26 (Vasquez Depo) Tr. 146-147; Ex. 79 (Sanon Decl. ) ¶ 14 ("The MDC is not testing staff to limit the spread of the virus. I would like everyone who works at the facility to be tested. To date, the MDC has not provided a testing site. Corrections Offers need to find their own tests. As a result, it has been difficult to get people tested. I have personally called around to try to locate testing sites for my members.").

[19] May 12 Tr. 116: 22-25; 117: 1-5; 247: 17-24.

13.     The MDC does not require that staff report their positive COVID-19 test results.[20] However, 39 staff have voluntarily reported positive COVID-19 test results.[21]

14.     The difference in the prevalence of positive COVID-19 tests among staff versus incarcerated people likely indicates a significant undercount of the number of detained people with COVID-19 in the MDC. As Dr. Venters explained: "My concern is that the systematic failures in sick call and screenings that are happening, and the observation that staff numbers are going up while the number of tests positive for detained people are flat, leaves me concerned that there is a significant amount of COVID-19 activity and infection among detained people that is currently undetected."[22]

**Inadequate Screening for COVID-19 Symptoms**

**A.     MDC Does Not Screen for COVID-19 Symptoms; At Most, It Merely Conducts Insufficient "Wellness Checks"**

15.      In its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (the "CDC Correctional Guidelines") the CDC "recommends verbal screening *and* temperature checks for

---

[20] Ex. 26 (Vasquez Depo) Tr. 147.

[21] 05/19/2020 Report from the Bureau of Prisons regarding the Metropolitan Detention Center and Metropolitan Correctional Center, *available at* https://www.nyed.uscourts.gov/covid-19.

[22] May 12 Tr. 98-99.

incarcerated/detained persons."[23]  The CDC Correctional Guidelines also recommends that facilities should "[i]mplement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms."[24]

16.     The CDC's Correctional Guidelines are regarded as the most authoritative source of policy recommendations by both parties. The MDC's experts unanimously agreed that CDC Guidance should be followed.  For example, according to Ms. Tekbali, there is "nothing" in the CDC Corrections Guidance that she would disagree with.[25] Further, Dr. Beard stated that the CDC Guidance on Corrections "seems to be the most authoritative source in dealing with this that we have"[26] and, that there was nothing in the Guidance "that [he] specifically saw that [he] disagreed with."[27]

17.     Despite this unanimous agreement with the CDC Correctional Guidelines, the MDC has failed to implement active screening for symptoms as well as temperature checks.

---

[23] Ex. 6 at 26 (emphasis added).

[24] Ex. 6 at 22.

[25] May 12 Tr. 253:3-5. Ms. Tekbali also conceded that quarantine units should be run in accordance with CDC Correctional Guidance.  May 12 Tr. 275:6-8.

[26] May 13 Tr. 395:13-14.

[27] May 13 Tr. 395:18-19.

18.    Thirteen people housed at the MDC Reported that they received no screening for COVID-19 beyond temperature checks.[28]

19.    Respondent admits that inmates in its general population are not regularly screened for COVID-19. [29]   BOP, however, has claimed on its website that they are screening and conducting daily temperature checks throughout general population.[30] The MDC also admits that it does not ask any specific COVID-19 questions when conducting its "wellness checks".[31]   Nor does it keep any records of what questions are asked (if any) or how they are answered by inmates.[32]   The only question that Ms. Vasquez, MDC's Health Services Administrator, asks when conducting her own rounds is "how are you doing?"[33]

20.    During summation, counsel for Respondent in response to a question from the Court, asserted that the reason the MDC staff do not conduct sign and symptom checks by asking about COVID-19 signs and symptoms is because "you don't want to

---

[28] Exs. 28,  32,  36, 37, 38, 39, 43, 44, 47, 48, 55, 64.

[29] Ex. 26 (Vasquez Depo) Tr.48:11-16; *see also* May 13 Tr. 324:19-21 (Dr. Beard testifies that MDC conducts twice a day sick calls in general population but describes temperature and wellness checks only in quarantine and isolation).

[30] Ex. 19 at PETS 1603.

[31] Ex. 26 (Vasquez Depo) Tr. 38:20-25, 39:1-10; 40-44.

[32] Ex. 26 (Vasquez Depo) Tr. 44.

[33] Ex. 26 (Vasquez Depo) Tr. 44:3-15.

lead the inmates either." [34]   However, counsel's assertion is inconsistent with CDC guidance[35] and is not supported by anything in the record.

21.     These screening failures were evident during Dr. Venters' visit to the MDC on April 23, 2020.  He reported that "none of the people [that he] spoke with reported symptom screening at all.  That is, they were never asked whether they had cardinal symptoms of COVID-19 including, for example: fatigue, shortness of breath, cough and other symptoms identified by the CDC.  According to Dr. Venters' medical expertise and experience, "it is essential that such active screening should be part of any [response] during a viral outbreak. To fail to do so can result in catastrophic consequences to populations exposed to a communicable virus, such as COVID-19."[36]

22.     Dr. Venters also observed that "[w]hen the MDC staff screens people for COVID-19, they rely only on temperature checks, which is a serious deviation from accepted standards."[37]

23.     This practice of relying on temperature checks is inadequate and contrary to the CDC Correctional Guidelines on "Verbal Screening and Temperature Check

---

[34] May 14 Tr. 545: 12-18.

[35] Ex. 6 at 26

[36] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 21.

[37] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 2. *See also* Ex. 25 (Dr. Venters Facility Evaluation) ¶ 18 "The CDC recommends that all new admissions to a detention facility should be screened for both signs and symptoms of COVID-19 … Several people I spoke with reported that they had not been screened at all when they arrived in MDC, a clear deviation from basic CDC guidelines."

Protocols for Incarcerated/Detained Persons, Staff and Visitors." [38]   This guidance recommends verbal screening for symptoms of COVID-19 by way of the following questions: (i) "Today or in the past 24 hours, have you had any of the following symptoms? Fever, felt feverish, or had chills? Cough? Difficulty breathing? (ii) "In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?"[39]

24.     The CDC Correctional Guidelines also recommend "[w]hen evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible."[40]   The MDC does not consistently ensure that people who do not speak English are provided with language interpretation to report symptoms.[41]

25.     The MDC's "wellness checks" are perfunctory, if they occur at all.  In fact, the MDC admits that the wellness checks sometimes happen through the food slot,[42] and that the "wellness checks" of an entire housing unit within MDC only take about an hour or so, even though there are about 120 people per unit.[43]  This is a clear deviation from

---

[38] Ex. 6 at 26.

[39] Ex. 6 at 26.

[40] Ex. 6 at 23.

[41] Ex. 51 (Sanchez Decl.) ¶¶ 11-12.

[42] Ex. 26 (Vasquez Depo) Tr. 79.

[43] Ex. 26 (Vasquez Depo) Tr. 43:8-16.

the CDC guidelines..   In fact, Ms. Tekbali has indicated that she considers questions regarding COVID-19 symptoms to be an "important" part of the screening procedure.[44]

26.     These simple questions—if implemented regularly and recorded adequately—could have a dramatic effect on the MDC's ability to control the spread of COVID-19 in the facility. According to Dr. Venters: "we're trying to find people as early as possible, and so it really comes down to this simple question. Do you want to find people with early COVID-19 in case you way want to be inclusive, which is what the CDC says that symptom and temperature checks, or do you want to find them later in which case you could be more reactive and just check temperature."[45]

27.     Although in her testimony, Respondent's expert stated that up to 93% of people with COVID-19 experience fever,[46] the CDC guidance on which her report relies does not support her assessment that fever is nearly this prevalent in typical cases. In her report, Ms. Tekbali relies upon CDC's Interim Clinical Guidance for Management of Patients with *Confirmed* Coronavirus Disease (COVID-19).[47]  This guidance cites a study that found fever present in only 44% of patients hospitalized for coronavirus at

---

[44] May 12 Tr. 282:4-7.

[45] May 12 Tr. 141:13-18.  *See also* May 12 Tr. 75:1-3 ("To the extent a facility wants to find people who have COVID-19, it should include a structured set of questions [about] symptoms and also a temperature check.").

[46] May 12 Tr. 240:14-16.

[47] Ex. BB.

admission.[48] The same study found that fever presents at higher rates (89%) during hospitalization.[49] Ms. Tekbali's report states that temperature screening is the standard in hospitals, but does not address the standard in correctional or other residential settings.[50]

### B.   MDC's Inmate Temperature Checks are Sporadic and Insufficient

28.   An elevated temperature is not always an early indication that an individual may be positive for a COVID-19 infection.[51] More often, it is a symptom that occurs at the time an individual may need to be hospitalized—a different time frame, which is not appropriate when trying to combat the spread of COVID-19 in a correctional facility.[52] Nevertheless, temperature checks appear to be the only method guided by policy that MDC is using as a means to attempt to identify potential cases of COVID-19 in its facility.

29.   Respondent's implementation even of temperature checks is inconsistent and sporadic.  As of April 27, 2020, the MDC reports that once a day temperature checks are not happening in the general population, because MDC "has not been given Central Office guidance about that."[53]  Dr. Venters noted that in their responsive reports "neither [MDC] expert rebutted reports by detained people that the housing area temperature

---

[48] Ex. BB, Tekbali 10.

[49] *Id.*

[50] Ex. AA at 3.

[51] May 12 Tr. 147-148.

[52] May 12 Tr. 147-148.

[53]Ex. 26 (Vasquez Depo) Tr. 211-12.

12

checks have slowed in frequency from twice daily, to less than daily."[54]  Thus, it is clear from the MDC's own evidence that it is not conducting temperature checks regularly, despite the CDC's recommendation of both verbal screening and temperature checks for incarcerated/detained persons."[55]  .

30.     This failure to implement a straight-forward policy was also confirmed on the ground at the MDC.  Fourteen MDC inmates have reported that there is no routine screening of COVID-19.[56]  And as Dr. Venters learned during his visit to the MDC, inmates reported only irregular temperature screening.   In his own words: "based on my interviews with people on [unit 40], no symptom screening was occurring at all, and the limited checking of a single sign—temperature—was intermittent."[57]  Such a limited and intermittent approach to temperature checks is insufficient to control an outbreak of COVID-19.

**B.     MDC's Intake/Entry Screening is Insufficient**

31.     According to the CDC Correctional Guidelines correctional facilities should "[p]erform pre-intake screening and temperature checks for ***all*** new entrants.  Screening should take place in the sallyport, before beginning the intake process."[58]  The

---

[54] Ex. 82 (Venters Supp. Report) ¶ 3(a).

[55] Ex. 6 at 26 (emphasis added).

[56] Exs. 28, 32, 36, 37, 38, 39, 43, 44, 47, 48, 55, 64, 66, 83.

[57] Ex. 25 ¶ 20.

[58] Ex. 6 at 10.

CDC Correctional Guidelines go on to state that this applies to "incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody."[59] The CDC Correctional Guidelines also recommend that if possible, all new intakes should be quarantined "for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case)."[60]   Indeed, Ms. Tekbali agrees with such a recommendation, stating that "everyone who enters the facility should be triaged at the front door."[61]

32.     The MDC has not implemented consistent, adequate screening for all new entrants to the building.  According to Dr. Venters, "people [that he] spoke with reported that they had not been screened at all when they arrived in MDC, a clear deviation from basic CDC guidelines."[62]  This represents a "systemic lack of quality assurance"[63] and could serve to work against other policies that MDC attempts to put in place to control the spread of COVID-19 throughout the facility.[64]

33.     Individuals entering the MDC are not always screened for symptoms of COVID-19. The completed "Inmate Screening Tool" for one individual who entered the

---

[59] May 12 Tr. 281.

[60] Ex. 6 at 14.

[61] May 12 Tr. 281.

[62] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 18.

[63] May 12 Tr. 79:16-17.

[64] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 4.

MDC on April 14, 2020 has no markings in the section titled "Assess Symptoms" aside from a notation of "97.0" next to the "fever" box.[65] The "Assess Symptoms" section of the screening tool has yes or no boxes for fever, cough, and shortness of breath, but none of these boxes were checked for this individual.[66] The "Assess the Risk of Exposure" section, which has yes or no boxes for "Traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk" and for "Had close contact with anyone diagnosed with COVID-19 illness within the last 14 days," was also left blank.[67]

34.     The MDC is not properly screening staff at entry.  The MDC has admitted that staff are not asked about whether they have had contact with people who are positive for COVID-19 in the community.[68]  Given the rising level of staff infections of COVID-19, this is concerning.

---

[65] Ex. ZZZZ at 2.

[66] *Id.*

[67] *Id.*

[68] May 12 Tr. 224:15-19; Ex. 79 (Sanon Decl.) ¶ 12 ("MDC continues to assign non-medical personnel to screen the staff."); *id.* ¶ 13 ("[W]hen staff are screened, we are not asked if we have been exposed to anyone who is positive for COVID-19 in the last 14 days.").

## **MDC Does Not Track COVID-19 Symptoms**

35.     Respondent does not track the reporting of symptoms consistent with COVID-19 within the prison, and it has no idea how many people have reported symptoms consistent with COVID-19.[69]

36.     Respondent's lack of knowledge with respect to symptomatic inmates leads to inadequate care and triaging of MDC's prisoner population.  The CDC guidelines related to management of COVID-19 cases, including the guidelines related to the use of medical isolation, rely on the prompt identification of inmates with COVID-19 symptoms and housing units with symptomatic inmates.[70]  Thus, it is crucial that MDC have a thorough understanding of the number of inmates who have symptoms on each day of the ongoing pandemic.

37.     MDC admits that its method of triage for COVID-19 relies on knowledge of inmate symptoms. As the BOP's Assistant Director Ms. English testified, triage for COVID-19 at MDC "would depend on the symptoms . . . It would depend on whether or not if they were symptomatic and voicing their concerns."[71]  Ms. English also admitted

---

[69] Ex. 26 (Vasquez Depo) Tr. 65-66; 94-95; Ex.80 (Resp.'s Response to Interrogatory No. 1(f)) (confirming that BOP does not track COVID-19 symptoms)); May 13 Tr. 517:12 (Dr. Beard admitted that he did not know if anyone at MDC had symptoms when he visited the facility).

[70] Ex. 6 at 15-17.

[71] May 12 Tr. 196:6-9.

that it would be alarming if the MDC was not tracking people with COVID-19 symptoms.[72]

38.     Neither the MDC nor the BOP is currently tracking who in the MDC has reported symptoms consistent with COVID-19.[73]   Respondent concedes that the MDC does not track COVID-19 symptoms. Other than testing data, the only data that the MDC tracks is the number of people who are in quarantine and isolation.[74]   The MDC's choice not to track symptoms therefore undermines its COVID-19 triage measures.

39.     The use of a tracking tool that collects information on inmate symptoms is a standard approach to prison outbreaks of communicable disease. During his testimony, Dr. Venters proposed that the MDC adopt a standardized COVID-19 surveillance tool which includes COVID-19 symptoms and signs, including temperature checks, to be administrated twice daily by nursing staff to all incarcerated persons who possess high-risk factors, patients in quarantine, and patients in isolation.[75]   He suggested that the information collected using this tool could be added to inmates' paper or electronic medical records, which MDC staff can use to track symptoms by housing area.[76]   Dr.

---

[72] May 12 Tr. 205.

[73] May 12 Tr. 197 (symptoms only appear in an individual person's chart); May 14 Tr. 538-39; Ex. 26 (Vasquez Depo) Tr. 93-94 (dashboard system is tracking people in isolation, quarantine, positive tests, but not tracking symptoms); May 12 Tr. 207.

[74] Ex. 26 (Vasquez Depo) Tr. 93-95, 176 (central BOP system is tracking people in isolation, quarantine, and tracking positive tests, but is not tracking symptoms).

[75] *See* May 12 Tr. 80:17-82:14.

[76] *Id*.

Venters notes that this approach is "eminently doable in both the paper and the electronic world."[77]  He spoke from experience, as he has employed this approach when managing outbreaks in his previous positions.[78]

     **A.**     **The MDC′s Sick Call System is Broken and Fails to Deliver Adequate Care to Inmates**

40.     A functioning sick call system is foundational to both patient care and outbreak management in prisons.  In order for a facility to take steps to provide medical care to sick inmates while controlling the outbreak, it requires a sick call system that simultaneously allows inmates to report symptoms and requires timely responses to their requests.  Yet, even in the midst of the COVID-19 pandemic, MDC's sick call system is severely deficient.  MDC "fails to provide timely and adequate response for individual patients with symptoms of COVID-19 and also fails to integrate sick call information into tracking of the outbreak."[79]

41.     First, detained people at the MDC struggle to report symptoms to the MDC staff.  The MDC's own Associate Warden concedes that the emergency call buttons located in cells are broken and are not likely to be fixed in the near future.[80] Absent functioning medical call buttons, frequent medical rounds would be ideal in order

---

[77] *Id.*

[78] *Id.*

[79] Ex. 82 (Venters Supp. Report) ¶ 3.

[80] Ex. 40 (King Depo) Tr. 103.

to track inmate symptoms.[81]  Yet, MDC is not conducting regular medical rounds for its general population to screen for COVID-19 symptoms.[82]  Even if the emergency call buttons were working and regular medical rounds were occurring, many inmates are afraid to report symptoms because they fear they will be placed in solitary confinement.[83]

42.     Second, the MDC does not provide timely responses to sick call requests. The MDC agrees that sick call requests should be considered in a timely way.[84]  The MDC also agrees that it is important to train staff on the importance of reporting health related problems among detainees.[85]  However, 22 inmates at the MDC have reported a failure to respond to sick call requests in a timely manner, and some reported never receiving a response despite submitting multiple requests for care.[86]

---

[81] May 12 Tr. 288:15.

[82]*See* May 13 Tr. 365:2-4.

[83] Ex. 11 (von Dornum Decl.) ¶ 37; Ex. 26 (Vasquez Depo.) Tr. 45:5-15 (Prisoners have not been assured that they will not be placed in the SHU if they report symptoms).

[84] May 12 Tr. 286:21.

[85] May 12 Tr. 281:10-13.

[86] Ex. 29 (Olivera Decl.), Ex. 32 (Dixon Decl.), Ex. 33 (Needham Decl.), Ex. 35 (Finch Decl.), Ex. 36 (Nelson Decl.), Ex. 37 (Platt Decl.), Ex. 38 (Pierson Decl.), Ex. 39 (Sojos-Valladares Decl.), Ex. 44 (Carpenter Decl.), Ex. 45 (Watson Decl.), Ex. 47 (Miller Decl.), Ex. 48 (Soria Decl.), Ex. 51 (Sanchez Decl.), Ex. 52 (Molina Decl.), Ex. 54 (Singer Decl.), Ex. 55 (Deutsch Decl.), Ex. 57 (Whitley Decl.), Ex. 59 (Castillo Decl.), Ex. 63 (Rabadi Decl.), Ex. 65 (Hair Decl.), Ex. 66 (Chunn Decl.), Ex. 81 (Gonzalez Decl.), Ex. 83 (Hair Supp. Decl.).

43.     Many incarcerated people throughout the MDC have not been screened even when they have multiple COVID-19 symptoms.[87]   Mr. Sojos-Valladares, who eventually was moved to isolation because of his COVID-19, asked medical staff on multiple occasions to take his temperature while he was in general population, but they refused, only providing him medical care when he refused to eat.[88]   Another incarcerated person was told that she would not be evaluated for her multiple COVID-19 symptoms because the medical staff were dealing with emergencies first.[89]

44.     In addition to these deficiencies, there is also no way of knowing exactly how many inmates reported symptoms of COVID-19 and were not seen promptly.   As Ms. Vasquez explained, paper sick call requests were discarded after a clinical encounter was scheduled but before the patient was seen.[90]   According to Dr. Venters, "[w]ithout having the paper form that the patient filled out, and being able to compare that to what a nurse or some other clinical person writes or a scheduler writes in the electronic medical record, it renders it impossible to know that if the thing the patient was worried about was

---

[87] *See* Ex. No. 28 (Bynum Decl.) ¶ 8 (despite reporting multiple COVID-19 symptoms, nurse only took his temperature);  Ex. 31 (Mabry Decl.) (had chills, coughing, stomach aches, and headaches but did not see a doctor; Ex. 32 (Dixon Decl.) ¶¶ 11-13 (complained of headache fever, and chills, but never received medical care); Ex. 38 (Pierson Decl.) ¶ 21 (cellmate with COVID 19 symptoms remained in cell and did not receive medical care).

[88] Ex. 39 (Sojos-Valladares Dec.) ¶ 5.

[89] Ex. 46 (Wilson Decl.) (reporting sore throat, headaches, fatigue, and loss of sense of taste and smell).

[90] Ex. 26 (Vasquez Depo.) Tr 194.

addressed or even acknowledged when they finally saw somebody."[91]   Thus, it is impossible to understand whether an actual healthcare provider – or, in fact, anyone at all – responds to sick call requests at MDC.   Dr. Venters stated that, in fact, "[i]t seems unknowable from my understanding of this system in this facility . . ." and that "the crux of the failure is that the system is set up to make that unhelpful."[92]

45.     The MDC does not contradict Dr. Venters' observations.   It merely asserts that its procedures, if followed, are adequate.   As Ms. English admitted, her observations regarding sick call requests were based only on what she saw the day she visited the MDC.   She could not confirm or deny what other testifying experts observed before her visit.[93]   Ms. English's team also made no assessment of the MDC's response to sick call requests reporting COVID-19 symptoms.   She merely observed medical rounds and how some inmates filled out sick call requests.[94]   Dr. Beard also did not observe staff responding to sick call requests during his visit.[95]   In addition, he did not review any documents related to sick call requests or review any surveillance video footage of staff responding to sick call requests.[96]   In fact, Dr. Beard noted that his report does not

---

[91] May 12 Tr. 140:18-24.

[92] May 12 Tr. 132:23-24, 138:20-21.

[93] May 12 Tr. 210:5-10.

[94] May 12 Tr. 214:2-25.

[95] May 13 Tr. 364:1-7.

[96] *Id.*

address Dr. Venter's observations of the MDC's sick call system failures.[97]   Finally, Ms.
Vasquez admitted that her daily report to the BOP via the Century System includes no
information about COVID-19 and does not track symptoms.[98]   Ms. Vasquez also stated
that her daily report to MDC staff and legal counsel on COVID-19 does not include
information about COVID-19 symptoms – it merely tracks the inmates who are isolated,
quarantined, and tested.[99]

46.     Even when inmates are able to successfully report COVID-19 symptoms
to staff, Respondent chooses not to promptly address all COVID-19 symptoms.
According to Ms. Vasquez, loss of sense of taste is not considered an emergent request
worthy of immediate care because it is "not quantifiable."[100] Therefore, inmates who
report that symptom will likely not be seen for 2.5 weeks.[101]   A sore throat also would
"probably not" be considered an urgent request by MDC staff.[102]   Therefore, MDC

---

[97] May 13 Tr. 369:17-25, 370:1-11; Ex. 80 (Resp. Response to Interrogatory No. 1(f)), 4
("The BOP does not maintain records of the total number of inmates who requested
medical care for COVID-19 symptoms. The BOP is unable to determine the total number
of requests for medical care for COVID-19 symptoms. The BOP does not contain in any
centralized fashion sick call requests for COVID-19 symptoms.")

[98] Ex. 26 (Vasquez Depo.) Tr. 94-95 (Central Health Office receives daily reports of
quarantine, isolation numbers but not of symptoms).

[99] *Id*.

[100] Ex. 26 (Vasquez Depo.) Tr. 196.

[101] *Id*.

[102] *Id*. at 197.

admits that some inmates with active COVID-19 symptoms must wait for weeks to be seen for the first time by medical staff.

### B.     Inadequate Contact Tracing

47.     Ms. Tekbali testified that contact tracing is a core disease control measure that it is a key strategy for preventing further spread of COVID-19.[103]

48.     However, Ms. Vasquez made it clear that the MDC's approach to contract tracing incorrectly assumes social distancing both within and outside of the MDC, which sharply decreases the effectiveness of its contact tracing measures.   When the MDC conducts contact investigations of inmates, it automatically considers a prisoner's cellmate as that prisoner's only close contact, because MDC assumes proper social distancing as to all other prisoners and staff members in the facility.[104]   This is the case even though MDC admits that keeping the recommended distance from others is not always possible in the facility.[105]   MDC staff would also never be considered a close contact of a prisoner, regardless of the nature of their interactions with the prisoner.[106]

---

[103] May 12 Tr. 262:11-14.

[104] Ex. 26 (Vasquez Depo.) Tr. 83-85.

[105] Ex. III (Flowers Decl.) ¶¶ 15-20, 23 ("Due to the physical design of the [women's] unit, there are occasions where the female inmates may not always achieve the ideal distance based on the bunk assignments while they are sleeping.").

[106] Ex. 26 (Vasquez Depo.) Tr. 87:14-16.

Furthermore, MDC does not take any preventive action to protect the general population from inmates with potential COVID-19 exposure.[107]

49.    MDC's contact tracing for staff is also deficient, despite its continued hiring of staff from all around the country.[108]  MDC does not ask its staff about close contacts in the community with positive or presumed positive people.[109]  Staff are not even required to report if they have tested positive for COVID-19, which makes contact tracing ineffective.[110]

50.    The MDC does not keep any records of its contact tracing investigations for inmates, and Ms. Vasquez, the Health Services Administrator for the prison, is not sure if there is any written guidance about performing contact tracing.[111]  This illustrates

---

[107] Ex. 80 (Response to Interrogatory No. 1), 3 ("Inmates are isolated and housed in the isolation unit if they have COVID-19 symptoms, not 'due to suspected COVID-19 exposure.'").

[108] Ex. 79 (Sanon Decl.) ¶ 7-8 ("Bureau of Prisons is bringing people from other parts of the country to work in MDC Brooklyn. There are officers working at the MDC from the Philadelphia Federal Detention Center and from USP Lewisburg in Pennsylvania, among other facilities . . . It was recently reported that an officer from USP Lewisburg, who had filled in at MDC Brooklyn because we are short-staffed, tested positive while working in Brooklyn and was sent home to be quarantine.").

[109] Ex. 26 (Vasquez Depo.) Tr. 136.

[110] Ex. 26 (Vasquez Depo.) Tr. 147; Ex. 79 (Sanon Decl.) ¶ 9: "There is currently no system in place to warn Correction Officers when they have worked closely with other staff who test positive."

[111] Ex. 26 (Vasquez Depo.) Tr. 88; Vasquez (Ex. YYYY) ¶ 3 ("[H]ealth services is responsible for conducting contact investigations of the close contacts of the positive staff member.").

the lack of any meaningful and effective contact tracing procedures at MDC, which can lead to widespread transmission of COVID-19 from exposed inmates and staff within the prison.

## MDC Does Not Provide Adequate Medical Care for those Sick with COVID-19 or at High Risk of Contracting COVID-19

### A.   MDC Does Not Provide Adequate Medical Care for those with COVID-19

51.    Detained people at the MDC who report symptoms of COVID-19 are not isolated or provided prompt medical care. The MDC has received at least 210 reports of COVID 19 symptoms since March 13 and yet, by its own calculation, it has placed only 19 people in isolation to date.[112]  This is contrary to the CDC Correctional Guidelines, which provide that "[a]s soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals."[113]

52.    Respondent admits that the MDC is not isolating inmates even when they report COVID-19 symptoms, and that it does not know how many inmates who report symptoms are not isolated.[114]

---

[112] Exs. 9, 24, 78  (BOP SCR 1 – 1192); Ex. 80 (Respondent's Response to Interrogatory 1(a), dated April 27, 2020).

[113] Ex. 6 at 15.

[114] Ex 26 (Vasquez Depo.) Tr. 65-66 ("Are there people who have expresses symptoms of COVID who have not been placed in isolation? A Yes. Q: Can you tell me when that would happen that a person who expressed COVID symptoms would not be placed in medical isolation? A. That is a clinical providers judgment. Q Do you know how many

53.     Sixteen detained people housed at the MDC reported not receiving treatment while sick with COVID-19 symptoms.[115]

54.     Several people detained at MDC reported COVID-19 symptoms to staff, but did not receive timely, or in some cases any, medical attention.[116]

55.     Multiple detainees reported that they were not asked about, and even were ignored when they reported, common symptoms of COVID-19, including shortness of breath.[117] Failing to provide medical attention where a patient presents a compelling history of COVID-19 symptoms without elevated temperature places that individual at risk of serious illness.[118] Examples of MDC's failure to provide medical attention to individuals at MDC who reported COVID-19 can be found throughout the record.[119]

56.     For a week, Victor Sojos-Valladares suffered from symptoms of COVID-19 and despite his complaints to both custody and medical staff, he was not screened

---

such people there have been at the MDC? A No. Q Do you know if there have been more than ten? A I wouldn't be able to tell you that.").

[115] Exs. 27, 28, 31, 32, 33, 35, 36, 39, 43, 44, 46, 47, 55, 65, 66, 81.

[116] Ex. 39 (Sojos Valladares Decl.); Ex. 76 (Rodriguez Decl.); Ex. 33 (Needham Decl.); Ex. 28 (Bynum Decl.); Ex. 35 (Finch Decl.); Ex. 66 (Chunn Decl.); Ex. 44 (Carpenter Decl.); Ex. 30 (Gomez Decl.); Ex. 65 (Hair Decl.) Ex. 55 (Deutsch Decl.).

[117] Ex. 82 Supp. Venters Rep. ¶ 6.

[118] May 12 Tr. 75:6-12.

[119] Ex. 25, Venters Rep. ¶ 58; Ex. 82 Supp. Venters Rep. ¶ 6; May 12 Tr. 75:6-12; Ex. 39, Sojos Valladares Decl.; Ex. 76, Rodriguez Decl.; Ex. 33, Needham Decl.; Ex. 28, Bynum Decl.; Ex. 35; Finch Decl.; Ex. 66, Chunn Decl.; Ex. 44, Carpenter Decl.; Ex. 30, Gomez Decl.; Ex. 65, Hair Decl.; Ex. 55, Deutch Decl.

during that time. His cell-mate was also sick at this time.[120] Mr. Sojos-Valladares initially suffered from headaches, but throughout the week his symptoms worsened and included difficulty breathing.  He made several paper and electronic sick-call requests.[121] He reported feeling so desperate for medical attention that he began to refuse meals.  On April 15, the day after he began refusing meals, staff took his temperature, which was elevated, and he was taken into isolation by staff who were not wearing masks or gloves.[122]

57.     Mr. Anaya-Martinez, the cell-mate of Mr. Sojos-Valladares, similarly made several sick call requests due to his symptoms of shortness of breath, chills, severe weakness, and loss of sense of taste and smell, all, according to Dr. Venters, symptoms of COVID-19.[123] After three or four requests, a nurse came to take his temperature and left when the reading was normal, without asking him about his symptoms. This nurse did not speak Spanish, which is how Mr. Anaya-Martinez communicates.[124]

58.     During this week Mr. Sojos-Valladares and Mr. Anaya-Martinez were reporting COVID-19 symptoms, they were held on a unit that housed approximately 120 people in double cells and who all shared phones, computers and showers.[125]  Several

---

[120] Ex. 39, Sojos Valladares Decl. ¶ 5.

[121] Ex. 25, Venters Rep. ¶ 58

[122] Ex. 39 ¶ 5; Ex. 25 ¶ 60.

[123] Ex. 25 ¶ 57.

[124] Ex. 25 ¶ 58.

[125] Ex. 39,  ¶ 8.

days after the first sick call request was made, both men came out of their cells to use the common areas.[126]

59.     Justin Rodriguez was housed in the MDC's unit 53 until the middle of April.[127] Mr. Rodriguez, who suffers from asthma, reported that there were both sick and elderly people on his unit, and that all of them were double-celled.[128] In late March,  Mr. Rodriguez began to feel sick, with chills, weakness and having lost his sense of taste and smell.[129] He requested medical attention from custody staff and asked both medical and custody staff several times for sick call slips, but staff never provided them.[130]  Finally, someone responded by coming to take his temperature, but because it was normal said there was nothing to be done. The officers also told him that without a fever, medical attention was not available. He suffered this way in his cell for approximately two weeks.[131]

60.     Mr. Rodriguez was released to a halfway house on April 26, 2020 and then home on April 28, 2020. Upon his release from the halfway house, he went to urgent

---

[126] Ex. 25¶ 59

[127] Ex. 76, ¶ 6.

[128] Ex. 76, ¶ 3-4, 6

[129] Ex. 76, ¶ 7

[130] Ex. 76, ¶ 7

[131] Ex. 76, ¶ 7

care and was tested for COVID-19 antibodies.[132] He tested positive for COVID-19 antibodies.[133]

61.     For approximately three weeks, while housed in the women's dorm at MDC, Derrilyn Needham experienced COVID-19 symptoms, including extreme weakness, trouble breathing, chills, cough, loss of sense of taste and weight loss.[134]  Ms. Needham informed Associate Warden Flowers of her symptoms on Monday, April 20. Flowers responded that there would be no testing at MDC.[135] Ms. Needham requested care during the time she was experiencing symptoms both verbally and in writing.[136]  On April 24, Ms. Needham's lawyer wrote to U.S. District Judge Pauley regarding her care at the MDC and on April 27, she received a visit from a physician's assistant ("PA").[137] The PA questioned why she would want a test now, given that she had symptoms for so long and had been exposed to everyone in the dorm and told her to imagine the panic on the unit if she were to test positive.[138] Ms. Needham told the PA that she was particularly concerned because she had been in close contact with a Lieutenant who had worked in

---

[132] Ex. 76, ¶  15-17.

[133] Ex. 71.

[134] Ex. 33, Needham Decl., ¶ 19.

[135] Ex. 33, ¶ 20-21

[136] Ex. 33, ¶ 23.

[137] Ex. 33, ¶ 24-25.

[138] Ex. 33, ¶ 26.

women's dorm before testing positive.[139] Ms. Needham was neither placed in quarantine nor tested for COVID-19.[140]

62.    Steven Bynum, who is housed on unit 53 at the MDC experienced COVID-19 symptoms, including headache, shortness of breath and stomach pain.[141]  He also lost his sense of taste and smell for seventeen days. Throughout the time that he experienced symptoms, he requested medical care, including screening and testing for COVID-19. The only response he received was a nurse coming to his cell to check his temperature.  The nurse told him that he could not get tested or see a doctor because he did not have a fever and had not fainted.[142]

63.    Hassan Chunn, who suffers from several medical conditions, including coronary heart disease, high blood pressure, diabetes and asthma, filed an electronic sick-call request reporting symptoms, including a dry cough and tightness in his chest.[143] His cellmate also had similar symptoms and filed a sick call request.  Neither of them received a response to their request.[144] He also brought his symptoms to the attention of the staff conducting pill call, who told him they could not see him and that he needed to submit a "cop-out." When Mr. Chunn informed the staff that he already had submitted a

[139] Ex. 33, ¶ 29.

[140] Ex. 33, ¶ 33-35.

[141] Ex. 28 (Bynum Decl.) ¶ 1, 8

[142] Ex. 28, ¶ 8.

[143] Ex. 66 (Chunn Decl.), ¶ 18, 21.

[144] Ex. 66, ¶ 21.

request, they told him he would just need to wait for care. He was never seen by medical staff after submitting his "cop-out."[145]



64.

65.

66.

---

[145] Ex. 66, ¶ 22.

[146] Ex. 9, BOP SCR 508.

[147] Ex. 9, BOP SCR 509



67.

68.

69.

---

[148] Ex. 9, BOP SCR 15.

[149] Ex. 9, BOP SCR 495.

[150] Ex. 9, BOP SCR 502.

[151] Ex. 9, BOP SCR 374.

70. 

71.

72.

73.

---

[152] Ex. 9, BOP SCR 39.

[153] Ex. 9, BOP SCR 375.

[154] Ex. 9, BOP SCR 379.

[155] Ex. 9, BOP SCR 247.

74.



75.

76.

---

[156] Ex. 9, BOP SCR 478.

[157] Ex. 9, BOP SCR 776.

[158] Ex. 9, BOP SCR 846





---

[159] Ex. 9, BOP SCR 664.

[160] Ex. 9, BOP SCR 679.

[161] Ex. 9, BOP SCR 699.



81.

82.

83.

---

[162] Ex. 78, BOP SCR 999.

[163] Ex. 78, BOP SCR 1019.

[164] Ex. 78, BOP SCR 1151.



84.

85.

86.

---

[165] Ex. 78, BOP SCR 1152.

[166] Ex. 78, BOP SCR 1002.

[167] Ex. 78, BOP SCR 1066.



87.     Mr. Victor Sojos-Valladares reports that while held in the isolation unit after testing positive with COVID-19 on April 17, 2020, he exhibited symptoms such as shortness of breath, fever and others.  However, he did not have another documented medical encounter until April 27, 2020.[170]  During this time, he reported that not one single health professional listened to his lungs or heart, despite his initial presentation of shortness of breath.[171]

88.     Mr. Justin Rodriguez reports that he was in a shared cell in housing area 53 in March 2020 when he started to feel ill, and exhibited symptoms of shortness of breath, feeling feverish, chills, weakness and loss of his sense of smell.[172] Mr. Rodriguez reports that he asked for sick call slips 5 or 6 times from correction officers as well as the nurses who passed to take his temperature each day. His requests were never met and he

---

[168] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

[169] May 12 Tr. 287.

[170] *See* Ex. 82 (Venters Supp. Report) ¶ 17.

[171] Ex. 39 (Sojos-Valladares Decl.) ¶ 5.

[172] Ex. 76 (Rodriguez Decl.) ¶¶ 6-7.

was both unable to obtain a sick call slip to fill out, and also unable to get any medical attention despite his COVID-19 symptoms for two weeks.[173]

89.     Mr. Rodriguez was ultimately transferred to the isolation unit because of an elevated temperature.[174]   Once on the isolation unit, Mr. Rodriguez reports being locked in his cell for 24 hours per day, with the exception of a shower every three days, and without any medical encounters occurring.  He reports being discharged home where he took a COVID-19 antibody test which was positive, confirming the fact that he had been infected with COVID-19 while at the MDC.[175]

90.     According to Dr. Venters, "[w]ithout conducting *daily* structured encounters with COVID-19 patients, the BOP remains unable to detect when this clinical deterioration would occur, and increases the risk of serious illness and death among these patients."[176]   Indeed, "[t]he expert reports proffered by the MDC do not allay [Dr. Venters'] fears that practices inside the MDC are causing many people with symptoms of COVID-19 to be denied assessment and care, and that … those who do become identified as having COVID-19 are not being adequately protected."[177]

**B.      The MDC has failed to implement adequate protections for people known to be at high risk for serious illness and death from COVID-19**

---

[173] Rodriguez Declaration at para. 7.

[174] Rodriguez Declaration at para. 13.

[175] Rodriguez Declaration at para. 17.

[176] Ex. 82 (Venters Supp. Report) ¶ 18 (emphasis added).

[177] Ex. 82 (Venters Supp. Report) ¶ 20.

91.     Per CDC guidance, individuals who are at greater risk of complications from COVID-19 if the disease is contracted are deemed "high risk."[178]  These guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.[179]  Those who are "high risk" include those over 65 and those with significant underlying medical conditions, such as chronic lung disease, moderate to severe asthma, liver disease, and diabetes.[180] Certain health conditions associated with Multiple Sclerosis, including Asthma, can increase the risk for COVID-19 complications.[181]

92.     At the beginning of the COVID-19 pandemic, the MDC's Health Services Department reviewed inmate medical records in order to determine which individuals at MDC Brooklyn were considered "high risk" for complications due to COVID-19 pursuant to CDC guidelines."[182]

93.     The MDC compiled a written list of individuals confined in the MDC deemed to be "high risk" if they contracted COVID-19.[183]  The list originally contained 537 people; as of April 27, 2020, the list contained approximately 380 individuals.[184]

---

[178] Ex. 10 (Jordan Decl.) ¶ 33; May 12 Tr. 93:13-21.

[179] Ex. 10 (Jordan Decl.) ¶ 33.

[180] Ex. 10 (Jordan Decl.) ¶ 33.

[181] May 12 Tr. 278-279.

[182] Ex. 10 (Jordan Decl.) ¶¶ 33, 34.

[183] Ex. 26, Vasquez Tr. at 204:18-205:3.

[184] Ex. 26, Vasquez Tr. at 205:4-8.

94.     The MDC does not use the list of high-risk inmates that it prepared in any way.[185]

95.     Other than compiling the list of high-risk individuals in its custody, the MDC has taken no specific affirmative steps to protect these high risk individuals from COVID-19 infection.[186]  High risk individuals do not receive additional screening, they are not as a group isolated in any way, and they are not placed in single cells based on being high risk.[187]

96.     High-risk individuals confined in the MDC require additional protections from COVID-19 infection than individuals who are not deemed high-risk pursuant to the CDC guidelines.[188]  For example, Respondent's expert, Ms. Tekbali, agreed that high risk patients should ideally be housed alone in single cells, consistent with CDC Guidance,[189] and should be checked twice a day.[190]

---

[185] Ex. 26, Vasquez Tr. at 206:3-8 ("Q: How often is that list updated? A: As needed. It is not a medical tool that we use. It is kept basically for you all and the court. We have access to the medical record. Q: How does the MDC use that list? A: MDC does not use that list.")

[186] Ex. 26, Vasquez Tr. 207:15-209:18.

[187] Ex. 26, Vasquez Tr. 207:25-208:12.

[188] May 12 Tr. 94:11-17 ("High-risk patients need special protection.").

[189] May 12 Tr. 260:4-10.

[190] May 12 Tr. 282:17.

97.     In the sworn Declarations submitted to the Court in support of Petitioners'
motion, 15 high-risk individuals in the MDC with underlying medical conditions reported
a lack of monitoring or care by medical staff.[191]

98.     As Dr. Venters notes, neither of the MDC's experts responded to his
criticisms that "The BOP has failed to implement adequate protections for people known
to be at high risk for serious illness and death from COVID-19."[192]

99.     Dr. Venters states that "Cohorting patients based on risk factors is an
essential and common practice in correctional settings, including in outbreak response. I
have managed numerous outbreaks in correctional settings and view this as a critical tool
in protecting the most vulnerable patients. Even the BOP's own pandemic influenza plan
anticipates that patients may be cohorted based on chronic health problems such as
diabetes."[193]

100.    According to Dr. Venters, the approach of cohorting patients "is not only
important to create increased levels of protection, but to provide higher levels of
screening and surveillance. Cohorting high-risk patients does not mean that they are to be
transferred from single cell settings to open dorms. In fact, the use of single cell housing
areas for high risk patients is beneficial, but the MDC's practice of having high-risk

---

[191] Exs. 29, 35, 38, 42, 45, 46, 47, 51, 56, 57, 63, 64, 65, 66, 81, 83.

[192] *See* Ex. 82 (Venters Supp. Report) ¶. 2(b); *see also* Ex. 82 (Venters Supp. Report) ¶
12 "Neither expert report provided convincing rebuttal of my concern that the BOP has
failed to implement adequate protections for people known to be at high risk for serious
illness and death from COVID-19."

[193] Ex. 82 (Venters Supp. Report) ¶ 14.

patients spread throughout the facility, and often in double bunk cells, means that there is no special or heightened surveillance of their health status."[194]

101.    Dr. Venters' recommendation is that high-risk individuals be housed "in a single cell which is really standard practice now around the country in this COVID response.  And the place where they are, the single cell, should have extra protections so that they can be surveilled more clearly and more tightly for symptoms and that there can be higher levels of training and infection control."[195]

102.    Respondent's correctional expert Dr. Beard does not consider himself to be "expert in medical care delivery in prisons."[196]

103.    Respondent's correctional expert, Dr. Beard, misunderstands Dr. Venters' cohorting recommendation.[197] Beard admits he did not base his opinion on cohorting on review of any documents, any information about housing at MDC, or any document that supports his view.[198] Dr. Beard admitted that he would have to have far more information

---

[194] Ex. 82 (Venters Supp. Report) ¶ 14.

[195] May 12 Tr. 119:24-25, 120:1-8.

[196] May 13 Tr. 351:15-17.

[197] May 13 Tr. 346:10-13 ("Q. … did you read Dr. Venters's reports as recommending that hundreds of inmates regardless of inmates' security classifications be housed together? A. Yes. I saw that and I saw that in his testimony.").

[198] May 13 Tr. 373-373.

about a facility than he has about the MDC to be able to draw conclusions about cohorting.[199]

104.    MDC has not isolated its "at risk" population because "the number of inmates who fall into this category is too large to contain and isolate on one or even two units.[200]

105.    Dr. Venters recommends that the MDC implement expanded testing in the MDC, and during the time it takes to scale up testing, "it is essential to implement a phased testing of detained people, starting with high risk patients and those who present with COVID-19 systems."[201]

106.    The MDC does not consider individuals who are at high risk for illness or death if they contract COVID-19 to quality for the compassionate release process.[202]

107.    Petitioner Elodia Lopez is "high risk" within the meaning of the CDC's COVID-19 guidelines, since she has a medical history that includes a previous lung infection, Type II diabetes, high blood pressure, and high cholesterol.[203]

108.    Petitioner James Hair is "high risk" within the meaning of the CDC's COVID-19 guidelines, since he has a medical history that includes asthma, as well as multiple sclerosis.[204]

---

[199] May 13 Tr. 377-378.

[200] Ex. 26 (Vasquez Depo) Tr. at 209; Ex. 13.

[201] *See* Ex. 25 (Dr. Venters Facility Evaluation) ¶. 27

[202] Ex. WWW.

[203] *See* Ex. 25 (Dr. Venters Facility Evaluation) ¶ 52.

**Impossibility of Social Distancing**

109.    Ms. Tekbali testified that she agrees with the CDC guidance that social distancing is a cornerstone of reducing transmission of respiratory diseases such as COVID-19, and that six feet is the optimum distance for social distancing.[205]  The CDC Correctional Guidance recommends "[i]mplement[ing] social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."[206]

110.    This is impossible in the majority of the MDC, where people are double bunked and the beds are three to four feet apart.[207]

111.    Eight detained people reported problems with social distancing within double cells and/or in common spaces.[208]

112.    The MDC acknowledges that common spaces are not set up for social distancing.  For example, when inmates use the computers, "[t]he computers are pretty close. The computers are like side by side."[209]

---

[204] May 13 Tr. 279:12-16.

[205] May 12 Tr. 264:13-16; May 12 Tr. 264:19-23.

[206] Ex. 6 at 11.

[207] Ex. 40 (King Depo) Tr. 95:2-4, 96:17-23.

[208] Exs. 27, 28, 29, 31, 32, 33, 35, 36, 37, 38, 39, 41, 42, 43, 44, 45, 46, 47, 50, 51, 53, 54, 55, 57, 64, 65, 66, 81.

[209] Ex. 40 (King Depo) Tr. 9:10-11.

113.    Social distancing is especially problematic in the dormitory style housing in which women live at MDC.  The beds in the women's dormitory are less than 6 feet apart and it is not always possible to stagger the women "high, low, high, low" in order to create more distance.[210]

114.    The MDC acknowledges that this dormitory-style housing "presents unique challenges."   Some women have "failed to comply with the directive they wear their masks," and not practiced social distancing. [211]  Bunk assignments do not always allow for six feet of distance while sleeping.[212]

115.    Women living in dorm-style housing have reported symptoms, but not been isolated.[213]

116.    Medical and custody staff move between quarantine, isolation, and general population sections. [214]  No one monitors staff for compliance with infections disease protocols when transferring between units.[215]

117.    25 inmates have reported that people moved in and out of their units during the COVID-19 crisis.[216]  Anthony Sanon also reports that  "MDC continues to

---

[210] Ex. 40 (King Depo) Tr. 97:16-19; Ex. 33 (Needham Decl.) ¶ 3. .

[211] Ex. III (Flowers Decl.) ¶¶ 15-18.

[212] *See* Ex. III (Flowers Decl.) ¶ 23.

[213] Ex. 33 (Needham Decl.) ¶¶ 19-35; Ex. 64 (Lopez Decl.) ¶ 8.

[214] Ex. 26 (Vasquez Depo) Tr.95-96.

[215] Ex. 26 (Vasquez Depo) Tr. 95-96.

move inmates between units inside the facility on a weekly basis. People go into and out of SHU based on their disciplinary status. Other people are moved into and out of the intake unit and the isolation unit."[217]

<u>**Inadequate PPE and Hygiene Supplies**</u>

**A.      The MDC Agrees with the Importance of Proper PPE**

118.    Ms. Tekbali agrees that it is best practice for staff at the MDC to orient other staff and detained people on the proper use of masks.[218] This is in line with the CDC Correctional Guidelines, which recommend "that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases."[219]

119.    Ms. Tekbali also agrees that detained people should be provided with adequate access to masks where possible and that the facility should provide replacement masks when masks become soiled or damaged.[220]   She testified that detained people

---

[216] Exs. 28, 32, 35, 36, 37, 38, 39, 41, 42, 43, 44, 45, 47, 48, 49, 51, 52, 53, 54, 56, 63, 64, 65, 66, 81, 83.

[217] Ex. 79 (Sanon Decl.) ¶ 19.

[218] May 12 Tr. 266:8-9.

[219] Ex. 6 at 23.

[220] May 12 Tr. 266:13-16.

should be given masks more frequently than once a week if they use a mask for more than three hours a week.[221]

120.    Ms. Tekbali also agreed that gloves should be worn in compliance with CDC Corrections guidance.[222] The CDC Corrections guidance recommends that incarcerated people use gloves when working in a work placement handling laundry or used food service items from a COVID-19 case or case contact and working in a work placement cleaning areas where a COVID-19 case has spent time.[223]

121.    Ms. Tekbali also agreed with the CDC Corrections guidance recommendation that staff wear gloves when performing temperature checks, having direct contact with confirmed or suspected COVID-19 cases (including asymptomatic people under quarantine), handling laundry or used food service items from a COVID-19 case or case contact, and when cleaning areas where COVID-19 case has spent time.[224]

122.    MDC agrees that PPE should be worn by staff when interacting with suspected cases of COVID-19.[225]

### B.    MDC Does Not Provide Proper PPE to Inmates

---

[221] May 12 Tr. 266:15.

[222] May 12 Tr. 272-274.

[223] Ex. 6 at 25.

[224] May 12 Tr. 273; Ex. 6 at 25.

[225] May 12 Tr. 275:1-5.

123.    However, 22 inmates reported no access to masks until this lawsuit was filed.[226] Petitioners' expert, Dr. Venters noted that "Detainees do not have access to adequate cleaning solutions or personal protective equipment."[227]

124.    As of April 27, people housed at MDC were given one mask per week.[228] People housed at MDC are not given gloves, unless they work as an orderly.[229]

125.    The MDC has 3,000 N95s sitting unused in storage but not a single person housed at MDC has been fit tested for one or given one to wear.[230]  According to Ms. Tekbali, N-95s protect a wearer from aerosols and the coronavirus can be aerosolized by flushing toilets.[231] The toilets in cells in the MDC are uncovered, thereby creating a need for N-95s.[232]

126.    Mask wearing at the MDC is imperfect. For example, on his tour of the facility, respondent's expert Dr. Beard observed an inmate being brought into SHU whose mask had fallen down, leaving his nose uncovered.

---

[226] Exs. 27, 28, 31, 32, 33, 35, 36, 37, 38, 42, 44, 45, 47, 49, 52, 53, 55, 57, 63, 64, 66, 81.

[227] Ex. 25 ¶ 4.

[228] Ex. 40 (King Depo) Tr. 64:6-7.

[229] Ex. 40 (King Depo) Tr. 64:6-21.

[230] Ex. 40 (King Depo) Tr. 66, 78, 81.

[231] May 12 Tr. 269:18-25;Ex. 10 (Jordan Decl.) ¶ 56: "On April 5, 2020, all inmates and staff were provided protective face masks for daily use. They were provided new masks on April 12, 2020."

[232] May 12 Tr. 270:6-8.

**C.      MDC Does Not Provide Proper PPE to Staff, or Penalize Staff for Not Using It Properly**

127.    MDC maintains that it has sufficient PPE and that the facility has a lot of PPE in storage.[233]

128.    Staff at the MDC are required to wear masks.[234] Staff at the MDC are generally not required to wear gloves.[235]

129.    It is a requirement that staff wear face shields or goggles and gowns when dealing with an inmate who has tested positive for COVID-19.[236]  A sign on a door in the quarantine unit instructed staff "if you're seeing this inmate, essentially, this is the PPE equipment that you need to have which was mask, face guard, gown, gloves."[237]

130.    The MDC's policies regarding wearing an N95 when working on the isolation or quarantine unit are ill-defined. In her deposition, Assistant Warden King said both that if staff have direct contact with positive or symptomatic patients, i.e. working on the isolation or quarantine units, they are required to wear N-95s, and also that staff are not required to wear N-95s but are provided N-95s.[238]  Respondent's expert, Dr.

---

[233] May 13 Tr. 328:1-5.

[234] Ex. 40 (King Depo) Tr. 69:10-12.

[235] Ex. 40 (King Depo) Tr. 81.

[236] Ex. 40 (King Depo) Tr. 85.

[237] May 13 Tr. 332:3-6.

[238] Ex. 40 (King Depo) Tr. 69-73.

Beard, reported that medical staff are required to wear an N-95 when coming in direct contact with a person housed on the isolation unit.[239]

131.    Dr. Beard admitted that custody staff, who he reported are not required to wear N-95s, would come into direct contact with people housed on the isolation unit when bringing them out to shower and to the medical exam room, which is located outside the unit.[240]  Dr. Beard wore an N-95 during the inspection.[241]

132.    According to Dr. Venters, staff in the isolation unit "should have full PPE and that includes a face shield that includes an N-95 mask. For the health staff it includes, you know, the ability to both put on that PPE on and take it off in a way that doesn't promote contamination."[242]

133.    Assistant Warden King testified that staff "should" be wearing appropriate PPE at all time and that is her "expectation" but did not testify to the reality of whether staff were consistently wearing PPE when interacting with people housed at the MDC.[243]

134.    Twenty-two detained people housed at the MDC reported that they observed staff working without wearing PPE.[244]

---

[239] May 13 Tr. 396:14-17.

[240] May 13 Tr. 396:18-25.

[241] May 13 Tr. 363:15-16.

[242] May 12 Tr. 104:7-11.

[243] Ex. 40 (King Depo) Tr. 73:15-19.

[244] Exs. 27, 28, 31, 32, 33, 37, 38, 41, 42, 43, 44, 45, 46, 51, 53, 55, 56, 63, 64, 65, 66, 81.

135.    According to Anthony Sanon, who has worked at the MDC for 20 years, as of April 22, 2020, staff at the MDC did not have access to N-95s on the isolation unit.[245]  Mr. Sanon reported that it was only after the Petitioners' expert inspection of the facility on April 23, 2020, that the isolation unit received N-95 masks.[246]

136.    Mr. Sanon also reported that staff "do not have access to gowns for protection and there are no face shields in the isolation unit."[247]

137.    Respondent's expert Dr. Beard did observe PPE out and available in the quarantine unit.[248] Staff and workers on the unit were wearing masks only.[249]

**D.    MDC Agrees with the Importance of Adequate Hygiene and Sanitation Supplies, But Does Not Provide them to Inmates**

138.    Respondent agrees that, given the importance of hand washing, it is the best practice to provide people at no cost adequate personal hygiene supplies for hand washing, and effective disinfectant products for daily cleaning.[250] Indeed, the CDC Correctional Guidance recommends that facilities "Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing. . . . Provide

---

[245] Ex. 79 (Sanon Decl.) ¶¶ 2, 28.

[246] *Id.*

[247] Ex. 79 (Sanon Decl.) ¶ 30.

[248] May 13 Tr. 332:8-9.

[249] May 13 Tr. 332:13-14.

[250] May 12 Tr. 276:22.

liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing."[251]

139.   CDC Correctional Guidance instructs: "Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones)."[252] CDC Correctional Guidance also states that "[s]taff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs)."[253] Respondent also agrees that common surfaces should be disinfected throughout the facility.[254]

140.   Petitioners' expert, Dr. Venters explained: "I would have expected—at minimum—that the MDC had sufficient levels of PPE, cleaning solution and equipment, an adequate quantity of tests available and that common, high-touch surfaces such as phones and computers would be cleaned between uses, and that no-touch waste receptacles would be present in the facility common areas and housing areas."[255]

---

[251] Ex. 6 at 8.

[252] Ex. 6 at 9.

[253] *Id.*

[254] May 12 Tr. 275

[255] Ex. 25 (Dr. Venters Facility Evaluation) ¶ 41.

141.    Despite this, twenty-eight people housed at the MDC reported insufficient access to sanitation products for their cells.[256] Thirty people housed at the MDC reported insufficient access to soap and/or hand sanitizer.[257]

142.    Staff also reported inadequate cleaning supplies, and access to soap and hand sanitizer as of March 22, 2020.[258]

143.    Assistant Warden King testified only to the theoretical availability of personal hygiene and cleaning supplies.[259]

144.    Assistant Warden King testified that people housed at the MDC are not given soap automatically (only on request) and that the type of soap and schedule on which it is provided has not changed since the pandemic began.[260]

145.    And yet, Respondent's expert, Dr. Beard testified that people housed at the MDC  should be getting soap more frequently than they ordinarily do.[261]

---

[256] Exs. 27, 28, 29, 32, 33, 35, 36, 37, 38, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 63, 65.

[257] Exs. 27, 28, 29, 31, 32, 33, 35, 36, 37, 38, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 63, 64, 65, 81.

[258] Ex. 79 (Sanon Decl.) ¶ 25: "We have very recently received sanitizer for cleaning equipment at the control station"; *id.* ¶ 26: "As of March 22, 2020, Correction Officers at MDC did not have adequate access to soap. Then we got hand sanitizer dispensers, but they were empty. I have only seen them get filled when we were having an outside inspection. Until last week, we did not have access to sanitizing wipes to clean our shared equipment, such as radios."

[259] Ex. 85 (King Depo) Tr. 24:13-18.

[260] *See* Ex. 85 (King Depo) Tr. 26:6-9, 27:14-19, and 34:2-10.

146.    Respondent agrees that it is important that sufficient disinfecting supplies are provided to people housed at the MDC so that they can clean high-touch areas or items (including, but not limited to, phones and computers) between each use.[262]

147.    Despite this agreement, twenty people housed at the MDC reported that there was no regular cleaning of common spaces or shared items between use.[263]

148.    Assistant Warden King testified to her "expectation" that cells and common areas are cleaned often by orderlies and that phones and computers are cleaned before and after use by those using them, but could not testify to whether this was actual practice at the MDC.[264]

149.    Ms. English recommended sanitation of legal phones and touchscreens, because she could not tell if they were being sanitized.[265]

150.    While staff on the quarantine unit told Dr. Beard that phones and computers were cleaned by orderlies between each use, Dr. Beard did not ask when this practice began or ask the inmate workers themselves if this was true.[266]

---

[261] "Q And given that these are smaller than the regular sized bars of soap and given that we're in a pandemic when people would need to wash their hands more frequently, is it your opinion that inmates would need to receive soap more frequently than they would during other times? A I would think so." May 13 Tr. 382:17-22.

[262] May 12 Tr. 276:12-17; Rohlfe (Ex. XXXX) ¶ 18: "In May 2020, the safety department has provided disinfectant wipes to be placed outside both the East and West Control Centers."

[263] Exs. 28, 31, 32, 33, 35, 36, 37, 38, 42, 43, 45, 46, 47, 49, 51, 54, 55, 64, 65, 81, 83.

[264] *See* Ex. 85 (King Depo Excerpts) Tr. 56: 2-7, 56:20-23.

[265] May 12 Tr. 221:14-20.

151.    Assistant Warden King admitted that MDC employed "every day" cleaning in the unit after they discovered their first positive.[267]

**Respondent's Witnesses Have Limited Knowledge and Limited Expertise**

152.    (i) None of Respondent's testifying experts and witness have any medical training; and (ii) all of Respondent's testifying experts concede that their observations were severely limited.

153.    First, Dr. Beard is not an expert in the delivery medical care in a correctional setting.  In fact, Dr. Beard admitted that he has no medical or epidemiology training[268] and does not consider himself an "expert in medical care delivery in prisons."[269]  Nevertheless, Dr. Beard has attempted to opine on medical issues in this case.[270]

154.    A court previously rejected Dr. Beard's sworn declaration finding that its claims of a safer prison system and reduced spread of disease had no factual basis in the

---

[266] May 13 Tr. 384:7-16.

[267] Ex. 40 (King Depo) Tr. 40.

[268] May 13 Tr. 351:8-11.

[269] May 13 Tr. 351:15-17.

[270] *See* Ex. RR (Beard Report) at 10 ("Second, from the *medical perspective*, the inmates have been essentially isolated together on individual housing units for many weeks."[Emphasis added]).

record.[271]  The fact that neither Dr. Beard nor Ms. Tekbali is a physician is concerning given the fact that this case revolves around the standard of medical care being given to inmates in a correctional facility during a global pandemic.

155.    Dr. Beard's observational evidence also lacks credibility.  He has admitted that his tour of the MDC only lasted about two hours.[272]  Dr. Beard did not speak to any detained people housed at the MDC.  In his own words: "I was told not to seek inmates out specifically because I might accidentally get one shouldn't complainant in the case and their counsel is not there and so they asked me to be careful about not engaging directly inmates specifically."[273]

156.    Ms. Tekbali's opinions about the MDC's response to COVID-19 are subject to a number of limitations. Ms. Tekbali is not an expert on correctional facilities,[274] and has had no prior experience with correctional facilities.[275] In fact, other than accompanying a colleague for fingerprinting, she has never been inside a correctional facility.[276]

---

[271] May 13 Tr. 418:5-25.

[272] May 13 Tr. 354:9-13.

[273] May 13 Tr. 329:12-16.

[274] May 12 Tr. 251.

[275] May 12 Tr. 251:21-23.

[276] May 12 Tr. 251.

157.    Ms. Tekbali has no first-hand knowledge of the conditions at the MDC.[277] Ms. Tekbali admitted that her opinions about hospitalization rates were ***not*** based on data from the MDC.[278] Ms. Tekbali expressed having no opinion about factual disputes regarding conditions at the MDC, except for discrepancies between MDC policies and CDC guidelines.[279]   Ms. Tekbali stated that she has no opinion about Dr. Venters' Facility Evaluation, nor about his supplemental report.[280]

158.    Ms. English's testimony confirmed that her observations at MDC were perfunctory.  Ms. English admitted that her observations were based only on what she saw the day she visited MDC and testified that she could not confirm or deny what other testifying experts saw.[281]  Ms. English admitted that she did not look at sick call records firsthand, and does not know how her team reviewed them.[282] She also did not look at past practice at MDC.[283]   Perhaps most tellingly, however, Ms. English claims that she spoke to 50 inmates, but spent only "seconds" with each one.[284]  Such observations are insufficient to determine whether the MDC was instituting a proper medical standard of

---

[277] May 12 Tr. 253.

[278] May 12 Tr. 291.

[279] May 12 Tr. 256.

[280] May 12 Tr. 254:19-21.

[281] May 12 Tr. 210:8-10.

[282] May 12 Tr. 214:5-15.

[283] May 12 Tr. 208:21-25.

[284] May 12 Tr. 203:9-15.

care in response to the COVID-19 pandemic.  But even if Ms. English did satisfactorily observe and interrogate the practices at MDC, she admitted that she has no medical training,[285] and therefore, she cannot credibly opine on MDC's response to COVID-19.

Dated: May 19, 2020
      New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:    /s/ Katherine Rosenfeld
Katherine Rosenfeld
O. Andrew F. Wilson
Samuel Shapiro
Scout Katovich
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

CARDOZO CIVIL RIGHTS CLINIC
Betsy Ginsberg
Cardozo Civil Rights Clinic
Benjamin N. Cardozo School of Law
55 Fifth Avenue, 11th Floor
New York, NY 10003
(212) 790-0871

Alexander A. Reinert
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 790-0403

DEBEVOISE & PLIMPTON LLP
Yeugenia (Jane) Shvets
Noelle E. Lyle
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Petitioners and Putative Class*

---

[285] May 12 Tr. 215:6-8.