UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

HASSAN CHUNN; NEHEMIAH McBRIDE;
AYMAN RABADI by his Next Friend Migdaliz
Quinones; JUSTIN RODRIGUEZ, by his
Next Friend Jacklyn Romanoff; ELODIA LOPEZ;      MEMORANDUM AND ORDER
and JAMES HAIR,                                  20-cv-1590 (RPK) (RLM)

individually and on behalf of all others similarly
situated,
                         Petitioners,

        -against-

WARDEN DEREK EDGE,

                         Respondent.

------------------------------------------------------------X

RACHEL P. KOVNER, United States District Judge:

        Six federal prisoners who were detained at the Metropolitan Detention Center ("MDC") in

Brooklyn when this suit was filed brought this lawsuit to challenge the facility's response to the

COVID-19 pandemic on constitutional grounds.  They contend that MDC officials' response to

the pandemic has been so deficient as to violate the Eighth Amendment.  They seek a preliminary

injunction that would release all MDC inmates whose age or medical condition places them at

heightened risk from the virus and would manage almost every aspect of the facility's COVID-19

response.

        To obtain such an injunction, petitioners must establish a clear or substantial likelihood

that the conditions at the MDC during the COVID-19 pandemic constitute cruel and unusual

punishment.  The bar is high:  Petitioners must show that officials' response to the pandemic

reflects "the deliberate infliction of punishment."  *Francis v. Fiacco*, 942 F.3d 126, 150 (2d. Cir.

2019) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  The standard is satisfied

when officials exhibit "'deliberate indifference' to a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citation omitted). But it is not satisfied by negligent "lack of due care for prisoner interests or safety." *Fiacco*, 942 F.3d at 150 (quoting *Blyden*, 186 F.3d at 262).

Based on the record from a two-day evidentiary hearing, I conclude that petitioners have not shown a clear likelihood that MDC officials have acted with deliberate indifference to substantial risks in responding to COVID-19. Rather than being indifferent to the virus, MDC officials have recognized COVID-19 as a serious threat and responded aggressively. They have, for example, implemented heightened sanitation protocols, distributed masks to inmates and staff, required use of masks when social distancing is not possible, initiated COVID-19 screenings upon entry to the MDC, created quarantine and isolation units, and substantially restricted movement within the facility. With those measures in place, just one MDC inmate has been hospitalized in connection with COVID-19, and none have died from the disease, even though the surrounding community has been at the epicenter of the pandemic.

Evidence submitted at the hearing does expose several deficiencies in the MDC's implementation of Centers for Disease Control and Prevention ("CDC") guidelines that both parties have treated as authoritative. Those shortcomings merit a swift response from MDC officials—the institutional actors charged in the first instance with ensuring that their facilities are managed in accordance with appropriate standards of care. *See, e.g.*, *Turner v. Safley*, 482 U.S. 78, 84-85 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979). But the facility's aggressive response to a public health emergency with no preexisting playbook belies the suggestion that these apparent deficiencies are the product of deliberate indifference on the part of prison officials.

## PROCEDURAL HISTORY

I.   **Petitioners' Lawsuit**

A.   **The Petitions**

Four inmates serving sentences at the MDC filed the initial petition in this case asserting violations of the Eighth Amendment on March 27, 2020.  After two of the named petitioners were granted compassionate release from custody by their sentencing judges under 18 U.S.C. § 3582(c)(1)(A), *see* Order Directing the Compassionate Release of Def. Hassan Chunn, *United States v. Chunn*, No. 16-cr-388 (E.D.N.Y. Apr. 8, 2020) (Dkt. #32); Order as to Nehemiah Casey McBride, *United States v. McBride*, No. 15-cr-876 (S.D.N.Y. Apr. 7, 2020) (Dkt. #73), petitioners filed an amended petition on April 23, 2020, raising the same Eighth Amendment claim but adding as named petitioners two additional inmates serving federal sentences at the MDC, including Elodia Lopez, *see* Am. Pet. (Dkt. #60).  Since the amended petition was filed, the remaining petitioners other than Ms. Lopez have also been released or transferred from the MDC.  *See* Ex. 76 (Declaration of Justin Rodriguez) ("Rodriguez Decl.") ¶ 2 (Dkt. #91-3); Status Report re: Release of Petitioner Ayman Rabadi (May 21, 2020) (Dkt. #104); Status Report re: Transfer of Petitioner James Hair (May 26, 2020) (Dkt. #106).  Ms. Lopez remains housed at the MDC.

In the petition, which is styled as a representative habeas action or class action petition under 28 U.S.C. § 2241, Ms. Lopez and the other petitioners have sought to represent all individuals detained at the facility during the pandemic.  Am. Pet. ¶ 110.  They contend that MDC officials have been deliberately indifferent to the risks of COVID-19.  *Id.* ¶¶ 98-103, 122-132.  Petitioners argue that, as a consequence, MDC officials have violated the Eighth Amendment rights of sentenced inmates, such as the named petitioners.  *Ibid.*  Petitioners further argue that conduct which qualifies as deliberate indifference under the Eighth Amendment also violates the Fifth Amendment rights of pretrial detainees at the MDC, because conduct that violates the Eighth

3

Amendment rights of sentenced inmates also violates the Fifth Amendment rights of pretrial detainees. *See* Mem. Supp. of Pet'rs' Mot. for Prelim. Inj. ("Pet'rs Br.") 22 n.6 (Dkt. #73). They have not raised arguments under the Fifth Amendment that are distinct from their deliberate-indifference claims under the Eighth Amendment.

To remedy the asserted violations, petitioners seek extensive judicial oversight of the MDC's response to COVID-19, and they ask that I order respondent to release from custody all medically vulnerable inmates housed at the MDC, *see id.* at 26-27; Mot. for Prelim. Inj. 2-4 (Dkt. #71), who represent about a quarter of the facility's population, *see* Ex. 26 ("Vasquez Tr.") 205:4-10.

### B.    Application for a Temporary Restraining Order

On March 30, 2020—three days after the initial habeas petition was filed—the four original petitioners sought a temporary restraining order ("TRO") directing their immediate release. *See* Mot. for TRO 1-2 (Dkt. #12). They also requested the immediate appointment of a special master who would make recommendations for the release of other medically vulnerable MDC inmates and make further "recommendations for ameliorative action." *Id.* at 2-3. On April 8, 2020, I denied the request for a TRO. I then set a schedule for expedited discovery and for a hearing on petitioners' anticipated request for a preliminary injunction. *See* Order (Apr. 8, 2020).

## II.    Petitioners' Preliminary Injunction Motion

Petitioners filed their motion for a preliminary injunction on April 30, 2020. Petitioners seek a preliminary injunction based on Eighth Amendment violations that directs the "immediate release" of the nearly 400 inmates at the MDC whom respondent "has identified as medically

vulnerable due to underlying health conditions or age."[1]  Mot. for Prelim. Inj. 2; *see* Am. Pet. ¶ 3.

Petitioners also ask the Court to enter a detailed injunction controlling almost every aspect of the

MDC's response to COVID-19.  Mot. for Prelim. Inj. 2-4.  The proposed injunction would require:

- Screening all detainees currently housed at the MDC for signs and symptoms of COVID-19;

- Screening all new detainees who arrive at the MDC, including those who return from the hospital or are transferred from other correctional facilities;

- Adopting a "standardized COVID-19 surveillance tool," including temperature checks, to be administered twice daily to (i) all incarcerated persons with elevated COVID-19 risks, (ii) all inmates in quarantine, and (iii) all inmates in isolation;

- Standardizing clinical evaluations of all inmates who are suspected or confirmed to have COVID-19 and administering those evaluations at least daily in a clinical setting;

- Implementing same-day review of every sick-call request to trigger same-day or next-morning assessment for COVID-19, along with tracking of such requests through a "facility wide symptom tracking dashboard" for use by healthcare staff;

- Identifying, grouping, and testing all inmates who are at elevated risk for COVID-19;

- Ordering the quarantine of all medically vulnerable detainees into units with routine checks for COVID-19 signs and symptoms, including temperature checks;

- Ordering all quarantine units to follow CDC guidelines, in areas such as use of appropriate personal protective equipment ("PPE"), cleaning of common surfaces, and surveillance;

- Testing inmates who exhibit more than one sign or symptom of COVID-19;

- Testing staff who are at risk of serious illness or death from COVID-19 or who exhibit more than one sign or symptom of COVID-19;

- Ordering all staff to wear PPE (including masks) when interacting with any person or when touching surfaces in cells or common areas;

- Ordering that disinfectants be supplied to inmates free of charge;

- Repairing broken emergency call-buttons in cells and requiring frequent medical rounds in units with broken call-buttons until such repairs are completed;

---

[1]   When this case was filed, respondent had identified 537 inmates as medically vulnerable.  *See* Pet. ¶ 3 (Dkt. #1). By April 27, 2020, the list had shrunk to approximately 380 inmates because some inmates had been released and because the CDC had revised its list of COVID-19 risk factors.  *See* Ex. 26 (Vasquez Tr.) 205:4-20.

- Training all staff and orderlies on reporting inmate health issues to medical staff;

- Instituting rotations of Spanish-speaking health staff;

- Providing free personal hygiene supplies to all inmates, along with daily access to showers and clean laundry;

- Mandating social distancing amongst inmates to the maximum extent possible at the MDC's current population level;

- Training staff and inmates on the proper use of masks, gloves, and other PPE, and providing masks and gloves to inmates at no cost to them, to be replaced by the facility as appropriate; and

- Providing weekly COVID-19 information sessions for inmates and correctional staff.

*Ibid.*  Petitioners further request that the preliminary injunction appoint a Special Master or other Court-appointed expert to "oversee implementation of the Court's ameliorative injunctive relief," make recommendations regarding the release of medically vulnerable inmates, and make "additional recommendations for ameliorative action at the MDC." *Id.* at 4.  In order to enable the Court to enter the broad injunctive decree that petitioners seek, petitioners also seek an order "[c]onditionally certifying the class" of all inmates at the MDC. *Id.* at 2.  Alternatively, they seek an order "awarding class-wide relief under the Court's general equity powers." *Ibid.*

## III.   Preliminary Injunction Hearing

I held an evidentiary hearing on petitioners' motion for a preliminary injunction on May 12 and 13, 2020.  Petitioners offered testimony from one witness:  Dr. Homer Venters, a physician and epidemiologist who specializes in the provision of health services for incarcerated people, and who conducted an inspection of the MDC on behalf of petitioners on April 23, 2020.  *See* Ex. 25 (Facility Evaluation: Metropolitan Detention Center COVID-19 Response) ("Venters Report") ¶¶ 7, 13 (Dkt. #72-1).[2]  Dr. Venters produced a written report that catalogues his observations,

---

[2]   Citations to exhibits use those documents' internal pagination, rather than Bates stamps or other pagination assigned by the parties.  Bates stamps are used for documents that lack internal pagination.

memorializes his conversations with 17 detainees, and offers recommendations.  Dr. Venters also produced a supplemental report that addresses the expert reports submitted on behalf of respondents.  *See* Ex. 82 (Suppl. Report of Dr. Homer Venters) ("Suppl. Venters Report") (Dkt. #91-6).  Dr. Venters was sharply critical of the MDC's response to the pandemic.  He described what he saw as "[m]ultiple systemic failures in the COVID-19 response in the MDC," including failure to properly screen inmates for signs and symptoms of COVID-19, to respond promptly to inmate requests for medical attention, and to implement adequate infection control practices. Venters Report ¶¶ 2-4, 23.  Dr. Venters also concluded that "current practices in the MDC do not adequately identify and protect detainees who are particularly vulnerable to the effects of COVID-19 due to their high-risk underlying medical conditions."  *Id.* ¶ 5.

Respondent offered testimony from three witnesses.  Nicole C. English, Assistant Director of the Health Services Division at the Bureau of Prisons ("BOP"), testified concerning a surprise inspection she conducted of the MDC on May 2, 2020, after BOP officials learned of the conclusions in Dr. Venters' report.  *See* Ex. OOO (Assessment of Metropolitan Detention Center, Brooklyn, New York, COVID-19 Response) ("English Report") 1.  Ms. English and three other BOP officials arrived at the MDC unannounced on that date and, after meeting briefly with respondent, split up to evaluate the facility's response to COVID-19.  *Ibid.*  Following her inspection, Ms. English issued her own report describing the observations of the inspection team. The report addressed entry-point screenings, sick-call procedures, use of quarantine and isolation units, infection control practices, and education of inmates and staff, among other topics.  *Id.* at 1-11.  Ms. English offered a handful of recommendations for improvements, but she concluded that the MDC "was not . . . failing in its response to the COVID-19 virus pandemic." *Id.* at 11-12.

Next, respondent offered testimony from Asma Tekbali, an infection preventionist in the Epidemiology Department of Lenox Hill Hospital in New York, who defended the MDC's infection control practices and criticized some of Dr. Venters' recommendations. *See* Ex. AA (Expert Report of Asma Tekbali, M.P.H.) ("Tekbali Report") (Dkt. #93-1). At Lenox Hill Hospital, Ms. Tekbali has played a role in developing hospital-wide policies on COVID-19 isolation and testing protocols, and containment measures. *Id.* at 1. In addition to testifying at the hearing, Ms. Tekbali prepared a report on the MDC's COVID-19 infection control practices, which was entered into evidence. *See generally* Tekbali Report.

Finally, respondent offered testimony from Dr. Jeffrey Beard, a prison management consultant who served as Secretary of Corrections for two States. *See* Ex. RR (Report of Jeffrey A. Beard, Ph.D.) ("Beard Report") 1 (Dkt. #83-2). Dr. Beard inspected the MDC on April 28, 2020, visiting the same areas as Dr. Venters: the screening area, the health services area, the quarantine and isolation units, and the Special Housing Unit ("SHU"). *Id.* at 5-7; *see* Prelim. Inj. Hr'g Tr. ("Hr'g Tr.") 343:16-19; Venters Report ¶ 13. After observing screening, sanitation, isolation, and quarantine protocols and speaking with staff members and inmates regarding these measures, Dr. Beard concluded that the MDC "is effectively implementing practices that protect[] inmates and staff alike from the coronavirus." Beard Report 10; *see id.* at 1-11. His report vigorously disputed the factual conclusions that Dr. Venters had drawn from his inspection days earlier. *See id.* at 7-9. Dr. Beard also contested some of Dr. Venters' recommendations for addressing the dangers of COVID-19. *See id.* at 7-10.

The parties offered thousands of pages of documents as exhibits. Petitioners' documentary evidence included declarations from 36 MDC inmates attesting to shortcomings in the prison's COVID-19 response. *See* Exs. 27-33, 35-39, 41-50, 52-57, 59 (Dkt. #72); Ex. 51 (Dkt. #76); Ex.

63 (Dkt. #71-1); Ex. 64 (Dkt. #71-2); Ex. 65 (Dkt. #71-3); Ex. 66 (Dkt. #71-4); Ex. 76 (Dkt. #91-3); Ex. 81 (Dkt. #91-5); Ex. 83 (Dkt. #91-9).  Petitioners also offered approximately 1,200 inmate sick-call requests, including 210 sick-call requests that petitioners identified as reporting symptoms that could relate to COVID-19.  *See* Exs. 9, 24, 78, 88.

Respondent's documentary evidence included declarations from Stacey Vasquez, the Health Services Administrator for the MDC, and from Milinda King, an Associate MDC Warden. *See* Ex. LLL (Decl. of Health Services Administrator Stacey Vasquez) ("Vasquez Decl.") (Dkt. #80); Ex. TT (Decl. of Associate Warden Milinda King) ("King Decl.") (Dkt. #18-1); Ex. XX (Suppl. Decl. of Associate Warden Milinda King) ("Suppl. King Decl.") (Dkt. #21); Ex. ZZ (Decl. of Associate Warden Milinda King) ("Second King Decl.") (Dkt. #81).  Ms. Vasquez offered a point-by-point response to Dr. Venters' report, arguing that the MDC has already implemented most of Dr. Venters' proposals and that those it has not implemented are impracticable.  *See* Vasquez Decl. ¶ 6.  Ms. King described various steps that MDC officials have taken to address the COVID-19 pandemic.  *See* King Decl.; Suppl. King Decl.; Second King Decl.  Both Ms. Vasquez and Ms. King were deposed by petitioners, and petitioners submitted their depositions into evidence.  *See* Vasquez Tr.; Ex. 40 ("King Tr.") (Dkt. #72).  Respondent also introduced a declaration from Lieutenant Commander D. Jordan, the MDC's Quality Improvement/Infection Prevention Control Officer that describes some of the infection prevention measures the MDC has adopted.  *See* Ex. YY (Decl. Of Lieutenant Commander D. Jordan, RN/BSN) ("Jordan Decl.") (Dkt. #47-1).

At the start of the hearing, I denied respondent's request to exclude on hearsay grounds the 36 inmate declarations submitted by petitioners.  *See* Hr'g Tr. 40:5-11.  "[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction," *Mullins*

*v. City of New York,* 626 F.3d 47, 52 (2d Cir. 2010), since "the decision of whether to award preliminary injunctive relief is often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits,'" *id.* at 51 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  Nevertheless, when a party relies on hearsay statements that are not subject to any cross-examination in seeking a preliminary injunction, the fact that those statements would normally be inadmissible hearsay goes to the weight that such evidence deserves.  *Id.* at 52; *see Zeneca Inc. v. Eli Lilly and Co.*, No. 99 Civ. 1452, 1999 WL 509471, at *4 (S.D.N.Y. July 19, 1999) ("[T]he affidavits are necessarily of less weight than the live testimony of witnesses who were available and subject to cross-examination at the hearing."); 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2949 (3d ed.); *see* Fed. R. Evid. 802.  Accordingly, I have given these declarations somewhat less weight than the accounts of witnesses who offered live testimony regarding personal observations.

At the hearing, I also addressed petitioners' claim that respondent spoliated evidence by destroying hard-copy sick-call requests.  *See* Pet'rs' Mots. in Lim. (Dkt. #86).  I informed the parties then that I was considering drawing an adverse inference regarding the content of the destroyed records.  Hr'g Tr. 450:9-25.  I now find it is appropriate to draw an adverse inference that the destroyed records would have contained additional reports of COVID-19 symptoms for the period from April 1, when the MDC began relying heavily on paper sick-call requests, to April 23, the day before respondent began preserving paper sick-call requests.  *See* Hr'g Tr. 451:10-16; 452:10-453:7.  Petitioners have satisfied the three-prong test for spoliation sanctions.  *See Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018).  First, respondent had an obligation to preserve the paper sick-call records at the time they were destroyed because he was on notice that sick-call requests were central to this litigation.  *See In re Terrorist Bombings of*

10

*U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008).  Second, contrary to respondent's suggestion, *see* Resp't's Opp'n to Pet'rs' Mots. in Lim. 3-6 (Dkt. #89); Decl. of Cdr. Scott A. Griffith, MSN, RN-BC ("Griffith Decl.") (Dkt. #97-1), it does not appear that the information in the paper records was uniformly preserved in the MDC's electronic medical activities report.  That report contains multiple vague or blank entries that leave questions as to what symptoms were reported.  *See, e.g.*, Attachment to Griffith Decl. ("Activities Report") 2, 30, 32.  Second, respondent destroyed the records with a culpable state of mind.  *See Klipsch Grp., Inc.*, 880 F.3d at 628.  That requirement is satisfied when documents were destroyed knowingly, even when, as here, the documents appear to have been destroyed without an intent to breach a duty of preservation.  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002).  Finally, the destroyed sick-call records were "relevant" to petitioners' claims, "such that a reasonable trier of fact could find that [they] would support" those claims.  *See Klipsch Grp., Inc.*, 880 F.3d at 628 (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)).

In addition to putting forward evidence of the conditions at the MDC, both parties offered into evidence CDC documents that provide guidance on COVID-19 both generally and in the correctional context.  *See, e.g.*, Exs. 6, 20, G, H, J; Exs. BB, CC, EE, GG, HH, II, LL, MM, NN, OO, PP (Dkt. #93-1); Ex. VV (Dkt. #18-2); Ex. JJJ (Dkt. #82-1), Ex. MMM (Dkt. #80-1).  The CDC protocols include a 26-page document setting out the CDC's recommendations for the management of COVID-19 in correctional facilities.  *See* Ex. 20 ("CDC Correctional Guidelines").

The parties frequently invoke these and other CDC guidance as authoritative.  *See, e.g.*, Pet'rs' Br. 3, 23; Pet'rs' Proposed Findings of Fact ¶ 16 (Dkt. #101); Mem. Opp'n to Pet'rs' Mot. for Prelim. Inj. ("Resp't Opp'n Br.") 9-12 (Dkt. #79); Resp't's Proposed Findings of Fact ¶¶ 188-199 (Dkt. #99).  And the experts retained by the parties have also treated CDC guidance as

11

authoritative.  *See, e.g.*, Venters Report ¶¶ 1, 6, 18, 20-21, 41, 46, 47, 52, 62, 64; Beard Report 6, 9-10; Tekbali Report 1-7.  After reviewing the CDC guidelines and considering the testimony of the experts regarding those guidelines, I have given the CDC's guidance substantial weight in assessing petitioners' challenge to the conditions of confinement at the MDC.

Finally, the parties filed letters after the hearing concerning whether the petitioners who were recently released or transferred from the MDC can continue to pursue their claims on behalf of the putative class.  Respondent suggests that all claims other than Ms. Lopez's are moot.  *See* Status Report re: Transfer of Petitioner James Hair (May 26, 2020).  Petitioners do not expressly disagree, but they argue that the petitioners who were released or transferred after the filing of the preliminary injunction motion can "continue to seek relief on behalf of the class even after [their] individual claims have been mooted."  Pet'rs' Letter (May 27, 2020) 1 (Dkt. #107);.  I need not resolve that question to decide petitioners' motion.  The claims of Ms. Lopez are indisputably not moot because Ms. Lopez is still detained at the MDC.  And petitioners have made the same basic arguments with respect to all of the named petitioners.  While Ms. Lopez is female and the other named petitioners are male, the only gender-related difference in the MDC's approach to COVID-19 appears to be that men have somewhat greater capacity to engage in social distancing, because women are generally housed in dormitory-style accommodations while men are typically housed in two-person cells.  Under these circumstances, my determination that Ms. Lopez has not demonstrated a clear likelihood of success on the merits of her Eighth Amendment claim would apply equally to the remaining petitioners if their claims remain live for purposes of seeking injunctive relief on behalf of the asserted class.

Based on the witness testimony and documentary evidence at the hearing, I make the following findings of fact and draw the following conclusions of law.

**FINDINGS OF FACT**

I.      **The COVID-19 Outbreak**

COVID-19 is an acute respiratory illness caused by a novel coronavirus that first appeared in the United States in January 2020. *See Clinical Care Guidance*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited June 7, 2020); *Evidence for Limited Early Spread of COVID-19 Within the United States*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/mmwr/volumes/69/wr/mm6922e1.htm?s_cid=mm6922e1_w (last visited June 7, 2020). There have now been over 1.9 million cases of COVID-19 in the United States. *See Cases in the U.S.*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 7, 2020). The State of New York, with 379,322 cases, accounts for about 20% of the nationwide total. *See ibid.* New York City has been at the epicenter of the outbreak in the United States, with about 208,517 COVID-19 cases. *See ibid.* Symptoms of COVID-19 include fever, chills, cough, shortness of breath or difficulty breathing, muscle pain, headache, sore throat, and loss of the sense of taste and/or smell. *See* Ex. MMM ("CDC List of Symptoms of Coronavirus"). Symptoms typically appear between two and 14 days after exposure to the virus. *Ibid.* The CDC has stated that the disease poses a heightened risk for those who are age 65 or older, those who are immunocompromised, and those who suffer from certain underlying health conditions such as chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease, and liver disease. *See People Who Are at Higher Risk*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 8, 2020).

## II.     The MDC and Its COVID-19 Action Plan

The MDC is a federal detention facility in Brooklyn that housed about 1,630 inmates as of May 2, 2020.  English Report 2.  As an institution administered by the BOP, the MDC has been following the BOP's COVID-19 Action Plan.  *See* Jordan Decl. ¶¶ 4-6.  Phase One of that plan, which was implemented in January, involved developing strategies and soliciting guidance for managing the virus response in BOP facilities.  *Id.* ¶ 7.  Phase Two, which began on March 13, 2020, suspended virtually all legal and social visitation and started new entry screenings for staff and prisoners.  *Id.* ¶¶ 8-10.  In addition, prison officials put into place "modified operations," such as staggered meal and recreation times, to maximize social distancing.  *Id.* ¶ 11.  Phase Three, which took effect on March 18, 2020, required inventories of cleaning, sanitation, and medical supplies, among other steps.  *Id.* ¶ 13.  Phase Four, which began on March 26, 2020, strengthened quarantine and isolation procedures.  *Id.* ¶ 14.  BOP facilities also began to assess all inmates arriving at its facilities with a screening tool and temperature check.  *Ibid.*  Phase Five, which took effect on April 1, 2020, mandated facility-wide lockdowns in every BOP institution for a 14-day period.  *Id.* ¶ 15.  During lockdown, inmates are to be secured in their cells where possible, with limited exceptions for essential activities.  *Ibid.*  Later phases have extended those lockdowns, which are currently scheduled to remain in effect through at least June 30, 2020.  *See id.* ¶ 16; *COVID-19 Action Plan: Phase Seven*, FED. BUREAU OF PRISONS, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited June 7, 2020).

## III.    The Prevalence of COVID-19 at the MDC

While the parties dispute the prevalence of COVID-19 at the MDC, the evidence at the hearing indicates that the facility has been more successful than many other prisons in preventing an outbreak.  In the absence of broad testing, the best available indicator of the extent to which the

14

virus has spread within the MDC are deaths and Intensive Care Unit hospitalizations.  As Ms.

Tekbali explained, those objective measures "are correlated with the rates or with the level of

infection," and are "indicators . . . on how the pandemic is progressing."  Hr'g Tr. 239:5-11.  That

data suggests that MDC officials have thus far succeeded in preventing a significant outbreak.  In

the months since the pandemic began, there have been no COVID-linked deaths at the MDC, and

only a single MDC inmate has been hospitalized in connection with COVID-19.  Vasquez Decl.

¶ 8;  Hr'g Tr. 238:20-25.  That inmate was discharged back to the MDC the next day.  *See* King

Decl ¶¶ 27-28.  This data is especially striking because the MDC has identified about a quarter of

its population as at elevated risk from COVID-19 due to age or preexisting conditions, and because

the MDC is in New York City, which has been at the epicenter of America's COVID-19 outbreak

over the past several months.  There have been about17,150 confirmed deaths from COVID-19 in

the surrounding community of about 8,340,000 people.  *See* Hr'g Tr. 238:22-239:2; *COVID-19:*

*Data*, N.Y.C. DEP'T OF HEALTH, https://www1.nyc.gov/site/doh/covid/covid-19-data.page (last

visited   June   7,   2020);   *Population*,   N.Y.C.   DEP'T   OF   CITY   PLANNING,

https://www1.nyc.gov/site/planning/planning-level/nyc-population/nyc-population.page       (last

visited June 7, 2020).  The MDC's extremely low COVID-19 hospitalization and death rates

suggest that it is faring reasonably well compared to its surrounding community.

Petitioners contend that "a significant amount of COVID-19 activity and infection among

detained people" may be "currently undetected" at the facility.  Hr'g Tr. 99:15-20 (testimony of

Dr. Venters).  They note that after the number of confirmed COVID-19 cases among inmates

plateaued, reports of staff infections continued to rise from five cases on April 2 to 36 cases on

May 5.  *See* Suppl. Venters Report ¶ 8.  Petitioners argue that if the MDC had more robust testing

in place, the number of confirmed COVID-19 cases among the inmate population would have

likely followed the same upward trajectory, because the "primary way in which the virus comes into and moves around [a] facility is through the movement of staff." Hr'g Tr. 116:20-117:5 (testimony of Dr. Venters). Petitioners are correct that the fact that just nine inmates have tested positive thus far sheds little light because the MDC has only tested 68 inmates out of its population of approximately 1,630. *See* Letter from MCC Warden Licon-Vitale and MDC Warden Edge to Chief Judge Mauskopf (June 4, 2020) ("Edge Letter") 2 (https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200604_044508.pdf). But the number of confirmed cases among staff also sheds limited light on the infection rate among inmates, because divergent rates could be the product not only of limited testing of inmates but also of effective infection-control measures. In any event, reported staff infections are no longer rising quickly. *Compare* Suppl. Venters Report ¶ 8 (36 cases on May 5), *with* Edge Letter 2 (40 cases on June 4). And while the MDC more than doubled the number of inmates tested between the end of May and early June, the number of positives increased only from six to nine. *Compare* Letter from MCC Warden Licon-Vitale and MDC Warden Edge to Chief Judge Mauskopf (May 28, 2020) (*available at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200529_093332.pdf) (25 tests and six positives as of May 28) *with* Edge Letter 2 (68 tests and nine positives as of June 4). Thus, the available data gives reason for cautious optimism about the effectiveness of the facility's COVID-19 response thus far.

**IV.    Conditions at the MDC**

The parties offered divergent accounts at the preliminary injunction hearing concerning what steps the MDC has actually implemented in response to the COVID-19 pandemic and whether those steps are adequate. The evidence establishes that, on the whole, the MDC has responded aggressively to COVID-19, implementing an array of measures that largely track CDC guidance. The record leaves open the possibility, however, that there were early lapses in

16

implementation of these policies.  And it suggests that in several areas, most notably relating to sick-call responses and use of isolation, the MDC has yet to fully implement the CDC's recommendations.

### A.     Inmate Screening at Entry

The best available evidence indicates that, contrary to petitioners' arguments, the MDC has implemented rigorous intake-screening procedures for inmates that comply with CDC guidance. Upon arrival at the MDC, inmates are now directed to a special area designated for receiving and discharge.  King Decl. ¶ 6.  All inmates entering or re-entering the facility are then screened with a "national inmate screening tool," Vasquez Decl. ¶ 6(a)-(b), which requires a temperature check as well as an inquiry into COVID-19 risk factors, including symptoms linked to COVID-19, *see* Ex. ZZZZ (Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool Examples) ("Inmate Screening Examples"); Vasquez Tr. 26:5-8, 104:18-106:3.  Asymptomatic inmates are then quarantined in an "intake" unit for 14 days to ensure that they do not develop symptoms before being admitted into the general population.  King Decl. ¶ 6; *see* Jordan Decl. ¶ 14; Vasquez Tr. 24:17-25:13, 26:3-15, 108:22-109:22.  Inmates who present COVID-19 symptoms on arrival, and possibly some inmates with exposure risk, are placed in medical isolation.  Jordan Decl. ¶ 29; Vasquez Tr. 105:22-106:22.  Those inmates are not released from isolation until they test negative for COVID-19 or are cleared by medical staff for release.  Jordan Decl. ¶ 14.  When they inspected the facility, both Dr. Beard and Ms. English confirmed that these inmate screening procedures were in effect.  *See* Beard Report 7-8, 10; English Report 3.

Dr. Venters drew a contrary conclusion after speaking with two identified inmates who "reported that they had not been screened at all when they arrived in [the] MDC."  Venters Report ¶ 18.  In response, however, respondent submitted intake forms documenting that those two

inmates had their temperatures taken and were asked about their symptoms and other risk factors. *See* Inmate Screening Examples 1-2. Petitioners argue that for one of these inmates, the checkboxes under the sections labeled "Assess the Risk of Exposure" and "Assess Symptoms" were "left blank," indicating that he was not in fact screened. *See* Pet'rs' Proposed Findings of Fact ¶ 33; Inmate Screening Examples 2. However, a closer look at the form reveals that the official who filled it out simply drew a line through the "No" boxes, rather than checking them off individually. Accordingly, petitioners' claim that "[i]ndividuals entering the MDC are not always screened for symptoms of COVID-19," Pet'rs' Proposed Findings of Fact ¶ 33, which is based on those two inmates' out-of-court statements to Dr. Venters, does not appear to be supported by the evidence.

The MDC's inmate screening procedures conform to CDC guidelines, which provide that "pre-intake screening and temperature checks for all new entrants" should occur "in the sallyport, before beginning the intake process." CDC Correctional Guidelines 10. The guidelines further provide that any asymptomatic inmate entering the facility who is a "close contact of a known COVID-19 case" should be placed under quarantine for 14 days. *Id.* at 11. The MDC's policy of quarantining asymptomatic inmates upon arrival—whether a close contact of a known COVID-19 case or not—is thus more protective of the inmate population than the policy recommended by the CDC. Finally, the CDC's guidelines provide that an inmate presenting COVID-19 symptoms on arrival should be placed in medical isolation, CDC Correctional Guidelines 10, which is the approach taken by the MDC.

### B.   Staff Screening at Entry

The MDC is also conducting COVID-19 screenings of staff members upon entry, as the CDC recommends, but it appears to have deviated from CDC guidance in two parts of that process.

Staff are screened at the point of entry with a screening tool that requires a temperature check and asks employees if they are suffering from a "New On-Set Cough," "New Onset Trouble Speaking because of Needing to take a Breath," or a "Stuffy/Runny Nose."  Ex. 22 (Coronavirus Disease (COVID-19) Staff Screening Tool) ("Staff Screening Tool"); *see* Vasquez Tr. 130:15-131:15. Any staff member with a fever is denied entry to the MDC and placed on leave for three days.  *See* Staff Screening Tool; Vasquez Tr. 138:20-139:12.  If a staff member has a normal temperature but exhibits other COVID-19 symptoms, he or she is subjected to a clinical evaluation and may be admitted to the facility on a discretionary basis.  *See* Staff Screening Tool; Vasquez Tr. 139:13-24.  When Dr. Beard and Ms. English toured the MDC, each observed that these screening procedures for staff members were being followed, and petitioners have not offered evidence to the contrary.  *See* Beard Report 5, 10; English Report 2.

As petitioners observe, however, several aspects of the MDC's screening process do not appear consistent with CDC guidance.  First, staff members are not being asked at entry whether they have had contact with a confirmed COVID-19 case in the past 14 days.  *See* Vasquez Tr. 136:15-21; Staff Screening Tool; *cf.* CDC Correctional Guidelines 26.  Second, the MDC does not appear to categorically bar staff from entering if they exhibit possible symptoms of COVID-19. *See* Vasquez Tr. 139:13-24 (describing fever as the only symptom that categorically prevents entry); Staff Screening Tool (noting that symptomatic staff may be directed to "Leave" or "Work"); *but see* Vasquez Tr. 137:21-138:2 (stating that staff who begin to experience COVID-19 symptoms on the job are instructed to "[r]eport it immediately to their supervisor and go home").  That contravenes CDC guidance which explains that staff members with COVID-19 symptoms should be sent home immediately.  *See* CDC Correctional Guidelines 12.

C.      **Facility-Wide Preventative Measures**

1.      **Social Distancing**

MDC officials have implemented measures to promote social distancing that comport with CDC guidance.  Female inmates are housed in a dormitory-style unit after a quarantine period when they first enter the facility.  Vasquez Tr. 100:24-101:7; Ex. III (Decl. of Associate Warden Caryn Flowers) ("Flowers Decl.") ¶ 15 (Dkt. #82).  They are required to wear masks if they are unable to social distance.  King Tr. 96:24-97:2, 99:21-100:3, 101:7-11; Flowers Decl. ¶¶ 17, 22-23; *see* Vasquez Tr. 102:2-16.  Because of space constraints, bunks in the unit may be less than six feet apart.  King Tr. 96:16-97:18; Flowers Decl. ¶ 23.  Nevertheless, MDC officials attempt to alternate bed assignments so that when one inmate sleeps on the top bunk, the neighboring inmate sleeps on the bottom bunk.  King Tr. 96:16-25.  Given the number of female inmates and the size of the unit, inmates in the women's unit are generally able to engage in social distancing.  *See* Vasquez Tr. 102:2-16.

Most male inmates are housed in two-person cells, except in the isolation and intake units, where inmates are generally housed alone.  *See id.* at 25:5-13; 33:17-23; 38:4-11; 68:11-17.  Male inmates are now secured in their cells for at least 23 hours each day to reduce contacts that could spread the virus, Jordan Decl. ¶ 15; Flowers Decl. ¶ 7; King Tr. 88:6-18, although a small number leave their cells more regularly to work, King Tr. 88:19-23.  Male inmates are generally allowed out of their cells in staggered intervals, so that no more than 10 inmates are outside their cells at once.  *Id.* at 88:24-89:7.

The MDC's actions in this area are consistent with the CDC's recommendation that correctional facilities implement "strategies to increase the physical space between incarcerated/detained persons," such as staggering meal and recreational times, limiting group activities, and reassigning bunks to provide more space between inmates.  CDC Correctional

Guidelines 11.  The MDC's lockdown of male inmates is arguably more protective than any of the social distancing measures suggested in CDC guidance.  While women are housed in a dormitory-style unit, rather than in two-person cells, CDC guidance recognizes that social distancing "strategies will need to be tailored to the individual space in the facility."  *Ibid.*  And the MDC's approach of alternating bed assignments in the women's unit, where possible, is a strategy that the CDC has expressly recommended for dormitory-style housing units.  *Ibid.*

### 2.    Sanitation

The MDC has instituted heightened sanitation protocols that conform to CDC guidance. While inmate declarations raise the possibility that there have been occasional failures to fully live up to the MDC's policies in this area, particularly in the earliest stages of the pandemic, the evidence does not support finding widespread or ongoing deficiencies.

### a.  Soap

The evidence indicates that soap is now widely available to inmates housed at the MDC. Staff provide soap through several mechanisms.  First, soap is provided to new inmates upon arrival.  King Decl. ¶ 11; Jordan Decl. ¶ 51.  Second, soap is available for purchase at the commissary.  King Decl. ¶ 11.  Inmates with insufficient funds to purchase soap can obtain it at no cost.  Jordan Decl. ¶ 51; King Tr. 25:12-19.  Third, soap is delivered on a biweekly basis to staff teams that work in the housing units, and inmates may request additional soap from those team members.  King Decl. ¶ 11; King Tr. 24:12-26:16.  Accordingly, MDC officials maintain that "[a]ll inmates have access to sinks and soap at all times."  King Decl. ¶ 11.

The individuals who inspected the MDC generally confirmed that inmates have access to soap.  Ms. English interviewed a number of inmates chosen at random about their access to soap and other hygiene products, and reported that "[e]very inmate stated that they have access to proper supplies."  English Report 4.  Ms. English noted that in each area she toured, "inmates have access

to adequate personal hygiene supplies for hand washing," and that while "[i]nmates are provided with soap upon request," most choose to buy soap from the commissary "based off personal preference." *Id.* at 6-7. Dr. Beard reached similar conclusions. He "looked in a number of cells and each cell had at least one bar of soap, and some had more than one." Beard Report 6. Dr. Beard also noticed "a pile of hand soap in a storage area on the housing unit." *Id.* at 7. Dr. Venters did not contradict these observations. *See generally* Venters Report. Many of the inmate declarations in this case also state that inmates are receiving soap on a weekly or near-weekly basis. *See, e.g.*, Ex. 32 ("Dixon Decl.") ¶ 6; Ex. 35 ("Finch Decl.") ¶ 6; Ex. 39 ("Sojos-Valladares Decl.") ¶ 10; Ex. 41 ("Altino Decl.") ¶ 6.

Other inmate declarations, dated between April 20 and May 4, assert that inmates receive soap infrequently and cannot always obtain soap upon request. *See, e.g.*, Ex. 27 ("Powell Decl.") ¶ 6; Ex. 47 ("Miller Decl.") ¶ 7; Ex. 49 (Haney Decl.) ¶ 6; Ex. 51 ("Sanchez Decl.") ¶ 20. Because almost all of the declarations appear to describe conditions before the facility inspections, it is possible that these declarations are indicative of distribution problems at the outset of the pandemic. But given the in-court testimony attesting to the availability of soap during the facility inspections, I do not conclude these out-of-court statements reflect a widespread or ongoing problem with access to soap.

The MDC's policies comport with CDC guidance, which recommends that correctional facilities "provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing." CDC Correctional Guidelines 8. While petitioners fault the MDC for failing to make hand sanitizer available to inmates in addition to soap, *see* Am. Pet. ¶ 75(e), the CDC recommends the use of hand sanitizer only "[i]f soap and water are not readily available," *see* Ex. LL ("CDC Guidance on How to Protect Yourself and Others") at Tekbali 82. And even

then, hand sanitizer is only an acceptable alternative to soap if it contains "at least 60% alcohol." *Ibid.* Like many correctional facilities, the MDC does not permit inmates to possess alcohol-based hand sanitizer. *See* Jordan Decl. ¶ 53; King Tr. 35:22-36:5. In deference to this policy, the CDC's correctional guidelines provide that alcohol-based hand sanitizer should only be made available "where permissible based on security restrictions." CDC Correctional Guidelines 7. The MDC's policy of making soap and sinks available to inmates, but not alcohol-based sanitizer, does not run contrary to CDC guidance.

### b. Cleaning Supplies

The best available evidence indicates that inmates are regularly supplied with a potent disinfectant to sanitize their living spaces, although it is possible that access was constrained at the outset of the pandemic. The MDC was authorized in response to the pandemic to use and distribute hdqC2, a powerful disinfectant, throughout the institution. King Tr. 40:2-7. According to Associate Warden King, the MDC has provided inmates with spray bottles and permits inmates to leave their cells on Mondays, Wednesdays, and Fridays to fill their bottles with hdqC2 for spraying and wiping down their cells. *Id.* at 40:15-23.

The individuals who inspected the MDC in connection with this case confirmed that inmates are being provided hdqC2. When Dr. Beard toured the MDC, inmate workers showed him what they use to clean their cells. Beard Report 6. The workers presented to him bottles of hdqC2. *Ibid.* Dr. Beard testified that he asked these workers if inmates were having difficulty accessing hdqC2 and was told that there was "no problem with access." Hr'g Tr. 330:9-13. Dr. Beard also noted that in preparing his evaluation of the MDC, he had reviewed a "significant order" for hdqC2 and spray bottles that was placed by the BOP. Beard Report 6. By the time Ms. English arrived at the facility on May 2, the MDC had 250 gallons of hdqC2 on hand. *See* English Report 7. Ms. English also observed that in all areas she toured, inmates had access to "disinfectant

23

products effective against the virus that causes COVID-19 for daily cleanings." *Id.* at 6. And while Dr. Venters spoke to several detainees who claimed to have received "insufficient cleaning solution for their cell area," Venters Report ¶ 42, he also testified that he saw spray bottles and disinfectant wipes in some of the housing areas and that some inmates told him that they had received cleaning supplies for their cells, Hr'g Tr. 146:8-18.

In written declarations dated between April 20 and 28, some inmates state that they have been provided with cleaning material for their cells, albeit not always in sufficient quantity to satisfy demand. *See, e.g.*, Ex. 28 ("Bynum Decl.") ¶ 4; Ex. 29 (Olivera Decl.) ¶ 6; Ex. 31 ("Mabry Decl.") ¶ 10; Dixon Decl. ¶¶ 6-7. Other inmate declarations from this period assert that inmates have not been provided with cleaning supplies. *See, e.g.*, Altino Decl. ¶ 7; Ex. 43 ("Hall Decl.") ¶ 7; Ex. 45 ("Watson Decl.") ¶ 9; Sanchez Decl. ¶ 20. It is difficult to assess these out-of-court statements because the declarants have not been subjected to any questioning about their claims. Crediting the observations of the individuals who inspected the facility and testified at the hearing, I conclude that the MDC now has an adequate supply of hdqC2 and is making that disinfectant available to inmates, but I do not rule out the possibility that there were occasions early in the pandemic on which individual inmates did not have access to those chemicals.

### c.  Cleaning of Common Areas and Shared Items

MDC officials have also provided cleaning supplies to inmates to wipe down shared items in common areas and have arranged for high-touch areas and surfaces to be cleaned periodically by orderlies. Associate Warden King and Health Services Administrator Vasquez have stated that spray bottles filled with hdqC2 and paper towels have been placed next to the phones and computers shared by inmates so that they can be cleaned between uses. *See* King Tr. 56:16-58:7; Vasquez Decl. ¶ 6(l). Inmates have been instructed to disinfect those items between each use. *Id.* at 56:18-57:9. Spray bottles with hdqC2 and Tilex have also been placed in the shower areas for

inmates to disinfect the showers between uses. *Id.* at 58:18-59:13. In addition, orderlies have been furnished with cleaning supplies and have been instructed to clean common areas "multiple times throughout the day." Jordan Decl. ¶ 52; *see* King Tr. 53:9-56:19.

When Dr. Beard and Ms. English inspected the MDC, they observed that disinfectant had been made available to both inmates and orderlies for cleaning common areas and shared items. During Dr. Beard's inspection, inmates showed Dr. Beard "the cleaning/disinfectant that had been diluted and put into spray bottles" that "is used on the telephones, computers and to clean common areas." Beard Report 6. Staff and inmate workers informed Dr. Beard that this disinfectant "was used by [orderlies] to disinfect showers, telephones[,] and computers after each use by an inmate," and that "spray bottles would be available if individual inmates wanted to clean any area themselves." *Id.* at 7-8. Ms. English's interviews with randomly selected inmates corroborated these observations, although Ms. English noted that in one area she did not see disinfectant spray near the phone handsets. English Report 5; Hr'g Tr. 192:10-19. Dr. Venters also testified that when he visited the MDC he saw disinfectant spray bottles and wipes in the housing units. Hr'g Tr. 146:14-18. In addition, several inmate declarations state that high-touch objects and common areas are being cleaned, both by inmates and orderlies, though a number of those inmates faulted the frequency with which cleaning is taking place. *See, e.g.*, Bynum Decl. ¶ 11; Sanchez Decl. ¶ 20; Ex. 55 ("Deutsch Decl.") ¶¶ 8-9; Powell Decl. ¶ 5; Dixon Decl. ¶ 10; Mabry Decl. ¶ 10.

Petitioners offer a contrary view, relying on declarations from other inmates dated between April 20 and 29 stating that almost no cleaning of shared items is occurring and that no supplies have been provided for this purpose. *See, e.g.*, Finch Decl. ¶ 10; Ex. 38 ("Pierson Decl.") ¶ 10; Watson Decl. ¶ 11; Ex. 53 (Batista Decl.) ¶ 9; Deutsch Decl. ¶ 9. They also rely on the reports of several inmates to Dr. Venters when he toured the facility that "they have not observed any

cleaning of the phones."  Venters Report ¶ 42.  I give these statements less weight than in-court testimony because the individuals who made them have not been subjected to questioning about their claims.  Moreover, these accounts are contradicted by declarations of other inmates and by the observations that Dr. Beard and Ms. English made when they toured the facility.  Indeed, Dr. Venters testified as well that when he visited the MDC he saw disinfectant spray bottles and wipes placed in the housing units.  Hr'g Tr. 146:14-18.  Taking together the staff declarations, live testimony, inspection reports, and inmate declarations, the MDC appears to be complying with its stated policy of providing supplies so that inmates can clean shared items and common areas, as well as assigning inmate workers to periodically clean those items.  But the inmate declarations suggest that the roll-out of this sanitation policy may not have been seamless, and there may have been instances in which the requisite supplies were not available or in which shared items were not cleaned by inmate workers.

In addition to arguing that shared items are not being cleaned in accordance with the MDC's policies, petitioners have faulted the MDC for failing to ensure that such items are cleaned between each use.  *See, e.g.*, Am. Pet. ¶ 54.  But the enforced cleaning of shared items between each use, while perhaps an ideal practice, is not called for by the CDC's guidelines.  Rather, those guidelines provide that frequently touched items and common areas should be cleaned "[s]everal times per day."  CDC Correctional Guidelines 9.  The MDC complies with that guidance.  Moreover, the availability of cleaning supplies so that inmates can disinfect shared items themselves undercuts any argument that cleaning *by orderlies* between every use should be required.

### 3.  Personal Protective Equipment (PPE)

The MDC's current PPE protocols for both inmates and staff are substantially in compliance with applicable CDC guidelines.

26

a.      **Inmate PPE**

The best available evidence suggests that inmates are being provided with appropriate PPE in accordance with CDC guidelines.  On or about April 5, the MDC provided all inmates with surgical masks.  Jordan Decl. ¶ 56.  Inmates were provided with new masks on April 12, *ibid.*, and the MDC's policy going forward has been to provide inmates with new masks on a weekly basis, *see* King Tr. 76:19-23.  Inmates can request new masks from MDC staff if their masks become damaged.  King Tr. 76:24-77:9.  The MDC has instructed inmates that they must wear masks whenever they leave their cells if they cannot maintain appropriate social distance from others. *See* King Tr. 78:2-14, 79:10-17.  It appears that this policy is being followed.  *See* Beard Report 6 ("[A]ll inmates had and were using their masks as we moved through the facility.  It is evident that this has become a part of their regular daily routine.").

A number of inmates acknowledge through written declarations that the MDC has been providing masks on a weekly basis, but some of those inmates complain that the masks have been non-washable.  *See, e.g.*, Altino Decl. ¶ 8; Hall Decl. ¶ 8; Ex. 44 ("Carpenter Decl.") ¶ 8;  Dixon Decl. ¶ 8.  MDC officials addressed these concerns, responding to complaints about the "poor quality of some of the initial face coverings," English Report 5, by shifting to washable cloth masks, *see* Vasquez Decl. ¶ 6(r); Second King Decl. ¶ 20.

Petitioners' expert, Dr. Venters, has criticized the MDC for failing to give inmates N-95 masks, which are tight-fitted respirators specifically designed to filter out airborne particles. *See* Venters Report ¶ 45; *see also* Personal Protective Equipment: Questions and Answers, CTRS. FOR  DISEASE  CONTROL  &  PREVENTION,  https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html (last visited June 7, 2020).  Respondent acknowledges that inmates have not been fitted with such masks.  *See* King Tr. 78:15-79:9.  But CDC correctional guidance advises that "face masks"—not N-95s—should be provided to inmates "as feasible based

27

on local supply." CDC Correctional Guidelines 25. The same guidelines recommend that even "[i]ncarcerated/detained persons who are confirmed or suspected COVID-19 cases, or [are] showing symptoms of COVID-19" should be provided with face masks, not N-95 respirators. *See ibid.* Respondent's expert Asma Tekbali, the witness with the greatest expertise on COVID-19 protocols, has explained that N-95 masks are "reserved for airborne viruses such as tuberculosis and measles" and generally are "indicated for [health care] providers only," rather than patients. Tekbali Report 3. Accordingly, the MDC's decision to provide inmates with ordinary face masks, rather than N-95 masks, is consistent with CDC guidance.

Dr. Venters also faults the MDC for failing to provide inmates with gloves unless they work as orderlies. *See* Venters Report ¶ 64(r). MDC officials have not disputed that the MDC provides gloves to inmates only when they work as orderlies or when they are involved in laundry or food services. *See* King Tr. 64:4-16. Here too, the MDC's policy comports with CDC guidelines, which generally recommend hand hygiene, rather than glove-wearing, to protect against COVID-19. *See* CDC Guidance on How to Protect Yourself and Others at Tekbali 82. The CDC accordingly recommends providing inmates with gloves only if (i) they handle laundry or food service items "from a COVID-19 case or case contact," or (ii) are assigned to clean an area where a COVID-positive person was present. CDC Correctional Guidelines 25. The MDC's policy aligns with this guidance.

### b.  Staff PPE

The MDC has instituted PPE policies for staff that conform to CDC guidelines. MDC staff members receive two surgical masks a week and are required to wear masks when they cannot engage in social distancing. King Tr. 69:21-23, 71:19-21. While gloves have been made available to staff, staff members generally are not required to wear gloves except when they perform tasks such as taking temperatures, working in the isolation unit, or dealing with an inmate who is

28

confirmed or suspected to have COVID-19.  *See id.* at 81:18-83:16.  Dr. Beard and Ms. English both noted that staff were wearing appropriate PPE when they toured the MDC.  *See* Beard Report 6; English Report 5.

In suggesting that staff do not make appropriate use of PPE, petitioners rely on Dr. Venters' statement that he "observed several correctional staff not wearing gloves or masks," and that it "was not clear who was mandated to wear masks or gloves."  Venters Report ¶ 43.  Petitioners also rely on a number of written declarations from inmates stating that staff members do not always wear masks and gloves.  *See, e.g.*, Bynum Decl. ¶ 12; Mabry Decl. ¶ 11; Dixon Decl. ¶ 16; Pierson Decl. ¶ 24.  But those observations, without more, do not support the inference that MDC staff members are failing to wear PPE when it is called for.  The CDC only recommends that staff members wear gloves when they are undertaking certain tasks, such as performing temperature checks or providing care to quarantined inmates.  *See* CDC Correctional Guidelines 25; Tekbali Report 6.  Similarly, the CDC recommends mask-wearing only when it is not possible to engage in social distancing.  *See generally* CDC Correctional Guidelines 25; Tekbali Report 7.  Neither the inmate declarants nor Dr. Venters offered a basis to conclude that staff members have been failing to wear masks or gloves when required under CDC protocols.

The MDC also has special PPE protocols for staff who work in the quarantine and isolation units, or who otherwise have direct contact with confirmed or suspected COVID-positive inmates. Consistent with the CDC's recommendation that staff interacting directly with confirmed or suspected COVID-19 cases wear N-95 masks, *see* CDC Correctional Guidelines 25, staff members who work in the quarantine or isolation units are given N-95 masks daily, *see* King Tr. 72:2-22. Each staff member is required to wear an N-95 mask, as well as a gown and either a face shield or goggles, when dealing with inmates who have tested positive for COVID-19.  *Id.* at 69:13-19,

84:19-85:25.  Dr. Beard and Ms. English both noted the availability and use of this specialized PPE when they toured the MDC.  Beard Report 7; English Report 5.  Ms. English did not see a cart for specialized PPE outside the quarantine unit, but she observed that "[t]he quarantine area was receiving masks and gloves [from] the Captain at the start of each shift on a cart which [was] pushed to the location."  English Report 4.  While noting that "there were no significant concerns raised about [the] availability of PPE for staff," she recommended that a "stationary cart" with PPE be placed in front of all units to "avoid even the appearance that PPE is not being made readily available" to staff who need it.  *Id.* at 12.

Dr. Venters did not reach the same conclusion because when he toured the isolation unit, he observed that the cart stationed outside the unit "lacked any gowns or masks."  Venters Report ¶ 45.  From that observation, Dr. Venters drew the conclusion that MDC staff "appear to lack appropriate PPE" for dealing with presumed or confirmed COVID-19 cases.  *Id.* ¶ 46.  But that broad conclusion is unwarranted, particularly because later visits to the MDC, including an unannounced inspection, found that staff had access to sufficient PPE and noted that the PPE cart outside the isolation unit was stocked.  Given that evidence, it appears likely that Dr. Venters simply came upon the isolation unit's PPE cart at a time when it needed restocking.

Petitioners also rely on a written declaration from Anthony Sanon, an official in a union that represents correctional officers, in which Mr. Sanon disputes whether the MDC has made appropriate PPE available to staff in the isolation and quarantine units.  *See* Ex. 79 (Sanon Decl.) ¶¶ 28, 30.  But Sanon's declaration deserves less weight than other accounts.  He appears to be reporting second-hand information rather than his own observations, he has not been subjected to any kind of questioning, and his statements are contradicted by the sworn testimony of Dr. Beard

and Ms. English, each of whom were subjected to cross-examination.  The best available evidence thus suggests that staff in the isolation and quarantine units have access to appropriate PPE.

### 4.   Communication Regarding COVID-19

MDC officials communicate with inmates about COVID-19 through "weekly town halls" at which "written information" is handed out to inmates.  Vasquez Decl. ¶ 6(s).  While these "town halls" initially took the form of group meetings, prison officials now distribute information by going cell-to-cell.  King Tr. 92:21-93:14.  Staff members also make rounds to answer inmates' questions.  Vasquez Decl. ¶ 6(s).  The facility evaluations by Ms. English and Dr. Beard corroborated that prison officials are disseminating information about the virus in these ways.  *See* English Report 9-11; Beard Report 3.  Ms. English further noted that informational posters have been placed "throughout the institution" in both Spanish and English.  English Report 9-11.  Dr. Venters' report did not dispute that the MDC has adopted these educational measures.  These communications protocols appear consistent with CDC guidance recommending that correctional institutions give inmates and staff "up-to-date information about COVID-19," to be conveyed "verbally on a regular basis" and via signs placed "throughout the facility."  CDC Correctional Guidelines 10, 12.

### D.   Testing for COVID-19

The MDC has tested only a small number of inmates for COVID-19, due to limited access to testing, although BOP officials expect that the facility's testing capacity will be increased in the near future.  As noted above, as of June 4, the MDC had tested just 68 inmates for the virus, with nine positive results.  Edge Letter 2.  The small number of tests conducted reflects MDC officials' difficulty obtaining test kits thus far.  *See* Vasquez Tr. 116:8-23 (noting that the MDC has made weekly requests for new tests from the lab that services it, without success).  That difficulty, in turn, reflects broader supply shortages.  *See* Tekbali Report 3-4.  Nevertheless, the

BOP has arranged for the MDC to receive new testing equipment in the near future.  In an apparent reference to the BOP's acquisition of Abbott ID NOW testing machines for some BOP facilities, Ms. English testified that "machines" will be sent to the MDC "shortly" because it "is being recognized as a detention facility in a hot zone."  Hr'g Tr. 226:15-17; *see* Press Release, Bureau of Prisons to Expand Rapid Testing Capabilities (May 7, 2020), https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf.  The MDC does not test staff because it is not "licensed" to do so, Vasquez Tr. 145:17-146:23, but staff members are encouraged to self-report if they test positive in the outside community, *id.* at 148:2-10.

Petitioners have faulted the MDC for failing to conduct "[b]roader testing" thus far.  Pet'rs Br. 7.  They argue that the MDC should be testing all inmates and staff who possess "more than one sign and/or symptom of COVID-19" or who possess "risk factors for serious illness or death from COVID-19."  Mot. for Prelim. Inj. 3.  But petitioners have failed to demonstrate that such an approach has been feasible to date, given the supply shortages discussed by Ms. Vasquez and Ms. Tekbali.  Indeed, CDC guidelines implicitly acknowledge that tests are in short supply by providing guidance to clinicians about how to prioritize testing.  *See Evaluation & Testing*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited June 8, 2020).  While Ms. Tekbali did not dispute that greater testing of inmates with symptoms would be desirable when "possible," Hr'g Tr. 285:1-15, and the availability of test kits appears to be increasing, it does not appear that the MDC has thus far missed opportunities to engage in widespread testing.

E.     **Quarantine and Isolation Procedures**

The MDC has established quarantine and isolation units whose basic design comports with CDC guidelines.  The isolation unit houses inmates who have tested positive for COVID-19 or who are "presumed positive" based on their symptoms.  Vasquez Tr. 56:13-23, 61:5-63:21, 118:4-24.  It is the MDC's policy to test the first inmate in a unit who exhibits symptoms that MDC officials deem consistent with COVID-19.  *Id.* at 119:13-16.  The inmate is placed in isolation pending test results and kept in isolation if the test comes back positive.  *Id.* at 61:22-62:6.  If the test is positive, the inmate's entire housing unit is placed under quarantine for 14 days.  *See* King Decl. ¶ 9; Jordan Decl. ¶¶ 37-38; Vasquez Tr. 84:25-85:2.  Inmates in the quarantine unit who display symptoms that MDC medical staff deem indicative of COVID-19 are to be treated as "presumed positive" without a test and placed in isolation.  *See* Vasquez Tr. 32:1-8, 56:15-23, 62:14-63:21.  Between when the MDC first began isolating inmates in connection with COVID-19 and April 27, a total of 19 inmates were confirmed or presumed positive for COVID-19 and placed in the isolation unit for some period.  *See* Ex. 80 (Resp't Response to Interrogatory 1(c)) 3.

Inmates in the isolation unit are housed in single cells that each have a dedicated bathroom.  Vasquez Tr. 68:11-17.  They cannot leave their cells except for limited purposes, such as to make legal calls and to shower.  *See* King Decl. ¶ 8 n.1.  Inmates are not released from the isolation unit until (i) seven days after the onset of their symptoms, and (ii) 72 hours without a fever.  Vasquez Tr. 81:19-82:4.

Male inmates in a quarantined unit remain housed in double cells, *id.* at 33:17-23, except that the cellmate of the individual who tested positive is housed alone in his original cell, *id.* at 34:5-23.  If the cellmate is determined to be symptomatic, he is transferred to the isolation unit.

33

*Ibid.*  Inmates in a quarantined unit may use the unit's common area but "will not be moved from the housing unit to other areas of the institution."  King Decl. ¶ 8 n.1.  The unit remains under quarantine until 14 days have passed since the last inmate was deemed symptomatic for COVID-19 and transferred to isolation.  *See* Jordan Decl. ¶ 49.

Medical staff make twice-daily rounds in the quarantine and isolation units.  Vasquez Tr. 38:17-40:10, 78:23-79:6; Vazquez Decl. ¶ 6(c); Beard Report 6; English Report 3.  On each round, the medical staff conduct temperature and wellness checks.  English Report 3.  The MDC did not originally specify particular questions to be asked during the wellness checks.  Vasquez Tr. 38:23-39:10.  By the time Ms. English inspected the facility in May, however, medical staff were asking about "wellness and symptomatic criteria."  English Report 3.  If the questioning or temperature check suggests that an inmate may have COVID-19 symptoms, the inmate "will be removed from the cell and escorted to a health services exam room on the floor for further examination."  *Ibid.*

Petitioners raise a number of objections to the MDC's procedures for quarantine and isolation units.  First, petitioners cite 12 declarations from inmates to question whether the MDC has actually been conducting wellness checks or twice-daily temperature checks in those units.  *See* Suppl. Venters Report ¶ 3(a); Pet'rs' Proposed Findings of Fact ¶ 18 (citing Bynum Decl.; Dixon Decl.; Ex. 36 (Nelson Decl.); Ex. 37 (Platt Decl.); Pierson Decl.; Sojos-Vallardes Decl.; Hall Decl.; Carpenter Decl.; Miller Decl.; Ex. 48 (Soria Decl.); Deutsch Decl.; Ex. 64 (Lopez Decl.)).  But only two out of the 12 declarations appear to have been submitted by inmates who had actually spent time in quarantine or isolation units.  *See* Sojos-Valladares Decl.; Miller Decl. And one of those two declarations complains only about the inmate's experiences before he entered quarantine.  *See* Sojos-Valladares Decl.  Respondent, by contrast, has marshalled first-hand deposition testimony from Ms. Vasquez about wellness and temperature checks that she and other

staff conduct, *see* Vasquez Tr. 38:17-40:10, 78:23-79:6, and testimony from Ms. English that her staff reported witnessing temperature and wellness checks in quarantine units, *see* Hr'g Tr. 213:12-16.  Unlike the single relevant declaration cited by petitioners, the testimony cited by respondent was provided under oath, and subject to cross-examination.  I credit this evidence that wellness and temperature check procedures are being implemented in quarantine and isolation units.

Second, petitioners assert that the current twice-daily medical rounds are insufficient.  *See* Mot. for Prelim. Inj. 2.  They contend that medical staff must (i) engage in more detailed questioning during wellness checks, (ii) perform "standardized clinical evaluation[s] at least daily" in the isolation unit, and (iii) evaluate inmates in the isolation unit "in a clinical setting and not cell-side."  Mot. for Prelim. Inj. 2.  Petitioners' preferred procedures go beyond anything the CDC has recommended.  Their recommendations do not even appear to be consistent with the ordinary standard of care for COVID-19 patients, who are commonly advised to "isolate and manage" symptoms rather than to seek daily assessments from healthcare providers.  Hr'g Tr. 242:5-23 (testimony of Ms. Tekbali).  To the extent petitioners believe CDC guidelines require more detailed questioning during wellness checks, *see* Pet'rs' Proposed Findings of Fact ¶ 15 (citing CDC Correctional Guidelines 26), that view is mistaken.  The list of screening questions petitioners highlight is for individuals entering a correctional facility, being transferred to a correctional facility, or being released from a correctional facility—not for daily rounds.  CDC Correctional Guidelines 26; *see* Ex. 6 ("CDC Correctional Guidelines Slides") at BOP 96.  In any event, the MDC has over time augmented its wellness checks to include inquiries about specific symptoms.

F.       **Access to Medical Staff Outside of the Isolation and Quarantine Units**

In the general population units, MDC officials do not conduct regular wellness screenings or temperature checks, but instead principally rely on inmates to alert prison staff to medical problems.  *See* Hr'g Tr. 523:25-524:23.  Inmates have at least two opportunities per day to report medical problems to medical staff—when members of the health team go door-to-door at every cell for the sick call and when they go door-to-door at every cell to distribute medications in the process known as the pill line.  *See* Vasquez Tr. 169:11-24, 182:15-183:20, 202:21-204:13; King Decl. ¶ 18.  On these rounds, inmates can report symptoms and seek care by submitting sick-call requests—a system discussed in more detail below.

Petitioners fault the MDC's monitoring of the general population because health staff do not initiate wellness screenings or temperature checks.  *See* Pet'rs Br. 8-9; Pet'rs' Proposed Findings of Fact ¶ 17.  But the MDC's approach tracks the CDC's recommendations.  The CDC's guidance on "Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms" advises correctional facilities to instruct "healthcare staff [to] perform regular rounds to answer questions about COVID-19" and to implement "daily temperature checks in just a subset of housing units"—those "where COVID-19 cases have been identified."   CDC Correctional Guidelines 22.  That is precisely what the MDC does, because MDC staff perform twice-daily temperature checks in quarantined units (i.e., those where COVID-19 cases have been identified). *See* Vasquez Tr. 38:17-40:10, 78:23-79:6; Vazquez Decl. ¶ 6(c); Beard Report 6; English Report 3.

G.       **The Sick-Call System**

Petitioners raise more substantial concerns about the MDC's system for handling sick-call requests once they are made.  Evidence at the preliminary injunction hearing suggests that the

36

MDC's sick-call process and the related isolation determinations are falling short when measured against CDC standards because of delays in response times and sparing use of isolation.

By way of background, the MDC's sick-call system permits inmates to report COVID-19 symptoms and seek medical attention verbally, electronically, or through a paper slip. *See* Ex. 80 (Resp't's Response to Interrogatory 1(f)) 4. Inmates usually submitted electronic requests before the pandemic, but the facility now relies heavily on paper requests because most inmates have only occasional computer access during the lockdown. *See* English Report 4; Hr'g Tr. 179:18-180:3; Eichenholtz Decl., Ex. A 28 (Dkt. #89-1). Inmates can obtain paper sick-call slips from medical staff when they make rounds each day. Vasquez Tr. 48:18-49:2; 186:19-187:7; *see* King Decl. ¶ 18. Medical staff then pick up the sick-call slips and triage requests as emergent or non-emergent "at the cell door," Hr'g Tr. 180:10-13; *see* Vasquez Tr. 54:10-19, 186:19-187:7, 194:13-21; English Report 3-4, although the cell-door triage system was not fully implemented at the beginning of the pandemic, Hr'g Tr. 180:4-15 (testimony from Ms. English noting that before her inspection, correctional staff sometimes collected the sick-call slips instead of leaving them for medical staff, which delayed triage by a few hours). Requests classified as "emergent" are to be addressed that same day, and non-emergent requests are to be entered into a scheduling system for follow-up at a later date. *See* Vasquez Tr. 54:10-19, 186:21-187:7, 188:13-23, 194:16-21. The MDC has added temporary medical staff to assist with the sick-call system during the pandemic. Vasquez Tr. 194:17-20; Hr'g Tr. 520:10-13.

The evidence at the preliminary injunction hearing indicates that the speed of the MDC's response to sick-call requests and its use of isolation in response to sick-call requests reporting COVID-19 symptoms both currently fall short of the standards in CDC guidelines. With respect to speed, CDC guidance specifies that inmates experiencing COVID-19 symptoms should be

evaluated expeditiously—"at the first sign of symptoms."  CDC Correctional Guidelines Slides at BOP 108; *see* CDC Correctional Guidelines 23.  Doing so enables inmates to receive treatment quickly, when treatment is warranted.  *See* CDC Correctional Guidelines 23.  And it ensures that inmates who are experiencing COVID-19 symptoms can "be immediately placed under medical isolation," "[a]s soon as" they develop COVID-19 symptoms.  CDC Correctional Guidelines 15; *see* CDC Correctional Guidelines Slides at BOP 100-01 (recommending isolating "[s]ymptomatic people . . . [i]mmediately once symptoms appear").

Evidence at the hearing indicates that the MDC is not currently meeting that standard because medical staff may take days or sometimes even weeks to respond to some sick-call requests reporting possible COVID-19 symptoms.  Petitioners' expert concluded based on his interviews of detainees that responses to sick-call requests typically took "between 3-7 days." Venters Report ¶ 23.  And Ms. Vasquez acknowledged that MDC medical staff would likely treat at least one COVID-19 symptom—loss of sense of taste—as non-emergent.  Vasquez Tr. 196:3-10.  She stated that the average response time to a non-emergent request is two and a half weeks. *Id.* at 195:2-8.

Further, multiple inmates submitted declarations stating that they reported symptoms that could be consistent with COVID-19 but did not receive timely responses from medical staff. *See, e.g.*, Sojos-Valladares Decl. ¶ 5; Rodriguez Decl. ¶ 7; Ex. 81 ("Gonzalez Decl.") ¶ 3; Ex. 66 ("Chunn Decl.") ¶ 21; Ex. 33 ("Needham Decl.") ¶¶ 19-27; Powell Decl. ¶¶ 11-12; Miller Decl. ¶ 8, Ex. 54 ("Singer Decl.") ¶ 12; Ex. 65 ("Hair Decl.") ¶¶ 12-13; Ex. 46 ("Wilson Decl.") ¶ 10. Several inmates reported delays even when they described symptoms such as trouble breathing. *See, e.g.*, Rodriguez Decl. ¶ 7; Ex. 88 ("Pet'rs Sick-Call Exhibit") at BOP_SCR 478, BOP_SCR 679.  That is of particular concern because the CDC has designated trouble breathing to be an

38

"emergency warning sign[ ]" for COVID-19.   CDC List of Symptoms of Coronavirus.   Indeed, Health Services Administrator Vasquez acknowledged that symptom to be emergent.   Vasquez Tr. 195:9-16.

Moreover, some inmates' accounts of the medical encounters that occurred after they reported COVID-19 symptoms raise questions about whether MDC medical staff are uniformly performing appropriate screening for COVID-19 when they do respond to sick-call requests reporting possible symptoms.   In particular, one inmate who reported experiencing symptoms consistent with COVID-19 stated that despite repeated requests for care, he went at least two weeks without receiving more than a temperature check from a nurse, who told him he could not "get tested or see a doctor" because he "did not have a fever and had not fainted."   Bynum Decl. ¶ 8. Another inmate stated that he experienced shortness of breath and chest tightness and was told via electronic response that he should buy allergy medicine from the commissary.   Deutsch Decl. ¶¶ 17-19.   And a third inmate reported that a physician's assistant told her that there was no point to testing her when she had already experienced symptoms for several weeks and that it would create panic in her unit if she tested positive.   Needham Decl. ¶¶ 19-27.   To be sure, the general course of treatment for many COVID-19 cases is simply to monitor and manage symptoms—there are "virtually no clinical interventions for patients who present with mild symptoms."   Tekbali Report 2; *see* Hr'g Tr. 241:22-242:23.   And it is hard to fully assess these accounts because the record before me does not include medical records and because the declarants did not provide live testimony and were not subject to questioning.   It is also not possible to gauge the extent to which these complaints reflect a widespread problem.   But these accounts suggesting that several inmates reporting COVID-19 symptoms may have had only a cursory medical encounter, after which they were neither tested nor placed in isolation, reinforce concerns about whether the MDC is

39

appropriately responding to sick-call requests describing potential COVID-19 symptoms and then quickly isolating possible cases based on informed clinical judgment.

Sick-call requests themselves provide additional evidence of delayed responses. Petitioners entered into evidence anonymized versions of electronic sick-call requests submitted between March 13 and early May, as well as certain paper sick-call requests from that period. *See* Pet'rs Sick-Call Exhibit; *see also* Attachment to Third Suppl. Decl. of  Health Services Administrator Stacey Vasquez ("Suppl. Paper Sick Calls") (*see* Dkt. #97-2) (additional paper sick-call requests from this time period submitted by respondent).  Dr. Venters determined after reviewing a subset of sick-call requests supplied to him by petitioners' counsel that at least 37 inmates had submitted requests reporting COVID-19 symptoms in which the inmate "expressly identified their concerns as a repeat."  Venters Report ¶ 25.  Some of those requests may come from inmates who were seen by medical staff but then filed an additional slip to request further attention. *See, e.g.*, Pet'rs Sick-Call Exhibit at BOP_SCR 822.  But the dozens of submissions that appear to be repeat requests corroborate the inmate declarations that reports of symptoms of COVID-19 did not receive timely responses.  In sum, taking together Ms. Vasquez's deposition testimony, the declarations submitted by inmates, and the evidence from the sick-call requests themselves, the MDC appears to be falling short of the CDC's guidance that correctional facilities should evaluate inmates reporting COVID-19 symptoms quickly, so that potential COVID-19 cases can be isolated immediately and receive swift medical treatment if needed.

The sick-call data also suggests that the MDC is not using isolation as fully as recommended  under the CDC guidelines, which call for inmates with COVID-19 symptoms to "be immediately placed under medical isolation."  CDC Correctional Guidelines 15; *see* CDC Correctional Guidelines Slides at BOP 100-01.  The sick-call requests reflect that between March

40

13 and early May, roughly 150 to 200 inmates submitted sick-call requests containing symptoms or combinations of symptoms that CDC guidance identifies as possible signs of COVID-19, and roughly 120 to 150 of these had been submitted by April 27.  *See* Pet'rs Sick-Call Exhibit; Suppl. Paper Sick Calls.[3]  Moreover, I have drawn the inference that an unknown additional number of paper sick-call requests from April 1 to April 23 also contained reports of COVID-19 symptoms. Yet as of April 27, the MDC had only transferred 19 inmates to medical isolation.  *See* Ex. 80 (Resp't's Response to Interrogatory 1(c)) 3.  The substantial number of sick-call requests reporting COVID-19 symptoms and the small number of inmates placed in isolation are hard to square with the CDC's guidance that "[i]f an individual has symptoms of COVID-19" such as "fever, cough, [or] shortness of breath," medical staff should "[p]lace the individual under medical isolation." CDC Correctional Guidelines 10; *see id.* at 15; CDC Correctional Guidelines Slides at BOP 100-01.

Respondent replies that it would not be reasonable to isolate every inmate who reports a symptom consistent with COVID-19.  *See* Hr'g Tr. 522:19-523:15.  After all, many symptoms of COVID-19 are also common symptoms of other ailments, such as sore throat, cough, and headaches.  CDC List of Symptoms of Coronavirus.  Respondent therefore contends that CDC guidelines are best understood to allow medical staff some discretion regarding whether isolation is warranted.  Hr'g Tr. 528:21-529:3.  And he notes that petitioners' expert appeared to agree that a single symptom consistent with COVID-19 would not necessarily warrant isolation.  *See id.* at

---

[3]   The exact number of requestsis difficult to calculate, in part because the CDC has updated its list of possible symptoms of COVID-19 over the course of the pandemic.  *Compare* CDC List of Symptoms of Coronavirus, *with Symptoms of Coronavirus*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited June 8, 2020); *see also* CDC Correctional Guidelines 10.

155:4-16 (testimony of Dr. Venters that he "would anticipate that most patients who go into an Isolation Unit for COVID-19 would have multiple signs or symptoms").

But the MDC's approach does not appear consistent with CDC guidelines even accepting, as I do, that the guidelines are properly understood to allow healthcare providers to exercise clinical discretion in deciding whether to isolate particular inmates. The sick-call data suggests that, for the period from March 13 to early May, the MDC was neither isolating nor testing more than 80 percent of inmates who report symptoms of COVID-19. In other words, in the main, the MDC appears not to be isolating individuals who report COVID-19 symptoms. That seems to be in tension with the CDC's guidance that those reporting symptoms should be isolated, even if the CDC guidelines are understood to allow discretion in individual cases. The conclusion that MDC staff are not fully utilizing isolation as called for under the CDC guidelines is compounded by several declarations that indicate that the MDC has failed to isolate at least some inmates who exhibited many symptoms of COVID-19 over an extended period. For instance, Victor Sojos-Valladares was not isolated until about a week after he started feeling sick and only after he refused three consecutive meals, seemingly because he did not immediately present with a fever. *See* Sojos-Valladares Decl. ¶ 5. Similarly, Justin Rodriguez reports "suffering in [his] cell for about two weeks" with multiple COVID-19 symptoms, without being transferred to isolation, because he did not have a temperature. Rodriguez Decl. ¶ 7. A blood test after Mr. Rodriguez was released several weeks later showed he had COVID-19 antibodies. *See id.* ¶¶ 15-17; Ex. 71. Respondent's unelaborated explanation that MDC medical staff are making "clinical decisions" about isolation, Resp't Opp'n Br. 13, does not sufficiently rebut the evidence that the MDC is underutilizing isolation relative to the CDC's expectations.

H.      **Sick-Call Record-Keeping and Tracking**

Petitioners argue that MDC officials have been deficient in their handling of sick-call requests themselves, contending that officials have failed to preserve records of such requests and that officials have also been deficient because they have not used sick-call data to create an MDC-wide symptom dashboard.

With respect to preservation, petitioners fault MDC officials for failing to retain paper sick-call requests and then scan them into inmates' medical records before April 24, 2020. *See* Hr'g Tr. 14:8-17; Venters Report ¶¶ 28-31.  Dr. Venters argued that if the paper requests are discarded, "the health service does not know how many requests were made, and how many responded to," and providers cannot determine "whether the assessment and care provided was appropriate to the patient's original concerns."  Venters Report ¶ 29.  Respondent does not appear to dispute that some record of the medical complaint raised in a paper request should be maintained for the quality-control purposes that Dr. Venters describes.  Instead, respondent argues that the substance of each medical complaint should be recorded in staff comments in the BOP's electronic scheduling system, in patient medical records, or in both.  *See* Resp't's Mem. Opp'n to Pet'rs' Mots. in Lim. 3; Hr'g Tr. 9:21-23, 11:9-12:3, 519:2-9.  Respondent is also now retaining the paper sick-call documents.  *See* Hr'g Tr. 451:10-16.

Contrary to respondent's arguments, it does not appear that the substance of the medical complaints in paper sick-call requests was uniformly preserved in the weeks between April 1, when the facility began relying heavily on paper sick-call requests, and April 24, when respondent began retaining paper sick-call requests.  *Id.* at 451:10-16.  When Dr. Venters reviewed one set of medical records that included a sick-call encounter note, Dr. Venters found that there was "no way of knowing" from the patient's medical record whether the record contained the substance of the

43

inmate's original request, and that therefore he could not determine "if the thing that the patient was worried about was addressed or even acknowledged." *Id.* at 140:13-141:23.  And while respondent has now produced an activities report reflecting that staff sometimes recorded the nature of an inmate's complaint in the MDC's electronic scheduling system, *see* Activities Report, that report itself suggests that medical staff did not uniformly record inmate complaints.  For instance, the comment on one inmate's scheduler entry simply reads "several medical issues"; the comment field on several other entries is left blank.  *See, e.g.*, Activities Report 2, 32.[4]  Thus, I credit petitioners' assertion that not all of the sick-call data has been preserved.

Petitioners also fault the MDC for failing to use data from its sick-call requests to create a "facility wide symptom tracking dashboard," Mot. for Prelim. Inj. 2-3, but they have not demonstrated that this particular method of record-keeping is required under CDC or other guidance.  Petitioners argue, more specifically, that a "symptom tracking dashboard" would enable staff to "track the overall incidence of various symptoms by date and location" within the facility. Venters Report ¶ 37; *see* Hr'g Tr. 80:17-81:13, 479:7-481:12.  Respondent does not dispute that the MDC lacks such a centralized tracking system; instead, the facility maintains information about clinical encounters with inmates in their individual medical files.  Hr'g Tr. 539:13-17; *see* Ex. 80 (Resp't's Response to Interrogatory 1(f)) 4.  A tracking system of the type petitioners recommend might well assist MDC staff in identifying clusters of symptoms consistent with COVID-19 within the facility.  That data, in turn, could inform MDC staff in deciding which sick-call requests to prioritize, when to perform testing once the facility has greater capacity to conduct tests, and when

---

[4]   Petitioners object to the inclusion in the preliminary injunction record of the activities report and a related declaration from BOP National Health Technology Administrator Scott A. Griffith because respondent did not file these documents until after the evidentiary hearing.  Petitioners principally argue that the documents are "late" and therefore "prejudicial" to petitioners, and they raise several concerns about the reliability of the documents. *See generally* Pet'rs' Ltr. in Opp'n to Resp't's Request 1 (Dkt. #102); *see* Griffith Decl.  I do not find that including these documents in the record is prejudicial to petitioners, given that I have relied on them for the limited purpose of establishing that the activities report does not appear to uniformly preserve inmate complaints.

isolation is warranted.  Nevertheless, the CDC's detailed 26-page guidance on COVID-19 for correctional facilities does not call for officials to use this particular record-keeping or tracking method.  Nor does guidance from any other expert body on medical care or correctional facilities that petitioners have identified.  And while petitioners' expert, Dr. Venters, opined that such a dashboard was "essential" and described his own use of that approach in monitoring infectious disease outbreaks at Rikers Island, *see* Venters Report ¶¶ 37-39; Hr'g Tr. 64:22-65:13, his testimony did not establish that the tracking method he recommends is standard practice among other institutions.  On this record, the tracking system that Dr. Venters recommends appears to be one means by which the MDC could meet its broader goal of implementing effective quarantine and isolation procedures, but it is not apparent that the MDC is violating any applicable standard of care because it has not adopted such a system.

## I.       Emergency Call Buttons and Translation Services

Petitioners raise several facility-wide concerns relating to inmates' ability to communicate medical concerns to staff, but petitioners have not demonstrated that the MDC's care is deficient in these areas.

First, petitioners allege that inmates' ability to communicate medical problems to medical staff is unacceptably impaired because while the MDC has emergency call buttons in inmates' cells, it is undisputed that some of the emergency call buttons do not work.  *See* Pet'rs Br. 15; King Tr. 103:3-13.  Respondent has explained that the MDC requested funding to repair these buttons earlier this year but that the funding was denied.  King Tr. 103:5-13.  And Ms. English testified that many BOP facilities do not have any "duress buttons."  Hr'g Tr. 187:19-25.  I cannot conclude the MDC is violating any standard of care because it has not yet performed repairs to buttons that many other federal facilities do not have at all, where the record indicates that inmates can report

medical concerns through other channels.  As noted above, the MDC provides that opportunity through regular medical rounds.  *See, e.g.*, Vasquez Tr. 169:11-24, 182:21-184:21, 202:21-204:14; King Decl. ¶ 18; *cf.* Mot. for Prelim. Inj. at 3 (arguing that until buttons are repaired, MDC staff should "conduct frequent medical rounds in those units where there are malfunctioning call buttons").  Correctional staff also perform rounds every 30 minutes, providing another avenue for reporting medical emergencies.  Vasquez Tr. 75:5-9, 187:8-15, 200:23-201:4.

Second, petitioners suggest that the MDC provides inadequate access to Spanish-language interpretation.  Mot. for Prelim. Inj. at 3.  But Ms. English's inspection report indicates that the MDC has a Spanish-speaking medical staff member at the facility seven days a week.  English Report 9; *see* Vasquez Decl. ¶ 6(o).  Health Services Administrator Vasquez further explained that the facility uses an interpretation service called Language Line if there are no interpreters available to speak with a particular inmate.  *See* Vasquez Tr. 174:19-175:8; Vasquez Decl. ¶ 6(o).  While petitioners invoke Dr. Venters' statement that he spoke with "more than one" Spanish-speaking inmate who reported having difficulty communicating his concerns "based on a language barrier," Hr'g Tr. 108:9-14; *see* Venters Report ¶¶ 58-59, petitioners have not established that the accounts of Ms. English and Ms. Vasquez are incorrect, or that the translation services prison officials have described violate any standard of care.

## J.     Inmates at an Elevated Risk from COVID-19

The MDC is tracking inmates who would face greater health risks if they contracted COVID-19, but it has not sought to protect those inmates using procedures different from those applicable to the rest of the inmate population.  At the beginning of the pandemic, the MDC's Health Services Department reviewed inmate medical records to determine which individuals at the MDC could be considered "high risk" under CDC guidelines due to age or a preexisting

medical condition.  Jordan Decl. ¶¶ 33-34.  The MDC then created a list of those inmates.  Vasquez Tr. 204:15-205:3.  The list originally contained 537 people.  *Id*. at 205:4-6.  As of April 27, 2020, the list had shrunk to approximately 380 inmates because some inmates were released and because the CDC delisted some medical conditions as risk factors.  *Id.* at 205:4-20.  MDC officials monitor the high-risk list on a dashboard.  Hr'g Tr. 215:19-216:2; English Report 3.  They also update the list periodically.  King Decl. ¶ 25.  Beyond maintaining and monitoring the high-risk list, the MDC does not take specific measures within the facility to protect high-risk inmates.  Vasquez Tr. 207:16-209:12.

Petitioners fault MDC officials for failing to treat high-risk inmates differently from other inmates in three respects, but the MDC's approach comports with CDC guidance in those areas. Petitioners first contend that the MDC should house all high-risk inmates in single-person cells. Hr'g Tr. 119:20-120:12.   But petitioners have not rebutted the testimony of Health Services Administrator Vasquez that staffing and space constraints prevent the facility from single-celling nearly 400 high-risk inmates—about a quarter of the facility's population.  Vasquez Decl. ¶ 6(f). Nor have petitioners shown that isolation reflects the accepted standard of care for high-risk individuals during the COVID-19 pandemic.  The CDC's detailed guidelines call for isolation of certain inmates—those with COVID-19 symptoms—but conspicuously do not recommend this measure for high-risk inmates.  *See generally* CDC Correctional Guidelines.

Petitioners next argue that the MDC should create a cohort of high-risk inmates, who would be grouped together in the same housing unit or units.  *See* Mot. for Prelim. Inj. 3.  They contend that this strategy would make it easier for medical staff to provide more intensive medical supervision.  *See* Hr'g Tr. 486:17-487:11; *see also* Suppl. Venters Report ¶ 14.  But while the CDC recommends cohorting confirmed COVID-19 cases if isolation is not possible, the CDC has not

recommended cohorting high-risk inmates.  *See* CDC Correctional Guidelines 16.  Instead, the CDC merely recommends what the MDC is already doing—being "especially mindful of those who are at higher risk of severe illness from COVID-19," and "ideally" avoiding cohorting high-risk inmates with "other infected individuals." *Ibid.*  Moreover, petitioners have not rebutted respondent's justifications for declining to cohort.  Health Services Administrator Vasquez has testified that the MDC does not have enough open space to move the hundreds of high-risk inmates into dedicated units.  Vasquez Decl. ¶ 6(f); Vasquez Tr. 209:3-18.  And grouping high-risk inmates into a cohort based on their elevated risk from COVID-19 would present security complications, because the MDC has safety-related reasons to keep apart many inmates who might share similar COVID risk profiles, such as gang members.  *See* Hr'g Tr. 346:10-347:23 (testimony of Dr. Beard); Beard Report 9-10.  Finally, shuffling inmates into new cohorts in the midst of a pandemic could spread the virus.  As Dr. Beard observed, "[i]f MDC-Brooklyn were to move everyone around so that it could cohort the high risk, there is a chance that you could spread the disease throughout the facility during these wide-spread transfers."  Beard Report 10.

Petitioners next contend that the MDC's care for high-risk inmates is deficient because the MDC is not conducting twice-daily temperature checks of those inmates.  *See* Mot. for Prelim. Inj. 2.  But again, CDC guidelines do not suggest that this particular method of monitoring is necessary—despite the fact that they do recommend temperature checks in numerous other contexts, such as upon entry to the facility and for quarantined individuals.  *See, e.g.*, CDC Correctional Guidelines 3, 21.  As noted above, the CDC instead encourages correctional facilities to be mindful of high-risk inmates and to keep high-risk inmates separated from infected inmates. *Id.* at 16.  Moreover, while MDC medical staff do not perform daily temperature checks in the general population units, they perform them twice daily in the quarantine and isolation units, and

48

they conduct twice-daily rounds in the general population units, giving inmates regular access to medical staff.  English Report 3; Vasquez Tr. 38:17-40:10, 78:23-79:9; Vazquez Decl. ¶ 6(a), (c). Particularly given these alternative measures, petitioners have not demonstrated that the MDC's failure to monitor high-risk inmates in precisely the manner they seek violates any standard of care.

## DISCUSSION

### I.    Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  Such injunctions are "never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  To obtain such an injunction, as a general matter, a litigant must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest.  *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter*, 555 U.S. at 20); *see Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019) (citing *Winter*, 555 U.S. at 20).

An even stronger showing on the merits is generally needed when a litigant seeks a "mandatory" injunction that will alter the status quo by commanding some positive act.  *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006); *see North American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018).  In such cases, the movant must demonstrate a "clear or substantial likelihood of success on merits." *North American Soccer League*, 883 F.3d at 37 (citations omitted)*; see New York Progress & Prot.*

*PAC v. Wash*, 733 F.3d 483, 486 (2d Cir. 2013).[5]   Petitioners must make that heightened showing on the merits here, because they seek an injunction that would "alter[] the status quo by commanding" numerous "positive act[s]."   *D.D. ex rel. V.D.*, 465 F.3d at 510.   They seek an injunction that would require respondent to release all medically vulnerable persons from the MDC and to make major changes at the detention center.   For instance, respondent would be ordered to reorganize housing units, change the handling of medical requests, and even modify inmates' shower schedules.   Mot. for Prelim. Inj. 2-4.   Petitioners must therefore show "a clear or substantial likelihood of success on the merits."   *DD ex rel. V.D.,* 465 F.3d at 510.   As explained below, I conclude that petitioners have not made the requisite showing on the merits, and therefore do not consider whether petitioners have met the additional requirements for a preliminary injunction.

## II.   Likelihood of Success on the Merits

Prison conditions can constitute "cruel and unusual punishment" if prison officials act (or fail to act) with "deliberate indifference to a substantial risk of serious harm to a prisoner." *Farmer*, 511 U.S. at 836.   A constitutional violation under these principles has both objective and subjective components.   First, a prisoner must be incarcerated under conditions that, objectively, pose "a substantial risk of serious harm."   *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 834).   Second, because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," a prison official must possess "a 'sufficiently culpable state of mind,'" which "[i]n prison-conditions cases . . . is one of 'deliberate indifference' to inmate health or safety."   *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297

---

[5]   Some Second Circuit decisions—albeit not especially recent ones—have stated that a movant may be able to obtain a mandatory injunction without needing to make the heightened showing of a clear likelihood of success on the merits "where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).   Petitioners have not invoked that standard or argued that they satisfy it.

(1991)).   On the record before me at the preliminary injunction stage, petitioners have not demonstrated a clear likelihood of success on their claim that the MDC's response to COVID-19 reflects deliberate indifference to a substantial risk of serious harm.

### A.    Objective Element

Petitioners have not shown a clear likelihood of success in demonstrating that they face "a substantial risk of serious harm" from conditions at the MDC, *Lewis v. Siwicki*, 944 F.3d 427, 430-31 (2d Cir. 2019) (quoting *Farmer*, 511 U.S. at 834), given the measures that prison officials have instituted to address COVID-19 and the best available evidence regarding those measures' results. There is no "bright line test" to determine if a risk of serious harm is "substantial" for Eighth Amendment purposes.  *Id.* at 432.  Rather, a court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original); *see Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017); *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002).   "In other words," the Supreme Court has written, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

The Supreme Court has made clear that whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger.  *See id*, 509 U.S. at 35-36.  For instance, when addressing a prisoner's Eighth Amendment challenge to environmental tobacco smoke exposure in *Helling*, the Court held that a lower court must consider the prison's new "formal smoking policy" and the recent changes to the prisoner's confinement circumstances in assessing whether conditions at the prison presented a substantial risk to the plaintiff's health.  *Id.* at 36.  The Court described it as "[p]lainly

relevant" to "the objective factor" that the plaintiff had been moved to a new prison and was "no longer the cellmate of a five-pack-a-day smoker." *Id.* at 35.  The Court also stated that "[i]t is possible that the new [formal smoking] policy will be administered in a way that will minimize the risk to [the plaintiff] and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health or that he is now entitled to an injunction." *Id.* at 36.  Thus, determining whether prison conditions pose a substantial risk of serious harm from COVID-19, or any other risk, must be determined "after accounting for the protective measures [the prison system] has taken." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

Under these principles, there is no question that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus.  Courts have long recognized that conditions posing an elevated chance of exposure to an infectious disease can pose a substantial risk of serious harm.  Thus, the Supreme Court has rejected the proposition that prison officials may "be deliberately indifferent to the exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33.  And the Second Circuit has explained that "correctional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996); *see Phelps*, 308 F.3d at 185 (noting that the Eighth Amendment reaches conditions that present an "unreasonable risk of serious damage to [prisoners'] future health").  Consistent with that principle, a number of courts have found substantial risk in particular facilities from COVID-19.  *See, e.g.*, *Martinez-Brooks v. Easter,* No. 3:20-cv-00569 (MPS), 2020 WL 2405350, at *31 (D. Conn. May 12, 2020); *Mays v. Dart*, __ F. Supp. 3d __, 2020 WL 1812381, at *8 (N.D. Ill. Apr. 9, 2020); *Banks v. Booth,* No. 20-849, 2020 WL 1914896, at *6-7 (D.D.C. Apr. 19, 2020); *Swain v. Junior*, __ F. Supp. 3d __,

2020 WL 2078580, at *16 (S.D. Fla. Apr. 29, 2020), *stayed on appeal by* 958 F.3d 1081 (11th Cir. 2020).

     As noted above, however, the relevant inquiry is whether petitioners have shown a substantial risk of serious harm from COVID-19 at the MDC in light of the countermeasures that the facility has in place.  The preliminary injunction record leaves substantial reason to doubt petitioners will ultimately succeed in making that showing.  The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units.  And the data—though limited—suggests that these measures have been quite effective in containing COVID-19 thus far.  Not a single MDC inmate has died from COVID-19.  And just one inmate has been hospitalized for a COVID-19 related illness, even though the MDC's population has a relatively high rate of comorbidities and the surrounding community has been at the epicenter of the pandemic for months.  A plaintiff can certainly raise a claim under the Eighth Amendment based on risks that have not manifested themselves in any adverse health outcome.  *See Helling*, 509 U.S. at 33.  But given that COVID-19 can lead to adverse health consequences quickly, and that the MDC has seen no deaths and just one hospitalization so far, it is hard to conclude that inmates are at an elevated risk of contracting COVID-19 inside the MDC relative to the risk they would face in the surrounding community.  That raises serious questions about whether petitioners can satisfy the objective prong of the Eighth Amendment test.  It is hard to say that prisoners are exposed to a risk that "is not one that today's society chooses to tolerate," or a risk "so grave that it violates contemporary standards of decency," *id.* at 36, if the risk inside the facility is no greater than—and perhaps less than—the risk outside of it.

A comparison to a number of cases in which district courts *have* found a substantial risk of serious harm for Eighth Amendment purposes illustrates the point.  The courts in those cases have commonly relied on evidence of elevated COVID-19 risks compared to the outside community.  In *Mays*, for example, the court relied on statistical evidence that the jail "currently has the highest rate of new coronavirus infections in the country," and it determined that the plaintiffs had "demonstrated that certain of the conditions created by the intentional actions of the Sheriff enable the spread of coronavirus and significantly heighten detainees' risk of contracting the virus."  2020 WL 1812381, at *8.  In *Banks*, the court found that the plaintiffs were likely to prevail only after concluding that the defendants' argument "that Plaintiffs' risk of infection is the same as that of the outside community" was undercut by undisputed data showing that "the infection rate in [Department of Corrections] facilities was over seven times the infection rate of the District of Columbia at large."  2020 WL 1914896, at *6.  In *Martinez-Brooks*, the court relied on the fact that it was "undisputed that there is an active and serious outbreak of COVID-19" at the facility in question, 2020 WL 2405350 at *20, which the Attorney General had identified "as one of three experiencing significant outbreaks" across the entire BOP system of more than 100 facilities, *id.* at *11.  And in *Swain*, the district court similarly relied on evidence of high infection rates, concluding that the "[d]efendants' contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced."  2020 WL 2078580, at *16.  This case is quite different, at least at this stage of the litigation, because petitioners have not made a comparable showing that those within the facility face a higher risk of infection than those outside of it.  Under those circumstances and on this preliminary injunction record, I conclude that petitioners have not demonstrated a clear likelihood of success in establishing that they face a risk so grave that it violates contemporary standards of decency, given the MDC's existing precautions.

B.      **Subjective Element**

Petitioners have also not shown a clear likelihood that they will succeed in establishing the subjective component of an Eighth Amendment violation—that MDC officials have exhibited "'deliberate indifference' to inmate health or safety," *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302-03), in their response to COVID-19.  Because the Eighth Amendment prohibits only cruel and unusual "punishments," a prisoner who seeks to establish an Eighth Amendment violation based on conditions of confinement must demonstrate that officials' conduct reflects "the deliberate infliction of punishment," and not just "an ordinary lack of due care for prisoner interests or safety."  *Fiacco*, 942 F.3d at 150; *see Farmer*, 511 U.S. at 834-35.  While officials need not engage in "acts or omissions for the very purpose of causing harm or with knowledge that harm will result," they must at least "know[] of and disregard[] an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 835, 837; *see, e.g.*, *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020); *Cuoco v. Moritsugu*, 222 F.3d 99, 106-07 (2d Cir. 2000); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (1996).  In other words, they must act with a *mens rea* "consistent with recklessness in the criminal law."  *Farmer*, 511 U.S. at 837.  Under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  *Id.* at 835; *see, e.g.*, *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Id.* at 842.

1.      **The MDC's Aggressive Actions to Combat COVID-19 Belie Claims of Deliberate Indifference**

Under these principles, even if I determined that petitioners had made the required objective showing of substantial risk from COVID-19 under current conditions at the MDC, I would nevertheless conclude that petitioners had not demonstrated a clear likelihood that MDC officials have displayed "deliberate indifference" to the risks of COVID-19 at the facility.  The evidence shows that MDC officials have been acting urgently to prevent COVID-19 from spreading and from causing harm.  They have imposed dozens of measures, such as (i) enhancing intake screening procedures for all inmates and staff, (ii) providing soap and other cleaning products to inmates at no cost, (iii) increasing cleaning of common areas and shared items, (iv) isolating symptomatic inmates, (v) broadly distributing and using PPE to prevent transmission of the virus, and (vi) modifying operations throughout the facility to facilitate social distancing to the greatest extent possible and abate the risk of spread.  Taken together, these and other measures indicate that prison officials are "trying, very hard, to protect inmates against the virus and to treat those who have contracted it," and belie any suggestion that prison officials "have turned the kind of blind eye and deaf ear to a known problem that would indicate" deliberate indifference.  *Money v. Pritzker*, No. 20-cv-2093, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020); *see Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) ("Accepting, as the district court did, that the defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures, the defendants' actions likely do not amount to deliberate indifference.").  As Judge Engelmayer put it in discussing an inmate's COVID-19-based challenge to conditions of confinement at the MDC at the start of the pandemic, the "numerous and significant plans and protocols recently implemented by the BOP to protect prisoners" at the MDC

do not support "find[ing] that the BOP has been deliberately indifferent."  *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020).

Petitioners argue for a contrary result because, in their view, the MDC's policies amount to "aspirational goals" that do not reflect "actual practices."  Reply Mem. Supp. of Pet'rs' Mot. for Prelim. Inj. ("Pet'rs Reply Br.") 1 (Dkt. #90).  But petitioners do not dispute that the MDC is implementing most of the policies that it has adopted to address the COVID-19 pandemic.  And the evidence presented at the preliminary injunction hearing contradicts petitioners' arguments, *id.* at 7-8, that the MDC's policies regarding PPE, sanitation, hygiene, and inmate entry screenings are mere aspirations.  The MDC conducts entry screenings for inmates in accordance with its policies.  *See* pp. 17-18, *supra.*  And inspections showed that at minimum, by late April, the facility's policies on PPE, sanitation, and hygiene were being implemented as well.  *See* pp. 21-31, *supra.*  While out-of-court declarations raise the possibility that some inmates did not receive adequate quantities of soap and cleaning supplies in the period shortly after the MDC's heightened protocols were instituted, the record does not suggest that any such instances reflected deliberate indifference, rather than negligent errors in implementing a new policy under emergency conditions.  *See Swain*, 958 F.3d at 1089 ("[L]apses in enforcement" of social-distancing policies during COVID-19 "do little to establish that the defendants were deliberately indifferent," absent evidence that prison officials were "ignoring or approving the alleged lapses."); *cf. Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (concluding that although "deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement," the plaintiff failed to establish deliberate indifference when "[i]t appear[ed] . . . that the defendants were negligent in replenishing [the plaintiff's] supply"); *Rangolan v. County of Nassau*, 217 F.3d 77, 79 (2d Cir. 2000) (finding no deliberate indifference when "the County took steps to protect"

a vulnerable inmate "but mistakenly failed to implement them").  The sweeping measures that MDC officials have adopted—which the record reflects are more than "aspirational goals," Pet'rs Reply Br. 1—counsel strongly against a finding that MDC officials are being deliberately indifferent to risks associated with COVID-19.

> ### 2. Petitioners Have Not Shown the MDC's Failure to Fully Implement Several CDC Recommendations Reflects a *Mens Rea* More Culpable Than Negligence

Petitioners next contend that even if MDC officials have implemented their policies concerning COVID-19, they have displayed deliberate indifference to the risks of the virus because they have not fully implemented several measures that the CDC recommends.  As discussed above, petitioners have adduced evidence that MDC officials are falling short of the CDC's guidance in several respects: While CDC guidance calls for inmates experiencing possible COVID-19 symptoms to be evaluated "at the first sign of symptoms," CDC Correctional Guidelines Slides at BOP 108, so that potentially infected inmates can be placed in isolation "immediately once symptoms appear," *id.* at BOP 100-01, evidence at the hearing indicates that MDC officials may take days or sometimes even weeks to respond to requests for medical attention that describe such symptoms.  *See* pp. 36-40, *supra*.  And while CDC guidelines call for isolating individuals who have symptoms of COVID-19, *see* CDC Correctional Guidelines at 10, 15, MDC officials appear to have isolated only a fraction of inmates displaying such symptoms, *see* pp. 40-42, *supra*.  In addition, while the MDC is conducting daily entry-point screenings of staff, including temperature checks, those entry screenings are somewhat less stringent than those recommended by the CDC. *See* pp. 18-19, *supra*.

Under standards of care that both parties have accepted, MDC officials' apparent failure to fully implement the CDC guidance in these areas constitutes a deficiency in the MDC's response to COVID-19.  Respondent has not disputed that the CDC protocols should guide the MDC's

response to COVID-19.  In fact, both of respondent's experts embraced the CDC standards.  *See* Hr'g Tr. 395:2-19 (Dr. Beard); Tekbali Report 1-7.  The MDC's deficiencies in this area accordingly warrant prison officials' attention.

To establish an Eighth Amendment violation, however, petitioners must show not only that prison officials have committed errors but also that prison officials made those errors with a mental state equivalent to criminal recklessness, "know[ing] of and disregard[ing] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  Here, the surrounding circumstances suggest that it is far more likely that MDC officials have made negligent errors in implementing complex guidelines during a novel crisis than that they have knowingly disregarded an excessive risk of serious harm.  The MDC's swift and extensive countermeasures are evidence that MDC officials are taking the threat of COVID-19 seriously, amid "shifting parameters and guidance regarding how to combat a previously little known virus," *Money*, 2020 WL 1820660 at *18, rather than consciously turning a blind eye to any known danger.

Moreover, the principal CDC guidance as to which the MDC appears to have fallen short to date—sick-call responses and use of isolation—requires complex implementation.  The guidance pertaining to sick-call requests calls for quick responses to scores of medical complaints per month relaying symptoms such as cough, sore throat, and headache that could be consistent with COVID-19.  That is a massive undertaking, even for a medical staff that the facility has been augmenting during the crisis.  And while the CDC guidelines call for extensive use of isolation, both parties appear to agree that the decision to isolate individual inmates should turn to some extent on the application of clinical judgment by healthcare providers.  Shortfalls in the immediate implementation of guidelines this complex and resource-intensive do not suggest knowing disregard of a substantial risk of harm, rather than negligent error.

Finally, any inference that MDC officials have been knowingly disregarding an excessive risk in their implementation of CDC guidance is undercut by the data about the effectiveness of the MDC's countermeasures thus far.  As noted above, the MDC has had no COVID-connected fatalities and only one COVID-linked hospitalization.  Petitioners offer little reason to conclude that prison officials have drawn the inference that inmates currently face a substantial risk of serious harm inside the MDC, in the face of data suggesting that the rate of deaths and hospitalizations may be lower inside the facility than outside of it.  *See Farmer*, 511 U.S. at 837 (deliberate indifference requires that a prison official have drawn the inference that a substantial risk of serious harm exists).

### 3.    Petitioners Have Not Established Deliberate Indifference Based on the Failure to Implement Additional Measures Not Called for Under CDC Guidelines

Petitioners finally contend that MDC officials are being deliberately indifferent because they have failed to adopt several steps recommended by petitioners' expert, Dr. Venters, but not called for by the CDC's guidance.  Petitioners fall far short of establishing deliberate indifference on those grounds.  With respect to at least one of the measures that petitioners seek—cohorting of high-risk inmates—respondent has set forth strong arguments that adopting petitioners' strategy during a pandemic might well spread the virus.  With respect to another—testing of all inmates and staff who possess "more than one sign and/or symptom of COVID-19" or who possess "risk factors for serious illness or death from COVID-19,"  Mot. for Prelim. Inj. 3—petitioners have failed to demonstrate that such an approach was practicable in the initial months of the pandemic, given shortages in supply.  *See Hernandez v. Keane*, 341 F.3d 137, 146 (2d Cir. 2003) (finding no deliberate indifference from delays in treatment when they were mostly "caused by factors outside defendants' control"); *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) (indicating that

deliberate indifference will not be found if treatment requested was "impossible under the circumstances" or not "practicable").

Petitioners also take aim at the MDC's failure to take additional steps that go beyond CDC guidelines, such as (i) instituting daily temperature screenings of all inmates (not just those in quarantine and isolation), (ii) directing orderlies to clean shared items between every use (rather than having orderlies clean periodically and making supplies available for other inmates to perform additional cleanings), and (iii) evaluating inmates in the isolation unit on a daily basis in a clinical setting (rather than through cell-side wellness checks). As discussed above, the CDC has not called for those practices, and petitioners have not demonstrated that respondent's failure to adopt those specific approaches falls below any standard of care. I cannot conclude on this record that MDC officials' failure to adopt those measures exposes inmates to a substantial risk of serious harm or that any MDC officials have drawn the inference that their failure to take such measures creates any such risk. *Cf. Valentine*, 956 F.3d 802 (finding that plaintiffs were unlikely to establish deliberate indifference when the evidence showed that prison officials were taking measures "informed by guidance from the CDC and medical professionals").

## CONCLUSION

Prison officials have a responsibility to protect inmates from substantial risks to their health and safety. *See, e.g.*, *Farmer*, 511 U.S. at 832, 834. That duty has special urgency during the COVID-19 pandemic. The record from the preliminary injunction hearing reflects that MDC officials recognize their duty to inmates and have taken extensive measures to combat the virus. The record also gives reason for cautious optimism about the effectiveness of those measures thus far—with no COVID-connected fatalities and just a single COVID-related hospitalization at the facility even though the surrounding New York City community has been hard hit. On this record, petitioners have not established a clear or substantial likelihood that prison officials have violated

the Eighth Amendment through deliberate indifference to substantial risks of serious harm at the MDC.  They are therefore not entitled to the extraordinary relief they seek:  a preliminary injunction at the outset of this case that would release hundreds of prisoners and subject many aspects of the facility's operations to judicial control.

Because petitioners have not shown a clear or substantial likelihood that they will prevail on their Eighth Amendment claim, I do not address whether petitioners have satisfied any of the other requirements for obtaining a preliminary injunction.  Nor do I address the parties' arguments regarding the scope of relief available in such an injunction.  These include petitioners' contention that classwide relief should be granted before formal class certification and respondent's argument that the Prison Litigation Reform Act of 1995, 42 U.S.C. §§ 1997e *et seq.*, would prohibit an individual judge from ordering the release of inmates as a remedy.  Petitioners, of course, remain free to develop the record further and to renew their requests for injunctive relief if warranted based on additional facts.

The motion for a preliminary injunction is denied.


SO ORDERED.



                                                              /s/ Rachel Kovner
                                                             RACHEL P. KOVNER
                                                             United States District Judge

Dated: Brooklyn, New York
        June 9, 2020